WITTELS MCINTURFF PALIKOVIC
Steven L. Wittels
J. Burkett McInturff
Tiasha Palikovic
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
tpalikovic@wittelslaw.com

*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**GERALDINE MAHOOD,**

**Individually and on Behalf of All Others
Similarly Situated,**

                          **Plaintiff,**

              **v.**

**NOOM, INC.**

                          **Defendant.**

---

*CLASS ACTION COMPLAINT*


*JURY TRIAL DEMANDED*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

OVERVIEW OF NOOM'S UNLAWFUL AUTO-ENROLLMENT SCHEME ............................2

JURISDICTION AND VENUE ..............................................................................................6

PARTIES ............................................................................................................................6

FACTUAL ALLEGATIONS ..................................................................................................7

     I.      NOOM'S MARKETING AND REPRESENTATIONS TO CONSUMERS ..........7

     II.     NOOM'S ENROLLMENT PROCESS AND DISCLOSURES .............................8

     III.    NOOM'S "COACHING" PROGRAM AND CANCELLATION POLICY .........12

     IV.    NOOM'S AWARENESS OF THE DECEPTIVENESS OF ITS AUTOMATIC
           RENEWAL SCHEME...........................................................................13

     V.     HOW NOOM MISLED PLAINTIFF MAHOOD ................................15

CLASS ACTION ALLEGATIONS........................................................................................20

COUNT I – NEW YORK GENERAL BUSINESS LAW § 349 .................................................23

COUNT II – FALSE ADVERTISING—VIOLATION OF THE CALIFORNIA AUTOMATIC
           RENEWAL LAW.................................................................................25

COUNT III – CALIFORNIA UNFAIR COMPETITION LAW ..................................................27

COUNT IV – CALIFORNIA CONSUMERS LEGAL REMEDIES ACT ...................................30

COUNT V – COMMON LAW FRAUD ................................................................................32

COUNT VI – UNJUST ENRICHMENT ................................................................................33

PRAYER FOR RELIEF ......................................................................................................34

Plaintiff Geraldine Mahood ("Plaintiff"), by her undersigned attorneys, Wittels McInturff Palikovic, brings this class action consumer protection action in her individual capacity and on behalf of a class of consumers defined below, against Defendant Noom, Inc. ("Noom" or the "Company"), and hereby alleges the following with knowledge as to her own acts, and upon information and belief as to all other acts:

## INTRODUCTION

1.      With over 50 million downloads of its weight-loss app, Noom is one of the fastest-growing weight-loss programs in the world and has almost quadrupled its annual revenue to over $237 million in the past year.[1]  According to its website, Noom is "backed by some of the best VCs [venture capitalists] in the world" and boasts of "tremendous growth."[2]  Such growth, however, is also fueled by Defendant Noom's deceptive and illegal automatic renewal scheme.

2.      Noom uses its renewal scheme to lure customers with deceptive promises of "low cost" or "zero cost" trial periods that turn out to be extraordinarily difficult to cancel and instead result in customers being trapped in costly auto-recurring plans they never had any intention of enrolling into.  Further, instead of monthly fees, Noom imposes lump-sum charges for its entire program, extracting up to six months of non-refundable advance payments on the very first day of a customer's enrollment.  As Noom's COO and CFO Adam Fawer blithely acknowledges, "If someone is only staying one month, we're not making a whole lot of money off that person."[3]

3.      Undeterred by the disastrous economic effects the current coronavirus pandemic is having on most people's budgets, Noom is not only continuing its illegal enrollment practices during the global pandemic, but is seeking to exploit it by now offering the trial period "at zero cost" and capitalizing on the moment by promising potential customers that Noom will "improv[e]

---

[1] Noom, https://www.noom.com/news/noom-quadruples-revenue-237-million (last visited May 12, 2020).
[2] Noom, https://www.noom.com/about (last visited May 12, 2020).
[3] Noom, https://www.noom.com/news/noom-quadruples-revenue-237-million (last visited May 12, 2020).

[their] health" and "help [them] find structure and relief during this difficult time."[4]  This consumer fraud class action seeks to put an end to Defendant's unfair business practices and hold Noom accountable for the damages it has caused—and continues to cause.

### OVERVIEW OF NOOM'S UNLAWFUL AUTO-ENROLLMENT SCHEME

4.      Defendant's automatic renewal program works as follows.   In exchange for customers' credit/debit card or PayPal account information, Noom gives customers the opportunity to "try" its weight loss "coaching" program for a purportedly "risk free" two-week trial period that is either free or at a set low cost ranging from $1.00 to $18.37.   After capturing its customers' payment information, as soon as the trial period ends the Company activates its auto-renewal program and begins assessing non-refundable membership fees.   The fees start with a lump-sum non-refundable advance payment for as many as six months at a time, at a cost as high as $199.00.[5]

5.      Prior to activating the automatic enrollment, Noom both fails to obtain customers' explicit consent to the automatic enrollment and fails to adequately disclose or actively misrepresents to prospective customers many material facts regarding the trial period and its weight loss service.   These include the fact that Noom:

  a.   fails to adequately disclose to customers that the trial period will automatically convert to an auto-recurring membership;

  b.   misrepresents to customers that they will be able cancel their enrollment by "simply letting their coach know," which is untrue;

  c.   fails to tell customers that even though they can sign up for the trial period on Noom's website, they cannot access Noom's service without an app-enabled smartphone;

  d.   fails to tell customers that even though they can sign up for the trial period on Noom's website, they cannot stop the trial membership from converting to an automatically renewing subscription unless they have a smart phone on which to

---

[4] Noom, https://www.Noom.com (last visited May 12, 2020).
[5] Noom, https://web.noom.com/support/support-question-topic/my-account/2018/03/what-are-my-purchase-options (last visited May 12, 2020).

initiate their cancellation;

    e.   fails to disclose that the automatic renewal will be activated even if customers never access the service during the trial period, and even if they never download the Noom app;

    f.   misrepresents to customers that the trial period is "no risk," even though it knows many customers end up unwittingly enrolled in its automatic-renewal program;

    g.   fails to tell customers that they will not be assigned a human "coach" at the outset of their trial period, but will instead be interacting with an automated computer bot;

    h.   fails to disclose that customers will not be able to cancel their trial membership or even contact Noom for any other purpose via e-mail, mail, phone, fax or through its website;

    i.   fails to adequately disclose to customers that the charge assessed immediately following the trial period will be an advance payment for multiple months of membership; and

    j.   fails to adequately disclose to customers that the advance charge assessed following the trial period will be non-refundable.

