WITTELS MCINTURFF PALIKOVIC
Steven L. Wittels
J. Burkett McInturff
Tiasha Palikovic
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
tpalikovic@wittelslaw.com

*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **GERALDINE MAHOOD, ALEXANDRA BURWOOD, SUSAN BREWSTER, MELISSA CUEVAS, MARYANNE DERACLEO, ELVERA HONORE, KAREN KELLY, MOJO NICHOLS, REBECCA RICHARDS,** and **JENNIFER SELLERS,** **Individually and on Behalf of All Others Similarly Situated,** | *FIRST AMENDED CLASS ACTION COMPLAINT* *JURY TRIAL DEMANDED* |
| **Plaintiffs,** | |
| **v.** | |
| **NOOM, INC.** | |
| **Defendant.** | |

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

OVERVIEW OF NOOM'S UNLAWFUL AUTO-ENROLLMENT SCHEME ......................... 2

JURISDICTION AND VENUE ..................................................................................... 7

PARTIES ................................................................................................................... 7

FACTUAL ALLEGATIONS ......................................................................................... 9

I.      NOOM'S MARKETING AND REPRESENTATIONS TO
        CONSUMERS ............................................................................................... 9

II.     NOOM'S ENROLLMENT PROCESS AND DISCLOSURES.................................. 10

III.    NOOM'S "COACHING" PROGRAM AND CANCELLATION
        POLICY ....................................................................................................... 15

IV.     NOOM'S AWARENESS OF THE DECEPTIVENESS OF ITS
        AUTOMATIC RENEWAL SCHEME................................................................ 16

        A.  Noom Has Received Thousands of Complaints Regarding the
            Deceptiveness of Its Enrollment Scheme ............................................ 17

        B.  Noom Acknowledges the Elements of Its Enrollment Scam in Its
            Communications to Customers ............................................................ 22

        C.  Noom Closely Tracks Customer Metrics, Including Cancellation and
            Complaint Rates, and Knows that It Is Charging Customers Who
            Are Not Using Its Plan ....................................................................... 25

        D.  Complaints About Noom's Enrollment Practices Resulted in an
            Alarming Chargeback Rate—Which Noom "Solved" by Adding a
            Small-dollar Charge For Its Previously Free Trial ............................... 26

        E.  Noom Has a History of Unlawful Attempts to Enroll Customers in
            Its Subscription Plans ........................................................................ 27

        F.  Noom Knows Its Claims of Personalized Coaching Are False and
            Misleading ......................................................................................... 27

V.      HOW NOOM MISLED CALIFORNIA PLAINTIFF MAHOOD............................ 29

VI.     HOW NOOM MISLED NEW YORK PLAINTIFF BURWOOD............................. 33

VII.    HOW NOOM MISLED WASHINGTON PLAINTIFF BREWSTER ....................... 35

VIII.   HOW NOOM MISLED CALIFORNIA PLAINTIFF CUEVAS................................ 36

IX.     HOW NOOM MISLED NEW YORK PLAINTIFF DERACLEO ............................. 38

X.      HOW NOOM MISLED PENNSYLVANIA PLAINTIFF HONORE ......................... 40

XI.     HOW NOOM MISLED CALIFORNIA PLAINTIFF KELLY.................................... 41

XII.    HOW NOOM MISLED DISTRICT OF COLUMBIA PLAINTIFF
        NICHOLS ........................................................................................................ 42

XIII.   HOW NOOM MISLED OHIO PLAINTIFF RICHARDS............................................ 44

XIV.    HOW NOOM MISLED ALABAMA PLAINTIFF SELLERS.................................... 46

CLASS ACTION ALLEGATIONS ............................................................................... 48

COUNT I - NEW YORK GENERAL BUSINESS LAW § 349 .................................... 51

COUNT II - CALIFORNIA FALSE ADVERTISING LAW–VIOLATION OF
        THE CALIFORNIA AUTOMATIC RENEWAL LAW ......................................... 53

COUNT III - CALIFORNIA FALSE ADVERTISING LAW ....................................... 56

COUNT IV - CALIFORNIA UNFAIR COMPETITION LAW..................................... 58

COUNT V - CALIFORNIA CONSUMERS LEGAL REMEDIES ACT................................... 62

COUNT VI – WASHINGTON CONSUMER PROTECTION ACT ....................................... 623

COUNT VII – PENNSYLVANIA UNFAIR TRADE PRACTICES AND
        CONSUMER PROTECTION LAW ................................................................... 65

COUNT VIII – DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT .................... 67

COUNT IX – OHIO CONSUMER SALES PRACTICES ACT ................................................ 70

COUNT X - ALABAMA DECEPTIVE TRADE PRACTICES ACT ....................................... 74

COUNT XI - COMMON LAW FRAUD ..................................................................... 74

COUNT XII - UNJUST ENRICHMENT..................................................................... 76

COUNT XIII - CONVERSION.................................................................................... 77

PRAYER FOR RELIEF ............................................................................................... 78

Plaintiffs Geraldine Mahood, Alexandra Burwood, Susan Brewster, Melissa Cuevas, Maryanne Deracleo, Elvera Honore, Karen Kelly, Mojo Nichols, Rebecca Richards, and Jennifer Sellers ("Plaintiffs"), by their undersigned attorneys, Wittels McInturff Palikovic, bring this class action consumer protection action in their individual capacity and on behalf of a class of consumers defined below, against Defendant Noom, Inc. ("Noom" or the "Company") and hereby allege the following with knowledge as to their own acts and upon information and belief as to all other acts:

## **INTRODUCTION**

1.       With over 50 million downloads of its weight-loss app, Noom is one of the fastest-growing weight-loss programs in the world and has almost quadrupled its annual revenue to over $237 million in the past year.[1]  According to its website, Noom is "backed by some of the best VCs [venture capitalists] in the world" and boasts of "tremendous growth."[2]  Such growth, however, is also fueled by Defendant Noom's deceptive and illegal automatic renewal scheme.

2.       Noom uses its renewal scheme to lure customers with deceptive promises of "low cost" or "zero cost" trial periods that turn out to be extraordinarily difficult to cancel and instead result in customers being trapped in costly auto-recurring plans they never had any intention of enrolling into.  Further, instead of monthly fees, Noom imposes lump-sum charges for its entire program, extracting up to eight months of non-refundable advance payments on the very first day of a customer's enrollment.  As Noom's COO and CFO Adam Fawer blithely acknowledges, "If someone is only staying one month, we're not making a whole lot of money off that person."[3]  To this end, Noom bombards the public with a barrage of nationwide advertising on social media, the internet, TV and radio in order to lure unsuspecting customers into its automatic enrollment trap.

---

[1] Noom, https://www.noom.com/news/noom-quadruples-revenue-237-million (last visited July 30, 2020).
[2] Noom, https://www.noom.com/about (last visited July 30, 2020).
[3] Noom, https://www.noom.com/news/noom-quadruples-revenue-237-million (last visited July 30, 2020).

3.      Undeterred by the disastrous economic effects the current coronavirus pandemic is having on most people's budgets, Noom is not only continuing its illegal enrollment practices during the global pandemic, but is seeking to exploit it by now offering the trial period "at zero cost" and capitalizing on the moment by promising potential customers that Noom will "improv[e] [their] health" and "help [them] find structure and relief during this difficult time."[4]  This consumer fraud class action seeks to put an end to Defendant's unfair business practices and hold Noom accountable for the damages it has caused—and continues to cause.

## OVERVIEW OF NOOM'S UNLAWFUL AUTO-ENROLLMENT SCHEME

4.      Defendant's automatic renewal program works as follows.   In exchange for customers' credit/debit card or PayPal account information, Noom gives customers the opportunity to "try" its weight loss "coaching" program for a purportedly "risk free" two-week trial period that is either offered at "zero cost" or at a set low cost ranging from $1.00 to $18.37.   After capturing its customers' payment information, as soon as the trial period ends the Company activates its auto-renewal program and begins assessing non-refundable membership fees.   The fees start with a lump-sum non-refundable advance payment for as many as eight months at a time, at a cost as high as $199.00.

5.      Prior to activating the automatic enrollment, Noom both fails to obtain customers' explicit consent to the automatic enrollment and fails to adequately disclose or actively misrepresents to prospective customers many material facts regarding the trial period and its weight loss subscription service.   These include the fact that Noom:

    a.   fails to adequately disclose to customers that the trial period will automatically convert to an auto-recurring membership;

    b.   misrepresents to customers that they will be able cancel their enrollment by "simply letting their coach know," which is misleading and untrue;

---

[4] Noom, https://www.Noom.com (last visited July 30, 2020).

   c.   fails to tell customers that even though they can sign up for the trial period on Noom's website, they cannot access Noom's service without an app-enabled smartphone;

   d.   fails to tell customers that even though they can sign up for the trial period on Noom's website, they cannot stop the trial membership from converting to an automatically renewing subscription unless they have a smart phone on which to initiate their cancellation;

   e.   fails to tell customers how they can cancel the trial period;

   f.   fails to disclose that the automatic renewal will be activated even if trial customers (i) never access the service during the trial period, (ii) are never assigned a coach, (iii) never download the Noom app, or (iv) download the Noom app but it doesn't work;

   g.   misrepresents to customers that the trial period is "risk free" even though it knows many customers end up unwittingly or unwillingly enrolled in its costly automatic-renewal program;

   h.   fails to tell customers that they will not be assigned a human "coach" at the outset of their trial period, but will instead be interacting with an automated computer bot;

   i.   fails to disclose that customers will not be able to cancel their trial membership or even contact Noom for any other purpose via e-mail, mail, phone, fax or through its website;

   j.   fails to adequately disclose to customers that the charge assessed immediately following the trial period will be an advance payment for multiple months of membership; and

   k.   fails to adequately disclose to customers that the advance charge assessed following the trial period will be non-refundable.

      6.     In short, Noom actively misrepresents and/or fails to accurately disclose the true characteristics of its trial period, its automatic-enrollment policy, and the actual steps customers need to follow in attempting to cancel a 14-day trial and avoid automatic enrollment. While Noom holds out the trial as a "risk-free" option costing customers either nothing or less than $20.00, the Company knows that in fact many unwitting customers are likely to be charged as much as $199.00 soon after signing up for the 14-day trial, and that Noom will keep charging them even though it knows they are not using its weight-loss plan.

3

7.      Compounding the Company's enrollment obfuscation is the fact that Noom also deceives customers by making false promises concerning the service itself—in particular, its claim that customers will receive a "customized," "personalized," "tailored" plan, and will receive support from Noom's "dedicated coaching team."  In reality, customers like Plaintiff Mahood receive only impersonal, automated messages powered by artificial intelligence which can only be accessed through Noom's smartphone app.  Thus, as was the experience of all Plaintiffs, many customers are either (i) not assigned a coach when they join the trial period, or (ii) do not even understand that they have been assigned a "coach" or know who their "coach" is because the "coach" is actually a bot.

8.      Noom's many omissions and misrepresentations are independently misleading, but they also work together to further confuse and mislead a reasonable consumer about the service Noom is providing and the effect of signing up for Noom's trial period.  These omissions and misrepresentations mislead and deceive customers in at least the following mutually-reinforcing ways:

   a.  Noom's false claims that the trial is "risk free" together with its failure to adequately disclose that the trial membership will automatically convert to a non-refundable membership lead consumers to believe that they will not be charged any more than the small amount they authorized for the trial period;

   b.  Noom misleads reasonable consumers who sign up for the trial plan into mistakenly believing that they do not need to cancel anything and that once the trial period is over so too is their relationship with Noom.  Noom creates or confirms a reasonable customer's belief that a cancellation is not required, since it does not appear to be possible in the following ways.  First,  Noom blocks all customers from communicating with the company  (its website and app provide no phone number, no fax number, no email address, no mailing address, and no link to customer service), and second, Noom makes it burdensome for consumers to cancel their trial membership (Noom tells them to "simply cancel by letting your coach know," but then (i) fails to connect all customers with a coach or make clear that a coach is not a human, and (ii) fails to disclose that this method of cancellation is ineffective for customers who provided their payment information through a mobile app store);

   c.  On the last day of the trial period Noom sends a message to its customers that fails to disclose that customers who haven't yet canceled are about to be charged for

multi-month plans.  Instead, Noom's message is simply that it "won't be checking in anymore."  With its curt omission, the Company fails to provide critical information about the trial, including that: (i) the customer's auto-enrollment is about to begin, (ii) that they will be charged, (iii) that the charge will be for many months in advance, and (iv) that the charge will be non-refundable.  Such omissions further contribute to a reasonable customer's misunderstanding that their relationship with Noom will end once the trial period is over;

d.  Noom's promise of connecting customers with coaches, together with its failure to disclose that its service can only be accessed through an app lead reasonable consumers who sign up through the website but never download the app and/or never speak to a coach to believe that their trial period never started.

9.  Noom thus subjects all of its potential customers to the same deceptive marketing and enrollment scheme and is already on notice of thousands of consumer complaints about its enrollment trickery.

