```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  GERALDINE MAHOOD, et al.,

 4                          Plaintiffs,

 5                          Case No. 20-cv-03677-LGS-KHP
         -vs-
 6
    NOOM, INC.,
 7
                        Defendant.
 8
    ------------------------------------x
 9
                        New York, New York
10
                        September 9, 2020
11
                ** VIA TELECONFERENCE **
12
    B e f o r e :
13                      HONORABLE KATHERINE H. PARKER
                        Magistrate Judge
14
    A P P E A R A N C E S :
15
    WITTELS McINTURFF PALIKOVIC
16       Attorneys for Plaintiffs
         18 Half Mile Road
17       Armonk, New York 10504
    BY:  J. BURKETT McINTURFF
18       STEVEN L. WITTELS
         TIASHA PALIKOVIC
19
    COOLEY, LLP
20       Attorneys for Defendant
         55 Hudson Yards
21       New York, New York 10001
    BY:  AARTI REDDY
22       CHARLES LOW

23  ALSO PRESENT:  THOMAS C. GRICKS, III
                    MICHAL ROSENN, General counsel for Noom
24

25  *Proceedings recorded via digital recording device*
```

```
1              THE DEPUTY CLERK:  Calling case 20-cv-3677, Mahood
2    versus Noom, Incorporated.  Beginning with -- the Honorable
3    Katherine H. Parker presiding.  Beginning with counsel for the
4    plaintiffs, could you please make your appearance for the
5    record?
6              MR. WITTELS:  Steven Wittels from Wittels McInturff
7    Palikovic for plaintiff and the proposed class.  Good morning,
8    Your Honor.
9              THE COURT:  Good morning.
10             MS. PALIKOVIC:  Tiasha Palikovic, also from Wittels
11   Mick Palikovic for the plaintiffs.  Good morning, Your Honor.
12             THE COURT:  Good morning.
13             MR. McINTURFF:  This is Burkett McInturff from Wittels
14   McInturff and Palikovic on behalf of the plaintiffs and the
15   proposed class; and, Your Honor, we also have with us Tom
16   Gricks, who is assisting the plaintiffs as our e-discovery
17   expert.
18             THE COURT:  Okay.  Hello.
19             MR. GRICKS:  Good morning, Your Honor.
20             THE DEPUTY CLERK:  And counsel for the defendants,
21   would you please make your appearance for the record?
22             MS. REDDY:  Good morning, Your Honor.  This is Aarti
23   Reddy from the Cooley law firm on behalf of defendant, Noom,
24   Inc.
25             THE COURT:  Good morning.
```

 1          MR. LOW:  Good morning, Your Honor.  This is Charles

 2 Low from Cooley as well on behalf of Noom, Inc.

 3          THE COURT:  Okay.  Good morning.  All right.

 4          So is that everybody on the call?

 5          MS. ROSENN:  You have also here Michal Rosenn, general

 6 counsel at Noom.

 7          THE COURT:  Okay.  Welcome.

 8          MS. ROSENN:  Thank you.

 9          THE COURT:  Just a few preliminaries before we get

10 started.  Normally, I would be meeting with you all in person in

11 my courtroom, but because we are still in the midst of the Covid

12 crisis, we are having this conference by phone.

13          In order to ensure that everybody can hear one

14 another, it's best if you keep your phone on mute unless you are

15 speaking.  Also, if I don't call your name before you speak,

16 it's helpful if you state your name before you speak.  This

17 conference is being recorded, and you can order a transcript of

18 it within three days.  This line is also open to the press and

19 public on a listen-only basis, and I want to remind everyone on

20 the call that court rules prohibit the tape-recording and

21 rebroadcasting of court conferences, including this one, and the

22 violations of this rule can result in sanctions.

23          All right.  Now that I have said those preliminaries,

24 both sides have written a number of letters regarding

25 e-discovery, and I know that there are some additional

```
 1  submissions contemplated.  I wanted to see if we could
 2  potentially avoid additional submissions and resolve some issues
 3  today.
 4          As I understand it, there are a number of issues
 5  between the parties with e-discovery, and -- but plaintiffs
 6  essentially want more information about litigation holds, ESI
 7  policies, relevant ESI from other litigation, and third parties
 8  with potentially relevant ESI.
 9          Have I adequately summarized the four main areas of
10  dispute?  Who is going to be speaking for plaintiffs?
11          MR. McINTURFF:  This is Burkett McInturff.  I will
12  primarily be speaking for plaintiffs.  I may, Your Honor, if an
13  issue comes up that one of my colleagues is better informed, I
14  may direct them, if Your Honor so permits, to respond, but
15  generally, I will be taking the lead for plaintiffs.
16          THE COURT:  Okay.  One more thing -- thank you,
17  Mr. McInturff.  Before you get started and address my questions
18  about the issues, I wanted to just disclose to everyone that I
19  have tried Noom, along with probably every other diet program in
20  the United States.  I am constantly on a diet, but I don't think
21  that that will interfere with my -- with my decision-making on
22  any discovery, but I did want to disclose that.
23          Okay.  So go ahead, Mr. McInturff.
24          MR. McINTURFF:  To answer your question, Your Honor,
25  the issues Your Honor outlined are the issues that are the
```

1  subject of our letter that is at ECF 36.  Our letter that is at

2  ECF 48 poses four additional, although similarly-related, issues

3  regarding the defendant's preservation efforts.  Specifically,

4  if I may, I'll just list the issues.

5            THE COURT:  Uh-huh.

6            MR. McINTURFF:  Okay.  Regarding the defendant's

7  transparency as to its preservation efforts and our related

8  request that the defendant be ordered to preserve its Slack

9  messages.  The second issue is defendant's transparency into its

10 ESI sources, the technology systems, and the type of data that's

11 in those sources, as well as date ranges.  The third issue in

12 ECF 48 is whether the parties are going to negotiate and agree

13 upon any technology that defendant intends to use to identify

14 relevant responsive ESI, and finally, the fourth issue is the

15 parties are seeking guidance as to the applicability of Judge

16 Schofield's -- the presumptive ESI discovery limits in Judge

17 Schofield's individual rules which limit ESI discovery to, among

18 other things, 160 hours and 10 individual custodians.

19            It's our view that those rules are no longer required

20 as a result of the referral order, or if they do, plaintiffs

21 would like to make an application to show good cause to have

22 those limits relaxed for this case, and that's the sum total of

23 issues.

24            THE COURT:  Okay.  All right.  Well, let's first start

25 with -- let's first start with the type of information that you

1  are seeking, Mr. McInturff.  I think, you know, my approach to

2  discovery and e-discovery, which is just no different than

3  discovery has always been, just using technology platforms, is

4  to understand what is the type of information that you are

5  looking for and who has it, and then that's going to have to be

6  the basis for forming reasonable searches and exchange of

7  information.  So what is it that are the key pieces of

8  information that you are seeking?

9           MR. McINTURFF:  So if I can summarize just sort of a

10  global view is that we are seeking information about the

11  location of potentially relevant data globally, and, you know,

12  those -- that global inquiry takes various side roads because of

13  the technology involved.

14           THE COURT:  Uh-huh.

15           MR. McINTURFF:  And essentially, it's our view that

16  until we are educated about the defendant's, for example, ESI

17  systems, we can't play a productive role in the discussion of

18  ESI discovery because, you know, this case is essentially a

19  number of consumers who have tried a product.  It's not like

20  there is an ongoing, you know, lengthy contract relationship

21  between sophisticated parties, and so until -- until we have a

22  view into relevant players, relevant systems, relevant policies,

23  we can't negotiate, we can't say, okay, let's go -- we agree

24  with you, Noom, that you -- that these 20 or so individuals have

25  relevant information, and you should collect their email.

1          THE COURT:  I understand.  I understand that, but that

2   didn't answer my question.

3          MR. McINTURFF:  Oh, okay.

4          THE COURT:  What do you think is the most relevant

5   categories of information and data that you are seeking?

6   Obviously, you are seeking information about individuals who

7   signed up for Noom and then had trouble ending their monthly

8   subscription; is that right?

9          MR. McINTURFF:  That's the heart of the case is that

10  it's too difficult to cancel and that there are not enough

11  avenues to cancel, and Noom knows this, and nevertheless is

12  keeping consumers' money even though they are on notice that

13  it's very difficult to cancel.

