UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOJO NICHOLS, SUSAN BREWSTER, DUANE DEA, MARYANNE DERACLEO, KAREN KELLY, REBECCA RICHARDS, JENNIFER SELLERS, and STACY SPENCER, *Individually and on Behalf of All Others Similarly Situated*,<br><br>                                         Plaintiffs,<br>                         v.<br>NOOM, INC., ARTEM PETAKOV, and JOHN DOES 1 to 5,<br>                                         Defendants. | No. 20 Civ. 3677 (LGS) (KHP)<br><br>USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #:_____<br>DATE FILED:_ 1/13/2021_ |

**ORDER CONCERNING DISCOVERY OF ELECTRONICALLY STORED INFORMATION**

I.       TERMS

Insofar as the parties have not been able to reach full agreement on a protocol for the production of Electronically Stored Information ("ESI"), the following discovery plan shall govern the search and production of ESI in this matter (the "Discovery Plan" or "Protocol").

A.       SCOPE

1.       The Parties shall cooperate in good faith throughout the matter consistent with the Federal Rules of Civil Procedure, this Order, and the Court's Local Rules and Individual Practices Rules.

2.      Nothing in this Discovery Plan shall supersede the provisions of any subsequent Protective Order.

3.      The Parties have identified the following sources and categories of ESI that they believe may have relevant information to the Parties' claims or defenses in this matter:

    (a)      Plaintiffs have identified and collected all relevant data from the following sources:

        (i)      Susan Brewster:

           (1)      Hotmail (now Outlook Mail);

           (2)      Noom App;

           (3)      Electronic Payment Records;

           (4)      Social Media;

           (5)      Text Messages

        (ii)      Maryanne Deracleo:

           (1)      Yahoo! Mail;

           (2)      Noom App;

           (3)      Social Media;

           (4)      Text Messages

        (iii)      Karen Kelly:

           (1)      Google Mail (two accounts);

           (2)      Electronic Payment Records;

           (3)      Social Media;

           (4)      Text Messages

        (iv)      Mojo Nichols:

2

       (1)     Google Mail;

       (2)     Noom App;

       (3)     Electronic Payment Records;

       (4)     Social Media;

       (5)     Text Messages

(v)     Rebecca Richards:

       (1)     Google Mail;

       (2)     Noom App;

       (3)     Social Media;

       (4)     Text Messages

(vi)     Jennifer Sellers:

       (1)     Google Mail;

       (2)     Noom App;

       (3)     Social Media;

       (4)     Text Messages

(vii)     Duane Dea

       (1)     Google Mail;

       (2)     Electronic Payment Records;

       (3)     Social Media;

       (4)     Text Messages

(viii)     Stacy Spencer

       (1)     RoadRunner Mail;

       (2)     Noom App;

       (3)     Electronic Payment Records;

       (4)     Social Media;

    (5)  Text Messages

  (b)  Defendants have collected all relevant data from the following sources:

    (i)  Google Mail

    (ii)  Hangouts (G-chat)

    (iii)  Google Drive

    (iv)  Google Calendar

    (v)  Slack

    (vi)  ZenDesk

    (vii)  Looker (reporting tool)

      (1)  AWS Redshift

        (A)  SQL databases

        (B)  Braintree

        (C)  GroupsMagic

        (D)  Supportland

        (E)  Homegrown

    (viii)  MixPanel (reporting tool)

4.  Each party is responsible for taking reasonable and proportionate steps to preserve relevant and discoverable ESI within its possession, custody, or control.[1] To reduce the costs and burdens of preservation and to ensure relevant and discoverable ESI is preserved, the Parties shall:

  (a)  Document their collection methodologies and ascertain that the selected methodology will not overwrite or alter pre-existing metadata such as file creation date or last modified date. Additionally, the Parties will determine and record their sources of potentially relevant information for preservation and collection consistent with their duty to assess the scope of preservation of potentially relevant ESI, documents, and tangible things.

---

[1] As used herein "relevant," "responsive" and "discoverable" are used interchangeably and in any instance shall be construed consistent with FRCP 26(b)(1).

