

January 19, 2021

**Via ECF**
Honorable Lorna G. Schofield
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *Nichols, et al., v. Noom, Inc., et al.*, No. 20 Civ. 3677 (LGS) (KHP)

Dear Judge Schofield,

Our firm represents eight individual Plaintiffs and proposed classes of consumers throughout the United States who were ensnared by Defendant Noom, Inc.'s deceptive "negative option" automatic renewal scheme.[1]  We write to request a pre-motion conference under Rule III.A.1 of Your Honor's rules to discuss Plaintiffs' renewed application for the establishment of a bellwether process for initially proceeding with dismissal, class certification, and merits litigation under two-to-five states' laws.  Specifically, we will ask the Court to order the parties to meet and confer on bellwether proposals and present those proposals to Your Honor in the coming weeks.

By way of background to shed light on why the bellwether process is appropriate here, this case challenges one of the largest ongoing negative option schemes in the United States.  Supposedly designed for consumers' "convenience," negative option scams are nothing new.  Since the 1970s, laws and regulations have been enacted to combat the abuse that occurs when sellers decide that a consumer's *inaction* constitutes assent to purchase.  For example, following decades of unordered merchandise scams, in 1970 Congress effectively banned sellers from mailing goods to consumers and then treating a failure to return the good as assent.  39 U.S.C. § 3009.  In 1973, the FTC stepped in and curbed the related practice of "prenotification negative option plans," whereby sellers would send notice (instead of the goods themselves) and if consumers took no action, the sellers would send the goods and charge consumers.  16 C.F.R § 425.

As FTC Commissioner Rohit Chopra (President Biden's nominee to lead the Consumer Financial Protection Bureau) noted in September, the automatic renewal scam is simply "the online successor to decades of dirty dealing in direct mail marketing."[2]  Worse, automatic renewal scams "pose an even bigger menace than their paper precursors" because they are "not limited by physical

---

[1] The Code of Federal Regulations defines a "negative option" as "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(t).

[2] Statement of Rohit Chopra Regarding Dark Patterns in the Matter of Age of Learning, Inc. Commission File Number 1723186, at 1 September 2, 2020 https://www.ftc.gov/system/files/documents/public_statements/1579927/172_3086_abcmouse_-_rchopra_statement.pdf (last visited Jan. 19, 2020).

constraints and costs." *Id.* Using the "Dark Patterns" rubric created by noted cognitive scientist Harry Brignull, PhD—which framework describes common website design choices that are used to manipulate consumers—Commissioner Chopra noted that "researchers have identified a wide variety of dark patterns" that foster outcomes that "could not be achieved without deception." *Id.*

Here, Plaintiffs' Third Amended Complaint ("TAC"), ECF No. 149, describes how Defendants have deployed dark patterns on a massive scale. ECF No. 149. According to its CEO, with "millions" of customers, Noom is now the "the largest consumer facing healthcare company" in the United States. TAC ¶ 14. The TAC also describes Dr. Brignull's preliminary conclusion that Noom's business model is predicated upon the "Hidden Subscription Dark Pattern"—that is, silently charging users a recurring fee under the pretense of a one-time fee or free trial—as well as other dark patterns. TAC ¶ 14. The TAC also shows that Noom's use of dark patterns is uniquely cynical, as Noom's core selling point is that its weight loss program is "based on a cognitive-behavioral approach." *Id.* ¶ 2.[3] The complaint likewise details how the Better Business Bureau recently issued a nationwide alert that "consumers reportedly try to cancel [Noom's] trial offer before it ends but still end up being billed for the subscription," that Noom refuses to "to address the underlying cause" of customers' complaints, and how an internal Noom whistleblower has stated that "Noom made the cancellation process difficult by design" and describes other unsettling conduct, including that "Noom's sign up flow was designed to mislead." *Id.* ¶¶ 3, 43.

Noom's use of dark patterns has also led  *Id.* ¶ 47. *Id.* *Id.* ¶ 48. . *Id.* ¶ 49.

There is no question that Noom's conduct is deceptive and violates the laws enacted to combat autorenewal scams. After this case was filed, the FTC cracked down on virtually identical practices that "scammed millions of dollars from families through dark patterns" by "making it extremely difficult to cancel recurring subscription fees." *See* Chopra *supra* n.2 at 1. While the FTC can use federal law to end nationwide autorenewal scams, the only way consumers can effectively combat such schemes is by banding together in nationwide class actions.

