

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _1/20/2021_

via CM/ECF

Charles Low
+1 212 479 6859
chlow@cooley.com

January 19, 2021

The Hon. Katharine H. Parker
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

**Re: Mahood et al. v, Noom, Case No. 20-cv-3677 (LGS) (KHP): Letter Motion for Redaction of Hearing Transcript**

Dear Judge Parker:

Pursuant to Paragraph III.d of the Court's Individual Practices, Defendants Noom, Inc and Artem Petakov ("Noom") respectfully request that the Court redact and seal one portion of the January 12, 2021 Hearing Transcript, (ECF No. 147).

During the hearing, Plaintiffs' counsel Mr. McInturff and Mr. Wittels each recited confidential user and refund data that Noom has produced to Plaintiffs. This confidential user and refund data appears on the January 12, 2021 Hearing Transcript at 21:2-5 and 54:3. Consistent with the Court's Individual Practices to limit filings under seal to the information that is strictly necessary to avoid harm to the designating party, Noom seeks to seal *only* the specific confidential data described in the January 12 Transcript. As set forth below, these proposed redactions are consistent with the Second Circuit's opinions in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) and *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132 (2d Cir. 2016).

Pursuant to *Lugosch*, the Court must first assess whether the documents at issue are "judicial documents." 435 F.3d at 119. Once the Court has made that determination, it must assess the weight of the presumption of public access to the documents under the common law and the First Amendment, and then, it must weigh the presumption of public access against any competing interests, such as the privacy interests of the party resisting disclosure. *Id.* at 119-20.

While Noom does not contest that the January 12 Transcript is a judicial document, the information it seeks to seal relates to material passed between the parties in discovery, explicitly for the purpose of productively engaging in a mediation. As such, the presumption of public access is low. *Bernstein*, 814 F.3d at 142 (documents "'such as those passed between the parties in discovery' often play 'no role in the performance of Article III functions' and so the presumption of access to these records is low") (citation omitted); *cf. In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 424 (E.D.N.Y. 2007) ("the documents at issue are not litigation filings, but documents produced in discovery, to which the right of public access has not attached"). Here, the confidential information in question is highly sensitive and closely guarded user engagement and refund data that Noom disclosed to Plaintiffs during discovery. Where, as here, redactions are applied narrowly only to specific confidential business information that was designated as confidential under the applicable protective order, courts have found the presumption of public access comparatively low and have granted the party's motion to seal. *E.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-md-2542, 2014 WL 12772236, at *2 (S.D.N.Y. Nov. 5, 2014) (sealing information

# Cooley

Hon. Katharine H. Parker
January 19, 2021
Page Two

produced in discovery); *Firmode (Int'l) Co. v. Int'l Watch Grp., Inc.*, No. 2008-4890, 2009 WL 3698137, at *2 (E.D.N.Y. Nov. 2, 2009) (collecting authorities sealing confidential supplier and pricing information).

Turning to the second portion of the *Lugosch* test, Noom has significant privacy interests in the data at issue. That information reflects Noom's competitively sensitive usage and revenue data. Noom is a private company and public disclosure of such sensitive information would be highly prejudicial and afford its competitors an unfair advantage, and poses a substantial risk of harm to Noom. Not surprisingly, this is precisely the type of confidential, competitively-sensitive information that courts regularly approve for redaction. *E.g.*, *IBM v. Lima*, No. 20-4573, 2020 WL 6048773, at *1-3 (S.D.N.Y. Oct. 13, 2020) (sealing hearing transcript that reflected "non-public details of IBM's revenues, . . . budget and performance"); *In re Keurig*, 2014 WL 12772236, at *2 (sealing sales and customer data); *Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of Greater N.Y.*, No. 07-1471, 2008 WL 4541014, at *1 (E.D.N.Y. Oct. 7, 2008) (sealing internal cost and revenue data); *Gelb v. AT&T Co.*, 813 F. Supp. 1022, 1035 (S.D.N.Y. 1993) (sealing internal financial information); *see also Bernstein*, 814 F.3d at 143 (noting that the duty to protect confidential client information is a factor that weighs in favor of sealing the material in question).

Finally, Noom's privacy interests are especially acute in this instance, because Plaintiffs grossly misconstrue the referenced data in a manner that is highly prejudicial to Noom. For example, Plaintiffs purport to draw conclusions about the number of users who have *never* opened Noom's app, but Noom has not produced any data of that kind in discovery. Permitting this false information to be unredacted on the docket would obviously be unfair to Noom and cause it potentially significant reputational and competitive harm.

As such, Noom's proposed redactions to the January 12 Hearing Transcript are appropriate and narrowly tailored to protect its interests under *Lugosch*, 435 F.3d at 120, and Noom respectfully requests that the Court redact and seal the identified portions therein.

In accordance with the Court's Individual Practices and the Southern District of New York's Standing Order 19-mc-00583, Noom has filed this letter motion publicly on ECF and the proposed sealed documents contemporaneously under seal via ECF.

Sincerely,


*/s/ Charles Low*

Charles Low

> The Court agrees that the transcript at ECF No. 147 should be redacted, but only to the limited extent that Defendants propose. Accordingly, Defendants must submit the Southern District's Redaction Request Form to the Court Reporter by February 4, 2021. The parties are free to appeal to the Court if an additional order granting the redaction request becomes necessary.

**SO ORDERED:**

*Katharine H Parker*

**HON. KATHARINE H. PARKER**
**UNITED STATES MAGISTRATE JUDGE**

Dated: January 20, 2021

```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
In re:                               :
                                        Docket #1:20-cv-03677-
 MAHOOD,                             :  LGSL-KHP

                    Plaintiff,       :

   - against -                       :

 NOOM INC.,                          :  New York, New York
                                        January 12, 2021
                    Defendant.       :

------------------------------------ :  TELEPHONE CONFERENCE
```

```
                       PROCEEDINGS BEFORE
              THE HONORABLE JUDGE KATHARINE H. PARKER,
                  UNITED STATES MAGISTRATE JUDGE
APPEARANCES:

For Plaintiffs:         WITTELS MCINTURFF PALIKOVIC
                        BY:  STEVEN L. WITTELS, ESQ.
                             J. BURKETT MCINTURFF, ESQ.
                             JESSICA HUNTER, ESQ.
                             STEVEN D. COHEN, ESQ.
                        18 Half Mile Road
                        Armonk, New York 10504
                        910-476-7253


For Defendants:         COOLEY LLP
                        BY:  MICHAEL RHODES, ESQ.
                             AARTI REDDY, ESQ.
                             MAX A. BERNSTEIN, ESQ.
                             KEVIN DUNCAN, ESQ.
                        101 California Street, 5th Floor
                        San Francisco, California 94111-5800
                        415-693-2000




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com
```

APPEARANCES - Continued:

For Defendants:           Cooley LLP
                          By:  Charles Low, Esq.
                          55 Hudson Yards
                          New York, NY 10001
                           212-479-6859


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service

**<u>INDEX</u>**

**<u>E X A M I N A T I O N S</u>**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|

None

**<u>E X H I B I T S</u>**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|

None

1

2          THE CLERK:  Calling case 20-civil-3677, Mahood vs.

3  Noom Incorporated, the Honorable Katharine H. Parker,

4  presiding.

5          Beginning with counsel for the plaintiff, could

6  you please make your appearance for the record?

7          MR. STEVEN WITTELS:  Steven Wittels for plaintiffs

8  and the proposed class.  Good morning, your Honor.

9          HONORABLE KATHARINE H. PARKER (THE COURT):   Good

10  morning.

11          MR. J. BURKETT MCINTURFF:  Burkett McInturff for

12  plaintiff and the proposed class. Good morning, your Honor.

13  And with us are Michael Chiamataro and Douglas Forrest from

14  IOS Litigation Services, who is plaintiff's ESI consultants.

15  We also have Richard Friedman, who is counsel to nonparty Ian

16  Myer on the line. He'll make his appearance in due course, but

17  I wanted to note that for your Honor.  Thank you.

18          THE COURT:  Okay.

19          THE CLERK:  And counsel for the defendants, could

20  you please make your appearance for the record?