6.    In short, Noom actively misrepresents and/or fails to accurately disclose the true characteristics of its trial period, its automatic enrollment policy, and the actual steps customers need to follow in attempting to cancel a 14-day trial and avoid automatic enrollment. While Noom holds out the trial as a "risk-free" option costing customers either nothing or less than $20.00, the Company knows that in fact many unwitting customers are likely to be charged as much as $199.00 after signing up for the 14-day trial.

7.    Compounding the Company's enrollment obfuscation is the fact that Noom also deceives customers by making false promises concerning the service itself—in particular, its claim that customers will receive a "customized," "personalized," "tailored" plan, and will receive support from Noom's "dedicated coaching team."  In reality, customers like Plaintiff Mahood receive only impersonal, automated messages powered by artificial intelligence which can only be accessed through Noom's smartphone app.  Thus, like Ms. Mahood, many customers do not even understand that they have been assigned a "coach" or know who their "coach" is.

8.     Noom's many omissions and misrepresentations are independently misleading, but they also work together to further confuse and mislead a reasonable consumer about the service Noom is providing and the effect of signing up for Noom's trial period.  They do so in at least the following mutually-reinforcing ways:

    a.  Noom's false claim that the trial is "risk free" together with its failure to adequately disclose that the trial membership will automatically convert to a non-refundable membership leads consumers to believe that they will not be charged any more than whatever amount they authorized for the trial period;

    b.  The fact that Noom (i) blocks all customers from communicating with the company (its website provides no phone number, no fax number, no email address, no mailing address, and no link to customer service), and (ii) makes it burdensome for consumers to cancel their trial membership (Noom tells them to "simply cancel by letting your coach know," but then fails to connect all customers with a coach), together either create or confirm a reasonable consumer's belief that a cancellation is not required, since one does not appear to be possible;

    c.  On the last day of the trial period Noom sends a message to its customers, but instead of reminding that their auto-enrollment is about to begin or that they will be charged, or that the charge will be for many months in advance, or that it will be non-refundable, Noom instead tells them that it "won't be checking in anymore." This further contributes to a reasonable customer's misunderstanding that their relationship with Noom is about to end;

    d.  Noom's promise of connecting customers with coaches, together with its failure to disclose that its service can only be accessed through an app leads reasonable consumers who sign up through the website but never download the app and/or never speak to a coach to believe that their trial period never started.

9.     Noom thus subjects all of its potential customers to the same deceptive marketing and enrollment scheme and is already on notice of thousands of consumer complaints about it.

10.     The Company's concerted pattern of misrepresentations, smokescreens and omissions may benefit Noom's bottom line, but it is unfair, deceptive, and fraudulent and has resulted in Noom's unjust enrichment.  Additionally, Noom's auto-renewal/continuous service policy runs afoul of multiple independently actionable requirements imposed by California's Automatic Purchase Renewal Statute, CAL. BUS. & PROF. CODE §§ 17601 *et seq.*

11.     As such, Noom's conduct is also in violation of California's False Advertising Law,

CAL. BUS. & PROF CODE § 175000 *et seq.*, the California Consumers Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*, Unfair Competition Law, CAL. BUS. & PROF CODE § 17200, *et seq.*, and the New York consumer fraud statute, N.Y. GEN. BUS. LAW § 349.

12.     Plaintiff Geraldine Mahood's experience is typical of the thousands of Noom customers harmed by the Company's billing and advertising practices: she, like many others, provided her payment information to Noom because she was misled into believing that she was authorizing only a one-time $10 payment for a two-week trial of Noom's program.  Ms. Mahood believed, based on the representations on Noom's website and the process of signing up for a trial membership, that she would be assigned a qualified "coach," that her trial was "risk-free," that she could "cancel anytime," and that there was no "no commitment" since customers are able to easily cancel the program by "simply let[ing] their coach know."   None of this turned out to be true.

13.     Like Noom's other customers, Plaintiff was therefore misled into a) signing up for a trial membership that Noom converted into an automatic renewal subscription without her consent, b) paying for a personalized, unlimited-access coaching service that Noom did not provide, c) paying well in excess of the initial amount that she authorized Noom to bill her for a 14-day trial (in Plaintiff's case, $99 above the initial $10.00 she authorized), and d) incurring monthly charges without being afforded adequate disclosures, including those required by California's Automatic Purchase Renewal Statute.  Plaintiff therefore seeks to represent Noom customers in New York, California, and throughout the United States who were similarly enrolled in Noom from the applicable statute of limitations period(s) to the date of judgment.

14.     Only through this class action can Noom's customers remedy the Company's wrongdoing.  Because Noom's fraudulent charges are relatively small compared to the much higher cost a single customer would incur in trying to challenge Noom's conduct, it makes no financial sense for an individual customer to bring legal action.  With this class action, Noom's

customers seek to level the playing field and make sure that companies like Noom engage in fair and upright business practices.  Plaintiff therefore seeks court-ordered relief requiring that Noom return to Plaintiff and the Class all misappropriated charges, compensate Plaintiff and the Class for the damages suffered, and enjoin Noom from continuing its unlawful business practices.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

16.     This Court may exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

17.     This Court has personal jurisdiction over Defendant under 18 U.S.C. §1965.  The Court also has personal jurisdiction over Defendant because Noom has sufficient contacts in this jurisdiction.

18.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a).  Substantial acts in furtherance of the alleged improper conduct occurred within this District, as Defendant is headquartered in this District.

## PARTIES

19.     Plaintiff **Geraldine Mahood** is a citizen of California and lives in Chico, California.  She was a customer of Noom in August 2019.

20.     **Defendant Noom, Inc.** is a diet and weight loss company headquartered in New York, New York and located at 229 West 28th Street, New York.  The Noom smartphone app, developed by health care startup WorkSmart Labs, was launched in 2011.

## FACTUAL ALLEGATIONS

### I.   NOOM'S MARKETING AND REPRESENTATIONS TO CONSUMERS

21.   Defendant aggressively markets its product through a variety of channels, including social media marketing, television, radio, and online streaming commercials, and magazine and other print advertisements.