10.  The Company's concerted pattern of misrepresentations, smokescreens and omissions may benefit Noom's bottom line, but it is unfair, deceptive, and fraudulent and has resulted in Noom's unjust enrichment.  Additionally, Noom's auto-renewal/continuous service policy runs afoul of multiple independently actionable requirements imposed by California's Automatic Purchase Renewal Statute, CAL. BUS. & PROF. CODE § 17601 *et seq.*  Further, the Company's failure to disclose to potential customers that they will be interacting with a bot also violates California's Bot Disclosure Law, CAL. BUS. & PROF. CODE § 17941.

11.  As such, Noom's conduct is also in violation of California's False Advertising Law, CAL. BUS. & PROF CODE § 175000 *et seq.*, the California Consumers Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*, Unfair Competition Law, CAL. BUS. & PROF CODE § 17200, *et seq.*, as well as the consumer protection statutes of New York, N.Y. GEN. BUS. LAW § 349, Washington, WASH. REV. CODE ANN. § 19.86, *et seq.*, Pennsylvania, 73 P.S. § 201-1, *et seq.*, the District of Columbia, D.C. CODE § 28-3901, *et seq.*, Ohio, OHIO REV. CODE § 1345.01, *et seq.*, and Alabama, ALA. CODE § 8-19-1, *et seq.*

12.     Plaintiff Geraldine Mahood's experience is typical of the other Plaintiffs and many thousands of Noom customers harmed by the Company's billing and advertising practices: she, like many others, provided her payment information to Noom because she was misled into reasonably believing that she was authorizing only a one-time small-dollar payment for a limited trial of Noom's program.  Ms. Mahood believed, based on the representations on Noom's website and the process of signing up for a trial membership, that she would be assigned a qualified "coach," that her trial was "risk-free," and that she could "cancel anytime."  Plaintiff Mahood also believed that canceling would be reasonably simple, and that there was "no commitment" since customers are able to easily cancel the program by "simply let[ting] their coach know."   None of this turned out to be true.

13.     Like Noom's other customers, Plaintiff Mahood was therefore misled into a) signing up for a trial membership that Noom converted into an automatic renewal subscription without her consent, b) signing up for a "risk free," simple-to-cancel, personalized, unlimited-access coaching service that Noom did not provide, c) paying well in excess of the initial amount that she authorized Noom to bill her for a 14-day trial (in Plaintiff Mahood's case, $99 above the initial $10.00 she authorized), and d) incurring monthly charges without being afforded adequate disclosures, including those required by California's Automatic Purchase Renewal Statute. Plaintiff Mahood, along with the nine additional named Plaintiffs from New York, California, Washington, Pennsylvania, the District of Columbia, Ohio, and Alabama who have joined this class action therefore seek to represent Noom customers in New York, California, and throughout the United States who were similarly enrolled in Noom from the applicable statute of limitations period(s) to the date of judgment.

14.     Only through this class action can Noom's customers remedy the Company's wrongdoing.  Because Noom's fraudulent charges are relatively small compared to the much

higher cost a single customer would incur in trying to challenge Noom's conduct, it makes no financial sense for an individual customer to bring legal action.  With this class action, Noom's customers seek to level the playing field and make sure that companies like Noom engage in fair and upright business practices.  Plaintiffs therefore seek court-ordered relief requiring that Noom return to Plaintiffs and the Class all misappropriated charges, compensate Plaintiffs and the Class for the damages suffered, and enjoin Noom from continuing its unlawful business practices.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

16.     This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

17.     This Court has personal jurisdiction over Defendant under 18 U.S.C. §1965.  The Court also has personal jurisdiction over Defendant because Noom has sufficient contacts in this jurisdiction.

18.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a).  Substantial acts in furtherance of the alleged improper conduct occurred within this District, as Defendant is headquartered in this District.

## PARTIES

19.     Plaintiff **Geraldine Mahood** is a citizen of California and lives in Chico, California.  She was enrolled in Noom's trial program in August 2019.

20.     Plaintiff **Alexandra Burwood** is a citizen of New York and lives in Delhi, New York.  She was enrolled in Noom's trial program in June 2020.

21.     Plaintiff **Susan Brewster** is a citizen of Washington and lives in Seattle, Washington.  She was enrolled in Noom's trial program in August 2019.

22.     Plaintiff **Melissa Cuevas** is a citizen of California and lives in Colton California.  She was enrolled in Noom's trial program in or around December 2018 or January 2019.

23.     Plaintiff **Elvera Honore** is a citizen of Pennsylvania and lives in Philadelphia, Pennsylvania.  She was enrolled in Noom's trial program in February 2020.

24.     Plaintiff **Maryanne Deracleo** is a citizen of New York and lives in Rotterdam, New York.  She was enrolled in Noom's trial program in July 2020.

25.     Plaintiff **Karen Kelly** is a citizen of California and lives in Carlsbad, California.  She was enrolled in Noom's trial program in September 2019.

26.     Plaintiff **Mojo Nichols** is a citizen of Washington, D.C. and lives in Washington, D.C.  He was enrolled in Noom's trial program in in August 2019.

27.     Plaintiff **Rebecca Richards** is a citizen of Ohio and lives in Tiffin, Ohio.  She was enrolled in Noom's trial program in May 2019.

28.     Plaintiff **Jennifer Sellers** is a citizen of Alabama and lives in Montgomery, Alabama.  She was enrolled in Noom's trial program in June 2020.

29.     **Defendant Noom, Inc.** is a diet and weight loss company headquartered in New York, New York and located at 229 West 28th Street, New York.  The Noom smartphone app, developed by health care startup WorkSmart Labs, was launched in 2011.

30.     All of the relevant acts complained of took place in New York: Noom processes all enrollment transactions and payments in New York; directs all marketing, billing, customer outreach, service and tracking efforts from New York; develops, updates, and operates its website

and app from its New York office, including all portions of its website and app that solicit and enroll consumers and collect their payment information; receives all payments from Plaintiffs and Class members and maintains a bank account in New York.  Further, Noom maintains its only U.S. office in New York, which is where all of its major business decisions, including decisions regarding the advertising, marketing, and sale of Noom's weight-loss programs are made.

31.     Additionally, Noom's Terms and Conditions of Use require that all disputes regarding its weight-loss subscription program be governed by New York law and be brought in New York state or federal courts.

## FACTUAL ALLEGATIONS

## I.     NOOM'S MARKETING AND REPRESENTATIONS TO CONSUMERS

32.     Defendant aggressively markets its product through a variety of channels, including social media marketing, television, radio, and online streaming commercials, and magazine and other print advertisements.

33.     Noom's robust advertising campaigns have yielded results: Noom has seen significant growth since its inception in 2011 and boasts of being recognized by Google as "the 3rd most searched diet in 2018."[5]  According to Facebook Business, Noom is an advertising "Success Story," as its "mobile-friendly" advertisements have "reach[ed] a multilingual audience worldwide, leading to a 5X increase in members" since May 2018.[6]  In 2018, an analysis of Google trends showed that Noom ranked as the overall top trending diet program of the year.[7]

34.     Noom's social-media, online, television, radio, and print advertisements all direct consumers to visit Noom's website to learn more about its weight loss program.  Noom then uses

---

[5] Noom, https://offers.noom.com/careers/# (last visited July 30, 2020).
[6] Noom, https://www.facebook.com/business/success/noom (last visited July 30, 2020).
[7] Noom Inc., *Noom Ranks as Top Trending Diet in 2018, According to Google – Year in Search* (Dec. 12, 2018), https://www.prnewswire.com/news-releases/noom-ranks-as-top-trending-diet-in-2018-according-to-google---year-in-search-300764426.html.

Facebook tools to track its website traffic, which enables Noom to "reconnect" – through Facebook and other social media channels – "with people who . . . visit[] its website."[8]

35.    As such, Noom's marketing is centered around its website.  The company uses the website to target consumers for its online advertising, and in turn directs consumers who view their ads back to Noom's website.

36.    Noom's website repeatedly states that a) as Noom members, customers can expect to receive "personalized coaching" from qualified experts who are easily accessible, b) customers are invited to purchase a 14-day, "no-risk" trial for no more than $18.37, and c) if customers decide that they do not want to continue with the program, they may easily cancel the trial membership by simply informing their "coach" that they would like to cancel.

## II.    NOOM'S ENROLLMENT PROCESS AND DISCLOSURES

37.    The following paragraphs describe the process for enrolling in Defendant's 14-day trial period in or around the time of Plaintiff Mahood's enrollment.  Upon information and belief, all material aspects of the enrollment process have remained the same throughout the applicable period.

38.    Potential customers can sign up for Noom's 14-day trial through Noom's website or directly through their smartphones by downloading the Noom app from the iTunes App Store (for iPhone users) or Google Play Store (for Android users).  Upon information and belief, both the Noom app and the Noom website feature the same sign-up process, contained the same representations and required customers to complete the same health and fitness evaluation.

39.    Noom's website and app both lead customers through a lengthy evaluation which asks for the customer's height, current weight, ideal weight, gender, and age.  The evaluation

---

[8] Noom, https://www.facebook.com/business/success/noom (last visited July 30, 2020).

continues with several multiple-choice questions regarding the customer's fitness goals, eating and exercise habits, medical history, home environment, marital status, weight loss motivations and struggles, and food restrictions.

40.     Next, customers are asked to enter an email address in order "to see how much weight" they can expect to "lose for good with Noom."  After clicking a button labeled "SEE MY RESULT," a graphic appears, stating, "You'll be [**ideal weight entered earlier**] by [**date 4-6 months from current date**]."  Under the graphic is a button labeled, "CLAIM MY PLAN."

41.     By asking customers for substantial information concerning their fitness goals, lifestyle, and medical history, Noom contributes to the net impression that customers can expect to receive a highly personalized course from a dedicated coach at the conclusion of the evaluation. Noom does not actually use the information supplied in order to personalize customers' courses and instead designed the lengthy enrollment flow as a way of increasing enrollments.

42.     At the conclusion of the evaluation, the 14-day trial offer appears, stating, "Try all of Noom for 2 weeks! . . . Starter fee waived, saving you $20 . . . Risk free 14-day trial."

43.     Customers are then asked at the bottom of the page to "pick" what price they "think is fair" for a 14-day trial.  The choices are $1, $3, $10, and $18.37.  However, "$10" is highlighted as the "most popular choice" and is the default option—even though the trial is touted as "free," as depicted below:



44.     On the following page, a countdown clock forces customers to purchase their "customized" plan within 15 minutes, along with the statement, "Your personalized plan has been reserved for the next 15 minutes!"

45.     The payment page, where customers are asked to enter their credit/debit card or PayPal account information under time pressure from the ticking timer, presents contradictory information.   The page is also visually confusing because it uses different font colors, sizes and styles, different-colored logos, different-colored backgrounds, extraneous information, and irrational spacing.   It appears as follows:

46.     This is the first and only time during Noom's multi-step sign-up process or in its marketing materials that the Company provides any information regarding the terms of the trial period or the process of canceling it.   As shown above, this small print information is not underlined, printed in capital letters, or written in a prominent color or in a bigger type size than the rest of the words on the payment page.   To the contrary, it is presented in small font, does not stand out, and is not in visual proximity to the payment information.   Indeed, it is placed so that it

13

sits below colorful and unrelated app-metric information and logos and to the left of other colorful and confusing logos stating "100% RISK FREE GUARANTEED" and "VERIFIED & SECURED."  Together the out-of-the-way placement and small low-contrast print have the effect of both contradicting and detracting attention from the information presented regarding the renewal language.  Adding to the muddle regarding the terms of the offer and the effect of entering payment is the presence of two contradictory statements: one that sits right below the renewal verbiage and falsely states: "No commitment – cancel any time"; the other which sits above the verbiage, next to the credit card number field outlined in orange, and falsely assures the customer that "You will only be charged $[the price chosen for the trial period] for your 14-day trial."

47.    If a customer decides not to make a payment within 15 minutes and exits the website, Noom will send that customer multiple emails containing links to his or her "customized course" and a motivational video.  In the video, customers are promised a "personalized to-do list every morning," and a "goal specialist" who will keep them accountable as they progress through the program.  Customers are then returned back to their "customized course" page, which again invites them to try the 14-day trial, but this time for free.  Noom thus "waives" the $1.00 to $18.37 charge for the 14-day trial for customers who do not immediately sign up for the trial upon initially completing the online evaluation.

48.    Even though Noom sends potential customers numerous emails offering its free 14-day trial, once customers actually sign up for the trial, Noom does not follow up with any emails containing instructions on how to start the program.

49.    Noom also fails to inform customers that Noom's program requires a smartphone, that the trial program can only be accessed and cancelled through the Noom smartphone app, and that the trial will begin even if a customer never even downloads the app.  This causes great confusion for customers who sign up for the trial via Noom's website, therefore expecting to be

able to access their "coach" and their "personalized plan" via Noom's website or with a non-app enabled phone.  It also confuses customers who believe their trial could not have ever started since they never accessed the trial on a smartphone.

50.     Moreover, although customers without a smartphone are unable to and never do use the Noom program, view their "personalized plan," or communicate with Noom's "coaches," their trial period begins as soon as Noom captures their payment information.  Yet Noom fails to disclose this and provides no way for such customers to cancel their trial enrollment.