14          THE COURT:  So what -- so it seems to me that what you

15  are looking for would be the information provided to consumers

16  about signing up and ending, the different pages that they were

17  shown over the relevant period of time or portals, however you

18  want to describe that, and the different methods by which they

19  could cancel the subscription.  I don't know how many methods --

20  even though I did use Noom -- I don't know how many methods

21  there are to do this or what the platforms are, but it seems to

22  me that it may be fairly discrete.

23          And what is the time period that you are looking for?

24          MR. McINTURFF:  Well, if I could just briefly respond,

25  Your Honor.  This claim, this case also contains a large

1  consumer and common law fraud component where consumers are
2  alleging that they were deceived into believing that, for
3  example, the trial period was a free trial or no risk, and that
4  following the trial, that they could try it out, and they didn't
5  know that they were going to be hit with a fee.
6          We also have allegations that it was improper for Noom
7  to charge a multi-month fee at the end of the trial period
8  instead of a monthly fee that consumers were hit with, you know,
9  six months' fees.  So there is a significant component -- in
10 addition to sort of what consumers were exposed to, there is
11 just a significant component that goes into what Noom knew, when
12 Noom knew it, the motivation behind Noom's design and marketing
13 choices, as well as, you know, we have allegations in the
14 complaint, for example, that credit card companies went to
15 Noom's payment processor and threatened to cut Noom off from
16 being able to process their credit cards because of the number
17 of chargebacks on the consumers; because they couldn't figure
18 out how to cancel, they would get this charge on their card.
19 They would go to their credit card company and request a
20 chargeback.  We have information in the complaint that Noom took
21 specific steps to conceal those chargebacks from the credit card
22 companies by adding additional charges to reduce the rate of
23 chargebacks, for example.
24         We also have information in the complaint about
25 internal conversations by Noom executive leadership telling

1  employees to disregard concerns about consumers' response or --

2  and so the fraud angle of the case is much more sort of looking

3  at Noom's conduct than looking at, you know, what a consumer

4  sees, what web page they are going to because there is a

5  component of motivation and intent as well as knowledge of

6  consumer deception.

7          THE COURT:  Sure.  Okay.  I understand --

8          (Cross-talk)

9          THE COURT:  So it sounds like the categories of areas

10 that you are looking at would be the marketing of the program,

11 the payment processing, the communications with the payment

12 processor, accounting for -- that would show people who started

13 and ended or tried to end, customer service who might have

14 received complaints from users, IT that may have designed the

15 page and/or may have a help desk that also helped users, and

16 then executive leadership involved in overseeing these aspects

17 of the program.

18         (Cross-talk)

19         THE COURT:  -- you will want information about the

20 signup and termination procedures for Noom over a specific

21 period of time.  That sounds to me like the gist of the big-

22 picture type of information you are looking for.

23         MR. McINTURFF:  If I could just add one more sort of

24 big-picture category.  There is a lot of tracking going on

25 within Noom of app usage rates, and there is internal data that

1  we believe will demonstrate that Noom knew that consumers who

2  were signing up for the program weren't actually accessing the

3  program and which was the only way to cancel.  So if you sign up

4  for the trial and don't access the app on your phone, like if

5  you never download it or you never open the app, there is quite

6  a bit of internal metrics that are being used to track a number

7  of issues that are relevant to the plaintiffs' claims.

8              So in addition to the broad categories Your Honor

9  outlined, there is also sort of internal metrics.  Again, it

10 goes to the general idea of:  What did Noom know, when did they

11 know it, what did they do in response to the information that

12 they had in their possession?

13             THE COURT:  All right.  I'm not sure about the

14 relevance of that internal tracking metrics, although that may

15 become clearer over the course of the case.

16             Have you exchanged initial disclosures?

17             MR. McINTURFF:  Yes.  We have exchanged initial

18 disclosures, Your Honor.

19             THE COURT:  Okay.  So now I have a question for Noom.

20             How many individuals did you list as -- in your

21 initial disclosures?

22             MS. REDDY:  Your Honor, this is Ms. Reddy on behalf of

23 Noom.  We listed six individuals in our initial disclosures, and

24 I would like to note we intend to supplement that list as

25 discovery continues, but I would like to note that five of those

1  individuals we have designated as custodians, and those

2  individuals hit on exactly the same subject areas that Your

3  Honor was just referencing.  So, for example, we have designated

4  as custodians the head of growth marketing, who would have been

5  involved in the disclosures that the putative class would have

6  seen.  We have designated as a custodian the head of growth who

7  would have been involved in the analysis or testing pertaining

8  to the ARL disclosures, and we've also listed the head of

9  customer service who is intimately familiar with consumer

10  complaints related to refunds and cancellation policies.

11          THE COURT:  And who else?  Who are the other three?

12          MS. REDDY:  If you just give me a moment, I believe

13  we've got an individual who is involved in product and another

14  individual involved in marketing.

15          THE COURT:  That's five.  How come there is nobody

16  from accounting or IT?  Wouldn't there be people who are

17  knowledgeable about just the process of signing up and ending

18  and have information about the -- just the metrics, numbers of

19  people who have signed up or the months that people were signed

20  up, things like that?

21          MS. REDDY:  That's really done by the growth team.

22  They are the team that actually does this sort of growth

23  analytics in determining signups, et cetera.  And so IT isn't --

24  IT isn't really involved in that respect.

25          We have disclosed the individual to plaintiffs from

1  the IT department who is responsible for preserving or is

2  helping assisting counsel in preserving relevant information

3  related to the lawsuit, but he is not identified on our initial

4  disclosures.

5        THE COURT:  And what about somebody from accounting?

6  Wouldn't that also be relevant?

7        MS. REDDY:  We -- so we did a data analysis that we've

8  provided thus far from the growth team.  We are serving

9  interrogatory responses tomorrow, and in connection with those

10  responses, we are disclosing two individuals from the data team

11  who've provided information regarding revenue, subscription-

12  related revenue, and so we can supplement our initial

13  disclosures to include those two individuals, but they will be

14  known to plaintiffs tomorrow as part of our interrogatory

15  responses.

16        THE COURT:  And what about this communications with

17  payment processors or credit card companies that may convey

18  complaints that way?

19        MS. REDDY:  So Noom's payment processing is actually

20  done through the application, through the Noom app and through

21  the Noom website, and so it's possible that we may end up

22  disclosing additional communications with third-party payment

23  processors, but at this stage, we haven't determined that to be

24  relevant to plaintiffs' requests.

25        THE COURT:  Well, why do you say it's not relevant?

PROCEEDINGS

```
1  Have you just not looked into it yet or what's the --

2          MS. REDDY:  Well, so the information that we've

3  compiled thus far in response to the interrogatories that we

4  have compiled in connection with our RFP responses, we have been

5  able to compile just with information that Noom has within its

6  possession, custody and control.  We haven't needed to reach out

7  to third-party payment processors to obtain that information.

8          THE COURT:  Oh, oh, okay.  No, what I was suggesting

9  is that internally you would have messages.  You would have

10 received messages potentially from payment processors that would

11 potentially be relevant to the issues plaintiffs have raised in

12 the lawsuit.

13         MS. REDDY:  I am not aware of any at this stage, but

14 again, our investigation is ongoing, and we are certainly

15 planning to supplement our initial disclosures as the

16 investigation continues.

17         THE COURT:  So what I am hearing from you is the

18 growth team is the -- is involved with the design of the program

19 insofar as how it will attract new users and how it markets to

20 new users and how it -- how it deals with people who, say, want

21 to stop the program; is that what you are saying, the growth

22 team is the --

23         MS. REDDY:  Everything but the last --

24         (Cross-talk)

25         THE COURT:  -- information?
```

1        MS. REDDY:  Correct.  That's the key team with most of

2   the information.  Although, the communications with individuals

3   who would like to stop the program often happen through customer

4   experience, and so we've designated someone from the customer

5   experience team, the head of customer service.

6        THE COURT:  Okay.  And so are there -- the heads of

7   these groups often in my experience often have deputies or

8   employees that have -- that are even a better source of

9   knowledge than the heads and may have -- may have more

10  information.  So I assume that you are including consideration

11  of some of those people as potential witnesses, but certainly as

12  people who would receive litigation holds; is that right?

13       MS. REDDY:  Correct.  Correct.  Correct.  Because

14  those individuals have received litigation holds, and I do

15  actually have an interview scheduled with the deputy of the head

16  of customer experience this week to determine whether or not we

17  should also designate her as a custodian and list her on the

18  initial disclosures.