(b)     Confirm that any backup, disaster recovery or archive media which may contain relevant discoverable ESI and is not otherwise available on a more accessible medium is being preserved. The Parties shall also confirm that all processes and procedures which would result in the elimination, or transfer of relevant ESI to a less accessible medium, of any unpreserved data and associated metadata which would otherwise be required to be preserved or produced have been suspended.

(c)     E-discovery will be limited to ESI in the Parties' custody, possession, or control created on or after January 1, 2017, with the exception of agreed-upon custodial and non-custodial data or after November 1, 2015 to encompass the Healthy Weight Program and any other exceptions permitted by the Court after a showing of good cause.

5.     The Parties have identified the following Third Parties as likely to have ESI relevant to this matter:

(a)     Plaintiffs

(i)     Plaintiffs are not aware of any third parties that have relevant information that is not otherwise duplicative of information maintained by Plaintiffs.

(ii)     Plaintiffs shall promptly notify Defendants if they become aware of any third parties with relevant ESI.

(b)     Defendants:

(i)     Defendants have disclosed several third parties with potentially responsive information and will promptly notify Plaintiffs if they become aware of any additional third parties with relevant ESI.

As a result of investigation and/or discovery, a Party may identify additional data sources that may or may not need to be searched or preserved pursuant to the foregoing, and will disclose any additional macro-level data sources that may contain relevant or responsive information. The Parties shall meet and confer about preserving such ESI as any additional data sources may be identified in the future.

6.     Apart from the custodians already identified by the parties as of the date of this Order, no more than 5 additional custodians per side shall be permitted absent a showing of good cause.

B.      SEARCHING AND INACCESSIBLE DATA.

The parties shall apply the proportionality standard set forth in Fed. R. Civ. P. 26(b)(2)(C).  Accordingly, requests for production of ESI and related responses should be reasonably targeted, clear, and as specific as practicable.

Producing parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information. The case law and the procedural court rules provide that discovery should take place without court intervention, with each party fulfilling its discovery obligations without direction from the court or opposing counsel. Deference regarding the selection and implementation of the discovery process should be given to the party that will incur the costs.

1. Searching

    a. The Parties shall continue to meet and confer in good faith regarding the list of custodians with relevant or discoverable information.

    b. The parties will disclose the custodians, date parameters, and search criteria, if any, used to respond to a request for production of documents.

    c. Defendant shall utilize search terms to identify potentially relevant or responsive documents in Noom's Slack and Google Vault environments. Google Vault includes Google Mail, Google calendar, Hangouts (i.e., G-chat), and Google Drive. Defendant will provide meaningful hit reporting for the number of documents that were search-term positive, family counts, and will identify unique hits by custodian.

    d. The Requesting Party may provide input and suggest supplemental search criteria, which will be evaluated in good faith by the Producing Party. To facilitate meaningful discourse and searching input, within 30 days of the entry of this Order, the Producing Party will disclose the following about their search software:

        i. The software to be used, including any installed modules and the version numbers of the software and any such modules;
        ii. A full description of the software's query syntax and operators;
        iii. A list of the software's default stop words and operators for software;
        iv. A list of any other default parameters, such as minimum indexed word length, of the software;
        v. A list of characters that cannot be searched or are treated as spaces or ignored by the software, or must be searched using alternate methodologies or syntax.
        vi. Whether the platform supports regular expressions, searching for numbers and single characters, and case-sensitive searches;
        vii. How diacritics are resolved;
        viii. Whether, if proximity limitations are supported, proximity-limited search terms are subject to an evaluation order, e.g.,

7

will terms structured X w/5 Y yield hits if the text reads Y w/5 X;

ix.  Whether synonym searching is supported;

x.  Whether and how the tool accounts for common misspellings;

xi.  Whether stemming is applied in indexing or searching the collection, and if so, what stemming algorithm is used;

xii.  Any parameters/options being used in setting up the index or in searching.

e.  Notwithstanding any agreements on the search terms to be used for electronic searches, should a search produce an unreasonably large number of non-responsive or non-relevant results, the parties shall (at the Producing Party's request) meet and confer to discuss application of further search restrictions. The party receiving production shall not unreasonably oppose such further restrictions designed to filter non-responsive or non-relevant search results.

f.  Agreement on an identification methodology does not relieve the party of its obligations under the Federal Rules to produce all relevant, proportional and responsive materials of which it is aware.