During the parties' December 17 hearing on our initial bellwether application and Defendants' anticipated dismissal motion, Your Honor made clear that this case would survive and counseled Defendants to consider forgoing a pleading attack. Hr'g Tr. at 12:17–25. Defendants responded that their "real[] goal" at the dismissal phase is to "narrow the claims that are going to be litigated at class certification." *Id.* 15:21–16:1. As the Court found that the then-operative complaint

---

[3] According to one Noom co-founder (a former Google engineer who studied psychology at Princeton), Noom tries "to understand a habit, break it down into: 'What's the trigger that occurs? What thought appears in your brain and what action does it cause you to do and can we interrupt any one of those things?'" *Id.* ¶ 4. Noom's other co-founder describes Noom as a "psychology-based program that empowers you to . . . better understand[] your brain, yourself, and **the science of the choice**." *Id.* ¶ 13.

contained claims from only seven jurisdictions, Your Honor denied Plaintiffs' bellwether application without prejudice until "some point in the future [when] it is clear that we are talking about all 50 states." *Id.* 7:6–20; 12:6–7. Now that this case unmistakably extends to 54 jurisdictions, it is time to prioritize the core factual and legal issues posed by negative option schemes. Your Honor also advised Plaintiffs to wait to renew their application until the close of discovery, *id.*12:6–7, but because last week Judge Parker allowed an amended complaint, extended discovery for a year, and set class certification briefing to begin in June, much of the work a bellwether process saves will have to be done before the close of discovery.

Further, this case is ideal for bellwether streamlining. The causes of action fall into just six categories: (i) Noom's violation of state consumer fraud laws, (ii) Noom's violation of state autorenewal/weight-loss laws, (iii) fraud, (iv) unjust enrichment, (v) conversion, and (vi) money had and received. Likewise, fact and expert discovery will be the same regardless of whether this case proceeds under the laws of 54 jurisdictions (as Noom proposes) or under the laws of a few jurisdictions (as Plaintiffs propose). The class action trial will also be largely the same, with almost all evidence centered on Defendants' conduct. The only meaningful difference in the trial will be whether jurors are given special verdict forms for 54 jurisdictions or just a few.

Indeed, the only real difference in how this case is litigated will be whether the parties and the Court spend months (if not years) parsing what will likely prove to be inconsequential aspects of certain states' laws at the dismissal and class certification stages. At the December 17 hearing, Your Honor expressed uncertainty that the dismissal, class certification, and merits rulings for any particular state would provide efficiencies. *Id.* 11:14–19. While the Court noted that such a process might be the case for a product liability case where "you might have a dispute about the science and whether . . . some product was defective or caused some injury" and that it might be "helpful to understand what a jury's take or reaction is to that science" the Court did not believe consumer protection class actions lend themselves to similar efficiencies. *Id.* 11:20–25. Plaintiffs respectfully believe nationwide consumer protection litigation has *identical* corollaries to nationwide products liability cases. Just as in a product liability case, common merits questions will drive the crucial legal issues and the jury's reaction to the parties' experts and the common proof of Defendants' scheme will be the same irrespective of the number jurisdictions. This is why, as discussed in our initial bellwether submission (ECF No. 110), courts overseeing similar nationwide consumer class actions frequently adopt a bellwether approach to promote the timely and efficient disposition of these complex and important matters.

Streamlining the laws the Court considers at dismissal, certification, and trial will conserve judicial and party resources. Selecting the states with the two or three largest number of enrollees (such as New York and California) will result in rulings at the key junctures that can later be applied to the other states. For instance, findings relating to Rule 23 issues for the bellwether states will inform later motions to certify classes for other states.

In sum, as the experience of courts in similarly complex class actions indicates, a bellwether process is far more conducive to the adjudication (and resolution) of this case than Defendants' "whole hog" approach. A bellwether procedure will allow the parties and the Court to focus pretrial and trial efforts on the claims arising under two-to-five states' laws before turning to other states' laws. The benefits of such an ordered procedure will inure to all parties and the Court.

Thank you for the Court's consideration of this request.

                     Respectfully submitted,

                     /s/ Steven L. Wittels_____
                     Steven L. Wittels

cc: All counsel of record (via ECF)
   Magistrate Judge Katharine H. Parker (via ECF)