21          THE COURT:  Was there anybody else --

22          Yes. Good morning, your Honor.  Sorry, your Honor.

23          THE COURT:  Was there anybody else from plaintiff on

24  the line or --

25          MR. WITTELS:  No.

```
 1                              PROCEEDINGS                        5
 2              MR. RICHARD FRIEDMAN:   Your Honor, this is
 3   Mr. Friedman -- I'm sorry, go ahead, Jessica.
 4              MS. JESSICA HUNTER:  This is Jessica Hunter for
 5   plaintiff and the proposed class.
 6              MR. STEVEN COHEN:  And Steven Cohen from Wittels
 7   McInturff Palikovic for plaintiff and the proposed class.
 8              MR. RICHARD FRIEDMAN:  And, your Honor, this is
 9   Richard Friedman from Richard Friedman PLLC. My firm does not
10   represent the plaintiffs, as Burkett mentioned, but we
11   represent nonparty Ian Myer.
12              THE COURT:  Okay. Welcome.
13              MR. FRIEDMAN:  Thank you, your Honor.
14              THE COURT:  Now for defendants.
15              MR. MICHAEL G. RHODES:  Good morning, your Honor.
16   This is Michael Rhodes of Cooley on behalf of the defendants.
17   And I'll let my colleague, Ms. Reddy, introduce everybody
18   else.
19              THE COURT:  Okay.
20              MS. AARTI REDDY:  Good morning, your Honor. This is
21   Aarti Reddy on behalf of defendants from the Cooley Law Firm.
22   I'm appearing with my colleagues, Charles Lowe and Max
23   Bernstein. And we also have our ESI consultant, Rob Dechico,
24   on the line; as well as our ESI attorney, Kevin Duncan.
25              THE COURT:  Okay. Welcome, everyone.
```

```
 1                        PROCEEDINGS                    6
 2            MR. RHODES:  Your Honor, this is Michael Rhodes. I
 3    believe we also have Macaul Rosen, who's the general
 4    counsel of Noom, on the line with us.
 5            THE COURT:  Okay. How are you?
 6            MS. MACAUL ROSEN:  Very well, thanks.
 7            THE COURT:  All right, very good. So before we get
 8    started, same rules apply as for all of our court
 9    conferences during this pandemic. Please keep your phones
10    on mute unless you are speaking.  That helps to ensure the
11    best reception possible so we can hear one another.
12            This line is open to the press and public on a
13    listen-only basis. I want to remind everyone that the Court
14    prohibits others from recording and rebroadcasting court
15    conferences, including this one.  Violations of this rule
16    can result in sanctions.
17            I also want to let you know that the Court is
18    making an official recording of this call; and if you'd
19    like a transcript, you can order one within three days of
20    today.
21            And, finally, for the benefit of any court
22    reporter who has to transcribe this conference, I ask that
23    you state your name before speaking.
24            We have a long agenda for today. You all have
25    submitted quite a lot of documents and arguments for me to
```

1  
2   read through, and I spent quite a lot of time reviewing it

3   all. I have a -- in reviewing the case, reviewing where you

4   are now, I wanted to talk about a couple of things.  So I'm

5   going to just let you know the order in which I want to

6   talk about things. First, I want to talk about the

7   Scheduling Order and modifying dates for discovery and

8   motion practice; I want to talk about the Proposed Amended

9   Complaint; then I want to talk about ESI; then I want to

10  talk about the RFPs; and then we'll talk about other issues

11  that have been raised, including plaintiff's request to

12  modify ECF 58 to allow use of certain information in

13  pursuit of a state court action; Noom's complaint

14  concerning Myer's responses and objection to the subpoena;

15  plaintiff's -- Noom raised the issue regarding plaintiff's

16  production of certain information; and a few other

17  miscellaneous items.

18        So first, with respect to the Scheduling Order,

19  it's clear that you're going to need an extension of the

20  schedule.  And I wanted to talk with both sides a little

21  bit about what those deadlines should be. First, the most

22  immediate thing that's coming up in terms of briefing,

23  separate from any Motion to Dismiss and then amended

24  pleading would be class certification.  And I wanted to ask

25  plaintiff what are the common issues of fact and law that

1

2   you believe exist that you're intending to brief on your

3   anticipated motion for class certification?

4           MR. MCINTURFF:  Sure, your Honor. This is Burkett

5   McInturff for plaintiffs. So the case breaks down into

6   deceptive practices claims under state consumer protection

7   laws as well as common-law claims -- and that's common-law

8   fraud and then common-law unjust enrichment and conversion.

9   And a lot of the counts sort of merge on the issue of

10  whether the defendants' conduct would deceive a reasonable

11  person acting reasonably.  That issue then involved a wide

12  range of proof that we could have access to prove that the

13  challenged conduct is deceptive. We also have more what I

14  would characterize as sort of threshold issues about, for

15  example, the types of representations and omissions made to

16  class members; the scope of the alleged misrepresentations

17  and omissions.

18          Then after you get past whether the conduct is

19  likely to deceive a reasonable person, you then get into

20  issues of damages.  But I think the critical, the biggest

21  component is whether the conduct is likely to mislead; and

22  that gets into all kinds of proof, whether it's consumer

23  complaints or internal emails, considerations that sort of

24  all boil down to what the defendant knew and when it knew

25  it, what the defendant intended by its conduct.  And so

1

2  that's really -- the analysis of that type of proof is

3  going to take up the lion's share of plaintiff's briefing

4  on class certification.

5          THE COURT:  Okay. So let me --

6          MR. WITTELS:  Could I jump in on one point, your

7  Honor? This is Steven Wittels.

8          THE COURT:  Sure.

9          MR. WITTELS:  Just to say, as well, that -- thank

10 you -- the automatic renewal statute that we're challenging

11 in California is also -- just to follow up on what

12 Mr. McInturff said -- is an important common claim that we

13 believe is, you know, susceptible to common proof.  And the

14 fact that there's really no -- well, there is a debate, but

15 we think it's a common question that will be certified as

16 to whether defendants violated that statute.

17         THE COURT:  Okay.  So in terms of the common

18 proof, because that's really what we're talking about for

19 purposes of Rule 23, when you're talking about common

20 proof, one, you have the evidence of what was consumer

21 facing, right? Because those are the statements, those are

22 the statements and/or omissions of what was consumer

23 facing, what you're alleging the consumer relied on. So

24 there are consumer-facing statements, I guess, that you're

25 saying are common to the proposed class with respect to

1

2  this Healthy Weight Program or certain aspects of it. And

3  so I understand that.

4        What does the internal -- what do internal

5  communications have to do with whether this conduct would

6  deceive a reasonable person or not? How is that playing

7  into the class certification piece? Just explain that to me

8  a little bit more.

9        MR. MCINTURFF:  Sure. Sure, your Honor. I mean,

10  first of all, it's absolutely critical. And the way that it

11  plays into the class certification piece is to show the

12  Court that this is the common proof that plaintiffs are

13  going to use at trial to prove that the challenged conduct

14  was fraudulent and deceptive or unjust.  And the

15  defendants' knowledge that consumers are being deceived and

16  decision to continue with the challenged conduct is

17  critical to an assessment as to whether or not the conduct

18  that's being challenged is in fact deceptive, fraudulent or

19  otherwise unjust.

20        So the internal communications are really --

21  because the defendant is going to say, well, no, what we

22  did was not unjust, and our use of the internal

23  communications, it will be to rebut the defense of the

24  conduct to say, look, here's what you knew, here's when you

25  knew it. You know, we already have evidence of thousands

1
2    and thousands of customer complaints. We need to know the
3    response to those complaints, we need to know why the
4    defendants, for example, created an idiosyncratic way to
5    cancel a free trial.  That's one issue. Another issue is
6    why the defendant, once the trial lapsed, why did consumers
7    get billed for multiple months instead of maybe one month
8    or one week or the length of time of the trial; why did the
9    defendant impose a charge up to sometimes eight months for
10   the program. So the internal communications, again, will
11   allow us to show that the conduct -- show the Court how
12   we're going to show that the conduct was excessive.
13            And then a whole other component that's critical
14   for -- that the internal communications are critical for is
15   a showing that the conduct was -- the challenged conduct
16   was material.  So why the defendant designed the
17   cancellation process the way it did and why the defendant
18   responded to complaints or didn't respond to the complaints
19   will be critical to showing it's material.
20            Then, in addition to that, to certify consumer --
21   or to certify the common law --
22            THE COURT:  Well, wait a minute. Isn't the -- let
23   me just stop you there for a second.  As to materiality,
24   isn't the issue whether the representation or omission was
25   material to the reliance -- the consumer and what happened

1

2  in terms of --

3          MR. MCINTURFF:  Showing -- sorry, your Honor --

4  show that the -- showing that the defendants designed the

5  conduct, the challenged conduct, in a way that had the

6  predictable result will help us make the showing that the

7  conduct is material.