22.   Noom's robust advertising campaigns have yielded results: Noom has seen significant growth since its inception in 2011 and boasts of being recognized by Google as "the 3rd most searched diet in 2018."[6]   According to Facebook Business, Noom is an advertising "Success Story," as its "mobile-friendly" advertisements have "reach[ed] a multilingual audience worldwide, leading to a 5X increase in members" since May 2018.[7]   In 2018, an analysis of Google trends showed that Noom ranked as the overall top trending diet program of the year.[8]

23.   Noom's social-media, online, television, radio, and print advertisements all direct consumers to visit Noom's website to learn more about its weight loss program.   Noom then uses Facebook tools to track its website traffic, which enables Noom to "reconnect" – through Facebook and other social media channels – "with people who . . . visit[] its website."[9]

24.   As such, Noom's marketing is centered around its website.   The company uses the website to target consumers for its online advertising, and in turn directs consumers who view their ads back to Noom's website.

25.   Noom's website repeatedly states that a) as Noom members, customers can expect to receive "personalized coaching" from qualified experts who are easily accessible, b) customers

---

[6] Noom, https://offers.noom.com/careers/# (last visited May 12, 2020).
[7] Noom, https://www.facebook.com/business/success/noom (last visited May 12, 2020).
[8] Noom Inc., *Noom Ranks as Top Trending Diet in 2018, According to Google – Year in Search* (Dec. 12, 2018), https://www.prnewswire.com/news-releases/noom-ranks-as-top-trending-diet-in-2018-according-to-google---year-in-search-300764426.html.
[9] Noom, https://www.facebook.com/business/success/noom (last visited May 12, 2020).

are invited to purchase a 14-day, "no-risk" trial for no more than $18.37, and c) if customers decide that they do not want to continue with the program, they may easily cancel the trial membership by simply informing their "coach" that they would like to cancel.

## II.    NOOM'S ENROLLMENT PROCESS AND DISCLOSURES

26.    The following paragraphs describe the process for enrolling in Defendant's 14-day trial period in or around the time of Plaintiff Mahood's enrollment.

27.    Potential customers can sign up for Noom's 14-day trial through Noom's website or directly through their smartphones by downloading the Noom app from the iTunes App Store (for iPhone users) or Google Play Store (for Android users).  Upon information and belief, both the Noom app and the Noom website feature the same sign-up process, contained the same representations and required customers to complete the same health and fitness evaluation.

28.    Noom's website and app both lead customers through a lengthy evaluation which asks for the customer's height, current weight, ideal weight, gender, and age.  The evaluation continues with several multiple-choice questions regarding the customer's fitness goals, eating and exercise habits, medical history, home environment, marital status, weight loss motivations and struggles, and food restrictions.

29.    Next, customers are asked to enter an email address in order "to see how much weight" they can expect to "lose for good with Noom."  After clicking a button labeled "SEE MY RESULT," a graphic appears, stating, "You'll be [**ideal weight entered earlier**] by [**date 4-6 months from current date**]."  Under the graphic is a button labeled, "CLAIM MY PLAN."

30.    By asking customers for substantial information concerning their fitness goals, lifestyle, and medical history, Noom contributes to the net impression that customers can expect to receive a highly personalized course from a dedicated coach at the conclusion of the evaluation.

31.    At the conclusion of the evaluation, the 14-day trial offer appears, stating, "Try all

of Noom for 2 weeks! . . . Starter fee waived, saving you $20 . . . Risk free 14-day trial."

32.    Customers are then asked at the bottom of the page to "pick" what price they "think is fair" for a 14-day trial.  The choices are $1, $3, $10, and $18.37.  However, "$10" is highlighted as the "most popular choice" and is the default option—even though the trial is touted as "free," as depicted below:



33.    On the following page, a countdown clock forces customers to purchase their "customized" plan within 15 minutes, along with the statement, "Your personalized plan has been reserved for the next 15 minutes!"

34.    The payment page, where customers are asked to enter their credit/debit card or PayPal account information under time pressure from the ticking timer, presents contradictory information.   The page is also visually confusing because it uses different font colors, sizes and styles, different colored logos, different colored backgrounds, extraneous information, and irrational spacing.  It appears as follows:



35.     This is the first and only time during Noom's multi-step sign-up process or in its marketing materials that the Company provides any information regarding the terms of the trial period or the process of canceling it.   As shown above, this small print information is not underlined, printed in capital letters, or written in a prominent color or in a bigger type size than the rest of the words on the payment page.   To the contrary, it is presented in small font, does not stand out, and is not in visual proximity to the payment information.   Indeed, it is placed so that it

10

sits below colorful and unrelated app-metric information and logos and to the left of other colorful and confusing logos stating "100% RISK FREE GUARANTEED" and "VERIFIED & SECURED." Together the out-of-the-way placement and small low-contrast print have the effect of both contradicting and detracting attention from the information presented regarding the renewal language. Adding to the muddle regarding the terms of the offer and the effect of entering payment is the presence of two contradictory statements: one that sits right below the renewal verbiage and falsely states: "No commitment – cancel any time"; the other which sits above the verbiage, next to the credit card number field outlined in orange, and falsely assures the customer that "You will only be charged $[the price chosen for the trial period] for your 14-day trial."

36.     If a customer decides not to make a payment within 15 minutes and exits the website, Noom will send that customer multiple emails containing links to his or her "customized course" and a motivational video. In the video, customers are promised a "personalized to-do list every morning," and a "goal specialist" who will keep them accountable as they progress through the program. Customers are then returned back to their "customized course" page, which again invites them to try the 14-day trial, but this time for free. Noom thus "waives" the $1.00 to $18.37 charge for the 14-day trial for customers who do not immediately sign up for the trial upon initially completing the online evaluation.

37.     Even though Noom sends potential customers numerous emails offering its free 14-day trial, once customers actually sign up for the trial, Noom does not follow up with any emails containing instructions on how to start the program.

38.     Noom also fails to inform customers that Noom's program requires a smartphone and can only be accessed through the Noom smartphone app. This causes great confusion for customers who sign up for the trial via Noom's website, therefore expecting to be able to access their "coach" and their "personalized plan" via Noom's website or with a non-app enabled phone.

39.     Moreover, although customers without a smartphone are unable to and never do use the Noom program, view their "personalized plan," or communicate with Noom's "coaches," their trial period begins as soon as Noom captures their payment information.  Yet Noom provides no way for such customers to cancel their trial enrollment.

### III.     NOOM'S "COACHING" PROGRAM AND CANCELLATION POLICY

40.     Regardless of whether they purchase the 14-day trial through Noom's website or through the smartphone app, once the trial is purchased, the only way a customer can access Noom's program—and communicate with their "coach"—is by downloading the Noom app on a smartphone.  This fact is not disclosed to consumers at any point prior to the start of their trial period or at any point thereafter.