### III.     NOOM'S "COACHING" PROGRAM AND CANCELLATION POLICY

51.     Regardless of whether they purchase the 14-day trial through Noom's website or through the smartphone app, once the trial is purchased, the only way a customer can access Noom's program—and communicate with their "coach"—is by downloading the Noom app on a smartphone.  This fact is not disclosed to consumers at any point prior to the start of their trial period or at any point thereafter.

52.     Thus, customers who might reasonably expect their Noom coach to reach out to them via a phone call or email, or who might expect that the coach will be accessible through the website, are left wondering how to use the program or whether their program has even started. New trial customers are thus left in the dark to figure out, if they can, that Noom's entire program exists only on the app, that it cannot be accessed through Noom's website, and that the so-called "coach" in fact exists only on a smart-phone app.

53.     The app allows users to log their meals and their regular "weigh-ins," and access articles and motivational tips for reaching their diet and exercise goals.  Through the app, users are also able to send messages to an artificial intelligence-powered "bot."  This bot is designated with a name and a picture icon of a person, but it is not a reachable human and only interacts with users through impersonal, automated statements.  The bot provides superficial answers to users'

questions, and sometimes does not respond to questions at all.  This automated messaging system is the so-called "coach" that Noom refers to when it tells its customers to cancel by "simply let[ting] your coach know."  Noom never discloses the fact that customers will be—or are— interacting with a bot.

54.     In order to cancel, customers must message the automated bot through the Noom app, so that the bot responds by sending customers a system-generated message directing them to cancel their membership and end their subscription through the iTunes App Store (for iPhone users) or Google Play Store (for Android users).  Thus, although customers may sign up for the 14-day trial period through Noom's website, the only way that customers who provide their payment information through a mobile app store can cancel their enrollment is through a multi-step process.  First, customers must be savvy enough to access the Noom smartphone app and try to cancel the membership by sending a message to a bot.  Then customers need to go to a third party to end the subscription through the iTunes App Store (for iPhone users) or Google Play Store (for Android users).

55.     Having handed off responsibility for processing cancellations to outside companies iTunes and Google Play, Noom thus knows that its cancellation instructions—telling customers to simply let their coach know—are incorrect and misleading.

56.     If customers are unable to navigate the iTunes/Google Play app cancellation procedure, they remain enrolled in Noom and are charged for a full membership following the end of their 14-day trial.

IV.     **NOOM'S AWARENESS OF THE DECEPTIVENESS OF ITS AUTOMATIC RENEWAL SCHEME**

57.     In continuing to carry out its fraudulent billing and marketing tactics, Defendant has ignored numerous glaring red flags demonstrating that its billing and advertising are deceitful, including abnormally high complaint rates.

### A. Noom Has Received Thousands of Complaints Regarding the Deceptiveness of Its Enrollment Scheme

58.     Through the Better Business Bureau, Noom has received almost *2,000* complaints from customers complaining about being billed without their authorization.   Moreover, the Company still has a "D" rating from the BBB due to the fact that it "has failed to resolve underlying cause(s) of a pattern of complaints."[9]

59.     The BBB cautions consumers to be wary of Noom as follows:

> BBB files indicate a Pattern of Complaints concerning free trial conversion billing and customer service practices of Noom, Inc. Consumers are telling BBB about their experiences after signing up for a free trial offer with the company. Many consumers reportedly try to cancel the trial offer before it ends but still end up being billed for the subscription. A number of these consumers say they believed that after the free trial the cost of monthly membership was between $20-$40. They also claim that after the free trial ends they are charged upfront for several months subscription (varying amounts from $120 to $180+) instead of being billed monthly. Nearly all consumers detail the difficulty they encounter when trying to get in contact with the company's customer service to request a refund of charges and must come to BBB for assistance.[10]

60.     The complaints listed on the BBB website echo the Plaintiffs' experience, as consumers complain that they were "unaware" that they would be auto-enrolled, "there is no way to contact support," that Noom "make[s] cancelling in the trial so difficult you can not possibly figure it out," that the "coach" seems automated," that it is "IMPOSSIBLE to contact the company," that the auto-enrollment is "very deceptive," and that Noom's website "never mentions you must have a smartphone, iPhone or Android device to use [the Noom app and] in order to cancel."[11]

---

[9] Better Business Bureau, https://www.bbb.org/us/ny/new-york/profile/exercise-programs/noom-inc-0121-150555/overview-of-bbb-ratings (last visited July 30, 2020).

[10] Better Business Bureau, https://www.bbb.org/us/ny/new-york/profile/exercise-programs/noom-inc-0121-150555/details#all-alerts (last visited July 30, 2020).

[11] Better Business Bureau, https://www.bbb.org/us/ny/new-york/profile/exercise-programs/noom-inc-0121-150555/overview-of-bbb-ratings (last visited July 30, 2020).

61.     Like Plaintiffs, other Noom customers have expressed similar outrage about Noom's scheme, including in the following complaints most recently posted on the BBB's website:



**Raymond Q**

★☆☆☆☆                                                                    07/14/2020

They completely fooled this old man, I was asked to authorize a $0.26 ****** payment as i wanted to investigate what the product was. I never wanted to join and didn't want the service. Instead I was charged over $129 (+ tax) for something I felt I never agreed to. I tried to stop the extra ****** charge, but ****** replied it could not reverse the charge. Now, I don't know what to do, and am worried they might find ways to scam me for more money. Can anybody HELP? ******* *



**Julya B**

★☆☆☆☆                                                                    06/02/2020

They make it IMPOSSIBLE TO CANCEL.....IT IS A RACKET



**Ray R**

★☆☆☆☆                                                                    05/29/2020

***** * I paid $5 to use the ap and then decided to not use the service. I deleted the ap and thought no more about it. 2 weeks later I noticed $129 taken from ****** under their name. I did not authorize any of this. I can't get my money back. Beware of Noom



**Maria**

★☆☆☆☆                                                                    05/04/2020

They set your account to auto-renew without your knowledge. They've literally gotten hundreds of dollars out of me before I realized it. If I could sue them, I absolutely would. They don't let you get a refund. Oh, and your "noom coach" is just a robot.



**al l**
★★★★★

*04/13/2020*

AVOID AT ALL COSTS! They are a very unethical company. My son worries about my health and wanted to show me Noom. He accessed it through my older LG phone but had a difficult time even looking at what Noom was. They had a "FREE" 14-day program but required a credit card and a $1.00 payment for the "FREE" trial. I DO NOT have the Noom app on my phone, as their program never worked. I wasn't happy to waste the dollar, but gave up trying to make the program load on my phone (IT ONLY WORKS ON A PHONE. THEY CLAIM THEY DON'T HAVE A PC VERSION). GAVE UP AFTER MORE THAN AN HOUR TRYING. Yesterday I looked at my credit card statement, as I was notified I was billed $159 by Noom. I contested the payment through ******, and via computer response was told it is a legitimate charge. I have now filed a complaint with my credit card company. People that are selling a legitimate product don't need to engage in unethical payment practices. IF YOU CLICK ON ANYTHING TO DO WITH NOOM, you begin a process that seem impossible to stop. They have SO many COMPLAINTS I'm amazed the government hasn't stepped in to enforce a change in their business practices. Go to their website and they proudly tell you they are one of the fastest growing companies in the field. Not surprising when you consider how they are doing it.



**JEANETTE C**
★★★★★

*04/15/2020*

This app is misleading.Tricks you to give a "donation" but in reality they are stealing your credit card information and charging you for there "services" which you would find after seeing a redraw in your account for $150 dlls! No contact information, no customer service, just an automated char reply....



**Ann H**
★★★★★

*04/05/2020*

Absolutely Awful! I fell for the free trial and without any warning was charged 129 $. No message, no email, no bill or receipt. I just ended up seeing the charge on my credit card bill. Don't fall for them



**Deanna C**
★★★★★

03/06/2020

The auto-renewal program is a complete scam. The company BY PRACTICE does not notify you when your account will renew, and it is inconsistent regarding whether it shows as a subscription in the app store or whether you must communicate with your "coach". I don't really care if the weight loss stuff is legit or not when it's obvious by shady billing practices that's where they are attempting to make money. How about that psychology?



**Ruth E**
★★★★★

03/09/2020

Do not use this company. I got charged $99 for a 10 day free trial. There was no clear warning that you would need to cancel your subscription after 10 days. I got no notice through email that they would be charging my card. This is an unethical business practice that Is purposefully unclear and counting on people to not have clear information to cancel. There are many, many complaints about this company and their business practices online.



**kba3745**
★★★★★

01/28/2020

Total scam....they do not contact you for anything. Signed up for a trial and was automatically charged $99 for TWO MONTHS without so much of a whisper. Yes they have grown fast and now I know why. They scam people out of a lot of money! Stay Away!



**Alyssa I.**
★★★★★

01/26/2020

I was never told that it would charge immediate after trail. I was charged $140. Now my card is in the negatives and I need to go food shopping! Oh and the "consultant" is like one email a week. This was not at all helpful and I am panicking bc I can not get in touch with anyone for my money back! I am about to dispute !!!!

20



**Julie K**

⭐☆☆☆☆

01/20/2020

You have to request cancellation in chat - there is no other way. This is intentional to make it difficult and allow them a chance to change your mind. Their billing practice of multiple months with no refund tells it all. They want your money. Oh, and the "fitness coach" is a text bot - not a real person. So they violate their Own contract terms but will not provide refunds. They are a complex scam.



**Keesha W**

⭐☆☆☆☆

07/14/2020

This is reviewing the advertisement of a free 2-week trial period. I signed up for the free 2-week trial period and ended up being charged $103.20. I did not see anything that indicated that Noon was going to charge me additional fees other the $0.32. The kicker is that after trying to cancel and receive a refund, I found out that the $103.20 is a reoccurring payment. I quick tried to contact Noon for about 4 hours with no avail. The way they advertise is definitely not clear and as a consumer, I will ensure that I share my experience to everyone that I know.



**Stacy S**

⭐☆☆☆☆

01/28/2020

Cancelling is impossible. The APP doesn't work. I can't login. I can't change my password. I can't do anything. When contacting support, they refer me to the APP. But since that doesn't work, there is no way for me to cancel. So frustrating. I wish I would have checked with BBB before I signed up. This is a scam!



**Jacquelyn B**

⭐☆☆☆☆

07/01/2020

Fraud. Agreed to $10 trial nothing more. They are charging my credit card over $120 every 4 months. Can't get them to stop. Filing complaint with my credit card company next.



**Amity**

★★★★★                                                                07/01/2020

DONT sign up for the trial. You WILL be charged $179 for a full subscription. The robot on the app that you're forced to cancel through also gives no help, just sends you a ton of links to submit more forms. The phone number doesn't work, it sends you into a loop of website- download app- IM robot - back to website. Insane.

62.    Hundreds more similar complaints on websites such as BirdEye.com[12] and RevDex.com[13], as well as reviews for Noom's app on the Google Play Store[14] have put Noom on further notice that its customers are unwillingly being charged far more than the $0.00 to $18.37 that they agreed to pay for a 14-day trial.

63.    Thus, after receiving thousands of complaints from customers who were unknowingly or unwillingly enrolled into Noom's auto-recurring memberships, Noom knew or should have known that customers were unaware of key aspects of how the trial worked.  Yet Noom has continued the marketing ploy, disregarding the fact that tens of thousands of customers (i) don't know their trial start date, (ii) don't know they need to cancel their trial, or if they do realize they have to cancel, are simply unable to, and/or (iii) don't understand they are going to be charged for a full non-refundable membership instead of a single month.

### B. Noom Acknowledges the Elements of Its Enrollment Scam in Its Communications to Customers

64.    Noom's responses to customers on consumer sites likewise show that Noom was well aware of the effect of its scheme, and even indicate that Noom was taking steps to address

---

[12] BirdEye, https://reviews.birdeye.com/noom-inc-992753024 (last visited July 30, 2020).
[13] RevDex, https://www.revdex.com/reviews/noom-inc/1455649 (last visited July 30, 2020).
[14] Google Play, https://play.google.com/store/apps/details?id=com.wsl.noom&hl=en_US&showAllReviews=true (last visited July 30, 2020).

the deceptiveness of its app and website.  For example, as the below excerpts of Noom's responses to customer complaints on Revdex.com clearly show, Noom knows that:

    a. Customers are unaware that they will be auto-enrolled at the end of the trial period:

"We're so sorry to hear you were caught off guard by your subscription auto-renewing.  **We are actively working on ways to better notify customers** when their subscription will auto-renew."

"We're really sorry to hear you were caught off guard by the $99.00 charge. […] We deeply apologize **this wasn't clear at the time of sign up**."

"We're sorry to hear about the confusion around these charges made to your account."

"We promise we will do our best to make it more apparent that payment has been processed, as it seems it was unclear at the time you purchased."

"We will be **exploring ways we can be more explicit about subscriptions auto-renewing**, and greatly appreciate your feedback and letting us know it wasn't clear."

    b. Customers are unwittingly enrolled in multiple identical weight-loss plans:

"It looks like you accidentally signed up for two subscriptions at the time of purchase."

"It looks like you accidentally signed up twice because we are seeing two subscriptions associated with your email address."