19       THE COURT:  Yes.  Okay.  So it seems to me that there

20  are certain areas within the company that should have received

21  litigation holds from a transparency standpoint.

22        And in terms of the data, what I am hearing is that

23  plaintiffs want to understand where you maintain all of this

24  data, and I assume that you have multiple databases, if you

25  will, for the different types of information that you are

PROCEEDINGS                              15

1  dealing with; is that correct?

2          MS. REDDY:  That is correct, Your Honor.  And I will

3  note that we have made a number of ESI source repository

4  disclosures to plaintiff and have committed to supplement that

5  list on an ongoing basis.

6          In speaking with the head of growth, our understanding

7  is the growth team does a lot of work in Google Drive, so any

8  analyses or studies that they perform, they ultimately end up

9  sharing, a lot of their work is done in Google.  They use GMail.

10 They use Google Hangouts, they use Google Drive.

11         So one thing that we've done is in interviewing our

12 custodians, we are trying to find out where the respective teams

13 do their work, and we have agreed to supplement our ESI

14 repository disclosures on an ongoing basis.  All of these teams

15 have received copies of the litigation hold, and all recipients

16 of the litigation hold have been placed on a preservation system

17 in Google's ecosystem known as Google Vault.  So there is an

18 automatic preservation system in place for these employees as

19 well.

20         THE COURT:  Okay.  And with respect to the Slack

21 issue, as I understand it, that there is a -- that it will be

22 preserved unless an individual overrides that, and you have

23 looked at that issue, and no one on your hold list has

24 overridden that; is that correct or -- tell me what you've done

25 with respect to Slack.

```
 1           MS. REDDY:  Yeah, yeah.  That's substantially correct,

 2  and I will admit it took me a while to get educated on Slack in

 3  connection with this case.

 4           So Slack is an instant messaging system that preserves

 5  all messages by default for the life of the workspace, so Noom

 6  uses both public and private Slack channels, so with the

 7  understanding that by default everything is preserved, we took

 8  additional steps to ensure preservation.

 9           So first, we initially investigated with our client to

10  determine whether any of the public Slack channels had altered

11  the default settings where the owners have altered those default

12  settings to set them to automatic deletion.  We have more than

13  2,000 public Slack channels, and we concluded, based on that

14  investigation, that three of those several thousand Slack

15  channel messages -- so two -- three of those channels have the

16  default settings altered.  We reviewed or conferred with our

17  client regarding the substance of those channels and determined

18  that one of those channels contained information that plaintiffs

19  would deem responsive, and so we restored the default setting

20  for that one channel.

21           On the private Slack channel messages, until recently

22  you had the ability to do the same sort of chat on the back end

23  regarding public Slack channel -- that they did with public

24  Slack channel messages.  That is to determine whether individual

25  owners had independently overridden the default settings and set
```

1  their private Slack channel messages to automatic deletion.  So

2  what we did is we specifically instructed users or recipients of

3  the hold notice to preserve potentially responsive Slack

4  messages.

5          Now, we explained this to counsel.  Counsel expressed

6  concerns that individual users within the company may have

7  modified the default settings, although we had no reason to

8  believe that was the case.  Plaintiff's counsel indicated they

9  would file a motion to request that Noom purchase a software

10 upgrade that would enable Noom to determine on the back end

11 whether the default settings for any private Slack channel

12 messages had been altered.  So in conferring with our client, we

13 determined that Noom had actually just recently in the beginning

14 of August upgraded from the Slack basic to the Slack premium

15 subscription, and so now we were able to immediately confirm

16 whether any of the private Slack channel messages have had the

17 default settings altered.

18         Now we weren't able to determine whether that was the

19 case, but we were able to override any potential alterations to

20 the default settings.  So now on the back end, Noom has the

21 ability to set -- to restore the default settings for any

22 private Slack channel messages, and it did that prior to

23 plaintiffs filing their most recent motion.

24         THE COURT:  Okay.  So what you have now in place is

25 that you are monitoring to ensure that users, internal users

```
 1  don't change the default setting to preservation?

 2            MS. REDDY:  Exactly.

 3            THE COURT:  Change it to not preserve as opposed to

 4  preserve?

 5            MS. REDDY:  Exactly.

 6            THE COURT:  Okay.  And you have a process in place to

 7  ensure that doesn't change over the course of the lawsuit?

 8            MS. REDDY:  Correct.

 9            THE COURT:  Okay.  And with respect to emails, I know

10  -- are people using emails or are they mostly using Slack?

11            MS. REDDY:  It's a combination of email, G-Chat and

12  Slack.

13            THE COURT:  Okay.  So for the G-Chat and the emails,

14  sometimes systems -- those kinds of systems also allow a user to

15  override a default preservation or require the user to, in fact,

16  preserve.  Otherwise they are not kept.  Have you investigated

17  both of those types of platforms?

18            MS. REDDY:  Correct.  Yes, Your Honor.  We have

19  implemented a Google Vault hold, which places a hold on all

20  Google Drive documents, GMail and G-Chats for any recipients of

21  the legal hold notice.

22            THE COURT:  Okay.  All right.  So at the moment, what

23  I am hearing is that you have disclosed the ESI sources for the

24  types of information you believe are relevant and responsive to

25  the plaintiffs' discovery requests, and that information has
```

1  been included in either your initial disclosures or will be

2  disclosed in your responses to the interrogatories and document

3  requests; is that right?

4       MS. REDDY:  So we provided a letter to plaintiff on

5  July 23rd, which provides a list of the sources of potentially

6  discoverable information.  Separately the parties are in the

7  process of negotiating an ESI protocol, and that protocol also

8  identifies the sources that we intend to collect from.

9       Now, I will say that we plan to supplement that list.

10 We provided an initial list of custodians to plaintiffs

11 yesterday, and based on those custodian interviews, we are

12 conducting followup investigations to determine whether there

13 are any other databases or specialized software sources that we

14 should be disclosing, but we do have a pretty fulsome

15 preliminary list that we have already provided to plaintiffs and

16 memorialized in the ESI protocols.

17      THE COURT:  Okay.  And so are there -- there will be

18 more than ten custodians ultimately that you are going to

19 collect from, I am assuming, but maybe that's not the case.

20      MS. REDDY:  So Judge Schofield's presumptive rule

21 provides for ten custodians.  We were planning on collecting

22 from ten custodians by doing a combination of targeted

23 collections from Share Drive.  So, for example, the growth team

24 has its own Google Drive folder, so we will be collecting from

25 there.  So that would include work product that's been prepared

1  by all of the growth team members.

2          So the custodial work will be, you know, the head of

3  customer experience and her emails and her Slack channel

4  messages, but she is constantly corresponding with her team.  So

5  there is going to be a combination of sort of drive collections

6  and public Slack channels, which are communications among those

7  respective teams that may have responsive information, and then

8  the custodial collections.  But ideally, we would like to stick

9  to ten.  We think we can do it in ten.

10         THE COURT:  Okay.  Very good.

11         So what I am thinking, Mr. McInturff, is that usually

12  the party that is producing ESI understands its systems best and

13  knows where to look for them, and it sounds like, based on my

14  cross-examination of Noom's counsel, that they are taking steps

15  necessary to identify, preserve and collect relevant

16  information.

17         So my thought is that some of the dispute here is

18  premature and that -- that you should allow Noom to begin to

19  collect and identify these sources, and then if, in fact, it

20  turns out that there -- you will be educated by looking at what

21  they produce.  You can't really have an intelligent

22  conversation, it's true, without knowledge, but some of your

23  knowledge is going to be derived from documents and information

24  produced.

25         So my thought is that some of these disputes that you

1   are having are premature, but you can get production of initial

2   information, and then to the extent there are more sources of

3   data identified, that you can then determine whether additional

4   custodians need to be tapped to get the information that you

5   need.  But I am of the belief that you can -- you can't really

6   even have -- just having a list of -- Noom is not even in the

7   position right now, as I understand it, to even know the full

8   scope itself.  It's done what it can since the lawsuit was filed

9   in May to identify things, identifying more, but it's still in

10  the process of conducting interviews to -- you know, to square

11  away where all of this information is.

12          So I think that process needs to be had.  They need to

13  produce stuff, and in my experience with complex cases, it's an

14  iterative process, and more information may be learned after

15  some initial period of discovery and then perhaps the scope

16  expanded.