2.  Inaccessible data: The Parties shall meet and confer to determine which types of data stores are presumed to be not reasonably accessible in accordance with Federal Rule of Civil Procedure 26(B)(2)(b).

3.  De-Duplication, Email threading, and De-Nisting

(a)  The Parties shall attempt to de-duplicate ESI to avoid substantially duplicative productions and reduce review burdens.

(b)  The Parties shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at the family level. Attachments should not be eliminated as duplicates for purposes of production, unless the parent e-mail and all attachments are also duplicates. An e-mail that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an e-mail that does not include identical content in those fields, even if all remaining content in the e-mail is identical. De-duplication should be done across the entire collection (global de-duplication) and the metadata for file name and file path for non-privileged documents, to the extent reasonably available, as well as the ALL CUSTODIAN field, to the extent reasonably available, should list each custodian, separated by a semi-colon, who was a source of that document. Should the ALL CUSTODIAN metadata field produced become outdated due to rolling productions, an overlay file providing all the custodians for the

affected documents should be produced prior to substantial completion of the production.

(c)     To the extent that deduplication is used, a document produced from one custodian's file but not produced from another custodian's file as a result of deduplication will nonetheless be deemed as if produced from that other custodian's file for purposes of deposition, interrogatory, request to admit and/or trial.

(d)     The Parties shall meet and confer about the use of email thread suppression to reduce the Producing Party's production burden.

(e)     NIST files

      (i)     Common system files defined by the NIST library (http://www.nsrl.nist.gov/) need not be produced. Identification of NIST list matches will be through MD5 Hash values.

4.     Identification Of ESI

The Parties shall continue to meet and confer in an effort to reach agreement regarding the identification of relevant sources of potentially responsive documents and ESI in accordance with the deadlines set by the Court or agreed upon by the Parties. As additional data sources are identified as a result of investigation and/or discovery, the Parties may identify additional data sources that may or may not need to be searched or preserved pursuant to the foregoing. The Parties will meet and confer about preserving such ESI as any additional data sources are identified.

5.     Documents with Insufficient Text

Documents that are reasonably believed to be responsive and for which text-based search technologies are fundamentally ineffective, such as handwritten notes, multimedia files, or images where OCR does not provide sufficient searchable text, must be reviewed without culling by search terms, predictive coding, or other technologies that rely primarily on text.

6.     Additional or Alternate Methodologies for Documents from Certain Custodians and Non-Custodial Data Sources

Upon request, the Parties will meet and confer to address the need for and implementation of additional or alternate methodologies for identifying possibly responsive documents from custodians and non-custodial data sources that may warrant such treatment.

7.      Other Filtering or Culling Technologies

Prior to use by Defendants, Defendants will disclose their use of any other culling technologies not specified herein to reduce the number of documents identified for classification, review, or production.

8.      Mobile and Handheld Device Documents and Data

If responsive data that can reasonably be extracted and produced in the formats described herein is identified on a mobile or handheld device, that data shall be produced in accordance with the generic provisions of this Protocol. The parties are to meet and confer to the extent that there is additional data that needs to be produced on a mobile or handheld device that is not susceptible to the provisions in the Protocol.

9.      Discrete Document Collections - "Short Cut Collection"

Upon request, the Producing Party agrees to meet and confer with the Receiving Party to discuss the feasibility of prioritizing the Producing Party's production of certain discrete categories of documents the Receiving Party considers highly relevant and responsive.

C.      PRODUCTION FORMAT

Except as detailed below, all electronic documents except emails shall be produced in Native. Natives will be provided in their original native format unless redactions are required or unless otherwise provided.

1.      Bates Numbering Documents

(a)      All images must be assigned a Bates number that shall always: (1) be unique across the entire document production; (2) maintain a constant length across the entire production; and (3) be sequential within a given document.