8          If I could move onto what's even a more critical

9  point, which is to certify a common-law fraud class action,

10  you have to show enough evidence for the Court to presume

11  reliance on behalf of the class.  So this is a critical

12  distinction between a consumer protection count, which most

13  of them don't require a sort of showing of reliance, and a

14  common-law fraud count, which you have to show

15  circumstantial evidence that will allow the Court to

16  conclude that, okay, these -- you know, all of these people

17  that ended up paying for this plan, they didn't do so

18  willingly. So in a common-law fraud class action you

19  marshal all of the evidence of the defendants' intent,

20  their knowledge of the challenged conduct to allow the

21  Court -- we will argue that with this evidence the Court

22  can make a presumption that other class members relied.

23          And that's why typically in a common-law fraud

24  class action, the class certification motion doesn't come

25  until basically the end of fact discovery. And those

1

2    motions, we've written these motions before, and they're

3    very heavy on the facts that show that -- you know, try to

4    show the common scheme or the common purpose and that the

5    defendants knew that it had a common result.  Because once

6    you show that, the Court can then make the inference that

7    not only did these number of consumers who are complaining,

8    were they misled, but the absent class members, who haven't

9    come forward, those individuals were also misled.  So the

10   intent and knowledge of the defendants throughout the

11   relevant period is absolutely critical to making the

12   showing that the district court will need to say, okay, I

13   can certify a common-law fraud class because I can make

14   inferences based on the available evidence that the class

15   relied.

16             THE COURT:  Okay.  And so what I hear you saying

17   is that class cert and merits discovery is intertwined.

18             MR. MCINTURFF:  Intimately, your Honor.

19             THE COURT:  Okay. I want to hear from Noom on this

20   issue and the extent to which Noom believes that there

21   could be a clean separation from class certification

22   discovery and merit discovery.

23             MR. RHODES:  Good morning, your Honor. This is

24   Michael Rhodes. Let me just make an observation. This

25   conversation a moment ago started with plaintiff's counsel

1
2  articulating this as a false advertising case.  And I
3  believe common-law said this is about what a reasonable
4  consumer would have concluded from the flow of information
5  facing that consumer. And this exercise we're going through
6  right now illustrates the macro-level problem here is that
7  we're constantly trying to boil the ocean in order to deal
8  with the specific issue at hand.  Right now we're talking
9  about Rule 23 procedure.
10              There is no doubt, your Honor, that, you know,
11  there is a general desire expressed in the case law as well
12  as the Manual on Complex Litigation that the Federal
13  Judicial Council promulgates that we should at least try to
14  phase discovery in a way that can be differentiated between
15  what's necessary for the Rule 23 analysis and the merits
16  that will ultimately be decided at trial.
17              I would concede to the Court that it is not always
18  the case, as here, to draw a clear line of demarcation
19  between those.  And so the question then becomes what
20  amount of information is necessary and what amount of
21  information starts to cross the line into burden and
22  oppressive discovery and when there's no doubt that the
23  plaintiffs here are really over the line. What I would
24  submit to you, your Honor, is take a look at that
25  *McLaughlin* case, I believe it is, in the Second Circuit,

1

2  that disavows the use of internal communications to prove

3  the elements of these fraud claims.

4          What we would submit is relevant here is, first,

5  let's start with the materials that face the user or the

6  consumer, ads in the disclosures themselves. Secondly, look

7  at the refund policies and the training policies that Noom

8  has instituted.  Third, we would agree about consumer

9  complaints; those might be useful, as well. And then the

10  data that surrounds how consumers actually use the product.

11  Right? So, for example, one of the contentions here is that

12  Noom designed a process where people were automatically

13  renewed, and they didn't want the renewal. Well, there's a

14  lot of data suggesting that people were actively involved

15  in the use of the product after the autorenewal, so that

16  would go against that. So we ought to talk about sampling

17  some usage data conversions, which is the internet

18  equivalent of getting the user to do something, conversion

19  data, and some of the revenue data. The internal

20  documentation and chasing all of that information is really

21  of peripheral relevance. Perhaps documents that would show,

22  you know, how the program itself was developed, you know, I

23  would concede that point.

24          So we're not saying they can't have any

25  information. What we're saying is they're trying to boil

1
2  the ocean; they're not focused, and this has become sort of
3  just a ritual in how to granularize everything possible
4  under the sun.  And the Court is supposed to phase
5  discovery in a way that's fair and balanced and give the
6  plaintiffs a reasonable opportunity to demonstrate their
7  burden under Rule 23 without causing us extensive
8  oppression and expense, which is what we feel is the case.
9            THE COURT:  Okay.
10           MR. MCINTURFF:  Can I respond?
11           THE COURT:  Sure.
12           MR. MCINTURFF:  I respectfully disagree with
13  counsel. We're not trying to boil the ocean. This is a
14  typical level of discovery in a fraud class action. It's as
15  nationwide class action.  The conduct is affecting millions
16  of people. It's a -- it actually is a relatively discrete
17  level of discovery that we're seeking; it's just that the
18  defendant is withholding the internal communications about
19  the program and considerations of the program. Mr. Wittels
20  and Palikovic and I have litigated these cases before. It's
21  very common for us to get pre-class certification,
22  extensive email, internal email communication and then to
23  take depositions of the key players in the case to show
24  that the defendant intentionally set out to deceive
25  consumers, and then also in the face of overwhelming red

flags, which we were already beginning to see those red

flags in this case. But in our class certification motions

we show that in the face over overwhelming red flags, after

the defendants were on notice that consumers were being

deceived by the thousands and tens of thousands, that they

continued with this course of conduct.

And so it's not an attempt to boil the ocean. It's

we want the emails, and we want the internal analysis.

That's really the only area that I hear common-law

disputing.  And it's not too far afield for class

certification; it's certainly relevant to the merits.  And

if you look at the recent Second Circuit cases dealing with

common-law fraud class certification, that's the

[indiscernible] *Foodservices* case, as well as the *Ex rel*

*Mel Harris Associates* case. Both of those class

certification motions came at the very end of discovery and

involved significant factual development about the

underlying conduct. Defense counsel would have us move for

class certification based on this limited discovery they're

willing to provide and then, you know, as the case law

makes very clear -- and your Honor is aware of this because

we've dealt with the bifurcation issue a couple of times --

but the case law is very clear then the defendant turns

around and says, oh, no, the plaintiffs haven't shown

1

2    enough facts to satisfy their burden at the class

3    certification stage.

4            So it's a Catch-22, and the way courts have

5    handled fraud class actions is they have the class

6    certification motion filed at the end of fact discovery,

7    which we're prepared to do; and then it allows the parties

8    to flesh out all of the issues, and it allows the Court,

9    critically, to make the searching inquiries that are

10   necessary at the class certification stage. Otherwise, it's

11   just conjecture and it's not based on facts, because what

12   you're looking at when you're moving for class

13   certification is you're telling the Court, look, the trial

14   is going to be efficient, we're going to present common

15   proof on behalf of a class of people that is going to show

16   that this conduct was deceptive or fraudulent or otherwise

17   improper.  And without access to that proof, we can't make

18   that showing.

19           THE COURT:  Okay. So --

20           MR. RHODES:  Your Honor, may I respond briefly?

21           THE COURT:  Let me -- I have a follow-up question,

22   which is whether plaintiffs are intending to offer any kind

23   of expert testimony in connection with the Rule 23 motion.

24           MR. RHODES:  Yes, your Honor.

25           MR. WITTELS:  Your Honor, can I address that?

1

2   This is Steven Wittels. We have retained and already served

3   on defendants reports from one of the preeminent consumer

4   fraud internet experts probably in the world. He started

5   and coined a neologism, a phrase called "dark patterns,"

6   which is what defendants are doing and what many internet

7   companies are doing, which is using the internet and using

8   consumer psychology to essentially trick consumers into

9   signing up for things they never wanted. Our expert's name

10  is Harry Bridnall, and we've served a long report on the

11  defendants, a preliminary report, that will be fleshed out

12  when there's further discovery.  And Mr. Bridnall is as

13  Ph.D., actually an English fellow, has gone through the

14  sign-up process and explains in detail at each step why the

15  consumer is led into or lulled into, really, a sense of

16  security and gives their credit card; and the next thing

17  they find out, as the thousands, many thousands of

18  consumers we're learning about here, have discovered is

19  that after the trial period, they're automatically enrolled

20  into these multi-month plans, and their credit card is

21  charged, and they never saw it coming.

22          So that's really what the essence of this case is.

23  And as Mr. McInturff explained, from our previous cases,

24  when we delve into the emails and the way the company

25  structured how they were going to set up the plan, why they

did a trial plan because here we know they initially only

had a fixed plan you paid for, and then it involved into a

method where they could garner, you know, hundreds of

millions of dollars. How did they do that? Again, by

deceiving customers into thinking that the trial is free,

there's no issue cancelling, no risk; all of these things

are told to a consumer, but in fact it's the exact

opposite.