41.     Thus, customers who might reasonably expect their Noom coach to reach out to them via phone call or email, or might expect that the coach will be accessible through the website, are left wondering how to use the program.  New trial customers are thus left in the dark to figure out, if they can, that Noom's entire program exists only on the app, that it cannot be accessed through Noom's website, and that the so-called "coach" in fact exists only on a smart-phone app.

42.     The app allows users to log their meals and their regular "weigh-ins," and access articles and motivational tips for reaching their diet and exercise goals.  Through the app, users are also able to send messages to an artificial intelligence-powered "bot."  This bot is designated with a name and a picture icon of a person, but it is not a reachable human and only interacts with users through impersonal, automated statements.  The bot provides superficial answers to users' questions, and sometimes does not respond to questions at all.  This automated messaging system is the so-called "coach" that Noom refers to when it tells its customers to cancel by "simply let[ting] your coach know."

43.     In order to cancel, customers must message the automated bot through the Noom

app, so that the bot responds by sending customers a system-generated message directing them to cancel their membership and end their subscription through the iTunes App Store (for iPhone users) or Google Play Store (For Android users).  Thus, although customers may sign up for the 14-day trial period through Noom's website, the only way that customers can cancel their enrollment is through a multi-step process.   First, customers must be savvy enough to access the Noom smartphone app and try to cancel the membership by sending a message to a bot.  Then customers need to go to a third party to end the subscription through the iTunes App Store (for iPhone users) or Google Play Store (For Android users).

44.     Having handed off responsibility for processing cancellations to outside companies iTunes and Google Play, Noom thus knows that its cancellation instructions—telling customers to simply let their coach know—are incorrect and misleading.

45.     If customers are unable to navigate the iTunes/Google Play app cancellation procedure, they remain enrolled in Noom and are charged for a full membership following the end of the 14-day trial.

### IV.     NOOM'S AWARENESS OF THE DECEPTIVENESS OF ITS AUTOMATIC RENEWAL SCHEME

46.     In continuing to carry out its fraudulent billing and marketing tactics, Defendant has ignored glaring red flags demonstrating that its billing and advertising is deceitful, including abnormally high complaint rates.  Through the Better Business Bureau, Noom has received more than sixteen hundred complaints from customers complaining about being billed without their authorization.  Moreover, the Company still has a "D" rating from the BBB due to the fact that it "has failed to resolve underlying cause(s) of a pattern of complaints."[10]

---

[10] Better Business Bureau, https://www.bbb.org/us/ny/new-york/profile/exercise-programs/noom-inc-0121-150555/overview-of-bbb-ratings (last visited May 12, 2020).

47.     The BBB cautions consumers as follows:

BBB files indicate a Pattern of Complaints concerning free trial conversion billing and customer service practices of Noom, Inc.  Consumers are telling BBB about their experiences after signing up for a free trial offer with the company.  Many consumers reportedly try to cancel the trial offer before it ends but still end up being billed for the subscription.  A number of these consumers say they were told at sign-up that after the free trial the cost of monthly membership was around $20.  They also claim that after the free trial ends, they are charged upfront for 6 months subscription (approximately $120-$150) instead of being billed monthly.  Nearly all consumers detail the difficulty they encounter when trying to get in contact with the company's customer service to request a refund of charges.[11]

48.     Hundreds more similar complaints on websites such as BirdEye.com[12] and RevDex.com[13], as well as reviews for Noom's app on the Google Play Store[14] have put Noom on further notice that its customers are unwillingly being charged far more than the $0.00 to $18.37 that they agreed to pay for a 14-day trial.

49.     After receiving thousands of complaints from customers who were unknowingly charged well in excess of $18.37 for a full Noom membership, Noom knew or should have known that customers were unaware of key aspects of how the trial worked.  Yet Noom has continued the marketing ploy, disregarding the fact that tens of thousands of customers (i) don't know their trial start date, (ii) don't know they need to cancel their trial, or if they do realize they have to cancel, are simply unable to, and/or (iii) don't understand they are going to be charged for a full non-refundable membership instead of a single month.

50.     Similarly, Noom is well aware that its claims of personalized coaching are untrue.  Upon information and belief, when Noom first launched its diet program in 2011 it offered

---

[11] Better Business Bureau, https://www.bbb.org/us/ny/new-york/profile/exercise-programs/noom-inc-0121-150555/details#all-alerts (last visited May 12, 2020).
[12] BirdEye, https://reviews.birdeye.com/noom-inc-992753024 (last visited May 12, 2020).
[13] RevDex, https://www.revdex.com/reviews/noom-inc/1455649/page/6 (last visited May 12, 2020).
[14] Google Play, https://play.google.com/store/apps/details?id=com.wsl.noom&hl=en_US&showAllReviews=true (last visited May 12, 2020).

consumers the option to supplement its free artificial intelligence fitness tracker with paid sessions from a human coach.  In or around 2019 Noom discontinued the paid coaching supplement. Instead, Noom began advertising its entire program as if personalized human coaching were an integral part of its customizable diet and exercise program.  But this marketing stratagem is just another come-on.

51.     Noom ceased differentiating between artificial intelligence-powered coaching and human coaching in its advertising.  Indeed, Noom's aggressive marketing campaigns, website, and smartphone app make absolutely no mention of technology-assisted coaching, and instead focus their advertising and messaging solely on the promise of individualized coaching from actual human weight loss experts.

52.     For example, Noom's website claims that Noom's "coaches come from a variety of backgrounds including psychology, nutrition/dietetics, personal training, health coaching, and more" and that they "undergo extensive training in lifestyle and health behavior change."[15]

53.     Indeed, Noom expressly states that "The best thing about your Noom coaches is that they are real, live people!! (Yes, we promise we're not robots)."[16]

54.     In reality, rather than fulfilling its promise to connect all customers with dedicated human coaches, Noom utilizes the artificial intelligence technology that it used in its original free fitness tracker to deceive consumers into believing that the messages and tips they receive on the Noom smartphone app are exclusively coming from a human coach.

## V.     HOW NOOM MISLED PLAINTIFF MAHOOD

55.     Plaintiff Geraldine Mahood learned of Noom in 2019 through various channels including radio, television and online advertisements, all of which directed her to visit Noom's

---

[15] Noom, https://web.noom.com/support/support-premium-features/my-coaching-team/2019/02/coaches-trained-psychologists (last visited May 12, 2020).
[16] Id.

website and download the smartphone app to get more information about the program.  In the summer of 2019 Plaintiff Mahood saw Noom's representations outlined above on Noom's website and app.  These representations led Ms, Mahood to believe that Noom would provide her with highly customized diet and workout plans, that she would receive "24/7 support" from a human coach, that Noom was different from other wellness programs because of its personalized coach-centered approach to weight loss, and that she was only signing up for a trial membership which she could easily cancel.