"We are so sorry for the confusion here. You **signed up for three subscriptions** with the same credit card which is why you were charged multiple times."

    c. Noom does not make clear that the charges are non-refundable:

"We apologize that the **refund policy was not made clear**. We include a link to the policy in an email that goes out to customers after they sign up for a trial to try to make them more aware.  We will look into including it in more places going forward."

    d. Noom does not make clear that the trial program and the auto-enrollment are activated even if a customer never downloads or uses the Noom app:

"We're really sorry to hear about the **confusion regarding the start date of your trial** and subscription. The trial is activated the moment a customer submits

payment information, regardless of whether or not they end up taking the necessary steps to activate the trial within their Noom Coach account."

"I'm **sorry it wasn't more clear that you would need to cancel your trial** within two weeks of purchasing (regardless of whether or not you're using the trial) to ensure you're not charged and your subscription is canceled."

e.  Noom's cancellation process is unreasonably difficult:

"We're really sorry to hear that you had such a **difficult time cancelling** your subscription."

"We're so sorry the cancellation process was so difficult."

"We deeply apologize for the confusion and that **cancelling wasn't intuitive**."

"We're really sorry to hear that you had such a difficult time cancelling your subscription."

"We deeply apologize for the trouble you've been experiencing getting your subscription canceled."

"**We're aware that there's a bigger problem here** (trial customers getting charged after having requested to cancel) and we are working to resolve it."

"We're so sorry to hear that you had to change your credit card information for fear of being charged."

f.  Noom's customers are prevented from cancelling because Noom's customer

service is virtually non-existent:

"First and foremost, we are deeply sorry to hear that your phone calls went unanswered.  Could you please let us know where you saw a phone number listed? We **don't provide phone support**[.]"

"We apologize it was **difficult to reach our Support Team**."

"We're so sorry for the trouble here and that it was **difficult to reach us :(**."

"We completely understand **how frustrating it is to try to reach Customer Service** and not be able to locate a phone number, particularly when your issue is related to finances. Unfortunately, we do not offer phone support."

g.  Noom is aware of all customer complaints:

"Rest assured that **we have access to all customer complaints**, and that assuring they are seen by our product teams."

"We're so sorry to hear you're feeling scammed and want to do everything we can to turn your experience around for the better. We have a dedicated Customer Support team here at Noom that **monitors all refund and cancellation requests**" (emphases added).[15]

### C. Noom Closely Tracks Customer Metrics, Including Cancellation and Complaint Rates, and Knows that It Is Charging Customers Who Are Not Using Its Plan

65.     That Defendant's fraudulent and deceptive conduct was knowing and intentional is also evident from the fact that Noom closely tracks various customer metrics that showed that customers' enrollment into Noom's monthly plans was involuntary and/or unwitting.

66.     For example, Noom closely monitors its cancellation and complaint rates, whether received directly or through third parties, and has tasked members of its customer support team with responding to complaints on the BBB website and Revdex.com.

67.     As noted above, complaints on the BBB website made clear to Noom that customers were unaware that they would be auto-enrolled; that some were unwittingly enrolled into two or even three identical weight-loss plans; that customers did not expect to be charged recurring, advance, non-refundable charges; that they did not expect their "coach" to be a bot; that they either did not know they needed to cancel or were finding it impossibly difficult to cancel; that the Noom app often did not work; and that customers were frustrated by their inability to reach Noom's customer service and stated time and time again that if they had understood how Noom's scheme worked, they never would have signed up for the trial period.

68.     Noom also tracked the "open ping" rate, which revealed, on a daily basis, whether each customer had opened their Noom app. The open ping rate therefore made patently clear that Noom was charging customers who had not accessed or may not have even installed the Noom

---

[15] RevDex, https://www.revdex.com/reviews/noom-inc/1455649 (last visited July 30, 2020).

app.  In other words, Noom was extracting monthly payments from customers it knew had never used its plan.

69.     Noom also tracked its program's Net Promoter Score ("NPS"), which is a metric used for tracking customer experience by gauging the likelihood that a customer would recommend Noom to a friend or colleague.  When asked about the Company's low NPS score, Noom management told employees not to work on improving it because the Company was focusing on acquiring more users instead.

### D. Complaints About Noom's Enrollment Practices Resulted in an Alarming Chargeback Rate—Which Noom "Solved" by Adding a Small-dollar Charge For Its Previously Free Trial

70.     In or around the fall of 2018, Noom co-founder and President Artem Petakov informed Noom employees during a Company meeting that Noom had received notice from its payment processor that because its chargeback rate[16] for its auto-enrollment charges had been unacceptably high for a prolonged period of time, it was jeopardizing Noom's ability to stay with the payment processor and continue to accept credit cards because credit card companies had placed Noom on final notice.  Mr. Petakov announced that his team had come up with a "solution" to this problem: by charging a small-dollar amount for the previously free trial, Noom would effectively double the number of transactions processed for each auto-enrollment, which would cut the chargeback rate in half.

71.     In other words, rather than incurring higher fees by being forced to switch to a more lenient payment processor or cutting the chargeback rate by addressing the substance of customer complaints, Noom devised and implemented a superficial workaround that would allow it to

---

[16] A chargeback is a charge that is returned to a payment card after a customer successfully disputes an item on their account statement or transactions report.  The chargeback rate is the metric that shows the ratio between the total number of a merchant's payment transactions and the number of chargebacks.

continue extracting advance, non-refundable auto-enrollment charges from customers despite the slew of complaints Noom and the credit card companies were receiving about this practice.

### E. Noom Has a History of Unlawful Attempts to Enroll Customers in Its Subscription Plans

72.     In or around the fall of 2017, Mr. Petakov announced at a company meeting that Noom would be switching from offering limited-period subscription to open-ended auto-renewing subscriptions in an effort to increase its revenue and enrollment numbers.  As part of this effort, he announced that Noom would be "turning on renewals"—in other words, that Noom would be using the payment information previously provided by customers who had made a one-time purchase for a limited-period subscription in order to enroll those single-purchase customers into auto-renewing open-ended subscriptions.  Mr. Petakov made no effort to pretend that Noom had any right to do so, acknowledging that the Company would provide a refund of all such charges to people who noticed the charges and complained about the unlawful conversion.

73.     Indeed, this stratagem resulted in considerable complaints from customers who were surprised to see an unauthorized charge for a service they never requested and had not used.

### F. Noom Knows Its Claims of Personalized Coaching Are False and Misleading

74.     Similarly, Noom is well aware that its claims of personalized coaching are untrue. Upon information and belief, when Noom first launched its diet program in 2011 it offered consumers the option to supplement its free artificial intelligence fitness tracker with paid sessions from a human coach.  In or around 2019 Noom discontinued the paid coaching supplement. Instead, Noom began advertising its entire program as if personalized human coaching were an integral part of its customizable diet and exercise program.  But this marketing stratagem is just another come-on.

75.     Noom ceased differentiating between artificial intelligence-powered coaching and human coaching in its advertising.  Indeed, Noom's aggressive marketing campaigns, website, and smartphone app make absolutely no mention of technology-assisted coaching, and instead focus their advertising and messaging solely on the promise of individualized coaching from actual human weight loss experts.

76.     For example, Noom's website claims that Noom's "coaches come from a variety of backgrounds including psychology, nutrition/dietetics, personal training, health coaching, and more" and that they "undergo extensive training in lifestyle and health behavior change."[17]

77.     Indeed, Noom expressly states that "The best thing about your Noom coaches is that they are real, live people!! (Yes, we promise we're not robots)."[18]

78.     In reality, rather than fulfilling its promise to connect all customers with dedicated human coaches, Noom utilizes the artificial intelligence technology that it used in its original free fitness tracker to deceive consumers into believing that the messages and tips they receive on the Noom smartphone app are exclusively coming from a human coach.

79.     Noom knows from its customer complaints that customers are confused by its instruction to "simply let [their] coach know" if they want to cancel, because customers are not paired with a human coach.

80.     Noom also knows its instruction to "simply let your coach know" in order to cancel is incorrect, because customers who provided their payment information through a mobile app store would need to cancel through the app store and could not simply cancel by letting their coach know, even if they had understood that their "coach" is a bot.

---

[17] Noom, https://web.noom.com/support/support-premium-features/my-coaching-team/2019/02/coaches-trained-psychologists (last visited May 12, 2020).
[18] *Id.*

V.        **HOW NOOM MISLED CALIFORNIA PLAINTIFF MAHOOD**

81.      Plaintiff Geraldine Mahood learned of Noom in 2019 through various channels including radio, television and online advertisements, all of which directed her to visit Noom's website and download the smartphone app to get more information about the program.   In the summer of 2019 Plaintiff Mahood saw Noom's representations outlined above on Noom's website and app.   These representations led Ms. Mahood to believe that Noom would provide her with highly customized diet and workout plans, that she would receive "24/7 support" from a human coach, that Noom was different from other wellness programs because of its personalized coach-centered approach to weight loss, and that she was only signing up for a trial membership, which she could easily cancel.

82.      Based on Noom's misleading promotion, Plaintiff Mahood began Noom's health and fitness evaluation in August 2019.   Relying on Noom's representations regarding the length of the trial period and the ease of cancellation, Mahood authorized a $10 charge for a 14-day trial through her PayPal account on August 8, 2019.   After enrolling in the 14-day trial, Plaintiff received a confirmation email which is reproduced on the next page:

----- Forwarded Message -----
**From:** "Noom" <updates@message.noom.com>
**To:** "gerimahood@yahoo.com" <gerimahood@yahoo.com>
**Cc:**
**Sent:** Thu, Aug 8, 2019 at 9:50 AM
**Subject:** Your Noom Receipt

Noom Inc
229 W 28th St.
New York, NY 10001
www.noom.com

For more information about your account visit: account.noom.com

Order placed on August 8, 2019.

Thanks for signing up for Noom's Healthy Weight program!

Here's a summary of your subscription:

Noom membership: **2 Months**
Special offers: **14-day trial**
Trial start date: **August 8, 2019**
Trial end date: **August 22, 2019**
Payment method: **PayPal**
Renewal date: **Automatic renewal every 2 months after Trial end date**

Your 14-day trial will last until **August 22, 2019**. You can cancel anytime before then and will not be charged the total plan amount. No questions asked, no small print.

If you decide Noom is right for you, on **August 22, 2019** you will be charged one payment of **$99** for your **2 month** Noom membership (**$49.50/month**).

Noom will automatically charge your card **$99** every **2 months** so you don't lose access to your account. No refunds or credits for partial months. To cancel, simply let your coach know.

**After your 14-day trial ends on August 22, 2019, your subscription fee is non-refundable. See our Refund Policy.**

FAQ

**I have a question about my subscription.**
Check out our handy-dandy Supportal! You can view your subscription details any time at account.noom.com.

83.     The email contained contradictory information.  It suggested Plaintiff could "cancel anytime" by "simply let[ting her] coach know," while also suggesting that she wouldn't need to cancel because she would only be charged "[i]f [she] decide[s] Noom is right for [her]."  This was misleading because a consumer like Ms. Mahood was led to believe that an affirmative step was required in order for the trial membership to convert to automatic enrollment.  Plaintiff was therefore not sure if her trial period needed to be cancelled.  Rather, she believed she would be able to easily cancel either the trial period or the program by simply telling the human coach who would be in touch with her during the trial period.

84.     Plaintiff's confusion only deepened once she began using the Noom smartphone app, because on the app Ms. Mahood was never introduced to a human coach, and her interactions were not with a real person, but rather with an automated system powered by artificial intelligence.

85.     Soon after Plaintiff Mahood purchased the 14-day trial, a chat message appeared on her Noom app under the label "Concierge Eva." The message stated, "Hi! I'm Eva, your Noom concierge . . . . To get started: chat me 'I'm done!' when you've completed your coaching preference survey. Then return to your task list – I'll reply soon!"  Plaintiff received no further information on how to fill out her "coaching preference survey," where the survey was located, or how she could contact a real person at Noom to get more information about the coaching program.

86.     During the 14-day trial period, Plaintiff Mahood did not receive a phone call or email or app message from a human coach. She gathered from exploring the app that her success with Noom would rely heavily on her entering extensive amounts of data into the app concerning her diet and exercise efforts. Plaintiff thus decided that she did not want to continue with the Noom program.

87.     The only cancellation instruction that Plaintiff could find by searching Noom's website was that she should "contact her coach" in order to cancel. However, Plaintiff did not know how to contact her coach, or even who her coach was. She tried numerous times to find a phone number or other contact information for Noom's customer service department, but was unable to communicate with Noom through any avenue other than the automated message system on the smartphone app because Noom's website did not offer any mechanism for contacting anyone at the Company. Noom's website did not provide a phone or fax number, an email or mailing address, a customer service chat option or any other way of contacting a Noom representative.

88.     On August 22, 2019, the 14th day of her 14-day trial period, Plaintiff received a message from the "Concierge Eva" bot, acknowledging that Plaintiff had not been using Noom and informing her that "Eva" would no longer be reaching out to her, as reproduced below:

> "Hey! It's been a little while since I heard from you, so I wanted to let you know that I won't be checking in anymore – don't want to bug you. :) Feel free to message me whenever you want to pick things up again and we'll get you going.  Hope to hear from you soon!