17          MR. McINTURFF:  Your Honor, this is Burkett McInturff.

18  Could I confer -- we would like to respond, but can I confer

19  briefly with my co-counsel?

20          THE COURT:  Sure.

21          MR. McINTURFF:  Okay.  Thank you.

22          (Pause)

23          MR. McINTURFF:  Your Honor?

24          THE COURT:  Yes.

25          MR. McINTURFF:  Thank you, Your Honor.  This is

1    Burkett McInturff again.

2              So two points:  The parties -- and it may not be

3    apparent from the letters -- but the parties have very differing

4    views of relevancy at this stage of the case.  For example, we

5    have allegations in our complaint about top executives'

6    involvement in the conduct at issue, yet there's no executives

7    listed in the initial disclosures.

8              We have also had a dispute with defense counsel --

9    it's not in our letters -- but regarding whether former

10   employees need to be disclosed in initial disclosures regarding

11   individuals with relevant information.

12             THE COURT:  Well, initial disclosures would only be

13   individuals who they would rely on, right, in -- that's initial

14   disclosures.  A former employee with knowledge and information

15   might be disclosed in response to interrogatories, but is not

16   necessarily someone that would be disclosed as a witness that

17   Noom would rely on.

18             But what is it about former employees that you want?

19             MR. McINTURFF:  Well --

20             THE COURT:  Information preservation or?

21             MR. McINTURFF:  Relevant information, but that was

22   just an example.  If I could move on to address Your Honor's

23   greater point --

24             THE COURT:  Okay.

25             MR. McINTURFF:  -- which is, and our expert, Mr.

1   Gricks can also speak to this, but if we do it in the way that

2   Noom is proposing and Your Honor has suggested, the issue

3   happens, and the issue crops up and it's like it did in your

4   *Brown v. Barnes & Noble* case, where if there is not transparency

5   at the beginning of the process, we start having iterations of

6   disputes where we take issue with both the process and the

7   outcome of the process that we have, and it ends up in satellite

8   litigation.

9            THE COURT:  Yes.

10           MR. McINTURFF:  And specifically here because the

11   parties have really divergent views.  For example, with the

12   litigation hold, the defendant has said it issued litigation

13   holds broadly throughout the company.  They won't disclose who

14   received the litigation hold, so we don't know whether or not we

15   agree with that, you know, that claim.

16           THE COURT:  But you don't know.  You wouldn't even --

17   you don't know enough information to even know if it's broad

18   enough right now, actually.

19           MR. McINTURFF:  Well, we have also asked -- which is

20   typically disclosed as part of the Rule 26(f) meet-and-confer

21   process for, you know, phone lists and directories that have

22   employee names and titles.  So we can -- what you do is you

23   cross-reference who is on those phone lists with the litigation

24   holds, and then you get an idea.

25           Another thing we have asked for in connection with the

1  disclosures regarding Noom's email systems, so Noom says, okay,

2  we primarily use GMail, but we also have a few people that use

3  Outlook.  What we asked, and what we routinely ask in cases is:

4  Okay, produce a list of the accounts that you have and the dates

5  of the accounts that they are in use and the name and the title

6  of the custodian of the account so that we can see, for example,

7  you know, director of growth has an account that was operating

8  from X date to X date, but then director of growth's

9  predecessor, who we didn't know beforehand, had an account that

10 was even larger and predated the current director of growth.

11        And it's those type of disclosures at the 26(f) stage

12 that allow us to get up to speed very quickly and to have

13 intelligent conversations about discovery plan that avoid the

14 type of disputes that occur when simply a producing party goes

15 off and produces information and certifies that they have taken

16 their best efforts.  And again, I can turn it over to Mr.

17 Gricks, and, you know, that's why we are involving him in the

18 case is he is an expert in dealing with these issues early on.

19 So I will turn it over to him.

20        THE COURT:  Well, who are the top executives that you

21 think have -- were involved and have relevant information?

22        MR. McINTURFF:  Let me -- so we -- in plaintiffs'

23 initial disclosures we itemize those executives.  So if you can

24 bear with me one second, I will pull that up.  Bear with me.

25        Artem Petakov is the president and co-founder, and he

1  is the leader of Noom's growth team.  Saeju Jeong is the CEO and

2  co-founder.  He is believed to have information regarding

3  defendant's knowledge and oversight of the practices that are

4  challenged in the complaint.  Adam -- I don't know if I am

5  pronouncing his last name right -- Fawer, F-A-W-E-R, he is the

6  CFO and the COO and a board member.  He is believed to have

7  information regarding defendant's credit status with credit

8  partners like banks and chargeback rates.  Denise de la Rama,

9  she is the VP of finance.  She is believed to have information

10 regarding credit status with credit card partners.  Raj

11 Krishnan, he is the VP of product management.  He is believed to

12 have information regarding the defendant's transaction

13 experiments and metrics.

14         One of the things I forgot to mention when we were

15 talking about sort of the heart of the case, there is an issue

16 with amounts of free trial, how much you charge for the free

17 trial, when you -- when the free trial ends, sort of testing

18 regarding the optimization of that process.  Brian Wright, he

19 the vice president of international growth and operations.  He

20 is believed to have information regarding the specific use of

21 what is challenged as deceptive tactics, auto-enrollment tactics

22 as a way to grow Noom's customer base.

23         Mark Horton, he is the head of talent.  He is believed

24 to have information regarding Noom's business model and

25 strategies for growing the business.  And again, as alleged in

1 | our complaint, that this specific enrollment process is critical
2 | to Noom's business model because, I mean, it's essentially, in a
3 | way it's akin to a gym where you want to incentivize people to
4 | sign up but in a way that the more difficult it is to cancel,
5 | that does benefit the party receiving the money at the end of
6 | the day.
7 |         So those are just the individuals that we have
8 | identified through our own investigation and, again, this is to
9 | underscore that, from our perspective, not knowing, for example,
10 | who the litigation holds were issued to, not knowing -- not
11 | being given the defendant's ESI policies, sort of how they hold
12 | their information, not being told, for example, whether there's
13 | already been a database of documents collected or produced in
14 | other litigation.  Like I had an experience in another case
15 | where I had an adversary, they had already produced a bunch of
16 | documents in connection with a government investigation, and we
17 | used those documents to sort of do the education phase that Your
18 | Honor had suggested where we went through those documents that
19 | had already been reviewed and produced in connection with
20 | another matter, and then we had followup ESI conversations; but
21 | the defendant won't disclose whether or not there is anything
22 | that's been collected or identified in connection with any other
23 | litigation.
24 |         And then in terms of the ESI sources and preservation
25 | methods, the extent that we've -- that we understand from Noom

PROCEEDINGS

1   about ESI sources is, you know, they use GMail; that they have

2   G-Chat; they use Slack, but we all know, you know, what is --

3   what's the date range of the Slack messages?  What are the names

4   of these various accounts that Noom has said?  For example, they

5   said they identified three public Slack accounts and that they

6   believe two of them are not relevant.  Well, we don't know what

7   the titles of those accounts are and whether or not we would

8   agree with that.

9          But more critically, Noom has not identified to us any

10  private Slack accounts.  We have no idea the number of private

11  Slack accounts.  Based on our numerous back-and-forths, we don't

12  know -- it appears now that Slack accounts may not -- some Slack

13  accounts may not have been preserved; that the default is to

14  preserve them, but it's not clear whether those defaults were

15  overridden.

16         Again, these are issues that -- and I will turn it

17  over to Mr. Gricks -- but they are issues that if we don't deal

18  with them now, we are likely going to deal with it later on.  So

19  I will hand it off to Tom.

20         MS. REDDY:  Your Honor, may I --

21         THE COURT:  Okay.  Okay.  All right.  Let me just hear

22  from Mr. Gricks for a moment, and then I will give you a chance

23  to respond, Ms. Reddy.

24         MR. GRICKS:  Good morning, Your Honor.  It's a

25  pleasure to be in your courtroom virtually.

1            Really, counsel has really just simply asked me to

2    address the value of these early disclosures and to get that

3    information out on the table as early as possible to eliminate

4    the problem of downstream fights about data and what's available

5    and what's not.  And, obviously, Your Honor, you clearly

6    understand the issues and the urgency and, you know, the cases

7    make it clear that the earlier that these things are addressed,

8    the better.