(b)      If a Bates number or set of Bates numbers is skipped in a production, and not otherwise identified on a privilege log, the Producing Party will disclose the Bates numbers or ranges in a cover letter accompanying the production.

2.      Images

(a)      Except as otherwise provided, all documents not produced natively shall be converted to black and white 300 dpi TIFF format image files with Group IV compression and one TIFF file per page. If a document cannot be accurately reviewed in black and white format, upon reasonable written request by the receiving party, a producing party shall produce color images for selected documents provided

10

the volume of documents selected for color production is reasonable. Documents produced in color shall be produced as JPEG images, 200 dpi or higher and 24-bit color depth. Each color document image file shall be named with the unique Bates Number of the first page of the document followed by the file extension "JPG." If a document cannot be rendered in TIFF format, the Parties will provide a placeholder TIFF image displaying information sufficient to explain why the document could not be rendered (e.g. "encrypted," "Corrupt," etc.);

(b)     Each image file shall be named with its unique Bates number and branded with the Bates number and confidentiality designation (if any) on the face of the image in a location that does not cover up any of the document's original text or images;

(c)     Bates numbers should be endorsed on the lower right corner of all images and confidentiality should be endorsed in the lower left corner of all images.

(d)     Image Load file: An image identification file shall be provided containing a row of information for every image included in the production. The format of the file should be industry standard IPRO format (LFP), Concordance Image format (OPT) or other delimited file format using common ASCII (American Standard Code for Information Interchange) characters for field identification that includes one row of information for each image with fields for image Bates number, relative path to the image, image filename, page number, and document start identifier to designate the first page of a document;

3.     Production and Use of Native Files

(a)     With respect to the production of non-email electronic documents in native format as set forth above:

(i)     The full path of the native file, as it exists in the production, must be provided in the .DAT file for the NATIVEFILELINK field.

(ii)     The number of native files per folder should not exceed 1,000 files.

(iii)     A Bates-stamped placeholder TIFF, bearing the legend "This document has been produced in native format" shall be provided for ESI produced in native format; these placeholders will be Bates numbered in the same way as any other TIFF, and the Bates number of that single page

shall be used as the BegBates and EndBates of the associated document. The file name of the native file produced shall be the Bates number of the corresponding TIFF slip sheet.

(iv)    For spreadsheets requiring redactions, the parties shall provide redactions in the native file to maintain file usability.

(b)    To the extent a native file produced cannot be rendered or viewed without the use of proprietary third-party software, the Parties shall meet and confer to discuss options.

(c)    The Parties will meet and confer on the production format of less-commonly used file types that may not fit the general provisions of this protocol.

4.    Text

(a)    Searchable text of the entire document must be provided for every record, at the document level. Parties shall not degrade, convert or corrupt extracted text and provide text in an appropriate encoding to not degrade, convert or corrupt extracted text. Extracted text must be provided for all documents that originated in electronic format, and electronic text must be extracted directly from the native electronic file unless it is a redacted document, an image file, or a hard copy document. In these instances, a text file shall be created using OCR and shall be produced in lieu of extracted text. The text file name shall be the same as the Bates number of the first page of the document. File names shall not have any special characters or embedded spaces.

(b)    To the extent OCR text is required, OCR software should be set to the highest quality setting during processing. Documents containing foreign language text shall be OCR'ed using the appropriate settings for that language so as not to degrade, convert or corrupt the original text. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

(c)    Text extracted from emails shall include all header information that would be visible if the email was viewed in Outlook including: (1) the individuals to whom the communication was directed ("To"), (2) the author of the email communication ("From"), (3) who was copied and blind copied on such email ("CC" and "BCC"), (4) the subject line of the email ("RE" or "Subject"), (5) the date and time of the email, and (6) the names of any attachments.

5. Family Groups

    (a)    A document and all other documents in its attachment range, emails with attachments, files with extracted embedded OLE documents, and email or other documents together with any documents referenced by document stubs within those emails or other documents all constitute family groups. If any member of a family group is produced, all members of that group must be also be produced or else logged as privileged.

    (b)    Parent-child relationships (the association between an attachment and its parent document or between embedded documents and their parent) shall be preserved.