          THE COURT:  Okay.

          MR. WITTELS:  Why do we need to get to their

ESI -- so that answers your question about how there will

be an expert --

          THE COURT:  So the expert's going to why the

consumer-facing materials are deceptive or why a reasonable

person might be deceived? It's going to --

          MR. WITTELS:  Well, that's what he has --

          THE COURT:  -- that --

          MR. WITTELS:  -- well, that's what he has --

          MR. MCINTURFF:  This is Burkett McInturff. Very

briefly. One other critical component of the expert's

analysis is also proof of consumer deception.  So there's

various ways that you can get at proof that consumers are

actually deceived. And by far the most efficient way is by

using the defendant's own internal information about

consumer deception. ██████ █████ ███ █████ █████ ███

████████████ ████ ██████ ███ ███ █████ ████

████ ██████ ██████ ██████ █████ ████ ████ █████

█████ ███     So facts like that, as well as internal

communications, you know, showing both intent and knowledge

can be used by the expert to show that this conduct does

deceive consumers.  So it's both the external sort of

forward-facing discovery, but also the internal discovery

is used to show that consumers are being deceived.

THE COURT:  Okay. All right. And I'll hear briefly

from Noom on this issue of separation of -- and/or the

intertwined nature of the proof on --

MR. RHODES:  Yes, your Honor.  This is Michael --

excuse me, your Honor -- this is Michael Rhodes, for the

reporter's benefit. A couple of things. One is they've

already proffered an expert report who relied upon the

external consumer-facing disclosures and shows that they

can already put together their argument. I'm not going to

go into my closing argument today, unlike my opposing

common-law.

And I think just the way they were expressing

themselves to the Court today, it shows the problem.  This

case -- you know, I do nothing but class actions. I've been

doing it almost 40 years. I don't think counsel's personal

1

2  experience is relevant to the analysis.  The analysis is

3  supposed to be a balancing test between what's fair and

4  reasonable for the plaintiffs to put together a Rule 23

5  application versus the burden and expense to the defendant.

6  And what we've proposed is a reasonable alternative to the

7  other universe that's being proposed to the Court, which is

8  in fact to boil the ocean.

9          Let me give you some context.  They have tried to

10  amend the Complaint now three times in six months.  The

11  current operative Complaint contains, I think, 1,000

12  paragraphs. We've already produced 60,000 pages of

13  material.  And the Court can just look at some of the scope

14  of the Request for Production. Number 6, number 7,

15  number 31, number 10, number 50 and 51, I think there's

16  something like 18 individual requests that include phrases

17  like "all documents relating to the litigation." There is

18  nothing about this discovery so far in the last six months

19  that bespeaks an effort to streamline the process and get

20  to class certification.

21          The cadence of these cases is you go through the

22  Motion to Dismiss, you have a limited discovery phase, you

23  have class certification followed by summary judgment, and

24  eventually, a trial.  What these plaintiffs want to do is

25  they want to have everything done before class

1   certification. And that's not reasonable or fair.  And

2   we've got to draw some limits here. I mean, this has just

3   been drifting for months without any direction or control.

4   And, frankly, it's just stunning to me that we find

5   ourselves in this place. I generally do not get involved

6   per se in discovery. I wanted to attend this hearing today

7   to beseech the Court to bring some sanity to this process.

8        THE COURT:  Well, that's going to happen.  That's

9   going to happen today. That's why I'm starting out with

10  this question about the Scheduling Order. Let's just talk

11  about the amended -- the proposed Third Amended Complaint.

12  I've reviewed the proposed document, the redline document

13  that plaintiffs provided. Let me ask plaintiff, do you have

14  a named plaintiff for each of the jurisdictions that you've

15  added and all the territories?

16       MR. MCINTURFF:  Your Honor, this is Burkett

17  McInturff. We do not have named plaintiffs for the

18  jurisdictions and the territories listed in the Complaint.

19  We've obviously been contacted by people from all over the

20  country.  We haven't been contacted by people from all of

21  the different jurisdictions and territories, but we are not

22  required to have a named plaintiff for each of the

23  jurisdictions under clear Second Circuit precedent in

24  *Langon v. Johnson & Johnson.* We have standing to bring

1

2  claims on behalf of consumers from other states that are

3  not the named plaintiffs. And as a practical matter -- and

4  that's really what's driving our requested amendment --

5  because we've been operating as the plaintiffs under the

6  understanding that this case covered every person in the

7  United States that signed up for Noom.  And as a practical

8  matter, there's no way to prevent other suits being filed

9  in other jurisdictions covering different portions of

10  whatever we don't cover because these consumers obviously

11  have a right to bring their claim. So we already have put

12  forth in the Complaint, the current Complaint, eight

13  consumers from various states.  And it's simply a practical

14  attempt to center the litigation in a single court for

15  purposes of adjudicating the damages claims. It's a little

16  bit different on the injunctive relief issue because of

17  some Article 3 concerns.

18          But to answer your Honor's question, we don't

19  represent people, but we don't have to; and it makes sense

20  to make sure that the Complaint encompasses the entire

21  country because -- and we believe defendants would agree --

22  we want a single forum to deal with these issues.  Because,

23  again, if we get contacted tomorrow by somebody, you know,

24  from a different state, that person, if they retain us,

25  they're likely to direct us to file a class action.  So

```
 1
 2   it's either serial class actions all over the country or
 3   serial class actions filed in this court because Noom is
 4   headquartered in New York.  So we think the quickest way to
 5   make sure that we're dealing with the entire subset of
 6   consumers who were affected by the conduct challenged by
 7   the case is to amend the Complaint and clear up any
 8   misconception as to the scope of consumers covered by this
 9   case.
10             THE COURT:  Okay. So --
11             MR. WITTELS:  Your Honor, this is Steven Wittels.
12   May I jump in just to follow-up briefly on what
13   Mr. McInturff said, if I could?
14             THE COURT:  Sure.
15             MR. WITTELS:  Thank you. Defendant points -- or
16   has made an argument about sanity. We had proposed -- and
17   this goes to why we want to amend the Complaint and think
18   it's appropriate -- we had proposed to Judge Schofield that
19   the Court allow us to go with -- set up a bellwether
20   process, which obviously --
21             THE COURT:  Yes, I'm well aware of that. And I --
22             MR. WITTELS:  Right.  So when --
23             THE COURT:  -- I'm familiar with -- I know exactly
24   what went on in the conference with Judge Schofield, so --
25             MR. WITTELS:  Right, right. So that was another
```

```
 1
 2   reason why we needed to amend the Complaint because
 3   defendants were taking -- they talked, and they wanted
 4   something streamlined, that was the way to have it. They
 5   opposed it, and the judge said, well, you have some
 6   nationwide counts but you don't seem to have all of them.
 7   So in light of that, she had suggested you need to go back
 8   to the magistrate judge, which we've done, and amend your
 9   Complaint, which we think, again, is appropriate to bring
10   in all of these states.  And then we'll still, if the
11   Court, the Article 3 judge thinks it's appropriate, we will
12   ask again for a bellwether. That's a way to streamline the
13   case where you don't deal with 50 states but you deal with
14   two, three states, the big states here of New York,
15   California --
16            THE COURT:  Well, if there's common proof, that's
17   just all issues of law.  So I don't -- I'm not sure I
18   understand or agree that a bellwether process makes sense
19   in this particular case. But I understand.
20            Okay. So with respect to the proposed amendment --
21            MR. RHODES:  Your Honor, may I respond just very
22   briefly?
23            THE COURT:  I want -- yes, I was just going to ask
24   for Noom's response to the proposed amendment.  Are you
25   objecting to it?  And if you are, on what basis are you
```

1

2    objecting to it?

3         MR. RHODES:  Yes, two things.  I mean, I don't

4    think it's fair to characterize the district court's

5    thinking in the manner that was just articulated. I would

6    note for the record that you asked a very simple question,

7    which was do they have a named representative plaintiff for

8    every state in the country.  And the answer was no. They do

9    not articulate any coherent theory under which any Court

10   has ever entertained an -- individual 50-state subclasses

11   without having representatives of each of those states, nor

12   have they articulated the variances among state law, how

13   they would deal with those variances.  And, indeed, there

14   is developed case law, starting primarily with the case of

15   *Mazza*, which is a Ninth Circuit case that articulates how

16   these kinds of cases cannot be certified.