56.    Based on Noom's misleading promotion, Plaintiff Mahood began Noom's health and fitness evaluation in August 2019.  Relying on Noom's representations regarding the length of the trial period and the ease of cancellation, Mahood authorized a $10 charge for a 14-day trial through her PayPal account on August 8, 2019.  After enrolling in the 14-day trial, Plaintiff received a confirmation email which is reproduced on the next page:

----- Forwarded Message -----
**From:** "Noom" <updates@message.noom.com>
**To:** "gerimahood@yahoo.com" <gerimahood@yahoo.com>
**Cc:**
**Sent:** Thu, Aug 8, 2019 at 9:50 AM
**Subject:** Your Noom Receipt

Noom Inc
229 W 28th St.
New York, NY 10001
www.noom.com

For more information about your account visit: account.noom.com

Order placed on August 8, 2019.

Thanks for signing up for Noom's Healthy Weight program!

Here's a summary of your subscription:

Noom membership: **2 Months**
Special offers: **14-day trial**
Trial start date: **August 8, 2019**
Trial end date: **August 22, 2019**
Payment method: **PayPal**
Renewal date: **Automatic renewal every 2 months after Trial end date**

Your 14-day trial will last until **August 22, 2019**. You can cancel anytime before then and will not be charged the total plan amount. No questions asked, no small print.

If you decide Noom is right for you, on **August 22, 2019** you will be charged one payment of **$99** for your **2 month** Noom membership (**$49.50/month**).

Noom will automatically charge your card **$99** every **2 months** so you don't lose access to your account. No refunds or credits for partial months. To cancel, simply let your coach know.

**After your 14-day trial ends on August 22, 2019, your subscription fee is non-refundable. See our Refund Policy.**

FAQ

**I have a question about my subscription.**
Check out our handy-dandy Support! You can view your subscription details any time at account.noom.com.

57.     The email contained contradictory information.  It suggested Plaintiff could "cancel anytime" by "simply let[ting her] coach know," while also suggesting that she wouldn't need to cancel because she would only be charged "[i]f [she] decide[s] Noom is right for [her]."  This was misleading because a consumer like Ms. Mahood was led to believe that an affirmative step was required in order for the trial membership to convert to automatic enrollment.  Plaintiff was therefore not sure if her trial period needed to be cancelled.   Rather, she believed she would be able to easily cancel either the trial period or the program by simply telling the human coach who would be in touch with her during the trial period.

17

58.     Plaintiff's confusion only deepened once she began using the Noom smartphone app,  because on the app, Ms. Mahood was never introduced to a human coach, and her interactions were not with a real person, but rather with an automated system powered by artificial intelligence.

59.     Soon after Plaintiff Mahood purchased the 14-day trial, a chat message appeared on her Noom app under the label "Concierge Eva."  The message stated, "Hi! I'm Eva, your Noom concierge . . . . To get started: chat me 'I'm done!' when you've completed your coaching preference survey.  Then return to your task list – I'll reply soon!"  Plaintiff received no further information on how to fill out her "coaching preference survey," where the survey was located, or how she could contact a real person at Noom to get more information about the coaching program.

60.     During the 14-day trial period, Plaintiff Mahood did not receive a phone call or email or app message from a human coach.  She gathered from exploring the app that her success with Noom would rely heavily on her entering extensive amounts of data into the app concerning her diet and exercise efforts.  Plaintiff thus decided that she did not want to continue with the Noom program.

61.     The only cancellation instruction that Plaintiff could find by searching Noom's website was that she should "contact her coach" in order to cancel.  However, Plaintiff did not know how to contact her coach, or even who her coach was.  She tried numerous times to find a phone number or other contact information for Noom's customer service department, but was unable to communicate with Noom through any avenue other than the automated message system on the smartphone app because Noom's website did not offer any mechanism for contacting anyone at the Company.  Noom's website did not provide a phone or fax number, an email or mailing address, a customer service chat option or any other way of contacting a Noom representative.

62.     On August 22, 2019, the 14th day of her 14-day trial period, Plaintiff received a message from the "Concierge Eva" bot, acknowledging that Plaintiff had not been using Noom and informing her that "Eva" would no longer be reaching out to her, as reproduced below:

> "Hey! It's been a little while since I heard from you, so I wanted to let you know that I won't be checking in anymore – don't want to bug you. :) Feel free to message me whenever you want to pick things up again and we'll get you going.  Hope to hear from you soon!

This message added to Plaintiff's misimpression that no cancellation was necessary and that an affirmative step was required in order for the trial membership to convert to automatic enrollment. Rather than sending a reminder that her enrollment was about to begin and that Noom was about to charge her credit card, the bot "Eva" delivered the distinct message that no further action was needed by Ms. Mahood to end the trial given her silence.  Accordingly, Ms. Mahood believed she would not incur any further charges since no action was required on her part.

63.     Despite this message, and despite the fact that Plaintiff had only authorized a $10 charge for a 14-day trial, she received a PayPal alert message informing her that Noom had charged her $99.00 for a full Noom membership subscription on August 23, 2019 –  the very next day after Noom informed her that it "won't be checking in anymore."

64.     Prior to being charged $99.00, Plaintiff received no reminder that her PayPal account would be charged again following the $10 trial period, and no final opportunity to cancel her trial and avoid the $99.00 charge.

65.     Upon again visiting Noom's website to try to cancel her unauthorized subscription and get a refund, Plaintiff again saw that there was no way to contact Noom via phone, fax, mail, email or chat and that the only way to cancel her membership was still through her "coach." Plaintiff then surmised that the automated bot – the entity labeled "Concierge Eva," who had sent

her a series of generic chat messages through the app, including the one about not checking in again – might be considered her "coach."

66.     On August 25 Plaintiff sent "Concierge Eva" a chat message through the app requesting cancellation of her subscription.  In the chat, Ms. Mahood stressed the fact that she had never intended to sign up for a full membership, that she never used the service, that she was unable to cancel during the 14-day period for the reasons outlined above, and that she never agreed to be charged more than the $10 she had authorized for the 14-day trial.

67.     Only after repeatedly asking for a refund and finally threatening legal action against Noom did Plaintiff Mahood receive confirmation that her membership was cancelled and that Noom would issue a refund for the unauthorized $99.00 charge in October 2019.