This message added to Plaintiff's misimpression that no cancellation was necessary and that an affirmative step was required in order for the trial membership to convert to automatic enrollment. Rather than sending a reminder that her enrollment was about to begin and that Noom was about to charge her credit card, the bot "Eva" delivered the distinct message that no further action was needed by Ms. Mahood to end the trial given her silence.  Accordingly, Ms. Mahood believed she would not incur any further charges since no action was required on her part.

89.     Despite this message, and despite the fact that Plaintiff had only authorized a $10 charge for a 14-day trial, she received a PayPal alert message informing her that Noom had charged her $99.00 for a full Noom membership subscription on August 23, 2019—the very next day after Noom informed her that it "won't be checking in anymore."

90.     Prior to being charged $99.00, Plaintiff received no reminder that her PayPal account would be charged again following the $10 trial period, and no final opportunity to cancel her trial and avoid the $99.00 charge.

91.     Upon again visiting Noom's website to try to cancel her unauthorized subscription and get a refund, Plaintiff again saw that there was no way to contact Noom via phone, fax, mail, email or chat and that the only way to cancel her membership was still through her "coach." Plaintiff then surmised that the automated bot – the entity labeled "Concierge Eva," who had sent

her a series of generic chat messages through the app, including the one about not checking in again – might be considered her "coach."

92.     On August 25 Plaintiff sent "Concierge Eva" a chat message through the app requesting cancellation of her subscription.  In the chat, Ms. Mahood stressed the fact that she had never intended to sign up for a full membership, that she never used the service, that she was unable to cancel during the 14-day period for the reasons outlined above, and that she never agreed to be charged more than the $10 she had authorized for the 14-day trial.

93.     Only after repeatedly asking for a refund and finally threatening legal action against Noom did Plaintiff Mahood receive confirmation that her membership was cancelled and that Noom would issue a refund for the unauthorized $99.00 charge in October 2019.

94.     If Plaintiff Mahood had known a) that Noom would not provide her with a human coach; b) that she would not be able to contact Noom's customer service during her trial period because Noom failed to provide any way of doing so, c) that she would not be able to cancel by "simply let[ting] her coach know" because she wouldn't know that her "coach" was an automated bot, or d) that Noom would convert her trial period into an auto-recurring membership without her consent, she would not have signed up for Noom's 14-day trial period.

## VI.    HOW NOOM MISLED NEW YORK PLAINTIFF BURWOOD

95.     In or around June, 2020, Plaintiff Alexandra Burwood saw ads for Noom and subsequently downloaded the Noom app to learn more.  She then followed the sign-up flow on Noom's app as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the app were in all material respects the same as those seen by the other named Plaintiffs.

96.     Misled by the representations and omissions outlined above on Noom's app into thinking that she was signing up for a "risk-free" trial, Ms. Burwood signed up for Noom's trial

period on June 24, 2020. She authorized a charge for $18.37 for the trial period and provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership.

97.     Plaintiff Burwood accessed the app several times during the trial period, but decided she did not want to continue with Noom.

98.     Having decided not to join the Noom program, Plaintiff Burwood believed that once the trial period was over, she would no longer be a Noom customer. Indeed, the only sum Plaintiff ever expected to pay Noom for the weight-loss plan was the charge for $18.37, which she had authorized for the trial period. Noom did not adequately disclose to Plaintiff Burwood that it would automatically enroll her in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $193.32 as soon as her trial period ended.

99.     On or about July 6, 2020, notwithstanding that the trial period had ended, Plaintiff Burwood saw on a third-party billing statement that Noom had charged her for a recurring subscription. Noom's unauthorized charges to Plaintiff Burwood amounted to $193.32 for 8 months of its weight-loss service.

100.    On July 6, 2020, Plaintiff Burwood requested a refund of her unauthorized charges but never received one.

101.    Prior to discovering the charges, Plaintiff Burwood neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

102.     If Plaintiff Burwood had known that by signing up for a Noom trial and authorizing a $18.37 payment for a "risk free" trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

103.     Plaintiff Burwood intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendant's, in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

**VII.     HOW NOOM MISLED WASHINGTON PLAINTIFF BREWSTER**

104.     In or around August 2019, Plaintiff Susan Brewster saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

105.     Misled by the representations and omissions outlined above on Noom's website into thinking that she was signing up for a "risk-free" trial, Ms. Brewster signed up for Noom's trial period on August 12, 2019.  She authorized a charge for $18.37 and provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership.

106.     After she provided Noom her payment information, she downloaded the app. Plaintiff Brewster accessed the app a few times during the trial period, but decided she did not want to continue with Noom.

107.     Having decided not to join the Noom program, Plaintiff Brewster believed that once the trial period was over, she would no longer be a Noom customer.  Indeed, the only sum Plaintiff ever expected to pay Noom was the charge for $18.27, which she had authorized for the trial period. Noom did not adequately disclose to Plaintiff Brewster that it would automatically enroll her in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $164.05 as soon as her trial period ended.

108.    On or about February 27, 2020, notwithstanding that the trial period had ended, Plaintiff Brewster saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Brewster amounted to $328.10 for 12 months of its weight-loss service.

109.    On or around April 2020, Plaintiff Brewster requested a refund of her unauthorized charges but never received one.

110.    Prior to discovering the charges, Plaintiff Brewster neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

111.    If Plaintiff Brewster had known that by signing up for a Noom trial and authorizing a $18.27 payment for a "risk free" trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

112.    Plaintiff Brewster intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendant's, in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

## VIII.    HOW NOOM MISLED CALIFORNIA PLAINTIFF CUEVAS

113.    In or around October 2018, Plaintiff Melissa Cuevas saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

114.    Misled by the representations and omissions outlined above on Noom's website into thinking that she was signing up for a "risk-free" trial, Ms. Cuevas signed up for Noom's trial period on or around December 2018 or January 2019.  She did not authorize any charge but

provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership and unaware that Noom would make it unreasonably difficult to cancel the account within the trial period and instead use her payment information to process unauthorized advance charges for a recurring, non-refundable membership.

115.   After she provided Noom her payment information, she downloaded the Noom app. Plaintiff Cuevas accessed the app a few times during the trial period, but decided she did not want to continue with Noom.

116.   Plaintiff Cuevas attempted to cancel within the trial period, but was unable to do so because, as outlined above, Noom failed to provide a reasonable way to cancel through each of the following:

> a.   Noom failed to provide any customer service contact information for the company, such as a phone number, email, fax, chat-window, or physical address;
>
> b.   Noom failed to provide trial customers with cancellation instructions on the company's app;
>
> c.   Noom misrepresented to customers that they could "simply cancel by letting your coach know";
>
> d.   Noom failed to make clear that a customer could not cancel without first installing the Noom app on a smartphone;
>
> e.   Noom failed to make clear that deleting the Noom app would not result in cancellation.

117.   On or about December 2019, notwithstanding that the trial period had ended and that she was unable to cancel, Plaintiff Cuevas saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Cuevas amounted to approximately $49.95 or more for 12 months of its weight-loss service.

118.   On or around December 2019, Plaintiff Cuevas requested a refund of all unauthorized charges but never received one.

119.     Prior to discovering the charges, Plaintiff Cuevas neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

120.     If Plaintiff Cuevas had known that by signing up for a Noom trial and not authorizing any payment for a "risk free" trial, she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

121.     Plaintiff Cuevas intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendant's, in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its service.

### IX.     HOW NOOM MISLED NEW YORK PLAINTIFF DERACLEO

122.     In or around July 2020, Plaintiff Maryanne Deracleo saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

123.     Misled by the representations and omissions outlined above on Noom's website into thinking that she was signing up for a "risk-free" trial, Ms. Deracleo signed up for Noom's trial period on or around July 16, 2020.  She authorized a charge for $18.37 and provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership.

124.     After she provided Noom her payment information, she downloaded the app. Plaintiff Deracleo accessed the app a couple of times during the trial period, but decided she did not want to continue with Noom.

125.     Having decided not to join the Noom program, Plaintiff Deracleo believed that once the trial period was over, she would no longer be a Noom customer.  Indeed, the only sum Plaintiff ever expected to pay Noom was the charge for $18.37, which she had authorized for the trial period. Noom did not adequately disclose to Plaintiff Deracleo that it would automatically enroll her in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $171.72 on the day her trial period ended.

126.     On or about July 30, 2020 notwithstanding that the trial period had ended, Plaintiff Deracleo saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Deracleo amounted to $171.72 for 6 months of its weight-loss service.

127.     On July 30, 2020, Plaintiff Deracleo canceled her subscription and she never received a refund of her charges.

128.     Prior to discovering the charges, Plaintiff Deracleo neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

129.      If Plaintiff Deracleo had known that by signing up for a Noom trial and authorizing a $18.37 payment for a "risk free" trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

130.     Plaintiff Deracleo intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendant's, in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

### X.        HOW NOOM MISLED PENNSYLVANIA PLAINTIFF HONORE

131.    In or around February 2020, Plaintiff Elvera Honore saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

132.    Misled by the representations and omissions outlined above on Noom's website into thinking that she was signing up for a "risk-free" trial, Ms. Honore signed up for Noom's trial period on February 14, 2020.  She did not authorize any charge but provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership.

133.    After she provided Noom her payment information, she downloaded the app. Plaintiff Honore accessed the app a few times during the trial period, but decided she did not want to continue with Noom.

134.    Having decided not to join the Noom program, Plaintiff Honore believed that once the trial period was over, she would no longer be a Noom customer.  Indeed, Plaintiff never expected to pay Noom anything and had not authorized any charge when she provided her payment information for the trial period.  Noom did not adequately disclose to Plaintiff Honore that it would automatically enroll her in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $168.54 as soon as her trial period ended.

135.    On or about March 2, 2020, notwithstanding that the trial period had ended, Plaintiff Honore saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Honore amounted to $168.54 for 8 months of its weight-loss service.

136.   On or around March 2, 2020, Plaintiff Honore requested a refund of her unauthorized charges but never received one.

137.   Prior to discovering the charges, Plaintiff Honore neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

138.   If Plaintiff Honore had known that by signing up for a Noom "risk free" trial, she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

139.   Plaintiff Honore intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendant's, in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

## XI.   HOW NOOM MISLED CALIFORNIA PLAINTIFF KELLY

140.   In or around September 2019, Plaintiff Karen Kelly saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

141.   Misled by the representations and omissions outlined above on Noom's website into thinking that she was signing up for a "risk-free" trial, Ms. Kelly signed up for Noom's trial period on September 22, 2019.  She did not authorize any charge but provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership.

142.   After she provided Noom her payment information, she did not download the app. Plaintiff Kelly never accessed the app during the trial period and decided she did not want to continue with Noom.

143.    Having decided not to join the Noom program, Plaintiff Kelly believed that once the trial period was over, she would no longer be a Noom customer.  Indeed, Plaintiff never expected to pay Noom anything and had not authorized any charge when she provided her payment information for the trial period.  Noom did not adequately disclose to Plaintiff Kelly that it would automatically enroll her in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $149.00 as soon as her trial period ended.

144.    On or about April 23, 2020, notwithstanding that the trial period had ended, Plaintiff Kelly saw on a third-party billing statement that Noom had charged her for a recurring subscription and an initial fee.  Noom's unauthorized charges to Plaintiff Kelly amounted to $301.00 for 12 months of its weight-loss service.

145.    On April 23, 2020, Plaintiff Kelly requested a refund of her unauthorized charges and subsequently, on or around April 24, 2020, she received a refund.

146.    Prior to discovering the charges, Plaintiff Kelly never accessed her Noom app or used Noom's weight-loss program.

147.    If Plaintiff Kelly had known that by signing up for a Noom trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a Noom subscription, she would not have signed up for a Noom trial.

148.    Plaintiff Kelly intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendant's, in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

## XII.    HOW NOOM MISLED DISTRICT OF COLUMBIA PLAINTIFF NICHOLS

149.    In or around August 2019, Plaintiff Nichols heard ads for Noom and subsequently downloaded the Noom app to learn more.  He then followed the sign-up flow on Noom's app as outlined above and answered a series of Noom's questions.  Upon information and belief, the

relevant representations in the sign-up flow on the app were in all material respects the same as those seen by the other named Plaintiffs.

150.    Misled by the representations and omissions outlined above on Noom's app into thinking that he was signing up for a "risk-free" trial, Mr. Nichols signed up for Noom's trial period on August 6, 2019.  He authorized a charge for $1.00 and provided Noom his payment information, unaware that Noom would make it unreasonably difficult to cancel the account within the trial period and instead use his payment information to process unauthorized advance charges for a recurring, non-refundable membership.

151.    After he provided Noom his payment information, he downloaded the Noom app. Plaintiff Nichols accessed the app a couple of times during the trial period, but decided he did not want to continue with Noom.