9            All right?  In the *Biomed* case, for example, the

10   producing party went on its own way and did a good bit of

11   review, incurred a ton of money to do that, and then when it was

12   discovered that there were documents left behind, the Court said

13   because of proportionality, they have already spent that money,

14   we are probably not going to be able to get to those.

15           I recently had a case where, because validation

16   procedures were never really clearly defined, the producing

17   party was actually able to cull data and the end of the day

18   showed that they left 80 percent of the documents behind.

19           So the value here really, in my experience, is that

20   there is a substantial benefit to getting these procedures

21   outlined as early as possible, right, so we are not having

22   fights down the road, and one of the benefits I think is if we

23   can get to an ESI protocol, and I would be happy to work with

24   opposing counsel and any expert that they might want to use, you

25   know, start to develop deadlines so that we can make sure that

1  this information is being turned over at the earliest possible

2  time so that we are not waiting to see what develops down the

3  road without knowing when that development will happen.  We can

4  start to get that information out, get it out more quickly, get

5  our roles and obligations defined and solve those problems

6  before -- before they become real problems, Judge.  That's

7  really what I have been asked to address.

8         THE COURT:  Okay.  Ms. Reddy, let me give you an

9  opportunity to respond.

10        MS. REDDY:  Thank you, Your Honor.  That was quite a

11  lot, so I'll just try to be brief.

12        THE COURT:  Yes.

13        MS. REDDY:  I will note that plaintiffs' requested

14  relief in this respect is quite vague and broad, and they've

15  sort of asked for everything under the sun, and so I'm happy to

16  respond on the specific individuals listed in the initial

17  disclosures, but I think broadly speaking, Your Honor's point is

18  a good one, which is, we are in the process of conducting our

19  investigation.  We are complying with our good-faith discovery

20  obligations.  We are making every effort to be transparent in

21  providing ESI repositories, in disclosing additional witnesses,

22  agreeing to produce documents on an ongoing basis.  And so, for

23  example, you know, counsel just referenced the production of the

24  litigation holds, which was the subject of a discovery letter.

25  Now, counsel stated that we are unwilling to disclose who

1  received the holds.  That's not accurate.  We simply asked that

2  plaintiffs serve a discovery request so that we can log the

3  information pursuant to the logging procedures that we are now

4  negotiating as part the ESI protocols on this long list of

5  titles that plaintiffs are requesting.  That is the subject of

6  an RFP where we have agreed to provide information on top of --

7          THE COURT:  Okay.  So let's just take the litigation

8  holds, for example.  So as I hear it, you don't have an

9  objection to producing the litigation holds, either whole or in

10 redacted formats or redact any privileged aspect on the hold

11 itself, but you don't have an objection to the plaintiff knowing

12 who received the litigation holds, and I assume the people that

13 plaintiff just listed have all received them since plaintiff has

14 listed them.  Whether -- you know, you can have people preserve

15 before you collect.  So it's better to cast a broad net for

16 preservation.

17          What I don't understand is why you need to have --

18 wait 30 days to have a document request and then a response to

19 provide the documents.  It seems to me that you can start Bates

20 stamping and keep track of what you produce, and they can -- if

21 you want to have it in a document request, you can certainly

22 have it included, but you could advance-produce the litigation

23 holds, Bates numbered, to expedite a conversation about ESI.

24          So it seems to me that there are some categories of

25 documents you can do that for.

1          And did you all enter into a confidentiality stip yet?

2   I don't know if you did that yet.

3          MR. McINTURFF:  No, Your Honor.

4          MS. REDDY:  We have provided -- we just provided a

5   draft to plaintiff's counsel yesterday of the protective order.

6          THE COURT:  Okay.  So I have a sample protective

7   order, and it covers most things.  It's worked in most

8   litigations.  So rather than have a lot of back and forth about

9   a confidentiality order, I suggest that you use my model, and

10  then if you want to have some -- sometimes the parties need a

11  few more specifics.  You can add those, but I suggest that you

12  use that model so you don't have a month of negotiations on the

13  confidentiality stip.  So I suggest you do that.

14          I suggest that, Noom, that you produce the litigation

15  holds in advance of the document request so you can have this --

16  this conversation, and of course you can redact information to

17  the extent it's privileged within the -- within the litigation

18  holds and begin to create a privilege log.

19          Are there any disputes about privilege or anticipated

20  disputes about privilege?

21          MR. McINTURFF:  Your Honor, this is Burkett McInturff

22  for plaintiffs.

23          The privilege issue is being teed up in connection

24  with the parties' ESI protocol, and we do have disputes on, you

25  know, the timing of privilege logs and --

1          (Cross-talk)

2          THE COURT:  Well, for the timing of privilege logs

3   should be with each tranche of production there needs to be a

4   privilege log.  You cannot wait until the end of discovery to

5   have the privilege log produced at that part -- at that -- in

6   this kind of case.  So you are going to need to -- there will be

7   rolling discovery, and the privilege log for each tranche can be

8   produced, you know, either simultaneously or within a week or

9   two of the tranche, but that's -- that's how I want production

10  to go on both sides because if there is a privilege issue, I

11  want to address it sooner rather than later.

12          With respect to a listing of the Slack accounts and

13  the GMails, et cetera, it seems to me that the custodians that

14  you have listed and their positions, I don't know for how long

15  they have been in their positions, but it seems to me that if

16  during the relevant timeframe those custodians had predecessors

17  that might have information that is being preserved, that you

18  need to have an accounting of what are you looking at, Google

19  Drive, GMail, Outlook, et cetera, for the custodians you have

20  identified, the individuals that the plaintiffs have identified

21  and their predecessors during the relevant time period so that

22  you have a framework of what you're -- of what you are looking

23  for.  So I just don't know.  I'm assuming that some of the

24  people identified by plaintiffs and defendants have been there

25  the entire relevant period.

 1              Is that correct, Ms. Reddy?

 2         MS. REDDY:  Yes.  So four out of the five individuals

 3    in our initial disclosures have been there for the entire

 4    relevant period.  We dispute the idea that several of the

 5    individuals on plaintiffs' initial disclosures have information

 6    that is relevant to the claims at issue in this case.  For

 7    example --

 8         THE COURT:  That's okay, but you can still preserve

 9    them.  You can still send them a preservation notice.

10         MS. REDDY:  Oh, correct.

11         THE COURT:  So the issue -- you can dispute the

12    relevance, but for purposes of preservation, you can have them

13    preserve information.  Same thing with the talent guy, who

14    sounds to me like it's an HR person, but maybe not.

15              So you need to preserve that information and then you

16    can talk about what kind of information that those individuals

17    may have that's relevant or not relevant.  Maybe that's -- maybe

18    those aren't collected until after you collect information from

19    other people that you believe have more -- more of the key

20    documents.  Plaintiffs will want that anyway.

21         MS. REDDY:  Yes, Your Honor.

22         THE COURT:  But it seems to me that you should be

23    providing for the people on your initial disclosures, the people

24    identified in your interrogatories, and the people that the

25    plaintiffs have named what the different -- you know, for

1  example, what are -- I don't know if all of -- if all of these

2  custodians used all of the public Slacks or just used some of

3  the public Slacks and had some of their private Slacks, but it

4  seems to me you should have an inventory for each of these

5  people.  This is -- it's more than ten, but you should at least

6  identify where they -- where their communications and data is

7  housed, and how -- and produce that list with the date ranges to

8  the plaintiffs.  That's a start.  And then you can decide from

9  whom you will collect, and we can start with the presumptive

10 limit of ten and then determine if there are -- more are needed.

11 There may not be more needed, but I think you need to have a

12 little bit -- you need to provide a little bit more information

13 to the plaintiffs so you can have an intelligent conversation

14 because I certainly -- I want to make sure that this process

15 goes efficiently and as inexpensively as possible.

16         MR. McINTURFF:  Your Honor, this is Burkett McInturff.

17 Could I briefly be heard?

18         THE COURT:  Uh-huh.  Sure.

19         MR. McINTURFF:  One, a couple of other issues, and

20 this is regarding our letter in ECF number 36, we are still

21 trying to determine whether the defendant has ESI relevant from

22 other litigations that have -- or other matters that have been

23 identified.  We got the defendant's response to our discovery

24 request last week seeking this information, and the defendant

25 took the position that it's "not able to decipher" -- I am

1   quoting -- it's "not able to decipher any meaning whatsoever

2   from this request," close quote.