6. Metadata Load files

    (a)    All document information and metadata for each document shall be produced in a delimited data load file with one row for each document produced and shall include the document information and metadata identified in the table below to the extent it is available. The format of the file shall be industry standard Concordance DAT file format or a delimited text file that uses ASCII character delimiters as follows: Field Delimiter= ""ASCII (020), Text Quote= "]l" ASCII (254), Multi-Entry=";" ASCII (059)

7. All ESI should be produced with the following metadata, to the extent such metadata is readily available:

- BegBates: Beginning Bates Number
- EndBates: Ending Bates Number
- BegAttach: Beginning Bates number of the first document in an attachment range
- EndAttach: Ending Bates number of the last document in attachment range
- Custodian(s): Name of All Custodians of the File(s) Produced - Last Name, First Name format
- FileName: Filename of the original digital file name
- FilePath: Original file/path of the location where the item was located at the time of collection. This should include location, and, for e-documents and e- attachments, file name, and file extension. Folder names and path should be included, and, for emails and attachments collected from a container such as a .pst, the full folder path within the container. Any container names should be included in the path.
- NativeLink: Path and filename to produced Native file
- EmailSubject: Subject line extracted from an email message
- Title: Title field extracted from the metadata of a non-email document
- Author: Author field extracted from the metadata of a non-email document
- From: From field extracted from an email message
- To: To or Recipient field extracted from an email message

- Cc: CC or Carbon Copy field extracted from an email message
- BCC: BCC or Blind Carbon Copy field extracted from an email message
- DateRcvd: Received date of an email message (mm/dd/yyyy format)
- TimeRcvd: Received time of an email message (hh:mm:ss format)
- DateSent: Sent date of an email message (mm/dd/yyyy format)
- TimeSent: Sent time of an email message (hh:mm:ss format)
- ConversationID: email thread identification ID
- DateCreated: Date that a file was created (mm/dd/yyyy format)
- DateModified: Modification date(s) of a non-email document
- AttachmentCount: number of attachments to a document
- AttachmentNames: names of documents attached to a documents, separated by semi-colons
- LastModifiedBy: internal document last modified or last saved by property
- MD5: or MD5- hash value generated by creating a binary stream of the file
- ProdVolume: Identifies production media deliverable
- ExtractedText: File path to Extracted Text/OCR File
- Redacted: "Yes," for redacted documents; otherwise, blank
- Hasrevisions: Y if a Word document with revisions, otherwise N or empty
- Hascomments: Y if a Word or Excel document with comments, otherwise N or empty
- Hashiddentext: Y if a Word document with hidden text, otherwise N or empty
- Hashiddenslides: Y if a PowerPoint document with hidden slides, otherwise N or empty
- Hasspeakernotes: Y if a PowerPoint document with speaker's notes, otherwise N or empty
- Hashiddenrows: Y if a Excel document with hidden rows, otherwise N or empty
- Hashiddencolums: Y if a Excel document with hidden columns, otherwise N or empty
- Hashiddenworksheets: Y if a Excel document with hidden worksheets, otherwise N or empty
- Hasveryhiddenworksheets: Y if a Excel document with very hidden worksheets, otherwise N or empty

8. This list of fields does not create any obligation to create or manually code fields that are not automatically generated by the processing of the ESI; that do not exist as part of the original Metadata of the document.

9. Shared resources should be produced as separate custodians if responsive custodians have access to them or if they contain responsive documents. The name of the group having access would be used as the custodian name, i.e. Marketing Execs or Accounting Dept.

10. Paper Documents, including spreadsheets maintained in paper form, will be produced as TIFF images. Production will include the appropriate Load File which will contain the following fields, if available:

- Beginning Production Number (PRODBEGBATES)
- Ending Production Number (PRODENDBATES)
- Beginning Attachment Production Number (PRODBEGATTACH)
- Ending Attachment Production Number (PRODENDATTACH)

- Custodian
- Page Counts (PGCOUNT)
- Text Path (TEXTPATH).

11. Social Media

    (a) To the extent social media is discoverable in this matter, parties shall meet and confer on acceptable formats and collection methodologies.