17        So our objection is that they are constantly

18   searching for a viable theory, and I would beseech the

19   Court to look for Second Circuit case law that says you can

20   have 50 individual subclasses over a national class action

21   that's already been pled without having representative

22   plaintiffs from each of those various jurisdictions. I

23   think this is the opposite of efficiency.  The whole

24   purpose of class certification is to have a case that is

25   susceptible of common proof at trial for efficiency

1
2   purposes.  There's nothing efficient about this.  Right?
3   It's just sprawling.  Every time you turn around, the case
4   sprawls; and yet, they don't want to go through the actual
5   requirements of the case. How can you have a Mississippi or
6   New Mexico subclass here with nobody in the class that
7   stands up and says, "I will act as a fiduciary for those
8   people, and I am a representative of that group of actors
9   that are governed by those states' laws," without going
10  through a Rule 23 civ?  They just want to skip that
11  process. You can't do it.
12          THE COURT:  Okay. So --
13          MR. WITTELS:  Your Honor, may we respond?
14          THE COURT:  No, no, not right now. I have a
15  question for Noom.
16          So from a practical standpoint, let me ask, Noom
17  already indicated that it wanted to file a Motion to
18  Dismiss.  And the question is is that Motion to Dismiss
19  going to be based on the current operative Complaint, or
20  should it be on the proposed Amended Complaint? And --
21          MR. RHODES:  Your Honor, Michael Rhodes -- oh,
22  sorry.
23          THE COURT:  -- so, as you know, there's a
24  liberal standard in amending Complaints. At the same time,
25  if the claim would be futile, it's the Rule 12B standard.

1

2    Judge Schofield's going to decide the Motion to Dismiss.

3    So if Noom wants, we can grant the amendment, and you can

4    include the arguments that you want to make in the Motion

5    to Dismiss that, you know, there can't be a subclass if

6    there's no representative plaintiff. But what I want to do

7    is something that's the most efficient here because if

8    it's an amend, then I'm looking at the futility argument,

9    then I think that that may not be as efficient because I

10   would be doing that as an R & R rather than the Motion to

11   Dismiss piece. And I think that the Motion to Dismiss is

12   jurisdictional, is it not, Mr. Rhodes?

13            MR. RHODES:  Yes.  Your Honor, your framework is

14   not unreasonable, and I agree with you. I'm familiar with

15   the *Foman v. Davis* standard that the Supreme Court

16   articulated I think back in 1963 and how amendments are

17   liberally to be granted.

18            Our gripe is we need to stop the expanding and

19   searching for viable legal theories. Get to a Complaint.

20   We've been trying now for multiple times to bring a Motion

21   to Dismiss; and every time we do, the plaintiffs say, no,

22   no, let us change the theory, let us add more claims,

23   let's try to do it differently.

24            So if the Court's instinct is allow the

25   amendment, schedule a Motion to Dismiss argument where

```
 1
 2   we'll tee up this on a joined record where we can argue
 3   about these legal issues, that's okay with me.
 4          THE COURT:  Yes, that's my thought, to permit
 5   the amended Complaint and then you can go and do your
 6   Motion to Dismiss, and we'll continue, and I'll set the
 7   schedule for -- I'm going to revise the Scheduling Order
 8   today, and we're going to set a schedule for class
 9   certification.  But that --
10          MR. RHODES:  The other thing I would say, your
11   Honor --
12          THE COURT:  -- that's [indiscernible]
13          MR. RHODES:  -- the other thing I need to say,
14   your Honor, is I sure hope I'm not going to be barraged now
15   with discovery targeting unique, individualized practice of
16   all 50 states before we've had an opportunity to brief this
17   and get an adjudication of it.  That's the only concern I
18   have.
19          THE COURT:  Well, I don't think that -- first of
20   all, with respect to Rule 23, if there's going to be --
21   there's got to be common proof. So I don't know -- I don't
22   see how that makes sense, necessarily, from a discovery
23   standpoint.  There's either nationwide common proof or
24   there's not.  And all of the claims the plaintiffs have
25   said, even the state law claims, are a similar type of
```

1

2     standard.

3            So I'm going to allow the Amended Complaint. This

4     is the last amendment.  There's not going to be any further

5     amendments after this Amended Complaint. You can file that

6     by Friday, and Noom can write Judge Schofield to tee up the

7     Motion to Dismiss and set that briefing schedule. I think

8     she, in her last conference with you, she already stated

9     what that schedule should be, although she said you could

10    agree to have a quicker motion practice.  But that's -- so

11    that's what we're going to do.  The amended -- plaintiff

12    should file the Amended Complaint by Friday, and you can

13    commence with the Motion to Dismiss briefing.

14           MR. MCINTURFF:  Judge Parker, this is Burkett

15    McInturff. I'd like to just make one comment, but I think

16    my colleague, Mr. Wittels, would like to confer internally

17    for 20, 30 seconds.  Could we briefly confer and then come

18    back on the line? We're not going to hang up. We've got a

19    separate line.

20           THE COURT:  Okay.  Go ahead.

21           MR. MCINTURFF:  Thank you.

22           (Brief silence.)

23           MR. MCINTURFF:  Judge Parker, this is Burkett

24    McInturff again. Thank you for indulging us. I just wanted

25    to make clear so that the record is clear, it's not

1

2  uncommon following a ruling on a Motion to Dismiss in a

3  case like this that there would be subsequent Amended

4  Complaints once the Court has weighed in on the underlying

5  causes of action.  So we just wanted to -- I just wanted to

6  flag that it's likely that there will be additional

7  amendment requests after the Motion to Dismiss ruling, if

8  anything, just to -- sometimes to clean up the pleadings.

9          THE COURT:  Well, it's one thing to conform it to

10  the Court's ruling; it's another thing to add new theories

11  and facts.  So I understand what you're saying.

12          No further amendments -- you're going to go ahead

13  and brief this, and any further amendments will be for good

14  cause or upon court order to conform to a ruling on the

15  Motion to Dismiss, if appropriate.

16          MR. MCINTURFF:  Just to be clear, your Honor, I

17  mean, discovery is ongoing. I mean, we do have a right to

18  conform the pleadings to the proof. I just don't want to

19  create a record of there being an absolute prohibition on

20  any amendment because that's not consistent with the

21  standard. We understand your Honor's direction; but, again,

22  I'm just concerned about the record because it wouldn't be

23  consistent to say that no amendments are ever allowed

24  again, period, because, as your Honor said --

25          THE COURT:  There's no amendments absent good

 1
 2     cause, absent good cause or to conform to a court order.
 3     That's what I said.
 4              MR. MCINTURFF:  Thank you.
 5              THE COURT:  You can bring a motion in accordance
 6     with the federal rules, but this is -- you've had many
 7     chances to amend the Complaint.  The Complaint is 1,000
 8     paragraphs; it's time that there's -- the issue is joined.
 9     So that's what we're talking about here.
10              MR. WITTELS:  Right, right, your Honor. Steven
11     Wittels. Just briefly on that.
12              THE COURT:  We're not going to have any more
13     argument on this, Mr. Wittels. So --
14              MR. WITTELS:  No, no, I wasn't arguing about --
15     okay, thank you, your Honor.
16              THE COURT:  You're going to file the Amended
17     Complaint by Friday.
18              Now, let's talk about the scheduling. I think that
19     the fact discovery needs to be extended through the end of
20     2021, given the volume of data and other issues.  And I've
21     already scheduled monthly court conferences through then, I
22     believe.
23              So let's talk about the class certification
24     briefing. It sounds like plaintiffs have already served an
25     expert report. Is Noom also engaging an expert, a rebuttal

1

2    expert?

3          MR. RHODES:  Yes, your Honor. It's very likely

4    that we will proffer expert reports in connection with our

5    opposition to the class certification motion.

6          THE COURT:  Okay. So given that we've got the

7    Motion to Dismiss that's going to be -- that should be

8    fully briefed by early March. So I don't think it makes

9    sense to have class certification briefing until, say,

10   June. I also don't think that you're going to be able to

11   produce some of the remaining information and data needed

12   until June. So what I'd like to do is set a schedule for

13   class certification briefing. Let's do June 30th for the

14   moving brief.

15         MR. RHODES:  August 30th, your Honor, for the

16   opposition papers? Can we have 60 days?

17         MR. MCINTURFF:  Your Honor, this is Burkett

18   McInturff. Just briefly, June 30th is the day before we

19   have a 10 a.m. conference with your Honor. Typically the

20   night before a class certification brief is a very late

21   night. Could we maybe do another day that week, like maybe

22   the 2nd of July, that Friday?