68.     If Plaintiff Mahood had known a) that Noom would not provide her with a human coach; b) that she would not be able to contact Noom's customer service during her trial period because Noom failed to provide any way of doing so, c) that she would not be able to cancel by "simply let[ting] her coach know" because she wouldn't know that her "coach" was an automated bot, or d) that Noom would convert her trial period into an auto-recurring membership without her consent, she would not have signed up for Noom's 14-day trial period.

**CLASS ACTION ALLEGATIONS**

69.     As alleged throughout this Complaint, the Class' claims all derive directly from a single course of conduct by Defendant.  Defendant has engaged in uniform and standardized conduct toward the Class—its marketing and billing tactics—and this case is about the responsibility of Defendant, at law and in equity, for its knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in the content of its statements or omissions. The objective facts on these subjects are the same for all Class members.

70.     Plaintiff sues on her own behalf and on behalf of a Class for damages and injunctive relief under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

71.     The Class, preliminarily defined as two subclasses ("Subclasses"), is as follows:

    a.  The Multistate Class, preliminarily defined as all Noom customers in the United States (including customers of companies Noom acts as a successor to) who were automatically enrolled into and charged for at least one month of Noom membership by Defendant at any time from [applicable statute of limitations period] to the date of judgment.

    b.  The State Classes, preliminarily defined as all Noom customers in the state of [e.g., New York, California, etc.] (including customers of companies Noom acts as a successor to) who were automatically enrolled into and charged for at least one month of Noom membership by Defendant at any time from [applicable statute of limitations period] to the date of judgment.

72.     Excluded from the Class are officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.  Also excluded are all federal, state and local government entities; and any judge, justice or judicial officer presiding over this action and the members of their immediate families and judicial staff.

73.     Plaintiff does not know the exact size of the Class, since such information is in the exclusive control of Defendant.  Plaintiff believes, however, that based on Noom's assertions, the Class encompasses tens of thousands of individuals whose identities can be readily ascertained from Defendant's records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

74.     The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control.  Plaintiff anticipates providing appropriate notice to each Class member, in compliance with all applicable federal rules.

75.     The Named Plaintiff is an adequate class representative.  Her claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar marketing and billing practices engineered by Defendant.  Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

76.     Plaintiff will fairly and adequately protect the interests of all Class members. Plaintiff has retained competent and experienced class action attorneys to represent her interests and those of the Class.

77.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

a.      Whether Defendant's representations and/or omissions are fraudulent;

b.      Whether Defendant's conduct constitutes unfair, unlawful and/or fraudulent practices prohibited by the laws of California and/or New York;

c.      Whether Defendant was unjustly enriched as a result of its conduct;

d.      Whether Class Members have been injured by Defendant's conduct;

e.      Whether any or all applicable limitations periods are tolled by Defendant's acts;

f.      Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

g.      The extent of class-wide injury and the measure of damages for those injuries.

78.     A class action is superior to all other available methods for resolving this controversy because i) the prosecution of separate actions by Class members will create a risk of adjudications with respect to individual Class members that will, as a practical matter, be dispositive of the interests of the other Class members not parties to this action, or substantially

impair or impede their ability to protect their interests; ii) the prosecution of separate actions by Class members will create a risk of inconsistent or varying adjudications with respect to individual Class members, which will establish incompatible standards for Defendant's conduct; iii) Defendant has acted or refused to act on grounds generally applicable to all Class members; and iv) questions of law and fact common to the Classes predominate over any questions affecting only individual Class members.

79.     Further, the following issues are also appropriately resolved on a class-wide basis under Fed. R. Civ. P. 23(c)(4):

a.     Whether Defendant's representations and/or omissions are fraudulent;

b.     Whether Defendant's conduct constitutes unfair, unlawful and/or fraudulent practices prohibited by the laws of California and/or New York;

c.     Whether Defendant was unjustly enriched as a result of its conduct;

d.     Whether Class Members have been injured by Defendant's conduct;

e.     Whether any or all applicable limitations periods are tolled by Defendant's acts;

f.     Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

g.     The extent of class-wide injury and the measure of damages for those injuries.

80.     Accordingly, this action satisfies the requirements set forth under Fed. R. Civ. P. 23(a), 23(b), and 23(c)(4).

## COUNT I

## NEW YORK GENERAL BUSINESS LAW § 349

## (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW)

81.     Plaintiff Geraldine Mahood re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

82.     Plaintiff brings this claim under N.Y. GEN. BUS. LAW § 349 on her own behalf and on behalf of each member of the Class.

83.     New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW §349.

84.     Defendant's marketing and billing practices are consumer-oriented in that they are directed at members of the consuming public.

85.     By engineering and implementing fraudulent billing and advertising practices, Defendant engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW §349.

86.     Defendant has violated N.Y. GEN. BUS. LAW §349 statute by, *inter alia*:

a.      Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.      Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.      Omitting material information in order to prevent customers from cancelling their 14-day trial before the last day of the trial period;

d.      Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.      Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.      Curtailing customers' ability to easily cancel their subscription to Noom prior to the expiry of the trial period; and

g.      Creating the net impression that enrolling in the trial program i) is "risk free;" ii) does not require a smart phone; and iii) costs only between $0.00 to $18.37; and that the trial program iv) will be easy to cancel; v) can be "cancelled any time;" and vi) will feature individualized coaching from a human weight loss expert.

87.     The aforementioned acts are unfair, unconscionable and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

88.     As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, the Class has suffered injury and monetary damages in an amount to be determined at the trial of this action and upon information and belief, believed to exceed $100 million.

89.     Plaintiff and the members of the New York Class further seek equitable relief against Defendant.  Pursuant to N.Y. GEN. BUS. LAW §349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to refund to the Plaintiff and the Class all monthly fees wrongfully assessed and/or collected on its auto-renew subscription plan.

## COUNT II

### FALSE ADVERTISING–VIOLATION OF THE CALIFORNIA AUTOMATIC RENEWAL LAW

### (ON BEHALF OF THE CALIFORNIA CLASS)

90.     Plaintiff Geraldine Mahood re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     Plaintiff Mahood brings this claim on her own behalf and on behalf of each Class member who is a California resident (the "California Class").

92.     As part of California's False Advertising Law, the California Automatic Renewal Law, CAL. BUS. & PROF. CODE § 17600 *et seq.* became effective on December 1, 2010.