152.    Plaintiff Nichols attempted to cancel within the trial period, but was unable to do so because, as outlined above, Noom failed to provide a reasonable way to cancel through each of the following:

   a.   Noom failed to provide any customer service contact information for the company, such as a phone number, email, fax, chat-window, or physical address;

   b.   Noom failed to provide trial customers with cancellation instructions on the company's app;

   c.   Noom misrepresented to customers that they could "simply cancel by letting your coach know";

   d.   Noom failed to make clear that a customer could not cancel without first installing the Noom app on a smartphone;

   e.   Noom failed to make clear that deleting the Noom app would not result in cancellation.

153.     On or about March 7, 2020, notwithstanding that the trial period had ended and that he was unable to cancel, Plaintiff Nichols saw on a third-party billing statement that Noom had twice charged him for a recurring subscription.  Noom's unauthorized charges to Plaintiff Nichols amounted to $315.88 for 12 months of its weight-loss service.

154.     On or around March 2020, Plaintiff Nichols requested a refund of all unauthorized charges but never received one.

155.     Prior to discovering the charges, Plaintiff Nichols neither accessed his Noom app nor used Noom's weight-loss program after the expiration of his trial period.

156.     If Plaintiff Nichols had known that by signing up for a Noom trial and authorizing a $1.00 payment for a "risk free" trial, he would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, he would not have signed up for a Noom trial.

157.     Plaintiff Nichols intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendant's, in furtherance of that pursuit, as long as he can gain some confidence in Noom's representations about its services.

**XIII.     HOW NOOM MISLED OHIO PLAINTIFF RICHARDS**

158.     In or around May 2019, Plaintiff Rebecca Richards saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

159.     Misled by the representations and omissions outlined above on Noom's website into thinking that she was signing up for a "risk-free" trial, Ms. Richards signed up for Noom's trial period on May 25, 2019.  She authorized a charge for $1.00 and provided Noom her payment

information, unaware that Noom would make it unreasonably difficult to cancel the account within the trial period and instead use her payment information to process unauthorized advance charges for a recurring, non-refundable membership.

160.     After she provided Noom her payment information, she downloaded the Noom app. Plaintiff Richards accessed the app a couple of times during the trial period, but decided she did not want to continue with Noom.

161.     Plaintiff Richards attempted to cancel within the trial period, but was unable to do so because, as outlined above, Noom failed to provide a reasonable way to cancel as follows:

    a. Noom failed to provide any customer service contact information for the company, such as a phone number, email, fax, chat-window, or physical address;

    b. Noom failed to provide trial customers with cancellation instructions on the company's app;

    c. Noom misrepresented to customers that they could "simply cancel by letting your coach know";

    d. Noom failed to make clear that a customer could not cancel without first installing the Noom app on a smartphone;

    e. Noom failed to make clear that deleting the Noom app would not result in cancellation.

162.     On or about June 8, 2020, notwithstanding that the trial period had ended and that she was unable to cancel, Plaintiff Richards saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Richards amounted to $447.00 for 18 months of its weight-loss service.

163.     On June 8, 2020, Plaintiff Richards requested a refund of all unauthorized charges but never received one.

164.     Prior to discovering the charges, Plaintiff Richards neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

165.     If Plaintiff Richards had known that by signing up for a Noom trial and authorizing a $1.00 payment for a "risk free" trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

166.     Plaintiff Richards intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendant's, in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

## XIV.    HOW NOOM MISLED ALABAMA PLAINTIFF SELLERS

167.     In or around June 2020, Plaintiff Jennifer Sellers saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

168.     Misled by the representations and omissions outlined above on Noom's website into thinking that she was signing up for a "risk-free" trial, Ms. Sellers signed up for Noom's trial period on or around June 24, 2020.  She authorized a charge for 32 cents and provided Noom her payment information, unaware that Noom would make it unreasonably difficult to cancel the account within the trial period and instead use her payment information to process unauthorized advance charges for a recurring, non-refundable membership.

169.     After she provided Noom her payment information, she downloaded the Noom app. Plaintiff Sellers accessed the app a few times during the trial period, but decided she did not want to continue with Noom.

170.     Plaintiff Sellers attempted to cancel within the trial period, but was unable to do so because, as outlined above, Noom failed to provide a reasonable way to cancel as follows:

46

  a. Noom failed to provide any customer service contact information for the company, such as a phone number, email, fax, chat-window, or physical address;

  b. Noom failed to provide trial customers with cancellation instructions on the company's app;

  c. Noom misrepresented to customers that they could "simply cancel by letting your coach know";

  d. Noom failed to make clear that a customer could not cancel without first installing the Noom app on a smartphone;

  e. Noom failed to make clear that deleting the Noom app would not result in cancellation.

171. On or about July 9, 2020, notwithstanding that the trial period had ended and that she was unable to cancel, Plaintiff Sellers saw on a third-party billing statement that Noom had charged her for a recurring subscription.   Noom's unauthorized charges to Plaintiff Sellers amounted to $179 for 8 months of its weight-loss service.

172. On July 9, 2020, Plaintiff Sellers requested a refund of all unauthorized charges but never received one.

173. Prior to discovering the charges, Plaintiff Sellers neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

174. If Plaintiff Sellers had known that by signing up for a Noom trial and authorizing a 32 cent payment for a "risk free" trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

175. Plaintiff Sellers intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendant's, in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

## CLASS ACTION ALLEGATIONS

176.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant.  Defendant has engaged in uniform and standardized conduct toward the Class—its marketing and billing tactics—and this case is about the responsibility of Defendant, at law and in equity, for its knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in the content of its statements or omissions. The objective facts on these subjects are the same for all Class members.

177.    Plaintiffs sue on their own behalf and on behalf of a Class for damages and injunctive relief under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

178.    The Class, preliminarily defined as two subclasses ("Subclasses"), is as follows:

   a.   The Multistate Class, preliminarily defined as all Noom customers in the United States (including customers of companies Noom acts as a successor to) who were automatically enrolled into and charged for at least one month of Noom membership by Defendant at any time from [applicable statute of limitations period] to the date of judgment.

   b.   The State Classes, preliminarily defined as all Noom customers in the state of [e.g., New York, California, etc.] (including customers of companies Noom acts as a successor to) who were automatically enrolled into and charged for at least one month of Noom membership by Defendant at any time from [applicable statute of limitations period] to the date of judgment.

179.    Excluded from the Class are officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.  Also excluded are all federal, state and local government entities; and any judge, justice or judicial officer presiding over this action and the members of their immediate families and judicial staff.

180.     Plaintiffs do not know the exact size of the Class, since such information is in the exclusive control of Defendant.  Plaintiffs believe, however, that based on Noom's assertions, the Class encompasses tens of thousands of individuals whose identities can be readily ascertained from Defendant's records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

181.     The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control.  Plaintiffs anticipate providing appropriate notice to each Class member, in compliance with all applicable federal rules.

182.     The Named Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.  Plaintiffs and the other members of the Class were subject to the same or similar marketing, enrollment and billing practices engineered by Defendant.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

183.     Plaintiffs will fairly and adequately protect the interests of all Class members.  Plaintiffs have retained competent and experienced class action attorneys to represent her interests and those of the Class.

184.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

a.     Whether Defendant's representations and/or omissions are fraudulent;

b.     Whether Defendant's conduct constitutes unfair, unlawful and/or fraudulent practices prohibited by the laws of California, New York, Washington, Pennsylvania, the District of Columbia, Ohio, and/or Alabama;

c.     Whether Defendant was unjustly enriched as a result of its conduct;

     d.      Whether Class Members have been injured by Defendant's conduct;

     e.      Whether any or all applicable limitations periods are tolled by Defendant's acts;

     f.      Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

     g.      The extent of class-wide injury and the measure of damages for those injuries.

185.    A class action is superior to all other available methods for resolving this controversy because i) the prosecution of separate actions by Class members will create a risk of adjudications with respect to individual Class members that will, as a practical matter, be dispositive of the interests of the other Class members not parties to this action, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by Class members will create a risk of inconsistent or varying adjudications with respect to individual Class members, which will establish incompatible standards for Defendant's conduct; iii) Defendant has acted or refused to act on grounds generally applicable to all Class members; and iv) questions of law and fact common to the Classes predominate over any questions affecting only individual Class members.

186.    Further, the following issues are also appropriately resolved on a class-wide basis under Fed. R. Civ. P. 23(c)(4):

     a.      Whether Defendant's representations and/or omissions are fraudulent;

     b.      Whether Defendant's conduct constitutes unfair, unlawful and/or
     h.      fraudulent practices prohibited by the laws of California, New York Washington, Pennsylvania, the District of Columbia, Ohio, and/or Alabama;

     c.      Whether Defendant was unjustly enriched as a result of its conduct;

     d.      Whether Class Members have been injured by Defendant's conduct;

e.      Whether any or all applicable limitations periods are tolled by Defendant's acts;

f.      Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

g.      The extent of class-wide injury and the measure of damages for those injuries.

187.    Accordingly, this action satisfies the requirements set forth under Fed. R. Civ. P. 23(a), 23(b), and 23(c)(4).

## COUNT I

### NEW YORK GENERAL BUSINESS LAW § 349

### (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW)

188.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

189.    Plaintiffs bring this claim under N.Y. GEN. BUS. LAW § 349 on their own behalf and on behalf of each member of the Class.

190.    New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW §349.

191.    Defendant's marketing and billing practices are consumer-oriented in that they are directed at members of the consuming public.

192.    By engineering and implementing fraudulent billing and advertising practices, Defendant engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW §349.

193.    Defendant has violated N.Y. GEN. BUS. LAW §349 statute by, *inter alia*:

a.    Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.    Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.    Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling the trial before the last day of the trial period;

d.    Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.    Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.    Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.    Misrepresenting and/or creating the net impression that enrolling in the trial program i) is "risk free;" ii) does not require a smart phone; and iii) costs only between $0.00 to $18.37;  and that the trial program iv) will be easy to cancel; v) can be "cancelled any time;" and vi) will feature individualized coaching from a human weight loss expert.

194.    The aforementioned acts are unfair, unconscionable and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

195.    As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, the Class has suffered injury and monetary damages in an amount to be determined at the trial of this action and upon information and belief, believed to exceed $100 million.

196.    Plaintiffs and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. GEN. BUS. LAW §349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to refund to the Plaintiff and the Class all monthly fees wrongfully assessed and/or collected on its auto-renew subscription plan.

## COUNT II

### CALIFORNIA FALSE ADVERTISING LAW–VIOLATION OF THE CALIFORNIA AUTOMATIC RENEWAL LAW

### (ON BEHALF OF THE CALIFORNIA CLASS)

197.    Plaintiffs Geraldine Mahood, Karen Kelly and Melissa Cuevas re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

198.    Plaintiffs Mahood, Kelly and Cuevas bring this claim on their own behalf and on behalf of each Class member who is a California resident (the "California Class").

199.    As part of California's False Advertising Law, the California Automatic Renewal Law, CAL. BUS. & PROF. CODE § 17600 *et seq*. became effective on December 1, 2010.

200.    CAL. BUS. & PROF. CODE § 17600, *et. seq.*, California's Automatic Purchase Renewal Statute, declares unlawful "the practice of ongoing charging of consumer credit or debit cards or third-party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Defendant's conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17602 because each of the following practices Noom has engaged in is an independent violation of the Automatic Purchase Renewal Statute:

a.    Noom failed to present the terms of its automatic renewal or continuous service offer in a clear and conspicuous manner before fulfilling the subscription and in visual proximity to the request for consent to the offer, as required by CAL. BUS. & PROF. CODE §§ 17602(a)(1);

b.    Noom charged Plaintiffs' and the Class's credit or debit cards, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous offer terms, as required by CAL. BUS. & PROF. CODE §§ 17602(a)(2);

c.    Noom failed to provide an acknowledgment that includes the automatic renewal offer terms or continuous offer terms, cancellation policy, and information regarding how to cancel, and to allow Plaintiffs and the Class to cancel, the automatic renewal or continuous service before they paid for it, as required by CAL. BUS. & PROF. CODE §§ 17602(a)(3);

d.    Noom failed to provide a toll-free telephone number, electronic mail address, a postal address or another cost-effective, timely, and easy-to-use mechanism for cancellation described in CAL. BUS. & PROF. CODE §§ 17602(a)(3), as required by CAL. BUS. & PROF. CODE §§ 17602(b);

e.    Noom failed to allow Plaintiffs and the Class to terminate the automatic renewal or continuous service exclusively online, as required by CAL. BUS. & PROF. CODE §§ 17602(c).

201.    Plaintiffs Mahood, Kelly and Cuevas and members of the California Class would not have enrolled in the trial periods if they had known the truth and have suffered injury in fact and lost money as a result of Defendant's violations of the Automatic Purchase Renewal Statute and.

202.    As a result of Defendant's misconduct, Plaintiffs Mahood, Kelly and Cuevas and

the California Class have suffered injury that cannot be remedied without restitution of all amounts that Noom charged or caused to be charged to Plaintiffs' and the California Class members' credit cards, debit cards, or third-party payment accounts during the applicable statute of limitations and continuing until Noom's statutory violations cease.  Pursuant to CAL. BUS. & PROF. CODE § 17535, this Court may award such restitution to Plaintiffs Mahood, Kelly and Cuevas and the California Class.