3           So this is an example of the impasses that we are

4   reaching with regard to disclosures of potentially relevant ESI.

5           If it would be possible, we would like to get the

6   defendants to tell us whether or not there have been documents

7   from other litigation or other matters that have been preserved

8   or collected.

9           THE COURT:  Well, I guess that is kind of a broad

10  question, frankly.  I mean, what you -- what you would be

11  wanting to know is:  Has there been another similar

12  litigation --

13          MR. McINTURFF:  We are investigating that.

14          THE COURT:  -- involving -- or investigation?

15          MR. McINTURFF:  Correct.

16          THE COURT:  Okay.

17          MS. REDDY:  Your Honor?

18          THE COURT:  Yes, go ahead.

19          MS. REDDY:  May I be heard?  I just --

20          THE COURT:  Sure.

21          MS. REDDY:  Mr. McInturff is not accurately

22  summarizing the record.  He is referring to a different

23  discovery request.  The discovery request actually at issue is

24  RFP number 11, and that document request seeks all documents,

25  communications or other information, including data or testimony

PROCEEDINGS                                             36

1  produced or received by Noom in any regulatory matter,

2  enforcement action, arbitration or other dispute or proceeding

3  relating to 21 different topics.  Now we have agreed to meet --

4            THE COURT:  All right.  Mr. McInturff, that's wildly

5  overbroad.  Wildly.  Under the -- that kind of request is --

6  under my rules, any request like that is presumptively overbroad

7  and not proportional.  You need to be specific.  You need to be

8  very specific and tailored in your discovery requests and -- and

9  in responding, the parties need to be specific.

10           Under the new rules, you have to say what you have and

11  can produce and be specific.  Those kinds of requests are simply

12  not acceptable.

13           So plaintiffs need to think about the scope of what

14  they are asking for.  It's your claim, and you had a hard time

15  coming up with the big categories of information that I was

16  trying to get at at the beginning of this call.  So you need to

17  think about how to tailor your requests to get at what the key

18  information is, and some of the stuff that you are raising now

19  is a bit of a sideshow; but I do think it's important to get --

20  if Noom doesn't have an objection to producing non-privileged

21  aspects of the litigation holds, you should do that.  I don't

22  think you should wait 30 days, and I do think that for the

23  individuals identified thus far, all of them need to have

24  preservation -- preservation, and you should at least provide

25  for those individuals, provide plaintiffs with the types of

1  accounts that they were using.  So, you know, maybe they

2  accessed five public Slacks and had one private Slack.  I don't

3  know, you know, what they are, but if there's titles to those,

4  there is some kind of list, I think you should categorize those

5  and provide it to the plaintiffs.

6          What I am going to do is I'm going to schedule monthly

7  conferences with you all because you cannot continue filing the

8  letters that you have been filing.  That's just simply not the

9  way this case should be managed, and that's raising costs for

10 both sides unnecessarily.  So let's talk about dates for future

11 conferences.  I have -- for October, I have Monday, October 6th

12 or Tuesday, October 13th at 11:00.  So the first one is at

13 12:30.  The next one is 11:30.  My preference is for the Tuesday

14 the 13th at 11:30.  Does that work for everybody?

15          MR. McINTURFF:  That's fine for plaintiffs, Your

16 Honor.

17          MS. REDDY:  That works for defendant.

18          THE COURT:  Okay.  So for November, Tuesday the 10th

19 at 10:45 or Wednesday the 4th at 12:30.  Which one do you guys

20 prefer?

21          MS. REDDY:  November 10th works for defendant.

22          MR. McINTURFF:  That's fine with plaintiffs.

23          THE COURT:  Okay.  December 7th at 11:30 or

24 December 10, which is a Thursday, at 10:00 a.m.  My preference

25 is the Thursday if that's works for you all.

 1          MR. McINTURFF:  The 10th works for plaintiffs as well.

 2          MS. REDDY:  Works for defendant, Your Honor.

 3          THE COURT:  Okay.  January, Tuesday the 12th at 10:00?

 4  Does that work for you all?

 5          MR. McINTURFF:  Yes, Your Honor, for plaintiffs.

 6          MS. REDDY:  Yes, Your Honor.  Thank you.

 7          THE COURT:  Okay.  So we are going to -- I'll schedule

 8  these monthly calls, and what I want you to do is three days --

 9  three business days before the conference to send me a joint

10  letter listing the issues that you want to discuss.  I don't

11  want to have a lot of back-and-forth.  I want you can state your

12  positions and just succinctly state the agenda and the items to

13  talk about.

14          Between now and October, the October 13th conference,

15  I want Noom to produce some of this information that we have

16  discussed today, and I want you -- you are going to be

17  responding, as I understand it, to the document requests and

18  interrogatories.  And it sounds like you are going to need to

19  have a meet-and-confer on some of those.

20          For plaintiffs, I want you to re-review your document

21  requests consistent with -- consistent with the recommendations

22  of the Sedona Conference in how to phrase your discovery

23  requests, and in the meet-and-confers you are going to need to

24  compromise to hone in on the information that you really need

25  because that information that you really need is also key to

1   designing the ESI protocol.

2            MR. McINTURFF:  Thank you, Your Honor.  This is

3   Burkett McInturff.  Could I be heard on a couple of more issues

4   briefly?

5            THE COURT:  Sure.

6            MR. McINTURFF:  We would also like to seek Your

7   Honor's guidance on our request that the defendant provide its

8   written policies that might potentially impact what relevant ESI

9   is available, as well as -- that's in ECF 36 -- and then in ECF

10  48 whether the defendant, it will disclose to us its

11  preservation efforts.  At this point, all we have heard from

12  defendant other than on this call was, well, we received them in

13  the July 23rd letter.  It doesn't give us a sufficient

14  understanding of what ESI is and isn't being preserved.

15           THE COURT:  Well, the preservation -- you are going to

16  get the litigation hold.  So that's going to -- the litigation

17  holds also goes to IT managers who manage databases, so you are

18  going to get that information.

19           MR. McINTURFF:  Okay.  Okay.  And then finally, the

20  third issue is we are in the process of negotiating an ESI

21  protocol.  As alerted to Your Honor previously, we have a number

22  of disputes outstanding regarding the ESI protocol.  Currently

23  the deadline for submitting those disputes for Your Honor is

24  next Thursday.  I just wanted to give Your Honor a heads up that

25  that -- my understanding of Your Honor's ruling today, that's

1  still applicable, and that we will discuss that at the next

2  conference; is that accurate?

3           THE COURT:  Yes.  We are going to discuss it at the

4  next conference.  So what I would like is, I would like you to

5  try to narrow down the issues.

6           And have you all seen the, sort of, talking points

7  document that I put up on my website?

8           MS. REDDY:  Yes, Your Honor.

9           MR. McINTURFF:  Yes, Your Honor.  If I could briefly

10  be heard on that issue?

11           THE COURT:  Sure.

12           MR. McINTURFF:  We alerted -- as soon as Judge

13  Schofield referred the case to Your Honor, we alerted the

14  defendant to those talking points in the checklist and asked

15  that we go through them, and the defendant took the position

16  that we had already gone through them.

17           It's our view that a lot of the information that we

18  are seeking in those talking points, and if we could just have

19  the disclosures that are in the talking points, we would at

20  least advance the ball significantly beyond where we are at this

21  point.

22           MS. REDDY:  Your Honor, may I respond?

23           THE COURT:  Sure.

24           MS. REDDY:  I disagree.  Defendant disagrees with that

25  characterization.  The parties have had many, many meet-and-

1 confers regarding the ESI protocols.

2          During the initial case management conference on

3 August 13th, Judge Schofield, in connection with disputes that

4 plaintiffs had teed up in the joint conference letter, had

5 instructed the parties to use the Seventh Circuit model ESI

6 protocol as a basis for further discussion, which we have done.

7 We prepared to draft ESI protocol that closely adheres to that

8 Seventh Circuit ESI protocol, have continued to meet and confer

9 with plaintiffs, including a three-hour meet-and-confer just

10 last week; and so it's not clear to us what additional relief

11 plaintiffs are seeking or what additional information they would

12 like, but those conversations are well under way, and we have

13 invested substantial time and energy in developing a protocol

14 consistent with Judge Schofield's recommendation.

15          THE COURT:  Sure.  Okay.  So Judge Schofield has now

16 referred the case to me for general pretrial management, and I

17 don't have a problem with the Seventh Circuit, you know, plan if

18 that's what you have developed, and you can of course modify it.