12. Databases: Production of databases or other structured data ("databases") will be the subject of separate agreements, as needed, and is excluded from this Protocol. To the extent a response to discovery requires production of information contained in databases, the Parties shall meet and confer to discuss an appropriate production protocol for information from such databases, including but not limited to whether native production is warranted for some or all of such data.

13. Additional Processing Treatment for Files

    (a) **Embedded Objects**: Embedded files in Microsoft Office and .RTF files will be extracted as separate files and produced as attachments to the file in which they were embedded, except for images embedded in emails, which shall not be produced separately.

    (b) **Compressed files**: Compression file types (*i.e.*, .CAB, .GZ, .TAR., .Z, .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

    (c) **Time Zone**: The preferred time zone of processing ESI is Eastern Standard Time. Care should be taken, however, that any alteration of time zone during processing does not interfere with or alter original metadata of that ESI. The Producing Party shall consistently produce all ESI processed using the same time zone.

14. **Replacement Productions.** Any replacement production will be transmitted with a cover letter or email to identify the production as a replacement and cross-reference the BegBates and EndBates of the documents being replaced. If the replacement production is being transmitted by physical media, the media shall include the phrase "Replacement Production."

D. THIRD-PARTY ESI

1.     A Party that issues a non-party subpoena (the "Issuing Party") shall include a copy of this Discovery Plan with the subpoena and state that the Parties to the litigation have requested that third-parties produce documents in accordance with the specifications set forth herein.

2.     The Issuing Party is responsible for producing any documents obtained under a subpoena to all other Parties.

3.     If the Issuing Party receives any hard-copy documents or native files, the Issuing Party will process the documents in accordance with the provisions of this Discovery Plan, and then produce the processed documents to all other Parties.

4.     However, any documents the Issuing Party does not intend to process for its own use may be disseminated to all other Parties in the format in which such documents are received by the Issuing Party. If the Issuing Party subsequently processes any such documents, the Issuing Party will produce those processed documents to all other Parties.

5.     If the non-party production is not Bates-stamped, the Issuing Party will endorse the non-party production with unique prefixes and Bates numbers prior to producing them to all other Parties.

E.  PRIVILEGE AND REDACTIONS

1.     No redactions for relevance may be made within a produced document or ESI item with the following exceptions: (1) a producing party may redact highly sensitive personal health information (not height, weight, date of birth) of non-parties and will brand such redactions with an accompanying redaction label that states "Personal Health Information" or "PHI;" (2) a producing party may redact all but the last four digits of social security numbers and the last four digits of full credit card numbers of non-parties and will brand such redactions with an accompanying redaction label that states "Personal Identifying Information" or "PII." The Parties shall meet and confer in good faith to the extent they identify additional items that may be suitable for relevance redactions. Plaintiffs have agreed and shall not use produced personal information to solicit representation of absent class members.

2.     For redacted items which were originally ESI, all metadata fields will be provided and will include all non-redacted data, to the extent that metadata is not privileged.

3.     Redacted documents shall be identified as such in the load file provided with the production. A document's status as redacted does not relieve the Producing Party from providing all of the metadata required herein. Only documents in which the responsive material is entirely privileged shall be fully withheld from production; documents containing a combination of

16

privileged and non-privileged information that is also responsive shall be produced with privileged portions redacted.

4. If any document is fully withheld on account of privilege or work product protection, to avoid the loss of context due to an "orphaned" email or attachment the entire message-attachment shall still be produced with the withheld document slip-sheeted with a bates stamped TIFF image, and the bates number will be identified on the privilege log. If a claim of privilege or work product protection applies to only a portion of a document, the document should be produced, and the portion claimed to be privileged or work product obscured and stamped "redacted-priv" or "Priv."