23         THE COURT:  So --

24         MR. RHODES:  We're worried about something six

25   months in advance, and they can't get it ready for trial?

```
 1                          PROCEEDINGS                    35
 2            THE COURT:  We can always modify the dates for the
 3    monthly conferences. So if we need to move that date at
 4    that time, we can do that.
 5            MR. MCINTURFF:  Okay. Okay.
 6            THE COURT:  That's not a problem. You can
 7    always -- if something comes up -- I'm going to get to know
 8    you all very well during the course of this year, so if
 9    something comes up and you need to make a modification of a
10    status conference day, just let me know that so we can move
11    that if we need to.
12            So June 30th. And, Noom, you're saying you need 60
13    days?
14            MR. RHODES:  That would be preferable, your Honor,
15    if that's possible.
16            THE COURT:  Sixty days is coming into the Labor
17    Day Weekend time frame.
18            MR. RHODES:  How about August 27th, your Honor,
19    which is before that.
20            THE COURT:  Okay.  So August 27 for opposition to
21    class cert. And do plaintiffs need 30 days?
22            MR. WITTELS:  No, your Honor, we would request 60
23    days because the reply contains, you know, most of the meat
24    responding to the defendant's arguments. On a class
25    certification motion of this sort, it's actually the reply
```

 1
 2   that takes the most work.
 3            MR. RHODES:  I would object to that, your Honor.
 4   Thirty days is more than sufficient.  That's nine months
 5   from today. It's their motion; it's their burden. We've got
 6   to move this thing along.
 7            MR. WITTELS:  Your Honor, that's very
 8   unreasonable.  And if he were the plaintiff's lawyer, he
 9   would know that, because we've done these many times; it's
10   always the reply that requires you to rebut the arguments
11   you -- and it's very different, from our perspective.  We
12   don't think 60 is unreasonable.  And you're arguing over 30
13   days?
14            THE COURT:  Well, normally, the reply is two
15   weeks.  But I am mindful that there's a lot of holidays
16   around September. You've got the -- September is a very
17   busy month typically. You've got, you know, Labor Day;
18   you've got the Jewish holidays; you've got the -- September
19   is an extremely busy month. So I'm going to put the reply
20   due October 22nd.
21            Okay, now, let's now talk about -- I understand
22   there is some overlap in discovery.  And we're not going
23   to -- you know, I don't want to have artificial bright --
24   it's difficult to draw a bright line as to some issues as
25   to what's class cert. and what's merit; so that there

1
2   necessarily is going to be some overlap. But what I want to

3   talk about now is the ESI protocol first. I'm not going to

4   appoint a special master; there's no need for that. Second,

5   the Court is going to issue its own order based largely on

6   Noom's proposed protocol.  And I will issue that shortly,

7   most likely this week.

8           With respect to the disputes that the parties have

9   been having in advance of the status conferences with the

10  Court, I am directing you to have a simultaneous exchange

11  of your agenda items five business days prior to the

12  conference, exchanged by five p.m., limited to two pages;

13  and simultaneous exchange of your positions three business

14  days prior, at 5 p.m., also limited to two pages. And you

15  can submit the letter two business days before the

16  conference.

17          MR. WITTELS:  Your Honor, this is Steven Wittels.

18  Can you just go over that again? Because what's been

19  happening with the rule you had about the three-page, you

20  know, submissions together is it's turned into almost a

21  back-and-forth briefing of issues.  We present something --

22          THE COURT:  That's what I do not want.

23          MR. WITTELS:  -- the defendants --

24          THE COURT:  I do not want a back-and-forth

25  briefing of issues.  That is totally excessive.  There is

```
1                            PROCEEDINGS                    38

2   no need for that. I have managed many, many, many large

3   cases, and I have never seen the amount of disputes that

4   you all are bringing to me.

5              MR. WITTELS:  All right.

6              THE COURT:  The purpose of the letter is simply to

7   highlight agenda items in a very high-level way.  And I

8   don't want a lot of briefing. We can have discussions about

9   them; and if I need more briefing, we'll have more

10  briefing. But that is not the point of the letters. And so

11  that's why we're going to have a simultaneous exchange.

12  Okay?

13             MR. WITTELS:  Right. So can you just go over what

14  it is you expect -- because you have a five-day and a

15  three-day -- so it's very clear?  Because we don't want any

16  misunderstanding about what's --

17             THE COURT:  Yes. Each side is going to exchange

18  their proposed agenda items five business days prior at

19  five p.m. I'm going to put this in an order so you're going

20  to have it written down. And then you'll, if you want to

21  summarize your position on the issue, there'll be a

22  simultaneous exchange summarizing your -- I don't know if

23  there's going to be overlap or not -- a simultaneous

24  exchange of the positions three business days prior at five

25  p.m.  And then you can take turns; one month the plaintiff
```

1
2   can combine it into one letter, another month defendants

3   can, to be submitted two business days prior to the

4   conference.

5            MR. WITTELS:  And is that still subject -- Steven

6   Wittels again -- is that still subject to the three-page

7   rule? We've been fighting about page limits, as well, on

8   this, unfortunately.

9            THE COURT:  Correct. I'm actually limiting it. Two

10  pages each for your simultaneous exchange.  That is

11  correct.

12           MR. WITTELS:  Two pages each.  So it's two pages

13  total, or it's two pages for each side?

14           THE COURT:  Two pages -- well, two pages for your

15  simultaneous exchange, but it may ultimately be up to six

16  pages if you -- I don't -- again, each side may have a

17  little response, you know, summarizing its response to the

18  two-page agenda items, and so that is building up to

19  potentially six pages for the joint letter.

20           MR. WITTELS:  Thank you for that clarification.

21           MR. MCINTURFF:  Your Honor, this is Burkett

22  McInturff. Could I raise a related issue? It seems like it

23  might make sense to discuss it now, which is plaintiff's

24  request for a standing weekly meet-and-confer so that the

25  parties can actually discuss outstanding issues?

```
 1                        PROCEEDINGS                    40
 2              THE COURT:  Yes. I'm not going to order that
 3   because the Court -- it's not appropriate for the Court to
 4   get into that kind of micromanagement of this. You all are
 5   officers of the court, and you should be able to meet and
 6   confer.  And there are parts of -- you know, there are
 7   times during the course of a case where you may need to
 8   have more frequent interactions and other parts of the case
 9   where you may not need to have that frequent interactions.
10   Right now it's an intense phase, so you may need that.  But
11   I'm not going to issue an order on that. I expect you all
12   to cooperate.
13              MR. WITTELS:  This is Steven Wittels on that
14   point.  And one reason that -- I'm sort of in Mr. Rhodes'
15   situation. I don't like to get into the weeds, so to speak,
16   on discovery.  And we let -- you know, we have a big team,
17   but you don't want to have everyone involved in this.  But
18   what I'm seeing happening -- and we put this into our
19   letter to you -- is that when we make proposals to the
20   defendant to meet and confer, we're now getting
21   roadblocked; they won't meet and confer.  So that's why
22   Mr. McInturff said there's got to be some way to jump-start
23   this without bothering your Honor and coming in here with
24   long lists.  So they don't want to produce discovery; we
25   get that. But we need to have meet-and-confers, and if
```

1                                                          

2  they're not going to produce something, we need to be able

3  to have a resolution without waiting for it, you know, 30

4  days where --

5          THE COURT:  Of course. Of course.

6          MR. WITTELS:  And we don't seem to have that,

7  because you've said cooperate; but from our standpoint,

8  from the plaintiff's, we're not getting that cooperation.

9  Defendants complain that they've never --

10          THE COURT:  Well, I'm --

11          MR. WITTELS:  You know, that we're boiling the

12  ocean --

13          THE COURT:  Okay, I'm directing you now -- I

14  understand. I understand the frustration that you have.

15  But I'm directing everybody now to do better. So -- and

16  hopefully today we're going to get some greater clarity of

17  what the Court's expectation is of both sides.