93.     CAL. BUS. & PROF. CODE § 17600, *et. seq.*, California's Automatic Purchase Renewal Statute, declares unlawful "the practice of ongoing charging of consumer credit or debit

cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." Defendant's conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17602 because each of the following practices Noom has engaged in is an independent violation of the Automatic Purchase Renewal Statute:

   a.   Noom failed to present the terms of its automatic renewal or continuous service offer in a clear and conspicuous manner before fulfilling the subscription and in visual proximity to the request for consent to the offer, as required by CAL. BUS. & PROF. CODE §§ 17602(a)(1);

   b.   Noom charged Plaintiff's and the Class's credit or debit cards, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous offer terms, as required by CAL. BUS. & PROF. CODE §§ 17602(a)(2);

   c.   Noom failed to provide an acknowledgment that includes the automatic renewal offer terms or continuous offer terms, cancellation policy, and information regarding how to cancel, and to allow Plaintiff and the Class to cancel, the automatic renewal or continuous service before they paid for it, as required by CAL. BUS. & PROF. CODE §§ 17602(a)(3);

   d.   Noom failed to provide a toll-free telephone number, electronic mail address, a postal address or another cost-effective, timely, and easy-to-use mechanism for cancellation described in CAL. BUS. & PROF. CODE §§ 17602(a)(3), as required by CAL. BUS. & PROF. CODE §§ 17602(b);

   e.   Noom failed to allow Plaintiff and the Class to terminate the automatic renewal or continuous service exclusively online, as required by CAL. BUS. & PROF. CODE §§ 17602(c).

   94.   As a result of Defendant's misconduct pursuant to CAL. BUS. & PROF. CODE § 17603, Plaintiff and the Class are entitled to restitution of all amounts that Noom charged or caused to be charged to Plaintiff's and Class members' credit cards, debit cards, or third-party payment accounts during the applicable statute of limitations and continuing until Noom's statutory violations cease.

   95.   As a result of Defendant's misconduct pursuant to CAL. BUS. & PROF. CODE § 17535, Plaintiff and the Class are entitled to an injunction (a) enjoining Noom from making

automatic renewal offers that do not comply with California law, (b) from making charges to credit cards, debit cards, or third-party payment accounts without prior affirmative consent to an agreement containing "clear and conspicuous" disclosures of automatic renewal or continuous service offer terms, (c) enjoining Noom from making automatic renewal offers that fail to provide an acknowledgment that includes "clear and conspicuous" disclosure of automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, and (d) enjoining Noom from making automatic renewal offers that fail to provide an online, easy-to-use mechanism for cancellation.

96.     Pursuant to CAL. BUS. & PROF. CODE § 17535, this Court has the power to award such equitable relief, including but not limited to, an order declaring Defendant's auto-renewal practices to be unlawful, an order enjoining Defendant from engaging in any such further unlawful conduct, and an order directing Defendant to refund to the Plaintiff and the Class all monthly fees wrongfully assessed and/or collected on its auto-renew subscription plan.

## COUNT III

## CALIFORNIA UNFAIR COMPETITION LAW

## (ON BEHALF OF THE CALIFORNIA CLASS)

97.     Plaintiff Mahood re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

98.     Plaintiff Mahood brings this claim on her own behalf and on behalf of the California Class.

99.     CAL. BUS. & PROF CODE § 17200, *et seq.* (the "UCL") prohibits acts of "unfair competition," including any unlawful and unfair business acts or practices.

100.    Under the "unlawful" prong of the UCL, a violation of another law is treated as unfair competition and is independently actionable.

101.   Defendant committed unlawful practices because it violated CAL. BUS. & PROF. CODE § 17600, *et. seq.*, California's Automatic Purchase Renewal Statute, which declares unlawful "the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Defendant's conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17602 because each of the following practices is an independent violation of the Automatic Purchase Renewal Statute:

a.   Noom failed to present the terms of its automatic renewal or continuous service offer in a clear and conspicuous manner before fulfilling the subscription and in visual proximity to the request for consent to the offer, as required by Cal. Bus. & Prof. Code §§ 17602(a)(1);

b.   Noom charged the Plaintiff's and the Class's credit or debit cards, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous offer terms, as required by Cal. Bus. & Prof. Code §§ 17602(a)(2);

c.   Noom failed to provide an acknowledgment that includes the automatic renewal offer terms or continuous offer terms, cancellation policy, and information regarding how to cancel, and to allow Plaintiff and the Class to cancel, the automatic renewal or continuous service before they paid for it, as required by Cal. Bus. & Prof. Code §§ 17602(a)(3);

d.   Noom failed to provide a toll-free telephone number, electronic mail address, a postal address or another cost-effective, timely, and easy-to-use mechanism for cancellation described in Cal. Bus. & Prof. Code §§ 17602(a)(3), as required by Cal. Bus. & Prof. Code §§ 17602(b);

e.   Noom failed to allow Plaintiff and the Class to terminate the automatic renewal or continuous service exclusively online, as required by Cal. Bus. & Prof. Code §§ 17602(c).

102.   Under the "unfair" prong of the UCL, a business practice is unfair if that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

103.   Defendant committed unfair acts and practices by, *inter alia*:

a.     Stating and creating the net impression that the 14-day trial was "risk free";

b.     Omitting the fact that a smartphone is necessary to access its program and cancel the 14-day subscription;

c.     Stating that the trial period lasts 14 days;

d.     Stating and creating the net impression that the 14-day trial program is either free or costs no more than $18.37;

e.     Stating and creating the net impression that customers are able to easily cancel;

f.     Stating and creating the net impression that customers can "cancel anytime" and that there is "no commitment;"

g.     Stating and creating the net impression that customers will receive individualized coaching from a human weight loss expert once they enroll with Noom and that they will be able to cancel simply by letting their personal coach know;

h.     Omitting the fact that customers could not cancel their enrollment on Noom's website, or by letting their coach know;

i.     Omitting the fact that customers would not be assigned a human coach; and

j.     Failing to adequately disclose how and when customers could cancel their enrollment.

104.     Plaintiff Mahood and the California Class reserve the right to allege other violations of law which constitute unlawful, unfair, or fraudulent business acts or practices as Defendant's conduct is ongoing and continues to this date.

105.     Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

106.     There were reasonably available alternatives to further Noom's legitimate business interests, other than the conduct described herein.

107.     Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

108.     As a result of Defendant's unlawful and unfair business practices, Plaintiff Mahood and the California Class have suffered an injury in fact and have lost money in an amount to be determined at the trial of this action.