203.    As a result of Defendant's misconduct, pursuant to CAL. BUS. & PROF. CODE § 17535, Plaintiffs and the Class are entitled to an injunction (a) enjoining Noom from making automatic renewal offers that do not comply with California law, (b) from making charges to credit cards, debit cards, or third-party payment accounts without prior affirmative consent to an agreement containing "clear and conspicuous" disclosures of automatic renewal or continuous service offer terms, (c) enjoining Noom from making automatic renewal offers that fail to provide an acknowledgment that includes "clear and conspicuous" disclosure of automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, and (d) enjoining Noom from making automatic renewal offers that fail to provide an online, easy-to-use mechanism for cancellation.

204.    Pursuant to CAL. BUS. & PROF. CODE § 17535, this Court has the power to award such equitable relief, including but not limited to, an order declaring Defendant's auto-renewal practices to be unlawful, an order enjoining Defendant from engaging in any such further unlawful conduct, and an order directing Defendant to refund to the Plaintiffs and the Class all monthly fees wrongfully assessed and/or collected on its auto-renew subscription plan.

## COUNT III

### CALIFORNIA FALSE ADVERTISING LAW

### (ON BEHALF OF THE CALIFORNIA CLASS)

205.    Plaintiffs Mahood, Kelly and Cuevas re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206.    Plaintiffs Mahood, Kelly and Cuevas bring this claim on her own behalf and on behalf of each Class member who is a California resident (the "California Class").

207.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, …in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

208.    Defendant's conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17500 by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading.  Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

209.    Defendant violated CAL. BUS. & PROF. CODE § 17500 by, *inter alia*:

a.      Stating and creating the net impression that the trial period was "risk free";

b.      Omitting the fact that a smartphone is necessary to access its program and cancel the trial subscription;

c.      Stating and creating the net impression that customers' payment information will only be used to pay for the cost of the trial program;

d.      Stating and creating the net impression that customers either do not need to cancel or are able to easily cancel while curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period;

e.      Stating and creating the net impression that customers can "cancel anytime" and that there is "no commitment;"

f.      Stating and creating the net impression that customers will receive individualized coaching from a human weight loss expert once they enroll with Noom and that they will be able to cancel simply by letting their personal coach know;

g.      Omitting the fact that customers cannot cancel their enrollment on Noom's website, or by letting their coach know;

h.      Omitting the fact that customers would not be assigned a human coach; and

i.      Failing to disclose that the trial period starts even if customers never access or use the trial program;

j.      Failing to adequately disclose how and when customers could cancel their enrollment.

210.    Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

211.    Plaintiffs Mahood, Kelly and Cuevas and the members of the California Class were deceived by and relied on Defendant's statements and omissions to their detriment when they signed up for Noom's trial and were subsequently automatically enrolled into Noom's auto-recurring subscription, and there is a strong probability that other California consumers and members of the public were also or are likely to be deceived as well.  Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions.

Plaintiffs Mahood, Kelly and Cuevas and other members of the California Class did not learn of Defendant's cancellation and automatic payment policies until after they had already signed up and were forced into paying for Defendant's service.

212.   Plaintiff and the Class lost money or property as a result of Defendant's violations because they would not have enrolled into Noom's trial programs or been charged for monthly subscriptions if the true facts about Noom's trial program and monthly subscriptions were known to them.

213.   As a result of Defendant's misconduct pursuant to CAL. BUS. & PROF. CODE § 17500, Plaintiffs Mahood, Kelly and Cuevas and the California Class are entitled to individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendant from continuing with its false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

<u>**COUNT IV**</u>

**CALIFORNIA UNFAIR COMPETITION LAW**

**(ON BEHALF OF THE CALIFORNIA CLASS)**

214.   Plaintiffs Mahood, Kelly and Cuevas re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

215.   Plaintiffs Mahood, Kelly and Cuevas bring this claim on their own behalf and on behalf of the California Class.

216.   CAL. BUS. & PROF CODE § 17200, *et seq.* (the "UCL") prohibits acts of "unfair competition," including any unlawful and unfair business acts or practices.

217.   Under the "unlawful" prong of the UCL, a violation of another law is treated as unfair competition and is independently actionable.

218.    Defendant committed unlawful practices because it violated CAL. BUS. & PROF. CODE § 17600, *et. seq.*, California's Automatic Purchase Renewal Statute, which declares unlawful "the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Defendant's conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17602 because each of the following practices is an independent violation of the Automatic Purchase Renewal Statute:

a.    Noom failed to present the terms of its automatic renewal or continuous service offer in a clear and conspicuous manner before fulfilling the subscription and in visual proximity to the request for consent to the offer, as required by Cal. Bus. & Prof. Code §§ 17602(a)(1);

b.    Noom charged the Plaintiffs' and the Class's credit or debit cards, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous offer terms, as required by Cal. Bus. & Prof. Code §§ 17602(a)(2);

c.    Noom failed to provide an acknowledgment that includes the automatic renewal offer terms or continuous offer terms, cancellation policy, and information regarding how to cancel, and to allow Plaintiffs and the Class to cancel, the automatic renewal or continuous service before they paid for it, as required by Cal. Bus. & Prof. Code §§ 17602(a)(3);

d.    Noom failed to provide a toll-free telephone number, electronic mail address, a postal address or another cost-effective, timely, and easy-to-use mechanism for cancellation described in Cal. Bus. & Prof. Code §§ 17602(a)(3), as required by Cal. Bus. & Prof. Code §§ 17602(b);

e.    Noom failed to allow Plaintiffs and the Class to terminate the automatic renewal or continuous service exclusively online, as required by Cal. Bus. & Prof. Code §§ 17602(c).

219.    Defendant also committed unlawful practices because it violated CAL. BUS. & PROF. CODE § 17941, California's Bot Disclosure Law, which declares unlawful "for any person to use a bot to communicate or interact with another person in California online, with the intent to mislead the other person about its artificial identity for the purpose of knowingly deceiving the

person about the content of the communication in order to incentivize a purchase or sale of goods or services in a commercial transaction."  Defendant's conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17941 because Defendant used bots to communicate or interact with consumers in California online as part of Noom's platform with the intent to mislead consumers into believing that Noom's services included a personal human coach in order to incentivize the purchase of Noom's services.

220.    Under the "unfair" prong of the UCL, a business practice is unfair if that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

221.    Defendant committed unfair acts and practices by, *inter alia*:

k.    Stating and creating the net impression that the trial period was "risk free";

l.    Omitting the fact that a smartphone is necessary to access its program and cancel the trial subscription;

m.    Stating and creating the net impression that customers' payment information will only be used to pay for the cost of the trial program;

n.    Stating and creating the net impression that customers either do not need to cancel or are able to easily cancel while curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period;

o.    Stating and creating the net impression that customers can "cancel anytime" and that there is "no commitment;"

p.    Stating and creating the net impression that customers will receive individualized coaching from a human weight loss expert once they enroll with Noom and that they will be able to cancel simply by letting their personal coach know;

q.    Omitting the fact that customers cannot cancel their enrollment on Noom's website, or by letting their coach know;

r.    Omitting the fact that customers would not be assigned a human coach; and

s.      Failing to disclose that the trial period starts even if customers never access or use the trial program;

t.      Failing to adequately disclose how and when customers could cancel their enrollment.

222.    Plaintiffs Mahood, Kelly and Cuevas and the California Class reserve the right to allege other violations of law which constitute unlawful, unfair, or fraudulent business acts or practices as Defendant's conduct is ongoing and continues to this date.

223.    Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

224.    There were reasonably available alternatives to further Noom's legitimate business interests, other than the conduct described herein.

225.    Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

226.    As a result of Defendant's unlawful and unfair business practices, Plaintiffs Mahood, Kelly and Cuevas and the California Class have suffered an injury in fact and have lost money in an amount to be determined at the trial of this action.

227.    Pursuant to CAL. BUS. & PROF CODE §17203 Plaintiffs Mahood, Kelly and Cuevas and the other members of the California Class are entitled to an order: (1) requiring Noom to make restitution to Plaintiffs and the Class; (2) enjoining Defendant from charging Plaintiffs' and Class members' credit cards, debit cards, and/or third party payment accounts until such time as Noom obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms; and (3) enjoining Noom

from making automatic renewal or continuous service offers in the State of California that do not comply with California Automatic Renewal Law.

## COUNT V

## CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

## (ON BEHALF OF THE CALIFORNIA CLASS)

228.    Plaintiffs Mahood, Kelly and Cuevas re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

229.    Plaintiffs Mahood, Kelly and Cuevas bring this claim on their own behalf and on behalf of the California Class.

230.    The California Consumers Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.* (the "CLRA"), prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

231.    Plaintiffs Mahood, Kelly and Cuevas and the California Class members are "consumers" within the meaning of CAL. CIV. CODE § 1761(d) in that Plaintiffs Mahood, Kelly and Cuevas and the California Class members sought or acquired Defendant's services for personal, family, or household purposes.

232.    Defendant's weight-loss and behavioral coaching program constitutes "services" within the meaning of CAL. CIV. CODE § 1761(a) and (b).

233.    Plaintiffs Mahood, Kelly and Cuevas have standing to pursue these claims because they have suffered injury in fact and a loss of money and/or property as a result of the wrongful conduct alleged herein.  Plaintiffs would not have enrolled in Noom's trial plans or been enrolled into Noom's monthly subscriptions had they known the truth.

234.     The purchases by Plaintiffs Mahood, Kelly and Cuevas and the California Class Members are "transactions" within the meaning of CAL. CIV. CODE § 1761(e)

235.     Defendant violated CAL. CIV. CODE § 1770, subdivisions (a)(5), (a)(9), (a)(14) and (a)(16) by, *inter alia*, representing that Noom's goods and services have certain characteristics that they do not have; advertising goods and services with the intent not to sell them as advertised; representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; and representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

236.     As a direct and proximate result of result of Defendant's violations of the CLRA, Plaintiffs Mahood, Kelly and Cuevas and the California Class were wrongfully charged fees for Noom's monthly weight-loss plans.

237.     Defendant's conduct alleged herein was undertaken by Defendant knowingly, willfully, and with oppression, fraud, and/or malice, within the meaning of CAL. CIV. CODE § 3294(c).

238.     On May 22, 2020, Plaintiff Mahood, through counsel, sent a notice and demand letter by registered mail to Defendant, pursuant to CAL. CIV. CODE § 1782.  A copy of Plaintiff's CLRA letter is attached hereto as Exhibit A.  Defendant failed to comply with the letter within thirty (30) days.

239.     Accordingly, Plaintiffs Mahood, Kelly and Cuevas and the California Class Members seek an injunction requiring Defendant to cease its unlawful practices, as well as compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices, as well as any other remedies the Court may deem appropriate.

## COUNT VI

## WASHINGTON CONSUMER PROTECTION ACT

## (ON BEHALF OF THE WASHINGTON CLASS AGAINST DEFENDANT)

240.     Plaintiff Susan Brewster re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

241.     Plaintiff Brewster brings this claim on her own behalf and on behalf of each Class member who is a Washington resident (the "Washington Class").

242.     The Washington Consumer Protection Act (the "Washington CPA"), WASH. REV. CODE ANN. § 19.86, *et seq.*, broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE ANN. § 19.86.020.

243.     The Washington CPA's stated purpose is "to protect the public and foster fair and honest competition" by preventing, among other things, "unfair, deceptive, and fraudulent acts or practices." WASH. REV. CODE ANN. § 19.86.920.

244.     Defendant committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE ANN. § 19.96.010.

245.     Defendant violated the Washington CPA by, *inter alia*:

a.     Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.     Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.     Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

d.     Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.   Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.   Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.   Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any time;" and (vi) will feature individualized coaching from a human weight loss expert.

246.   As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, Plaintiff Brewster and the Washington Class have suffered injury and monetary damages.

247.   Defendant is liable to Plaintiff Brewster and the Washington Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate pursuant to WASH. REV. CODE ANN. § 19.86.090.

248.   Plaintiff Brewster and the Washington Class also seek equitable relief against Defendant.  Pursuant to WASH. REV. CODE ANN. § 19.86.095, Plaintiff Brewster is serving a copy of the Washington Attorney General with a copy of this Amended Complaint, which was the initial pleading alleging a violation of the Washington CPA.

## COUNT VII

### PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (ON BEHALF OF THE PENSYLVANIA CLASS AGAINST DEFENDANT)

249.   Plaintiff Elvera Honore re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

250.   Plaintiff Honore brings this claim on her own behalf and on behalf of each Class member who is a Pennsylvania resident (the "Pennsylvania Class").

251.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "Pennsylvania CPL"), 73 P.S. § 201-1, *et seq.*, prohibits as "unlawful" "unfair or deceptive acts or practices," including: (a) "Representing that goods or services have . . . characteristics, . . . uses, benefits or quantities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" (d) "Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;" (e) "Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;" and (f) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. §§ 201-2(4), 201-3.

252.     All of the acts complained of herein were perpetrated by Defendant in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

253.     The services offered by Noom to Plaintiff Honore and the Pennsylvania Class were and are primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2(a).

254.     Defendant violated the Pennsylvania CPL by, *inter alia*:

a.     Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.     Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.     Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

d.     Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

66

e.      Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.      Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.      Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any time;" and (vi) will feature individualized coaching from a human weight loss expert.