19          The talking points that I have are just the

20 constructive way, a guidelines, for going through these issues.

21 That's what they are there for.  They are not mandatory.  I put

22 them up to help parties have intelligent discussions early on

23 and to cover topics that are sometimes, you know, major sources

24 of dispute.  So they should -- those topics should be able to

25 be -- to fit within any discovery plan, including the Seventh

1   Circuit model if that's how you start it off.  That's fine.

2          You know, there is no -- there is no, you know, one

3   size fits all or only one model that works; but I think, based

4   on what I have heard so far, you guys are disputing everything,

5   and you are going to have to learn to get along and have

6   transparent discussions because that's going to be necessary.

7   Otherwise, everybody is going to be miserable during this

8   litigation, and it's going to be very expensive for everybody.

9          And so in terms of a submission on the 17th, I wonder

10  whether that is -- whether that is necessary.  I am wondering

11  whether you can submit whatever your proposed ESI plan is

12  together with your letter in advance of the next conference, and

13  you can just put in your respective positions in the areas that

14  you dispute.  You know, you can have -- you can have a track

15  change or comments or whatever outlining, you know, defendant

16  wants this, plaintiffs want this on those aspects of the plan

17  that you disagree with.  That may be an easier way to deal with

18  it, and I can look at it in advance of the next conference.

19          MS. REDDY:  Your Honor, that's -- we have no objection

20  to that, and we are happy to take any proposal that's going to

21  streamline the resolution of the disputes on this issue.

22          THE COURT:  Yes.  So and I think giving you a little

23  bit more time to do that based on the instructions that I have

24  given you today will perhaps minimize the disputes, but again,

25  ESI and who is the custodian and who is your -- whose data you

1   are preserving and all of that is all keyed off of:  What's the

2   information that's relevant?  So you need to have some more

3   discussions about that and really the buckets of information or

4   the departments with the key information and have some

5   conversation about that and so that we can have an intelligent

6   conversation at the October conference around those areas.

7            MS. REDDY:  Your Honor --

8            THE COURT:  But those should inform the dispute.

9            MS. REDDY:  Understood.  And just to give Your Honor a

10  flavor, we have received 80 requests for production, some with

11  as many as between 11 and 21 subparts.  So they are extremely,

12  extremely extensive.

13           THE COURT:  That's clearly excessive.  That is

14  excessive.  And so, you know, what parties sometimes do is they

15  are afraid they are going to miss something, and they are afraid

16  to be tailored, but it's better to be tailored and then get at

17  the information.  Having requests like that wastes time, and so

18  this is why I am directing plaintiffs to meet and confer with

19  you and to really narrow down those requests.

20           Just say what you want, and that will be a better way

21  to go about getting what you want instead of creating a ton of

22  discovery disputes.  Okay?

23           MR. McINTURFF:  Your Honor, this is Burkett McInturff.

24  Could I briefly -- just briefly be heard on that issue?

25           THE COURT:  Not right now.  I want you to go back --

1  the number of requests and the specifics, it just -- it seems

2  excessive based on what I have heard now.  So what I would like

3  you to do is meet and confer, and then you can put whatever the

4  issues are in the letter before the next conference.

5          MS. REDDY:  And Your Honor?

6          THE COURT:  Everybody, you are going to get the

7  information you need to prosecute the case, but I'm not going to

8  permit excessive redundant requests and things that are getting

9  into things that aren't relevant.

10         MR. McINTURFF:  Understood.

11         MS. REDDY:  Your Honor --

12         MR. McINTURFF:  Just if I could ask, again, we had

13 requested a ruling on our request that defendants provide its

14 written or description of the unwritten policies of -- the ESI

15 policies that might impact what ESI is available.  These are

16 typically like IT manuals that tell us about the defendant's

17 systems.  They are not very burdensome to produce, and we have

18 been asking for them for several weeks.

19         THE COURT:  Well, are there even such -- are there any

20 manuals?

21         MS. REDDY:  Your Honor, I am not aware, and frankly,

22 not really even sure what plaintiffs are requesting.  It's an

23 extremely broad request that they have put in a letter.  Again,

24 this is one where I do feel it would be beneficial if they just

25 served a discovery request so we can understand the scope of

1  what's being sought.

2          THE COURT:  I don't think there should be more

3  discovery requests.  It sounds like this is -- that -- let's

4  deal with what you have right now because if you have 80, that's

5  -- with 20 subparts each, that's enough to deal with right now.

6  So I don't think you should be dealing with -- you don't

7  necessarily need a formal request for everything, and sometimes

8  informal interviews and that kind of thing is better.

9          So I think -- right now the request for the manuals is

10 denied without prejudice because I think you first need to get

11 some more information that I have described, and then -- then

12 maybe a next step is to have a conversation with the people who

13 have the most knowledge about the systems to gather the data and

14 you can have an informal conference call.  That is sometimes a

15 way --

16         MR. McINTURFF:  Would that includes plaintiffs, Your

17 Honor?  That would include plaintiffs?

18         THE COURT:  Yes, of course.  That's -- that may be the

19 way to go, but I think right now let's exchange the information

20 that I have directed you both to exchange and to work on, and

21 then I'm going to lift that 17th deadline, and instead you will

22 submit a proposed plan with the disputed issues along with the

23 letter three business days in advance of the October 13th

24 conference.  And between now and then, no -- no motions.  No

25 letter motions between now and then.

1          MS. REDDY:  That's fine with defendant, Your Honor.

2          MR. McINTURFF:  Well, Your Honor --

3          MS. REDDY:  I do want to ask Your Honor, if I may be

4    heard.  I know Mr. Burkett has had a number of issues that he

5    has raised.

6          We have not yet received any confirmation that the

7    named plaintiffs -- there are ten of them -- have turned off

8    auto-delete from their text messages, communication applications

9    or emails, nor have we received any specific information about

10   the repositories that plaintiffs intend to collect from for nine

11   of the ten named plaintiffs.  So we have been asking for this

12   information for some time.  We have gone to great lengths to

13   provide various disclosures to plaintiffs, and we would just ask

14   for reciprocal timely disclosures from them.

15         THE COURT:  Well, sure.  I mean, the plaintiffs, I

16   assume, all were signed up for Noom at some point or other and

17   then ended Noom at some point or another, and they did so and

18   accessed it through their phones, iPads, computers, desktops, or

19   maybe even a smart watches.  So I assume that plaintiffs have --

20   that you have talked with all of your plaintiffs and preserved

21   data for the duration of their participation in Noom and any

22   communications that they have had with people from Noom or

23   relevant third parties like a credit card company that they may

24   have complained to.  Have you done that?

25         MR. McINTURFF:  We have, Your Honor.  Unfortunately,

1  we have been trying to work with defense counsel on this.  We

2  are collecting the last remaining information of the defendant's

3  requests, and we are preparing to transmit it.

4          I will note that none of these requests came until we

5  started raising issues with Slack preservation, but we can set

6  that aside.  I did have a question.

7          THE COURT:  Yes.  Because for each of the plaintiffs I

8  think you need to provide -- you need to explain how they were

9  accessing Noom, which devices, right, they were accessing it,

10  and because those would be sources of the data and -- and for

11  what period of time, and you are going to have to download, you

12  know, that information from their devices.

13          Plus, some of them may have been on Facebook or other

14  chats, other apps, where they were talking about Noom or

15  promoting Noom.  You know, some people go onto Facebook and they

16  are like, "Hey, I am doing Noom" or "I'm on whatever diet,

17  Weight Watchers," or whatever, and they talk about it, and so I

18  assume that you've also taken steps to preserve any social media

19  and email accounts where the plaintiffs were talking about their

20  diets and the Noom application?

21          MR. McINTURFF:  We have, Your Honor.  We have done

22  exhaustive preservation and collection efforts.  We've already

23  collected everything possible under the sun from our clients.

24          THE COURT:  Okay.

25          MR. McINTURFF:  And we are willing to be totally

 1  transparent in our process, and we have told defendant that, and

 2  we have already made substantial disclosures.