5. Privilege and redaction logs should be produced on a rolling basis within two weeks after each production, and shall be accompanied by an Excel copy of the log. The PDF copy will be the official log of record.  The parties are advised that any privilege logs submitted to the Court for resolution of privilege disputes shall include for each document the Bates Number, the Subject Matter, date of document, Custodian, Author, Recipient, CCs, BCCs, titles and attorney designations, privilege(s) asserted, an explanation for the basis of the asserted privilege(s) as required by Local Rules and as set forth below, and a hyper-link to the disputed document, and a hyper-link to any explanatory parent documents/emails.   Further, the Court expects that challenged documents be grouped together such that duplicates and/or near duplicates are together and have consistent subject matter labelling. Likewise, to the extent challenged documents all fall in certain categories (i.e., communications where non-attorney outsider participated, communications with in-house counsel only when it appears in-house counsel was acting in a business role, communications solely among non-lawyers), they should be grouped together for ease of court review.

6. The following documents presumptively need not be included on a privilege log:

   (a) Defendants do not need to log withheld documents or communications sent directly to outside counsel (not copied or blind copied) created after May 12, 2020 or withheld documents or work product created by in-house or outside counsel created after May 12, 2020.

   Pursuant to the Court's rulings at the October 16, 2020 Conference: Defendants shall produce a "bucket" privilege log indicating the number of withheld documents or communications for the following categories of information:

   i. direct communications (not copied or blind copied) between Noom employees and Defendants' in-house counsel created after May 12, 2020;

       ii.   copied or blind copied communications between Noom employees and Defendants' in-house counsel created after May 12, 2020;

       iii.   copied or blind copied communications between Noom employees and outside counsel created after May 12, 2020

       iv.   withheld work product that does not involve in-house or outside counsel created after May 12, 2020.

(b)     Plaintiffs do not need to log: withheld documents or communications sent to outside counsel created after the date they were named as plaintiffs in the lawsuit.

Pursuant to the Court's ruling at the October 16, 2020 Conference: Plaintiffs shall produce a "bucket" privilege log for each Named Plaintiff indicating the number of withheld documents or communications sent to outside counsel prior to and including the date they were named as plaintiffs in the lawsuit.

(c)    Documents not responsive to the Requesting Party's substantive document requests and otherwise not required to be produced.

(d)    Privilege Logs should contain the following information:

1. a sequential number associated with each Privilege Log record;

2. the date of the document, which may be extracted in an automated fashion via available metadata;

3. the Bates numbers of documents redacted or withheld with a slipsheet;

4. to the extent reasonably available, the author(s) of the document, which may be extracted in an automated fashion via available metadata, and identification of which of them are attorneys and the relationship of the author, addressees, and recipients to each other;

5. to the extent reasonably available, the sender(s), addressee(s) and/or recipient(s) (including "cc" and "bcc" recipients) and, if email, subject line of the document, which may be extracted in an automated fashion via available metadata, along with other information about them necessary for the Requesting Party to assess the privilege (e.g., title, company/organization, job function, etc.) and identification of which of them are attorneys;

6. Custodian, File Name, File Path, and, for non-emails, Date Created, to the extent readily available;

7. In-house attorney names shall be designated with an asterisk; outside counsel attorney names will be designated with a double asterisk;

8. the type of document, *e.g.*, letter or memorandum

9. a description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter

19

of the document and the basis of the claim of privilege or immunity;

10. the type or nature of the privilege asserted (i.e., attorney-client privilege; work product doctrine);

11. These same requirements shall apply to oral communications except that the log shall identify (i) the name of the person making the communication and the names of the persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of the communication.

## F. OTHER

i. In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). In the case of an organized compilation of separate documents - for example, a binder containing several separate documents behind numbered tabs - the document behind each tab should be scanned separately, but the relationship among the documents in the compilation should be reflected in the proper coding of the beginning and ending document and attachment fields. The Parties shall make their best efforts to unitize the documents correctly.

ii. This Discovery Plan shall have no effect on any producing Party's right to seek reimbursement for costs associated with collection, review, or production of documents or ESI.

iii. Nothing in this Discovery Plan shall be interpreted to require disclosure of information protected by the attorney-client privilege, work-product doctrine, or any other disclosed and applicable privilege or immunity. The Parties do not waive any objections as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

iv. Nothing in this Discovery Plan is intended or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or third parties to object to a subpoena

**IT IS SO ORDERED.**

The Hon. Katharine H. Parker
United States Magistrate Judge

Dated: January 13, 2021