18          Now, let's next go to -- and I will say that, to

19  the extent there needs to be -- there's some urgent issue

20  that can't be addressed at the monthly conference, you can

21  write a letter to me, and I can have another interim

22  conference in between.  But that should not be something

23  that is routinely necessary. It may be that we have to have

24  it during some months in the course of litigation that we

25  need to have biweekly conferences. If we need to do that,

```
 1                          PROCEEDINGS                    42
 2    we can.  But I do expect you all to be cooperating, both
 3    sides to be cooperating.
 4              Now let's move onto the RFPs. Okay, no more charts
 5    with respect to RFP requests. I think, having reviewed your
 6    charts, I think it's a waste of time now. Many of the
 7    plaintiff's requests were very overbroad, and I mentioned
 8    that when I initially saw the requests.  The charts did not
 9    assist this Court, and in terms of -- it doesn't seem to me
10    to make much sense.  There's no point in plaintiff saying
11    what they think Noom's position is and then have Noom
12    clarify. It just -- to me, after having reviewed the charts
13    at length for hours, it seems more make-work than anything
14    else. So no more charts. That doesn't seem to be an
15    effective use of people's time, in my view.
16              In terms of document requests, I'm limiting
17    plaintiff to 25 more document requests without subparts.
18    Your requests have been so broad that I can't imagine that
19    there's anything else that you possibly need. Now, if
20    something comes up and there's good cause to have more,
21    then you can make an application to the Court.
22              In terms of the instructions, directions and
23    definitions, the Federal Rules of Civil Procedure and the
24    Local Rules will apply, and that's it, except to the extent
25    you want to define a term that's unique to the case, such
```

```
 1
 2    as, you know, the Healthy Weight Program, something like
 3    that.
 4              Now, with respect to Noom's request for the
 5    Protective Order, I'm going --
 6              MR. MCINTURFF:  Your Honor -- your Honor, this is
 7    Burkett McInturff --
 8              THE COURT:  Yes?
 9              MR. MCINTURFF:  Could I interrupt just for a
10    clarification? So you're saying that plaintiffs have leave
11    to file an additional 25 document requests targeting the
12    particularized data that we identified in our letter?
13    That's what I understand you to be saying.  What about the
14    requests that have already been issued that are the
15    subject of the parties' dispute in the charts?
16              THE COURT:  Well, we're going to talk about that
17    now.
18              MR. MCINTURFF:  Oh, got you.  Okay. I just wanted
19    to clarify.
20              THE COURT:  You've already served a kazillion --
21    not a kazillion but a number of document requests that --
22              MR. MCINTURFF:  I think the word is "bazillion,"
23    your Honor.
24              THE COURT:  What's that?
25              MR. MCINTURFF:  I said I think the word is
```

1                          PROCEEDINGS                    44

2   "bazillion."

3            THE COURT:  Yes, right.  So there's -- but you're

4   quite thorough in your requests, but overzealous in terms

5   of how they're phrased.  So that's a problem.

6            I'm going to grant the Protective Order with

7   respect to requests, RFPs 6, 7, 8, 13, 28, 41, 42, 46.

8   With respect to 48, that relates largely to the org

9   charts; and as I understand it from Noom, Noom has

10  produced or is willing to produce the current org chart,

11  but it does not have historical data --

12           MS. REDDY:  That is correct. That is correct,

13  your Honor.

14           THE COURT:  Oh, okay.

15           MS. REDDY:  Yes, so we produced the historical org

16  chart back in September.  And we've explained to plaintiff

17  that we do not have historic -- we've produced the

18  organizational chart that existed as of September to

19  plaintiffs.  And we explained to them we do not have

20  historical versions.  There's no ability for Noom to

21  prepare a historical version retroactively without

22  significant burden or expense.  So we believe we've

23  produced documents that we have sufficient to satisfy a

24  response to this request.

25           THE COURT:  Has there been a lot of turnover in

1

2   the last couple of years of staff with knowledge about the

3   Healthy Weight Program? It's only been around for a little

4   bit of time, anyway.  But has there been a lot of

5   turnover --

6           MS. REDDY:  Correct, your Honor. No, actually. I

7   mean, so nine of the ten custodians who we have designated

8   so far have actually been at Noom for virtually the entire

9   relevant period, so over four years.  There hasn't been a

10  lot of turnover.  We've designated custodians who are

11  intimately familiar with the issues involved in this

12  litigation, including the head of product; the president of

13  Noom, who's also the cofounder of Noom. Most of these

14  individuals are longstanding employees of the company.

15          THE COURT:  Okay. All right, so I don't know that

16  there's anything more to produce from 48. Let me hear from

17  plaintiff?

18          MR. MCINTURFF:  Could I be heard on this? Thank

19  you, your Honor. This is Burkett McInturff. As a follow-up,

20  we requested that if Noom doesn't have historical org.

21  charts, that they give us email lists or thumb trees.

22  Because the purpose here is -- or any other document that

23  identifies people's titles because it's not a big company.

24  It's, you know, between 50 and 100 people during the

25  relevant period that are in the headquarters that are

1
2  making the decisions that relate to the conduct that's
3  being challenged. And if the company doesn't have an org.
4  chart, which is not uncommon, they certainly have -- likely
5  have some sort of email list that lists everybody's email
6  or some other directory, whether it's phone or otherwise.
7  And typically those lists contain titles and positions.
8  And we want this because we want to be able to evaluate the
9  proposed custodians and proposed alternative or additional
10 custodians.  And we don't think it's too much to ask to
11 produce phone lists or phone trees or email lists if they
12 historically existed.  And, again, it's not a big ask; and
13 we don't see why the defendants are refusing to provide the
14 information.

15         THE COURT:  So given that you've already received
16 information on the staff and given that there's been little
17 turnover and given that there's going to be production of
18 information at depositions where you can learn who may be
19 the additional custodians, I'm going to deny the request
20 for additional production under Request 48. I don't think
21 that's proportional to the needs of the case.

22         Okay, so next --

23         MR. MCINTURFF:  Your Honor, could I just -- could
24 I raise one other issue related to this request?

25         THE COURT:  No. I've made my decision.

1

2          Now let's move onto Requests 31 and 33. In my

3   view, they overlap, to some extent. And they are both

4   drafted in a very overbroad manner.  What I did think would

5   be relevant, though, would be internal reports, memoranda,

6   PowerPoints to management and the board regarding consumer

7   complaints about the Healthy Weight Program and in

8   particular the complaints about the deceptive information

9   provided to consumers about signing up, about the free

10  trial period, then enrollment into autorenewal, how to

11  cancel, the Better Business Bureau warning that was issued

12  and the company response thereto. So it seems to me that

13  those are somewhat overlapping, but that would be a more

14  specific type of request, and that type of information I

15  think is relevant and should be produced.

16          In terms of the Request 34, where you're

17  requesting -- that's a much more specific request related

18  to the statement that the CEO put out regarding -- I guess

19  it came the day of or the day after the Better Business

20  Bureau warning. In my view, this is a very discrete request

21  insofar as this was a very concentrated time frame. So it

22  seems to me there should be nonprivileged communications in

23  the week prior to the warning. I'm guessing that the

24  company had a heads-up that this may be coming.  And -- or

25  if it didn't, it didn't -- but a week prior, and then the

1
2   communications about the warning, how it was phrased, and
3   the drafting and issuance of the message of Noom's CEO.  So
4   it seems to me there were probably various stakeholders
5   involved from, you know, marketing, from compliance, PR,
6   etc., who may have been evaluating what was coming down the
7   pike and planning exactly what to post, you know, what the
8   CEO should say about it and post about it. And there may
9   have been a couple of -- there may have been some
10  communications in the week after the issuance of the
11  statement, you know, responses to it. I don't know if there
12  were responses to the board about this and the statement
13  that was issued. But it seems to me that you can look in
14  the two-week period, you know, a week ending with the week
15  prior to the warning and week after the issuance of the
16  CEO's statement for communications about this. I realize
17  that there will be some privileged communications; those
18  are going to have to be logged.
19          Okay, now --
20          MS. REDDY:  That's fine with us. Thank you.
21          THE COURT:  -- with respect to Request
22  Number 45, the plaintiffs have requested some information
23  or in their response they say that many of the complaints
24  are recorded in this ZenDesk application.  And I understand
25  that Noom has already agreed and is producing internal

1
2    policies and training materials that it provided to
3    customer service or coaches about the trial period, the
4    signing up, the autorenewal, the cancellation, etc.  But
5    what -- and that you're suggesting that you do a sample of
6    complaints. I'm just wondering what is the -- have you had
7    discussions about this ZenDesk application or database and
8    even how you would do a sample or whether a sample is, you
9    know, a scientifically appropriate sample?  What's been
10   discussed about that? Let me hear first from the plaintiff.
11            MR. MCINTURFF:  Yes, your Honor, so the parties
12   have discussed a sampling of the ZenDesk customer service,
13   I'll categorize them as "tickets," because whether or not
14   something is a complaint is another issue.  And plaintiffs
15   are prepared to agree to negotiate a statistically-
16   significant and methodologically sound sampling of these
17   tickets.  But in order to do something that is defensible
18   from a methodological standpoint, we need to know more
19   about what's in the ZenDesk database. And we're prepared to
20   work with defense counsel, and we have a statistical expert
21   on retainer who can advise us to work out a sampling
22   methodology that will allow us to draw conclusions about
23   the underlying data in the database. But if the sampling is
24   not both defensible and joint, we're going to have fights
25   about whether the sampling yields results that can be used

1

2  to draw inferences from.  So we proposed to the

3  defendant --

4           THE COURT:  Right.

5           MR. WITTELS:  -- we proposed to the defendant to

6  work out a joint sampling methodology.  But if we can't

7  work that out, it's our position that we are entitled to

8  the contents of the database.  But we'd rather not deal

9  with the burden of the review of the database, and we would

10  like something targeted. But we can't agree until we've

11  been educated about the database.