109.     Pursuant to CAL. BUS. & PROF CODE §17203 Plaintiff Mahood and the other members of the California Class are entitled to an order: (1) requiring Noom to make restitution to Plaintiff and the Class; (2) enjoining Defendant from charging Plaintiff's and Class members' credit cards, debit cards, and/or third party payment accounts until such time as Noom obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms; and (3) enjoining Noom from making automatic renewal or continuous service offers in the State of California that do not comply with California Automatic Renewal Law.

## COUNT IV

### CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

### (ON BEHALF OF THE CALIFORNIA CLASS)

110.     Plaintiff Geraldine Mahood re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

111.     Plaintiff Mahood brings this claim on her own behalf and on behalf of the California Class.

112.     The California Consumers Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*. (the "CLRA"), prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

113.    Plaintiff and the Class members are "consumers" within the meaning of CAL. CIV. CODE § 1761(d) in that Plaintiff and the Class members sought or acquired Defendant's services for personal, family, or household purposes.

114.    Defendant's weight-loss coaching program constitute "services" within the meaning of CAL. CIV. CODE § 1761(a) and (b).

115.    The purchases by Plaintiff and Class Members are "transactions" within the meaning of CAL. CIV. CODE § 1761(e)

116.    Defendant violated CAL. CIV. CODE § 1770, subdivisions (a)(5), (a)(9), (a)(14) and (a)(16) by, *inter alia*, representing that Noom's goods and services have certain characteristics that they do not have; advertising goods and services with the intent not to sell them as advertised; representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; and representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

117.    As a direct and proximate result of result of Defendant's violations of the CLRA, Plaintiff Mahood and the California Class were wrongfully charged fees for Noom's monthly weight-loss plans.

118.    Defendant's conduct alleged herein was undertaken by Defendant knowingly, willfully, and with oppression, fraud, and/or malice, within the meaning of CAL. CIV. CODE § 3294(c).

119.    By reason of the foregoing, Plaintiff Mahood and members of the California Class seek an injunction requiring Defendant to cease their unlawful practices.  If Defendant fails to rectify or agree to rectify the unlawful acts detailed above and give notice to all affected consumers within 30 days of written notice pursuant to § 1782 of the CLRA, Plaintiff Mahood will amend

this Complaint to add claims for actual, punitive, and statutory damages, as appropriate, as well as any other remedies the Court may deem appropriate under CAL. CIV. CODE § 1750 *et seq*.

## COUNT V

### COMMON LAW FRAUD

### (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANT DOES BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)

120.    Plaintiff Geraldine Mahood re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

121.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Multistate Class under New York law or under the laws of each of the states where Defendant does business, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

122.    As discussed above, Defendant made a number of materially misleading statements and/or omissions in the marketing and billing of its monthly subscriptions, including:

a.    Stating and creating the net impression that the 14-day trial was "risk free";

b.    Omitting the fact that a smartphone is necessary to access its program as well as cancel the 14-day subscription;

c.    Stating and creating the net impression that customers' payment information will only be used to pay for the cost of the 14-day trial program;

d.    Stating and creating the net impression that customers can easily cancel if they choose to do so;

e.    Stating and creating the net impression that customers can "cancel anytime" and that there is "no commitment;"

f.    Stating and creating the net impression that customers would be paired with and receive individualized coaching from a human weight loss expert once they enroll in the trial period and that they will be able to cancel simply by letting their personal coach know;

g.    Omitting the fact that customers could neither cancel their enrollment on Noom's website, nor contact a customer service representative by mail, email, phone or fax;

h.    Omitting the fact that customers would not be assigned a human coach; and

i.    Failing to adequately disclose how customers could cancel their enrollment during the trial period or whether they needed to do so.

123.    In deciding to enroll in Noom's 14-day trial, Plaintiff and the Class reasonably relied on these misrepresentations and/or omissions to form the mistaken belief that their enrollment in a 14-day trial was risk-free, that it would not require the purchase or use of a smart-phone, that they were not authorizing anything other than whatever the user had selects as a "fair" price, which is no higher than $18.37, that they could easily cancel on any day during their 14-day trial period, and that they would be assigned a human coach through whom they could cancel their enrollment.

124.    Defendant's fraudulent conduct was knowing and intentional.  The omissions and misrepresentations made by Defendant were intended to induce and actually induced Plaintiff and Class Members to become Noom customers.

125.    Defendant's fraud caused damage to Plaintiff and the Class, who are entitled to damages and other legal and equitable relief as a result.

126.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT VI**

**UNJUST ENRICHMENT**

**(ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANT DOES BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)**

127.     Plaintiff Geraldine Mahood re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

128.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Multistate Class under New York law or the laws of each of the states where Defendant does business, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

129.     This claim is brought under the laws of all states where Noom does business that permit an independent cause of action for unjust enrichment, as there is no material difference in the law of unjust enrichment as applied to the claims and questions in this case.

130.     As a result of its unjust conduct, Defendant has been unjustly enriched.

131.     By reason of Defendant's wrongful conduct, Defendant has benefited from receipt of improper funds, and under principles of equity and good conscience, Defendant should not be permitted to keep this money.

132.     As a result of Defendant's conduct it would be unjust and/or inequitable for Defendant to retain the benefits of its conduct without restitution to Plaintiff and the Class. Accordingly, Defendant must account to Plaintiff and the Class for its unjust enrichment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)     Issue an order certifying the Classes defined above, appointing the Plaintiff as Class representative, and designating Wittels McInturff Palikovic as Class Counsel;

(b)     Find that Defendant has committed the violations of law alleged herein;

(c)     Determine that Defendant has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Nationwide Class or, alternatively, the State Classes;

(d)        Determine that Defendant committed fraud, and enter an appropriate order awarding damages to the Nationwide Class or, alternatively, the State Classes;

(e)        Enter an order granting all appropriate relief including injunctive relief on behalf of the State Classes under the applicable state laws;

(f)        Render an award of compensatory damages of at least $100,000,000, the exact amount of which is to be determined at trial;

(g)        Render an award of punitive damages;

(h)        Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(i)        Grant all such other relief as the Court deems appropriate.

Dated:  May 12, 2020
       Armonk, New York

**WITTELS MCINTURFF PALIKOVIC**

By:     /s/ Steven L. Wittels           
        Steven L. Wittels (SW-8110)
        J. Burkett McInturff (JM-4564)
        Tiasha Palikovic (TP-5697)

        18 HALF MILE ROAD
        ARMONK, NEW YORK 10504
        Telephone: (914) 319-9945
        Facsimile: (914) 273-2563
        slw@wittelslaw.com
        jbm@wittelslaw.com
        tpalikovic@wittelslaw.com

        *Counsel for Plaintiff and the Class*