255.    As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, Plaintiff Honore and the Pennsylvania Class have suffered injury and monetary damages.

256.    Plaintiff Honore and the Pennsylvania Class are entitled to monetary damages for treble their actual damages or $100, whichever is greater, as well as attorneys' fees and costs.  73 P.S. § 201-9.2(a).  Plaintiff Honore and the Pennsylvania Class are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, and/or exhibited a reckless indifference to the rights of others.

<u>COUNT VIII</u>

**DISTRICT OF COLUMBIA CONSUMER
PROTECTION PROCEDURES ACT**

**(ON BEHALF OF THE WASHINGTON, D.C. CLASS AGAINST DEFENDANT)**

257.    Plaintiff Mojo Nichols re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

258.    Plaintiff Nichols brings this claim on his own behalf and on behalf of each Class member who is a resident of the District of Columbia (the "District of Columbia Class") under the District of Columbia Consumer Protection Procedures Act (the "DC CPPA"), D.C. CODE § 28-3901, *et seq.*

259.     The purpose of the DC CPPA is to "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices," to "promote, through effective enforcement, fair business practices throughout the community," and to "educate consumers to demand high standards and seek proper redress of grievances."  D.C. CODE §§ 28-3901(b)(1)-(3).  The DC CPPA's provisions are to be "construed and applied liberally to promote its purpose."  D.C. CODE § 28-3901(c).

260.     The DC CPPA prohibits "unfair or deceptive trade practice[s]," including: "(a) represent[ing] that goods or services have . . . characteristics, . . . uses, benefits or quantities that they do not have;" "(d) represent[ing] that goods or services are of a particular standard, quality or grade . . . if they are of another;" "(e) misrepresent[ing] as to a material fact which has a tendency to mislead;" "(f) fail[ing] to state a material fact if such failure tends to mislead;" "(f-1) us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead;" "(h) advertis[ing] or offer[ing] goods or services . . . without the intent to sell them as advertised;" "(i) advertis[ing] or offer[ing] goods or services without supplying reasonably expected public demand, unless the advertisement or offer discloses a limitation of quantity or other qualifying condition which has no tendency to mislead;" and "(q) fail[ing] to supply to a consumer a copy of a sales or service contract . . . [.]"  D.C. CODE § 28-3904.  These are considered violations "whether or not any consumer is in fact misled, deceived, or damaged thereby."  D.C. CODE § 28-3904.

261.     The services offered by Noom to Plaintiff Nichols and the Washington, D.C. Class were and are for personal, household, or family purposes within the meaning of D.C. CODE § 28-3905(k)(1)(B).

262.     Defendant violated the DC CPPA by, *inter alia*:

a.     Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.      Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.      Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

d.      Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.      Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.      Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.      Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any time;" and (vi) will feature individualized coaching from a human weight loss expert.

263.    As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, Plaintiff Nichols and the District of Columbia Class have suffered injury and monetary damages.

264.    Plaintiff Nichols and the District of Columbia Class are entitled to monetary damages for treble their actual damages or $1,500 per violation, whichever is greater, as well as attorneys' fees. D.C. CODE § 28-3905(k)(2)(A)-(B). Plaintiff Nichols and the District of Columbia Class are also entitled to an award of punitive damages under D.C. CODE § 28-3905(k)(2)(C) and any other relief which the Court determines proper under D.C. CODE § 28-3905(k)(2)(F). Plaintiff Nichols and the District of Columbia Class are also entitled to equitable relief against Noom pursuant to D.C. CODE § 28-3905(k)(2)(D).

**COUNT IX**

**OHIO CONSUMER SALES PRACTICES ACT**

**(ON BEHALF OF THE OHIO CLASS AGAINST DEFENDANT)**

265.    Plaintiff Rebecca Richards re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

266.    Plaintiff Richards brings this claim on her own behalf and on behalf of each Class member who is an Ohio resident (the "Ohio Class").

267.    The Ohio Consumer Sales Practices Act (the "Ohio CSPA"), OHIO REV. CODE § 1345.01, *et seq.*, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.

268.    Defendant is a "[s]upplier" as that term is defined in OHIO REV. CODE § 1345.01(C).

269.    The Ohio Class members are "[c]onsumer[s]" as defined in OHIO REV. CODE § 1345.01(D), and the transactions with Defendant being complained of herein are "[c]onsumer transaction[s]" within the meaning of OHIO REV. CODE § 1345.01(A).

270.    The Ohio CSPA declares: "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction.  Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."  OHIO REV. CODE § 1345.02(A).

271.    The Ohio CSPA also prohibits suppliers from, *inter alia*, representing "(1) That the subject of a consumer transaction has . . . performance characteristics, . . . uses, or benefits that it does not have;" "(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;" "(4) That the subject of a consumer transaction is available to the consumer for a reason that does not exist;" "(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not . . . ."  OHIO REV. CODE § 1345.02(B).

272.     The Ohio CSPA also prohibits suppliers from "commit[ting] an unconscionable act or practice in connection with a consumer transaction . . . whether it occurs before, during, or after the transaction." OHIO REV. CODE § 1345.03(A).   Included among circumstances used to determine whether an act or practice is unconscionable is "[w]hether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier," [w]hether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction," and "[w]hether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment,"

273.     Defendant violated the Ohio CSPA by, *inter alia*:

a.     Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances and which Defendant knew was misleading consumers;

b.     Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.     Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

d.     Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.     Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.     Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.     Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any

time;" and (vi) will feature individualized coaching from a human weight loss expert.

274.    As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, Plaintiff Richards and the Ohio Class have suffered injury and monetary damages.

275.    Due to Defendant's wrongful conduct, Plaintiff Richards and the Ohio Class have been damaged in an amount to be proven at trial.  They seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendant's deceptive, unfair, and unconscionable conduct, treble damages, and reasonable attorneys' fees, pursuant to OHIO REV. CODE § 1345.09.

## COUNT X

### ALABAMA DECEPTIVE TRADE PRACTICES ACT

### (ON BEHALF OF THE ALABAMA CLASS AGAINST DEFENDANT)

276.    Plaintiff Jennifer Sellers re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

277.    Plaintiff Sellers brings this claim on her own behalf and on behalf of each Class member who is an Alabama resident (the "Alabama Class").

278.    By engineering and implementing fraudulent billing and advertising practices, Defendant engaged in, and continues to engage in, deceptive acts and practices in violation of the Alabama Deceptive Trade Practices Act (the "Alabama DTPA"), ALA. CODE § 8-19-1, *et seq.*

279.    The Alabama DTPA provides that "public health, welfare and interest require a strong and effective consumer protection program to protect the interest of both the consuming public and the legitimate businessperson."  ALA. CODE § 8-19-2.

280.    Defendant was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

281.    The Alabama DTPA declares "various deceptive acts or practices in the conduct of any trade or commerce . . . to be unlawful," including: "(5) Representing that goods or services have . . . characteristics, . . . uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," "(9) Advertising goods or services with intent not to sell them as advertised," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5.

282.    Defendant violated the Alabama DTPA by, *inter alia*:

a.    Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.    Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.    Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

d.    Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.    Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.    Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.    Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any time;" and (vi) will feature individualized coaching from a human weight loss expert.

283.    The aforementioned acts by Defendant are unconscionable, false, misleading, and/or deceptive.

284.     As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, Plaintiff Sellers and the Alabama Class have suffered injury and monetary damages.

285.     Pursuant to ALA. CODE § 8-19-10, the Alabama Class seeks monetary relief against Defendants measured as (a) actual damages or the amount of $100 for each Alabama Class Member, whichever is greater and (b) statutory damages in an amount to be determined at trial.

286.     Plaintiff Sellers and the Alabama Class also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Alabama DTPA.

## COUNT XI

## COMMON LAW FRAUD

### (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANT DOES BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)

287.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

288.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class under New York law or under the laws of each of the states where Defendant does business, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

289.     As discussed above, Defendant made a number of materially misleading statements and/or omissions in the marketing and billing of its monthly subscriptions, including:

a.   Stating and creating the net impression that the trial was "risk free";

b.   Omitting the fact that a smartphone is necessary to access its program as well as cancel the trial subscription;

c. Stating and creating the net impression that customers' payment information will only be used to pay for the cost of the trial program;

d. Stating and creating the net impression that customers either do not need to cancel or are able to easily cancel while curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period;

e. Stating and creating the net impression that customers can "cancel anytime" and that there is "no commitment;"

f. Stating and creating the net impression that customers would be paired with and receive individualized coaching from a human weight loss expert once they enroll in the trial period and that they will be able to cancel simply by letting their personal coach know;

g. Omitting the fact that customers could neither cancel their enrollment on Noom's website, nor contact a customer service representative by mail, email, phone or fax;

h. Omitting the fact that customers would not be assigned a human coach; and

i. Failing to disclose that the trial period starts even if customers never access or use the trial program;

j. Failing to adequately disclose how customers could cancel their enrollment during the trial period or whether they needed to do so.

290. In deciding to enroll in Noom's trial period, Plaintiffs and the Class reasonably relied on these misrepresentations and/or omissions to form the mistaken belief that their enrollment in a trial was risk-free, that it would not require the purchase or use of a smart-phone, that they were not authorizing anything other than whatever the user had selects as a "fair" price, which is no higher than $18.37, that they could easily cancel during the trial period, and that they would be assigned a human coach through whom they could cancel their enrollment.

291. Defendant's fraudulent conduct was knowing and intentional. The omissions and misrepresentations made by Defendant were intended to induce and actually induced Plaintiffs and Class Members to become Noom customers.

292. Defendant's fraud caused damage to Plaintiffs and the Class, who are entitled to damages and other legal and equitable relief as a result.

293.     Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XII**

**UNJUST ENRICHMENT**

**(ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANT DOES BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)**

294.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

295.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class under New York law or the laws of each of the states where Defendant does business, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

296.     This claim is brought under the laws of all states where Noom does business that permit an independent cause of action for unjust enrichment, as there is no material difference in the law of unjust enrichment as applied to the claims and questions in this case.

297.     As a result of its unjust conduct, Defendant has been unjustly enriched.

298.     By reason of Defendant's wrongful conduct, Defendant has benefited from receipt of improper funds, and under principles of equity and good conscience, Defendant should not be permitted to keep this money.

299.     As a result of Defendant's conduct it would be unjust and/or inequitable for Defendant to retain the benefits of its conduct without restitution to Plaintiffs and the Class. Accordingly, Defendant must account to Plaintiffs and the Class for its unjust enrichment.

## COUNT XIII

### CONVERSION

### (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE WHERE DEFENDANT DOES BUSINESS OR, ALTERNATIVELY, ON BEHALF OF EACH INDIVIDUAL STATE CLASS)

300.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

301.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class under New York law or the laws of each of the states where Defendant does business, or, alternatively, on behalf of each member of the individual State Classes under the laws of those States.

302.    This claim is brought under the laws of all states where Noom does business that permit an independent cause of action for conversion, as there is no material difference in the law of conversion as applied to the claims and questions in this case.

303.    Plaintiffs and the Class own and have a right to possess the money that is in their respective bank accounts, internet accounts, and/or credit cards.

304.    Noom interfered with Plaintiffs' and the Class's possession of this money by making unauthorized charges to their bank accounts, internet accounts, and/or credit cards for multiple-month Noom subscriptions.  Plaintiffs and the Class never consented to Noom's taking of this money from their bank accounts, internet accounts, and/or credit cards.

305.    Noom wrongfully retained dominion over this monetary property and/or the time-value of the monetary property.

306.    Plaintiffs and the Class have been damaged by Noom's wrongful taking of such money from their bank accounts, internet accounts, and/or credit cards in an amount that is capable of identification through Plaintiffs' and Noom's records.

307.    By reason of the foregoing, Noom is liable to Plaintiffs and the Class for conversion in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Issue an order certifying the Classes defined above, appointing Plaintiffs as Class representatives, and designating Wittels McInturff Palikovic as Class Counsel;

(b)    Find that Defendant has committed the violations of law alleged herein;

(c)    Determine that Defendant has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Nationwide Class or, alternatively, the State Classes;

(d)    Determine that Defendant committed fraud, and enter an appropriate order awarding damages to the Nationwide Class or, alternatively, the State Classes;

(e)    Enter an order granting all appropriate relief including injunctive relief on behalf of the State Classes under the applicable state laws;

(f)    Render an award of compensatory damages of at least $100,000,000, the exact amount of which is to be determined at trial;

(g)    Render an award of punitive damages;

(h)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(i)    Grant all such other relief as the Court deems appropriate.

Dated:  July 30, 2020
        Armonk, New York

**WITTELS MCINTURFF PALIKOVIC**

By:     /s/ Steven L. Wittels
        Steven L. Wittels (SW-8110)
        J. Burkett McInturff (JM-4564)
        Tiasha Palikovic (TP-5697)

        18 HALF MILE ROAD
        ARMONK, NEW YORK 10504
        Telephone: (914) 319-9945
        Facsimile: (914) 273-2563
        slw@wittelslaw.com
        jbm@wittelslaw.com
        tpalikovic@wittelslaw.com

        *Counsel for Plaintiffs and the Class*