 3          If I could just ask a logistical question?  We have

 4  teed up for the next conference is the ESI protocol issues, but

 5  also now we are going to have issues regarding plaintiffs'

 6  discovery requests.  I don't know if Your Honor appreciated

 7  this, but the defendants have responded to our written -- our

 8  document requests, and we were going to get the interrogatory

 9  responses tomorrow or the next day.  I'm not sure.  But last

10  week we sent the defendant a deficiency letter regarding, among

11  other things, very lengthy boilerplate objections, and we have

12  requested a meet-and-confer regarding those objections, and, you

13  know, we will meet and confer pursuant to Your Honor's order in

14  an attempt to narrow our requests and discuss those with the

15  defendant.

16          You know, we are not trying to be -- trying to collect

17  every document in the company.  There is a significant

18  information asymmetry here.  We represent consumers.  This isn't

19  an ongoing relationship.  We don't know what the defendant has,

20  and part of the 26(f) process is to determine that, but --

21          THE COURT:  Sure.

22          MR. McINTURFF:  -- but we expect that there are going

23  to be significant and sharp differences about the scope of

24  discovery and relevance in this matter, so I suspect we are

25  going to have disputes regarding our discovery requests and

1   defendant's responses also teed up.

2           THE COURT:  Right.  And so what I -- exactly so --

3           MR. McINTURFF:  So do you want a separate letter?

4           THE COURT:  No.  I want a joint letter.  It can be six

5   pages in advance of the -- and accompanying it will be this

6   proposed ESI plan.  We will talk about the ESI, and then to the

7   extent you have disputes about particular document requests, you

8   know, either side, that you weren't able to resolve in

9   meet-and-confers, then you can tee those up for me; but what I

10  am directing you to do between now and then is to meet and

11  confer.  Both sides need to think about their document requests

12  and their responses and look at the -- look at the Sedona

13  Conference suggestions about that.

14          MR. McINTURFF:  I am sorry.  Just to be clear, Your

15  Honor --

16          THE COURT:  It's going to be --

17          MR. McINTURFF:  I am sorry.

18          THE COURT:  -- very important.

19          MR. McINTURFF:  Yes.

20          THE COURT:  In terms of the responses, right, the

21  guidance on Rule 34, which is very -- they give some good

22  suggestions for how to draft and respond to document requests.

23          MR. McINTURFF:  Your Honor, I am sorry.  I am asking a

24  logistical question.  So now I understand that you are saying

25  the parties need to submit a joint six-page letter on their ESI

1  protocol disputes, but then if there are discovery request

2  disputes, is that a separate letter?

3          THE COURT:  No.  The same letter.

4          MR. McINTURFF:  Okay.  Because I also understood --

5  and, Aarti, correct me if you understood differently -- but I

6  understood Your Honor said we are going to submit our ESI

7  protocol disputes separately.  Then you said a joint letter.  So

8  I'm not sure which one it is.

9          THE COURT:  So you are going to have a joint letter

10 talking about the agenda and outlining the issues that you have.

11 So they may be the -- they may -- some may relate to document

12 requests in the interrogatories.  Some may relate to ESI, and

13 then you are going to submit the draft ESI protocol, and within

14 that document, if there are points within it that you have

15 disputes, you can present to me in that draft both sides'

16 position as to what it should be.  Do you understand?

17         MR. McINTURFF:  I do, Your Honor.

18         One of the issues I am concerned with is the joint

19 letter being six pages considering the length of the disputes

20 that we -- you know, the number of discovery disputes we have.

21 It might make more sense just dividing up the issues to do a

22 letter on discovery requests and a letter on the ESI protocol.

23         THE COURT:  I think you can be short.  You can

24 summarize.  It doesn't have to be extensive briefing.

25         MR. McINTURFF:  Okay.  Sure.

1            THE COURT:  We will have a conversation.

2            MR. McINTURFF:  Sure.

3            THE COURT:  And if there needs to be additional

4   briefing, there can be additional briefing.  Let's start small.

5   We can only handle so much in one conference, and then we can

6   have -- we can decide what we will do next.  Okay?

7            MR. McINTURFF:  Okay.

8            THE COURT:  But you guys have a lot of work to do

9   between now and October 13th.

10           MS. REDDY:  Understood.  And, Your Honor, we have a

11  rolling production deadlines to begin stuff that Judge

12  Schofield -- there is rolling productions for both parties is

13  supposed to begin on September 16th.  Given that the parties are

14  still negotiating the ESI protocol and are in the midst of

15  negotiating the scope of defendant's response to plaintiffs'

16  RFPs, we think it makes sense to push this deadline back by a

17  few weeks.  So we plan to meet and confer with plaintiff on this

18  issue.  We have reached out to them a number of times, but

19  haven't heard their position on whether they would oppose.

20           THE COURT:  Well, it seems to me that you can produce

21  at least some things.  For example, you can produce the

22  litigation holds on the 16th.  That's part of your production.

23  That's part of something the plaintiffs -- there is going to be

24  some things that you can produce that are not necessarily

25  confidential on the 16th.  It may not be large, but you can

 1  certainly produce some stuff.  Sounds like plaintiffs are going

 2  to produce some stuff, but you identified some things I am sure

 3  already that are relevant.  Is that not the case?

 4          MS. REDDY:  That is the case.  Just given that we are

 5  concurrently negotiating the protective order --

 6          THE COURT:  Yes.

 7          MS. REDDY:  -- and the ESI protocol will determine --

 8  we are disputing the metadata fields that would be associated

 9  with the different documents.  We would need to reproduce

10  documents likely if we end up negotiating an ESI protocol that

11  is different than the draft protocol that we currently -- the

12  defendant's currently proposed.

13          THE COURT:  Okay.  So --

14          MR. McINTURFF:  Your Honor, could I briefly confer

15  with my colleagues for --

16          THE COURT:  Yes.

17          MR. McINTURFF:  -- 30 seconds?

18          THE COURT:  Go ahead.

19          (Pause)

20          MR. WITTELS:  Your Honor, hi.  This is Steven Wittels.

21  I am just jumping in here at the end.

22          Your Honor, we will be producing on the 16th.  We

23  don't see why we can't get started.  We have been trying for

24  months to get some documents.  We know if they produce these

25  documents regarding the litigation hold, we don't get the

1  disputed -- we will come back, and that's not a big deal to get

2  us the metadata.  We should start producing what Your Honor has

3  ordered.  It's not exhaustive.  They have already found the

4  documents.  So let's get them --

5         THE COURT:  Yes.  That -- I am with you, and so

6  defendant -- so Noom should produce its first iteration, first

7  tranche of documents based on the metadata that Noom says it's

8  willing to produce, and then if there is a dispute, we will deal

9  with that.  We can deal with that metadata issue at the October

10 conference.  So you won't have to go back and do too much more,

11 and it may not even be necessary for the documents that you are

12 producing in the first tranche.

13        Privilege logs, those -- I require pretty detailed

14 privilege logs if there is going to be any privilege disputes.

15 So you need to include everything that the local rules require

16 on the privilege logs.  Of course, I encourage you to agree to

17 categorical logs with respect to certain things if that's

18 possible, and to the extent that you can agree not to log

19 certain kind of things, I encourage you to have those kinds of

20 conversations to minimize the logging because it's extremely

21 expensive; but there may be some categories of privileged

22 documents where you need a document-by-document log.

23        So I want you to have a conversation about that, too.

24 But just so you know, both sides know, I require a pretty

25 detailed log on an Excel sheet if anything is going to be

1 presented to me to look at in camera.

2          MR. McINTURFF:  Your Honor, we also had a dispute

3 about relevancy redactions I would like to flag for Your Honor.

4 It's been plaintiffs' position that the defendant can't redact

5 information from documents that are otherwise relevant, that it

6 deems it is irrelevant, and we couldn't get a commitment from

7 the defendant on this issue to agree not to do any relevancy

8 redactions of the documents it produces.  It's our position that

9 the only permissible redactions are for privilege and work

10 product.

11          MS. REDDY:  Your Honor, may I be heard?  This is -- I

12 don't think this is productive to have a piecemeal --

13          THE COURT:  I don't want -- I don't want to address

14 this issue right now.  So if this is something that we have to

15 address -- if we have to address it in October, we can address

16 it in October.  Just start with the production now.  Start with

17 the issues that we talked about now.  We can't deal with

18 everything right now, and then I will talk with you in October,

19 and I'll issue an order just summarizing what you are going to

20 do between now and then.  Okay?

21          MS. REDDY:  Thank you, Your Honor.

22          MR. McINTURFF:  Thank you, Your Honor.

23          THE COURT:  Okay.  Have a good day.  Bye-bye.

24

25