12           THE COURT:  Yes. Okay. So let me ask Noom about

13  this database. So is my understanding correct that any kind

14  of consumer complaint or complaints go into and are stored

15  in this ZenDesk platform?

16           MS. REDDY:  Your Honor, this is Ms. Reddy. Yes,

17  that is correct. Our understanding is escalated complaints

18  and any sort of consumer complaints, including those that

19  are addressed by Noom's third-party consultants, end up

20  within ZenDesk, with the exception of complaints that are

21  addressed on social media, since those are public, those

22  communications are public, they're not separately logged in

23  ZenDesk.

24           THE COURT:  Okay. All right. And so do you have a

25  separate team that evaluates complaints on social media and

1

2   tracks them in any way?

3          MS. REDDY:  Correct. So that's handled by the

4   consumer service team and also Noom's third-party

5   consultant, which we've disclosed to plaintiffs, Brann

6   Zaftian.

7          THE COURT:  Okay. So there's two sources of data

8   for the complaints and what's happening with the

9   complaints, the ZenDesk and then the materials from social

10  media and what's done with that internally or externally

11  with your consultant?

12         MS. REDDY:  Correct. But the vast majority --

13         THE COURT:  So --

14         MS. REDDY:  Excuse me, your Honor. I was just

15  saying the vast majority of communications or customer-

16  related complaints are stored within the ZenDesk.

17         THE COURT:  Okay. But does the ZenDesk segregate

18  or have any kind of cataloging system so that you can

19  ascertain whether the complaints are relevant to the

20  Healthy Weight Program and the particular concerns about

21  it, such as the alleged deception and autorenewal? Is there

22  any way to pull those out?

23         MS. REDDY:  So there are broad macro-level

24  categories in which complaints are categorized in ZenDesk,

25  including billing-related disputes.  Again, since

 1
 2  [indiscernible] during the relevant period was the Healthy

 3  Weight product, most consumer communications are going to

 4  relate to the Healthy Weight products.  So what we would

 5  propose to do and what we had been working with the data

 6  team at Noom internally to devise is a sampling methodology

 7  to sample ZenDesk tickets using the macro-level

 8  categorization that the company assigned.

 9          THE COURT:  But what I'm hearing you say, though,

10  is that during the relevant period -- remind me when the

11  Healthy Weight started again? It was '16?

12          MS. REDDY:  So the pilot program was first tested

13  in the summer of 2016, and the flagship product was

14  launched in March of 2017.

15          THE COURT:  Okay.  And so -- and the autorenewal

16  started with the pilot?

17          MS. REDDY:  That is correct, your Honor, the

18  autorenewal of the Healthy Weight Program.

19          THE COURT:  Okay, and so after the launch of the

20  flagship product in 2017, most of the complaints in ZenDesk

21  would pertain to the Healthy Weight?

22          MS. REDDY:  That is correct, your Honor.

23          THE COURT:  And in terms of the features of that

24  product that are the subject of the Complaint, have any of

25  those changed or, you know, in a way, in any material way

1

2 since the suit was filed; or are they still in place?

3         MS. REDDY:  So I suppose it depends on the

4 specific features of the product that are being challenged.

5 My understanding, based on the operative Complaint, is that

6 the only other feature that is really being challenged is

7 the use of alleged bot-coaching.  And that's aside from the

8 cancellation and renewal features of the product.  And so,

9 you know, I don't know if the proposed Amended Complaint is

10 going to expand the scope of features to the product that

11 are alleged to be deceptive. But at this point, we would

12 propose to pull primarily documents and complaints related

13 to billing, autorenewals, refunds, cancellations.

14         THE COURT:  And do you have an idea of the volume,

15 how many complaints? Plaintiffs have said that there's

16 millions of people in the putative class, but only a subset

17 would be complaining.  Do you have any idea what the

18 numbers are? I'm just trying to figure out, like, does it

19 make sense to even extract? Does it make sense just to

20 take, you know, take from, you know, day one of the launch

21 to, you know, a date through 2020?  What makes sense?

22         MR. WITTELS:  Your Honor --

23         THE COURT:  Yes.

24         MR. WITTELS:  Your Honor, this is Steven Wittels.

25 On that point, we know -- and I don't know if this is

1

2   confidential information, but we know that there's -- I

3   won't give the exact number, but a ███ ███ ██████████

4   number for the number of people who received refunds.  And

5   that means that those people had complained and wanted

6   their money back. So you're talking about a very large

7   number of people. And that's the ones we know they gave

8   refunds to. I mean, we don't know how many more people than

9   that complained.

10          THE COURT:  Okay. But we don't know precisely why.

11  You're guessing the majority are because of the features

12  that are challenged in this lawsuit.

13          All right, it sounds like you all need to have a

14  little bit more discussion about how best to do that.

15  Sometimes extracting data, it takes more time than it's

16  worth because you have to, you know, create separate code

17  to extract it. And maybe -- but I'll let you all talk about

18  that. But it's -- and also what data there is from the

19  social media and the consultant. Because it sounds to me

20  that's very key information that needs to be produced. And

21  I want you to focus on how you're going to do that over the

22  next two weeks. And I want you to really focus on what

23  makes sense to extract and exchange that information.

24          With respect to requests --

25          MR. MCINTURFF:  Your Honor --

| | PROCEEDINGS | 55 |
|---|---|---|

```
 1                          PROCEEDINGS                    55

 2              THE COURT:  -- and I only have a few more

 3    minutes --

 4              MR. MCINTURFF:  Could I seek a clarification?

 5              THE COURT:  -- now. Yes.

 6              MR. MCINTURFF:  Yes, just this is Burkett

 7    McInturff.

 8              THE COURT:  Go ahead.

 9              MR. MCINTURFF:  If I could just very briefly seek

10    a clarification? One of the issues is that we're concerned

11    about from the plaintiff's side is originally the parties

12    agreed to work out a sampling methodology, and then the

13    language that the defendant has been using has changed to

14    the defendant is going to do a sampling methodology. We

15    cannot agree to a unilaterally implemented sampling

16    methodology for complaints.

17              THE COURT:  Sure, sure.

18              MR. MCINTURFF:  So we want to make it clear that

19    we have to be involved and we have to reach agreement

20    before this happens.

21              THE COURT:  Yes.

22              MS. REDDY:  Yes, your Honor. We've already

23    confirmed with them that we'll involved them in the

24    sampling methodology.

25              THE COURT:  Okay. So what I want to do now is
```

1

2  there were some other items that I wanted to review with

3  you all. We're not going to have time to do it because I

4  have another call. I'm going to schedule an interim status

5  conference.  We're going to go over the remainder of the

6  items that are at issue. And between now and the next

7  conference, I want you to talk about this sampling and this

8  data, because that is very important to get out and address

9  that now. I see that as more important than, you know,

10 miscellaneous emails.

11          So let's see here. Chris, are you on?

12          THE CLERK:  I'm on, Judge.

13          THE COURT:  Can we schedule something maybe

14 Jan. 27?

15          MR. WITTELS:  That works for plaintiffs, your

16 Honor.

17          MS. REDDY:  That works for defendants, your Honor.

18          THE CLERK:  January 27 is pretty jammed, Judge.

19 You have a -- the morning's full, and you have a settlement

20 conference in the afternoon, unless you're looking to --

21          THE COURT:  Okay. Hang on.  So what about around

22 that day?

23          THE CLERK:  Would you want to do Friday, the 29th?

24          THE COURT:  Let's see. Yes, we can do that.

25          MR. WITTELS:  That also works for plaintiffs, your

1

2   Honor.

3          MS. REDDY:  That also works for defendants, your

4   Honor.

5          THE COURT:  Do we have the morning open, Chris.

6          THE CLERK:  Yes, the whole day; the morning's

7   open, Judge.

8          THE COURT:  Okay, let's do 10 a.m. the 29th.

9          And I don't need a preconference letter from you

10  all.  What I want you to report on verbally is what you're

11  going to do about producing customer complaints and

12  information and response thereto. And then we'll address

13  some of the other RFPs that I didn't address today and some

14  of the other issues that were raised in your agenda

15  letters. Okay?

16         MS. REDDY:  Thank you, your Honor.

17         MR. WITTELS:  Thank you, your Honor.

18         THE COURT:  Thanks, everyone. We're adjourned.

19         (Whereupon, the matter is adjourned.)

20

21

22

23

24

25

58

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Mahood v. Noom Inc., Docket #20-cv-03677-LGS-KHP, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

               Carole Ludwig

Date:    January 14, 2021