WITTELS MCINTURFF PALIKOVIC
Steven L. Wittels
J. Burkett McInturff
Tiasha Palikovic
Steven D. Cohen
Jessica L. Hunter
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
tpalikovic@wittelslaw.com
sdc@wittelslaw.com

*Attorneys for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MOJO NICHOLS, SUSAN BREWSTER, DUANE DEA, MARYANNE DERACLEO, KAREN KELLY, REBECCA RICHARDS, JENNIFER SELLERS, and STACY SPENCER,** | **No. 20 Civ. 3677 (LGS) (KHP)** |
| **Individually and on Behalf of All Others Similarly Situated,** | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **NOOM, INC., ARTEM PETAKOV, and JOHN DOES 1 TO 5,** | |
| **Defendants.** | |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

THE UNIFORM WEB OF NOOM'S AUTO-ENROLLMENT SCHEME................................... 7

JURISDICTION AND VENUE ..................................................................................... 12

PARTIES .................................................................................................................. 13

FACTUAL ALLEGATIONS ......................................................................................... 14

I.    BACKGROUND ON THE SUBSCRIPTION E-COMMERCE MARKET,
NOOM'S USE OF DECEPTIVE "DARK PATTERNS," AND THE
DISCOVERY TAKEN TO DATE THAT DEMONSTRATES THE
EXISTENCE OF MORE THAN ███████████████████
████████████ .................................................................................. 14

II.   NOOM'S MARKETING AND REPRESENTATIONS TO
CONSUMERS ..................................................................................... 21

III.  NOOM'S ENROLLMENT PROCESS AND RELATED MATERIAL
MISREPRESENTATIONS AND OMISSIONS ............................................. 23

IV.  NOOM'S "COACHING" PROGRAM AND CANCELLATION POLICY
AND RELATED MATERIAL MISREPRESENTATIONS AND
OMISSIONS ........................................................................................ 30

V.   NOOM'S AWARENESS OF THE DECEPTIVENESS OF ITS
AUTOMATIC RENEWAL SCHEME ........................................................ 33

     A.    Noom Has Received Thousands of Complaints Regarding the
Deceptiveness of Its Enrollment Scheme ............................................. 33

     B.    Noom Acknowledges the Elements of Its Enrollment Scam in Its
Communications to Customers............................................................. 39

     C.    Noom Meticulously Tracks Customer Metrics, Including
Cancellation and Complaint Rates, and Knows that It Is Charging
Customers Who Are Not Using Its Plan ................................................ 42

     D.    Complaints About Noom's Enrollment Practices Resulted in an
Alarming Chargeback Rate—Which Noom "Solved" by Adding a
Small-Dollar Charge for Its Previously Free Trial ................................. 44

     E.    Noom Has a History of Unlawful Attempts to Enroll Customers in
Its Subscription Plans......................................................................... 45

     F.    Noom Knows Certain Customers Have Inexplicably Opened
Multiple Noom Accounts..................................................................... 45

     G.    Noom Knows Its Claims of Personalized Coaching Are False and
Misleading......................................................................................... 46

VI. HOW NOOM MISLED DISTRICT OF COLUMBIA PLAINTIFF NICHOLS ................................................................................................... 47

VII. HOW NOOM MISLED WASHINGTON PLAINTIFF BREWSTER ........................... 50

VIII. HOW NOOM MISLED CALIFORNIA PLAINTIFF DEA ............................................ 52

IX. HOW NOOM MISLED NEW YORK PLAINTIFF DERACLEO .................................. 54

X. HOW NOOM MISLED CALIFORNIA PLAINTIFF KELLY..................................... 58

XI. HOW NOOM MISLED OHIO PLAINTIFF RICHARDS.............................................. 61

XII. HOW NOOM MISLED ALABAMA PLAINTIFF SELLERS..................................... 64

XIII. HOW NOOM MISLED TEXAS PLAINTIFF SPENCER .............................................. 67

CLASS ACTION ALLEGATIONS ................................................................................................ 69

CAUSES OF ACTION .................................................................................................................... 72

I. STATE CLASS COUNTS.............................................................................................. 72

A. State Consumer Protection Counts............................................................... 72

COUNT 1: NEW YORK GENERAL BUSINESS LAW § 349.............................. 72

COUNT 2:  CALIFORNIA FALSE ADVERTISING LAW–VIOLATION OF THE CALIFORNIA AUTOMATIC RENEWAL LAW..................................................... 74

COUNT 3: CALIFORNIA FALSE ADVERTISING LAW–DECEPTIVE PRACTICES ............................................................................................................ 76

COUNT 4: CALIFORNIA UNFAIR COMPETITION LAW–VIOLATION OF THE CALIFORNIA AUTOMATIC RENEWAL LAW AND DECEPTIVE PRACTICES ............................................................................................................ 78

COUNT 5: CALIFORNIA CONSUMERS LEGAL REMEDIES ACT– VIOLATION OF THE CALIFORNIA AUTOMATIC RENEWAL LAW........... 82

COUNT 6: CALIFORNIA CONSUMERS LEGAL REMEDIES ACT– DECEPTIVE PRACTICES ................................................................................... 84

COUNT 7: CALIFORNIA'S WEIGHT LOSS CONTRACTS LAW ................... 85

COUNT 8: WASHINGTON CONSUMER PROTECTION ACT ......................... 88

COUNT 9: DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT .............................................................................................. 90

COUNT 10: OHIO CONSUMER SALES PRACTICES ACT................................ 92

COUNT 11: ALABAMA DECEPTIVE TRADE PRACTICES ACT................... 94

COUNT 12: TEXAS DECEPTIVE TRADE PRACTICES — CONSUMER PROTECTION ACT.............................................................................. 97

COUNT 13: ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT.............................................................................. 99

COUNT 14: ARIZONA CONSUMER FRAUD ACT........................................... 100

COUNT 15: ARKANSAS DECEPTIVE TRADE PRACTICES ACT ............... 102

COUNT 16: COLORADO CONSUMER PROTECTION ACT ......................... 104

COUNT 17: CONNECTICUT UNFAIR TRADE PRACTICES ACT................ 106

COUNT 18: DELAWARE CONSUMER FRAUD ACT .................................... 108

COUNT 19: FLORIDA DECEPTIVE TRADE PRACTICES ACT.................... 109

COUNT 20: GEORGIA FAIR BUSINESS PRACTICES ACT .......................... 111

COUNT 21: HAWAII UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ............................................................................................................... 112

COUNT 22: IDAHO CONSUMER PROTECTION ACT................................... 114

COUNT 23: ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT ............................................................................................ 116

COUNT 24: INDIANA DECEPTIVE TRADE PRACTICES LAWS................. 117

COUNT 25: IOWA CONSUMER FRAUD ACT ................................................ 118

COUNT 26: KANSAS CONSUMER PROTECTION ACT ............................... 120

COUNT 27: KENTUCKY CONSUMER PROTECTION ACT ......................... 122

COUNT 28: LOUISIANA UNFAIR TRADE PRACTICES ACT ...................... 123

COUNT 29: MAINE UNFAIR TRADE PRACTICES ACT................................ 125

COUNT 30: MARYLAND CONSUMER PROTECTION ACT ........................ 127

COUNT 31: MASSACHUSETTS CONSUMER PROTECTION ACT ............. 128

COUNT 32: MICHIGAN CONSUMER PROTECTION ACT ........................... 129

COUNT 33: MINNESOTA CONSUMER FRAUD ACT, UNLAWFUL TRADE PRACTICES ACT, AND UNIFORM DECEPTIVE TRADE PRACTICES ACT ............................................................................................................... 131

COUNT 34: MISSISSIPPI CONSUMER PROTECTION ACT .......................... 133

COUNT 35: MISSOURI MERCHANDISING PRACTICES ACT .................... 134

COUNT 36: MONTANA UNFAIR TRADE PRACTICES AND  CONSUMER PROTECTION ACT OF 1973 .............................................................. 136

COUNT 37: NEBRASKA CONSUMER PROTECTION ACT .......................... 137

COUNT 38: NEVADA DECEPTIVE TRADE PRACTICES ACT .................... 138

COUNT 39: NEW HAMPSHIRE CONSUMER PROTECTION ACT .............. 139

COUNT 40: NEW JERSEY CONSUMER FRAUD ACT .................................. 141

COUNT 41: NEW MEXICO UNFAIR PRACTICES ACT ................................ 142

COUNT 42: NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT .............................................................................................. 144

COUNT 43: NORTH DAKOTA CONSUMER PROTECTION ACT ................ 145

COUNT 44: OKLAHOMA CONSUMER PROTECTION ACT ........................ 147

COUNT 45: OREGON UNLAWFUL TRADE PRACTICES LAW.................... 148

COUNT 46: PENNSYLVANIA UNFAIR TRADE PRACTICES  AND CONSUMER PROTECTION LAW ...................................................................... 149

COUNT 47: RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT............................................................................ 151

COUNT 48: SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT.......... 153

COUNT 49: SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW ...................................................................... 154

COUNT 50: TENNESSEE CONSUMER PROTECTION ACT ........................ 156

COUNT 51: UTAH CONSUMER SALES PRACTICES ACT .......................... 157

COUNT 52: VERMONT CONSUMER FRAUD ACT ........................................ 159

COUNT 53: VIRGINIA CONSUMER PROTECTION ACT .............................. 160

COUNT 54: WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT ..................................................................................................................... 162

COUNT 55: WISCONSIN FALSE ADVERTISING ACT .................................. 163

COUNT 56: WYOMING CONSUMER PROTECTION ACT ............................ 164

COUNT 57: GUAM CONSUMER PROTECTION ACT ..................................... 166

COUNT 58: U.S VIRGIN ISLAND CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT. ........................................................... 167

COUNT 59: NORTHERN MARIANA ISLANDS CONSUMER PROTECTION ACT ................................................................................................. 168

B.   State Common Law Counts ...................................................................... 169

COUNTS 60 – 113: COMMON LAW FRAUD .................................... 169

COUNTS 114 – 167: UNJUST ENRICHMENT ................................. 172

COUNTS 168 – 221: CONVERSION................................................. 173

COUNTS 222 – 275:  MONEY HAD AND RECEIVED.................................... 174

II.   MULTISTATE CLASS COUNTS ................................................................ 175

COUNT 276: COMMON LAW FRAUD .................................... 175

COUNT 277: UNJUST ENRICHMENT............................................. 177

COUNT 278: CONVERSION............................................................ 178

COUNT 279: MONEY HAD AND RECEIVED................................. 179

PRAYER FOR RELIEF ............................................................................. 180

Plaintiffs Mojo Nichols, Susan Brewster, Duane Dea, Maryanne Deracleo, Karen Kelly, Rebecca Richards, Jennifer Sellers, and Stacy Spencer ("Plaintiffs"), by their undersigned attorneys, Wittels McInturff Palikovic, bring this consumer protection action in their individual capacity and on behalf of a class of consumers defined below against Defendants Noom, Inc., Artem Petakov, and John Does 1 to 5 (hereafter collectively "Noom," the "Company" or "Defendants" unless otherwise specified) and hereby allege the following with knowledge as to their own acts and upon information and belief as to all other acts:

## INTRODUCTION

1.     With over 50 million downloads of its weight-loss app, Noom is one of the fastest-growing weight-loss programs in the world and has almost quadrupled its annual revenue to over $237 million in the past year.[1]  According to its website, Noom is "backed by some of the best VCs [venture capitalists] in the world" and boasts of "tremendous growth."[2]  Such growth, however, is fueled by Defendants' deceptive and illegal automatic renewal scheme.

2.     The scheme works as follows.  Noom lures customers with deceptive promises that consumers can "try" its revolutionary weight-loss program supposedly "built on psychology and science" and that if the consumer decides during the trial period that Noom's program is not the right fit, the consumer can move on with no strings attached.   The pitch is as classic as it is simple. Noom is so confident in its weight-loss program "based on a cognitive-behavioral approach" that it is willing to let consumers "try" Noom at a financial loss.  Consumers are supposed to be so happy with Noom's weight loss program that they will want to become full-fledged customers after giving Noom a try.  Yet not only does it turn out that Noom's trial program must be cancelled lest it turn into an automatically renewing subscription, a fact most customers are unaware of, but

---

[1] Noom, https://www.noom.com/news/noom-quadruples-revenue-237-million (last visited Jan. 15, 2021).

[2] Noom, https://www.noom.com/careers (last visited Jan. 15, 2021).

the trial period is also extraordinarily difficult to cancel and instead results in customers being saddled with exorbitant <u>multi-month</u> subscription fees as soon as the trial ends.  By imposing lump-sum charges for its entire program and extracting up to eight months of non-refundable advance payments once the supposedly "risk-free" trial expires, Noom burdens consumers with the cost of a weight-loss service they never intended to purchase.  As Noom's COO and CFO Adam Fawer blithely acknowledges, "[i]f someone is only staying one month, we're not making a whole lot of money off that person."[3]  To further their end of "making a whole lot of money," Defendants barrage the consuming public with nationwide advertising on social media, the internet, TV, and radio to lure unsuspecting customers "try" Noom and enter Defendants' automatic enrollment trap.

3. Defendants' wide-spread deceptive conduct has spawned a massive consumer backlash.  For example, on August 19, 2020, Good Morning America's "Cover Story" was a "new warning about the massively popular diet app Noom from the Better Business Bureau."[4]  The BBB warns that "customers have submitted well over a thousand complaints alleging that the company offers misleading free trials, and that subscriptions are difficult to cancel."[5]  The BBB's alarm sums up this lawsuit when it explains that "consumers reportedly try to cancel the trial offer before it ends but still end up being billed for the subscription" and that Noom refuses to "to address the underlying cause" of customers' complaints.[6]  For context, the BBB's warning about Noom's

---

[3] Noom, https://www.noom.com/news/noom-quadruples-revenue-237-million (last visited Jan. 15, 2021).

[4] Good Morning America, https://www.goodmorningamerica.com/wellness/story/business-bureau-warns-consumers-diet-app-noom-thousands-72457171 (last visited Jan. 15, 2021).

[5] BBB Warning: Consumers Lose More than Weight with Popular Noom Health App (Aug. 19, 2020), https://www.bbb.org/article/news-releases/22930-bbb-warning-consumers-lose-more-than-weight-with-popular-noom-health-app (last visited Jan. 15, 2021).

[6] *Id.*

practices can be found amongst its alerts on pyramid schemes, COVID-19 scams, fake charity solicitations, and identity theft.[7]

4.      Noom holds itself out as a "behavior change company" that purports to deliver weight loss through "successful behavior change at scale."[8]  Noom's co-founder and President Defendant Artem Petakov told Forbes Magazine in January 2020 that Noom sells "a behavior change [weight loss] product that requires a very subtle touch to nudge people."[9]  Petakov, a former Google engineer, studied both psychology and computer science at Princeton.[10]  He founded Noom as a marriage of these two disciplines, which aims to "disrupt the weight loss industry" by using artificial intelligence, evidence-based guidelines of physiology, psychology, and cognitive behavioral therapy.[11]  According to Defendant Petakov, Noom tries "to understand a habit, break it down into: 'What's the trigger that occurs?  What thought appears in your brain and what action does it cause you to do and can we interrupt any one of those things?'  That process is rooted in cognitive behavioral therapy."[12]

5.      Yet rather than employing cognitivef behavioral therapy in service of their actual weight loss program Defendants use their scientific knowledge to take advantage of the consuming public, as Defendants' entire sales and automatic renewal model is designed to exploit well-studied weaknesses in human decision-making.  Defendants lure consumers to "try" Noom with promises

---

[7] BBB News Releases, https://www.bbb.org/us/news (last visited Jan. 15, 2021).

[8] *Id.*

[9] *Id.*; *see also* Monica Melton, Weight Loss App Noom Quadruples Revenue Again, This Time To $237 Million, FORBES.COM (Jan. 14, 2020, 1:12 PM), https://www.forbes.com/sites/monicamelton/2020/01/14/weight-loss-app-noom-quadruples-revenue-again-this-time-to-237-million/#77a070dc60f2.

[10] Noom, https://www.noom.com/news/noom-quadruples-revenue-237-million (last visited Jan. 15, 2021).

[11] *Id.*

[12] *Id.*

of a revolutionary weight loss system and then deploy a series of barriers to cancellation to trap consumers into making a lump-sum non-refundable advance payment for as many as eight months at a time, at a cost as high as $199.00.

6.      Central to Defendants' scheme is the fact that consumers who are tempted by ubiquitous marketing to "try" Noom via its "low cost" or "zero cost" trial are automatically defaulted to become paying subscribers once the trial period ends.  The fields of the psychology of decision-making and behavioral economics, pioneered by Nobel Laureate Daniel Kahneman, have long demonstrated that defaults are powerful drivers of consumer behavior.  That is, a need to take action to opt in (compared to having to take action to opt out) usually greatly lowers the likelihood that the action will indeed be taken.  There are various factors underlying this human tendency that have been identified in the judgment and decision-making literature, such as the work about the "status quo bias,"[13] "nudges"[14] and information overload (due to the amount of information available to and directed at consumers).  To use an example of the impact of defaults from a different context, fewer than 5 percent of people in Denmark choose to donate organs after they die, as opposed to 99.91 percent in France.[15]  Is it that people in France are so much more altruistic?  No.  What determines this is the default choice.  If a person wants to become an organ donor in Denmark they have to be proactive.[16]  In France they do not have to do anything, since being an organ donor is the default.[17]

7.      Noom's co-founder Defendant Petakov knows these principles well, as he

---

[13] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[14] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

[15] E. Johnson and D. Goldstein (2003), "Do Defaults Save Lives?" *Science*, 302, 1338-9.

[16] *Id.*

[17] *Id.*

highlights on his LinkedIn profile that he "[t]ook Daniel Kanheman's 'Psychology of Decision Making' class at Princeton, making me forever fall in love with psychology of decision-making," and that "[m]y biggest passion is influencing people's everyday decisions on a large scale."[18]

8.      Indeed, a presentation given by Defendant Petakov and tellingly titled "Hacking Willpower: How to Master the Science of Decision Making With Noom" highlights the very behavioral insights that Noom employed in the design of its deceptive and illegal auto-enrollment trap.   In the presentation, Mr. Petakov acknowledges several key aspects of human decision making.   One of them is "Ability," summed up by Mr. Petakov as whether something can be done "quickly and easily," which recognizes that the more complicated an action is, the less likely a person is to follow through with it.   Another is "Trigger," which recognizes that the presence or absence of reminders to act is directly correlated to the likelihood of an action being taken.

9.      In this case, Defendants know that once they convince a consumer to "try" Noom, they can charge exorbitant non-refundable advance fees as soon as the trial period expires and most customers will be stuck paying the fee because Noom intentionally hinders a customer's "ability" to cancel the program and takes away the "triggers" that might otherwise spur a customer to action.   Defendants' cynical exploitation of these well-studied patterns of consumer behavior explains why Noom fills its trial period marketing and "disclosures" with material misrepresentations and omissions.

10.      Worse, Defendants manipulate human psychology by making it extremely difficult for consumers to cancel their trial membership.   While Noom's marketing directs consumers to Noom.com to "try" Noom, Defendants curiously do not allow consumers to cancel via e-mail, mail, phone, fax, or through its website.   Unlike other apps, and further upending consumer

---

[18] Artem Petakov, https://www.linkedin.com/in/artem-petakov-745a62b/ (last visited Jan. 15, 2021).

expectations, Noom also does not allow customers to cancel by simply deleting the Noom app from their phone.  Instead, Noom offers only a highly unusual way for consumers to "try" Noom without becoming full-fledged customers.  A pro-Noom article by a boutique research firm entitled "This Weight Loss App Could Be Worth Billions" is just one example of how Defendants have long been on notice that Noom's trial period cancellation process is both wildly inconsistent with consumer expectation and highly lucrative:

> If you want to cancel, you don't go to "Settings – My Account – Cancel Subscription."  You don't get to give up that easy.  In order to cancel the app, you need to contact your virtual trainer and tell them you're a big pansy . . . .  That's a genius move that will only serve to increase customer retention . . . .[19]

Noom's "genius move" also constitutes a calculated exploitation of the psychology of human decision-making that demonstrates how little Noom cares about the impact its conduct has on people.

11.     Indeed, undeterred by the disastrous economic effects the current coronavirus pandemic is having on most people's budgets, Noom is not only continuing its illegal enrollment practices during the global pandemic but has sought to exploit it by offering the trial period "at zero cost" and capitalizing on the moment by promising potential customers that Noom will "improv[e] [their] health" and "help [them] find structure and relief during this difficult time."[20]

12.     Only through a class action can Noom's customers remedy Defendants' ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Defendants' unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Further, many customers do not realize they are victims of Defendants' deceptive conduct.  With

---

[19] Nanalyze.com, May 13, 2019, https://www.nanalyze.com/2019/05/weight-loss-app-worth-billions/ (last visited Jan. 15, 2021).

[20] Noom, https://www.Noom.com (last accessed July 30, 2020).

this class action, Plaintiffs and the Class seek to level the playing field, put an end to Defendants' unfair business practices, and hold Noom accountable for the hundreds of millions of dollars in damages it has caused—and continues to cause.

### THE UNIFORM WEB OF NOOM'S AUTO-ENROLLMENT SCHEME

13.     Noom's CEO Saeju Jeong describes Noom as a "psychology-based program that empowers you to make healthier choices by better understanding your brain, yourself, and ***the science of the choice***."[21] (Emphasis added).  "So that's the way we approach and build the platform" and "we use psychology, AI, [and] Big Data . . . ."[22]  Yet Defendants also use psychology, AI, and Big Data to trap consumers into becoming full-fledged Noom subscribers through a uniform web of conduct that exploits a series of well-known biases that influence consumer decision-making.

14.     Noom's strategy has been as successful as it is deceptive.  On January 11, 2021 Noom's CEO explained that Noom has "millions" of customers "at this moment" and that Noom is now "the largest consumer facing healthcare company, at this moment."[23]  The paragraphs below describe the various ways in which Noom employs deception in the structure of its auto-enrollment scheme.  While Noom's deceptive web has several different components that can independently ensnare a consumer, taken together the components all lead to a common and predictable outcome that benefits Noom's bottom line:  unintended purchases of Noom's weight-loss service.

15.     First, in exchange for customers' credit/debit card or PayPal account information, Noom gives customers the opportunity to "try" its weight loss "coaching" program during a purportedly "risk free" trial period.  Noom tells consumers "money shouldn't stand in the way of

---

[21] LinkedIn News Live, Jan. 11, 2021 at 10:30 to 10:43, https://www.linkedin.com/video/live/urn:li:ugcPost:6754458828546289664/ (last visited Jan. 15, 2021).

[22] *Id.* at 10:43 to 10:47, 11:14 to 11:19.

[23] *Id.* at 12:50 to 13:07.

finding a plan that finally works" and offers its weight-loss trial at either "zero cost" or via a simulated donation that allows consumers to "pick what you think is fair" amongst amounts ranging from less than $1 to $18.37, because "[i]t costs us just over $18 to provide each trial . . . ."  After capturing the consumer's payment information and as soon as the trial period ends the Company begins assessing non-refundable multi-month membership fees.  Noom thereby extracts a lump-sum non-refundable advance payment for as many as eight months at a time, at a cost as high as $199.00.

16.     Prior to activating the automatic enrollment, Noom both fails to obtain customers' explicit consent to an automatic enrollment feature and fails to adequately disclose or actively misrepresents to prospective customers many material facts regarding the trial period and its weight loss subscription service.  These include the fact that Noom:

a. fails to adequately disclose to consumers that the trial period will automatically convert to an auto-recurring membership;

b. misleads consumers as to the true nature of the trial period by misrepresenting that consumers can try Noom without becoming full-fledged customers even though Noom knows that many consumers end up unwittingly or unwillingly becoming full-fledged customers via automatic-renewal;

c. misrepresents that consumers' payment information will only be used to pay for the cost of the trial period;

d. misrepresents to consumers that they will be able cancel their enrollment by "simply letting their coach know," which is misleading and untrue;

e. fails to adequately disclose that even though consumers can sign up for the trial period on Noom's website, they cannot access Noom's service without an app-enabled smartphone;

f. fails to adequately disclose that even though consumers can sign up for the trial period on Noom's website, they cannot stop the trial membership from converting to an automatically renewing subscription unless they have a smart phone on which to initiate their cancellation;

g. fails to adequately disclose to consumers how they can cancel the trial period;

h.  fails to adequately disclose that the automatic renewal will be activated even if trial customers (i) never access the service during the trial period, (ii) are never assigned a coach, (iii) never download the Noom app, or (iv) download the Noom app but delete it or find that it doesn't work;

i.  misrepresents to consumers that the trial period is "risk free" even though Noom knows that many consumers end up unwittingly or unwillingly becoming full-fledged customers via automatic-renewal;

j.  misrepresents that consumers can "cancel anytime" and that there is "no commitment" even though Noom knows that many consumers end up unwittingly or unwillingly becoming full-fledged customers via automatic-renewal;

k.  fails to adequately disclose that consumers will not be assigned a human "coach" at the outset of their trial period, but will instead be interacting with an automated computer bot;

l.  fails to adequately disclose that consumers will not be able to cancel their trial membership or even contact Noom for any other purpose via e-mail, mail, phone, fax, or through its website;

m.  fails to adequately disclose that the charge assessed following the trial period will be an advance payment for multiple months of membership; and

n.  fails to adequately disclose to customers that the advance charge assessed following the trial period will be non-refundable.

17.     In short, Noom actively misrepresents and/or fails to adequately disclose the true characteristics of its trial period, its automatic-enrollment policy, and the actual steps customers need to follow to take Noom up on its offer to try Noom before becoming full-fledged customers. While Noom holds out the trial as a "risk-free" option costing customers either nothing or less than $20.00, the Company knows that in fact many unwitting customers who "try" Noom will be charged as much as $199.00 soon after signing up for the trial, and that Noom will keep charging them even though it knows they are not using its weight-loss plan.

18.     Compounding the Company's enrollment obfuscation is the fact that Noom also deceives customers by making false promises concerning the service itself—in particular, its claim that customers will receive a "customized," "personalized," "tailored" weight-loss plan, and will

receive support from Noom's "dedicated coaching team."   In reality, customers receive impersonal, automated messages powered by artificial intelligence which can only be accessed through Noom's smartphone app.   Thus, as was the experience of all Plaintiffs, many customers are either (i) not assigned a coach when they join the trial period, or (ii) do not even understand that they have been assigned a "coach" or know who their "coach" is because the "coach" is actually an artificial intelligence "bot."

19.   Noom's many omissions and misrepresentations are independently misleading, but they also work together as an integrated web to further confuse and mislead a reasonable consumer about the service Noom is providing and the effect of "trying" Noom by signing up for Defendants' trial period.   These material omissions and misrepresentations mislead and deceive customers in at least the following mutually reinforcing ways:

a.   Noom's false claims that trying Noom's weight-loss program is "risk free" together with its failure to adequately disclose that the trial membership will automatically convert to a non-refundable membership leads consumers to believe that they will not be charged any more than the small amount they authorized for the trial period;

b.   Noom misleads reasonable consumers who sign up for the trial into mistakenly believing that they do not need to take action to cancel and that once the trial period is over so too is their relationship with Noom unless they decide to affirmatively enroll in Noom's weight-loss program.   Noom creates or confirms a reasonable customer's belief that cancellation is not required, since it does not appear to be possible in the following ways.   First, Noom blocks all customers from communicating with the company   (its website and app provide no phone number, no fax number, no email address, no mailing address, and no link to customer service), and second, Noom makes it difficult for consumers to cancel their trial membership (Noom tells them to "simply cancel by letting your coach know," but then (i) fails to connect all customers with a coach or make clear that a coach is not a human, and (ii) fails to disclose that this method of cancellation is ineffective for customers who provided their payment information through a mobile app store);

c.   On the last day of the trial period Noom sends a message to its customers that fails to disclose that customers who have not yet canceled are about to be charged for a multi-month subscription.   Instead, Noom's message is simply that it "won't be checking in anymore."   With this curt and

misleading message, the Company fails to provide critical information about the trial, including that: (i) the customer's auto-enrollment is about to begin, (ii) that they will be charged, (iii) that the charge will be for many months in advance, and (iv) that the charge will be non-refundable.  Such material omissions further contribute to a reasonable customer's misunderstanding that their relationship with Noom will end once the trial period is over; and

d.  Noom's promise of connecting customers with coaches, together with its failure to disclose that its service can only be accessed through an app lead reasonable consumers who sign up through the website but never download the app and/or never speak to a coach to believe that their trial period never started or that Noom's weight-loss program was not as advertised but that these consumers will not continue to be Noom customers after the trial period.

20.     Thus, while a customer may not be ensnared by every aspect of Noom's web, all Noom customers face the same traps and need only be tricked by one to end up paying a hefty multi-month subscription fee for a weight-loss app they do not want.  Considering these facts, it is thus no surprise that Noom is already on notice of *thousands* of complaints from such consumers about how they were duped into becoming full-fledged Noom "customers."

21.     The Company's concerted pattern of misrepresentations, smokescreens, and omissions may benefit Noom's bottom line, but they are unfair, deceptive, and fraudulent and have resulted in Noom's unjust enrichment.  Additionally, Noom's auto-renewal/continuous service policy runs afoul of multiple independently actionable requirements imposed by California's Automatic Purchase Renewal Statute, CAL. BUS. & PROF. CODE § 17601 *et seq.*, and California's Weight Loss Contracts Law, CAL. CIV. CODE § 1694.5, *et seq*.  Further, the Company's failure to disclose to potential customers that they will be interacting with a bot also violates California's Bot Disclosure Law, CAL. BUS. & PROF. CODE § 17941.

22.     Noom's conduct is also in violation of California's False Advertising Law, CAL. BUS. & PROF CODE  § 175000 *et seq.*, the California Consumers Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*, Unfair Competition Law, CAL. BUS. & PROF CODE  § 17200, *et seq.*, as well as the

consumer protection statutes of New York and 52 additional jurisdictions.

23.     As detailed below, Plaintiffs' experiences are typical of the more than ████

Noom customers harmed by the Company's deceptive and unlawful auto-enrollment scheme: they,

like many others, provided their payment information to Noom because they were tricked by the

multiple material misrepresentations and omissions that together form the common web of Noom's

auto-enrollment scheme.

24.     The eight Named Plaintiffs from the District of Columbia, Washington, California,

New York, Ohio, Alabama, and Texas who bring this proposed class action seek to represent Noom

customers throughout the United States who were similarly enrolled in Noom from the applicable

statute of limitations period(s) to the date of judgment.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the claims asserted in this action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the aggregate claims of the Class

exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of

citizenship exists between at least one member of the Class and at least one of the Defendants.

26.     This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims

under 28 U.S.C. §1367 because all of the claims arise from a common nucleus of operative facts

and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

27.     This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965. The

Court also has personal jurisdiction over Defendants because Noom, Petakov, and John Does 1 to

5 have sufficient contacts in this jurisdiction, including because substantial acts in furtherance of

the deceptive and unlawful conduct challenged in this action occurred at Defendants' Manhattan

headquarters.

28.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a). Substantial acts in

furtherance of the alleged improper conduct occurred within this District, as Defendant Noom is headquartered in this District.

## PARTIES

29.     Plaintiff **Mojo Nichols** is a citizen of Washington, D.C. and lives in Washington, D.C.  He was enrolled in Noom's trial program in in August 2019.

30.     Plaintiff **Susan Brewster** is a citizen of Washington and lives in Seattle, Washington.  She was enrolled in Noom's trial program in August 2019.

31.     Plaintiff **Duane Dea** is a citizen of California and lives in Alameda, California. He was enrolled in Noom's trial program in September 2020.

32.     Plaintiff **Maryanne Deracleo** is a citizen of New York and lives in Rotterdam, New York.  She was enrolled in Noom's trial program in July 2020.

33.     Plaintiff **Karen Kelly** is a citizen of California and lives in Carlsbad, California. She was enrolled in Noom's trial program in September 2019.

34.     Plaintiff **Rebecca Richards** is a citizen of Ohio and lives in Tiffin, Ohio.  She was enrolled in Noom's trial program in May 2019.

35.     Plaintiff **Jennifer Sellers** is a citizen of Alabama and lives in Montgomery, Alabama.  She was enrolled in Noom's trial program in June 2020.

36.     Plaintiff **Stacy Spencer** is a citizen of Texas and lives in Spicewood, Texas.  She was enrolled in Noom's trial program in March 2019.

37.     **Defendant Noom, Inc.** is a diet and weight loss company headquartered in New York, New York and located at 229 West 28th Street, New York.  The Noom smartphone app, developed by health care startup WorkSmart Labs, was launched in 2011.

38.     **Defendant Artem Petakov** has at all relevant times been Noom's co-founder. According to Petakov's LinkedIn profile, he was Noom's Co-Founder/CTO while Noom was in

the incubator phase from November 2008 to October 2011.[24]  From October 2011 to January 2015 Petakov was Noom's Co-Founder/Co-CEO and beginning in January 2015 Petakov assumed the role of Co-Founder/President.[25]  Petakov is also the head of Noom's "Growth" team.  Defendant Petakov is known to his subordinates as being closely involved in the oversight of all aspects of Noom's business practices, including the deceptive and unlawful practices challenged in this lawsuit.

39.     **Defendants John Does 1 to 5** are the Noom management, employees, contractors, and investors who perpetrated the unlawful acts described herein and who will be identified and added as Defendants if discovery warrants it.  Defendants John Does 1 to 5 directed, developed, substantially assisted in, or otherwise knew about Noom's misleading and deceptive practices and resulting complaints from consumers, payment processors, and ratings entities.  Upon information and belief, Defendants John Does 1 to 5 acted with the goal and effect of exposing consumers to the deceptive and unlawful conduct challenged in this action.

## **FACTUAL ALLEGATIONS**

I.     **BACKGROUND ON THE SUBSCRIPTION E-COMMERCE MARKET, NOOM'S USE OF DECEPTIVE "DARK PATTERNS," AND THE DISCOVERY TAKEN TO DATE THAT DEMONSTRATES THE EXISTENCE OF MORE THAN** ████████████████

40.     With the growth of e-commerce, subscription e-commerce has also grown rapidly in recent years. The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[26] According to a TechCrunch.com article entitled "Sneaky subscriptions are plaguing the App Store,"

---

[24] Artem Petakov, https://www.linkedin.com/in/artem-petakov-745a62b/ (last visited Jan. 15, 2021).

[25] *Id.*

[26] Core DNA, How to Run an eCommerce Subscription Service: The Ultimate Guide (Dec. 8, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services#23 (last visited Jan. 15, 2021).

"[s]ubscriptions have turned into a booming business for app developers, accounting for $10.6 billion in consumer spend on the App Store in 2017, and are poised to grow to $75.7 billion by 2022."[27] As TechCrunch points out, however, "alongside this healthy growth, a number of scammers are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans."[28] "They do this by intentionally confusing users with their app's design and flow, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics."[29]

41.     Subscription e-commerce services now target a wide range of activities and cater to a variety of specific interests. The production, sale, and distribution of subscription-based products and services via apps like Noom's has boomed in the past few years.  According to Forbes, "[t]he subscription e-commerce market has grown by more than 100% a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[30]

42.     Yet the subscription e-commerce market's boom has also brought with it retailers' recognition of the fact that where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[31]  As companies like Noom have realized,

---

[27] TechCrunch, (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/ (last visited Jan. 15, 2021).

[28] *Id.*

[29] *Id.*

[30] Forbes, *The State of The Subscription Economy*, 2018 (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef (last visited Jan. 15, 2021).

[31] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html (last visited Jan. 15, 2021).

"[t]he real money is in the inertia."[32]   To prod consumer inertia, companies like Noom take purposeful and active steps to obstruct cancellation.

43.     For example, a former senior iOS[33] engineer for Noom has provided Plaintiffs a whistleblower statement that offers an insider's prospective of Noom's practices.   The whistleblower states that "Noom made the cancellation process difficult by design so that many customers would be charged a nonrefundable autorenewal fee by failing to cancel in time or by failing to cancel at all because they didn't realize the trial would automatically convert to a paid subscription at the end of the trial period."   Whistleblower Decl. ¶ 27.   The whistleblower also describes highly unsettling conduct, including (i) how, when a credit card processor put Noom on "final notice and probation" due to a high charge back rate, Noom's co-founder Defendant Artem Petakov "devised a work-around: he announced that Noom would begin charging a small fee (*e.g.*, $1) for the 'free' trial and then later charge customers for the autorenewal, which would double the number of total transactions, and in turn reduce the charge back rate by half," *id.* ¶¶ 25–26; (ii) how Noom shaved 24 hours off of the trial period "so even customers who knew to track the deadline were getting converted and charged for subscription[;]" and (iii) how "Noom's sign up flow was designed to mislead."   *Id.* ¶¶ 29, 33–36.

44.     Similarly, one of the leading experts in the field of consumer psychology as applied to internet user experience, cognitive scientist Harry Brignull, PhD, has conducted a preliminary analysis of Noom's processes and concludes that Noom employs various deceptive design practices in its sign-up flow and cancellation processes.   His analysis details the numerous instances of Noom's use of what are known as "Dark Patterns"—i.e., deceptive design tactics on

---

[32] *Id.*

[33] iOS is an operating system used for Apple mobile devices.

websites and in mobile apps that manipulate users into taking certain actions.  Dark Patterns prey upon frailties known to exist in human cognitive processing.

45.   After engaging in an initial yet extensive analysis, Dr. Brignull prepared a preliminary expert analysis and report which concludes that Noom employs deceptive design practices in its sign-up flow and cancellation processes.  At its core, Dr. Brignull finds that Noom's business model is predicated upon the "Hidden Subscription Dark Pattern"—that is, it silently charges users a recurring fee under the pretense of a one-time fee or free trial.  Brignull Preliminary Report at 12, 15, 18.  Noom augments this overarching scheme with numerous other Dark Pattern design techniques, which psychologically manipulate users into being more likely to sign up for the service and less likely to understand the need to cancel, or to be able complete cancellation.  Examples of the additional Dark Patterns used by Noom include:

- **Mental Fatigue**: Noom forces its users through a 58-step sign up process with delay tactics built in, such as a faked period of connection to a database.  These delays psychologically manipulate the user into experiencing mental fatigue, causing him or her to spend less time and effort critically evaluating the information about future charges presented on the very last step of the extensive sign-up process, the payment page.  *Id*. at 17, 22–26.

- **Trick Wording** and **Visual Interference**: Noom's payment page employs the Trick Wording Dark Pattern because it includes untrue statements—such as "RISK FREE 100% GUARANTEED"—about the level of financial commitment and risk to which completing the transaction on that page will expose the user.  It also uses the Visual Interference Dark Pattern, in the form of intentionally low-prominence text being the only mention of auto-enrollment, thus allowing Noom to direct the user's attention away from that critical information.  *Id*. at 15, 19–20.

- **Deceptive Countdown Timer**: Noom's payment page includes a fake countdown timer that Dr. Brignull determined serves no technical purpose, but rather exists to create psychological pressure to complete the payment transaction and, consequently, cause users to spend less time engaged in critical evaluation of the information presented on that page, at precisely the point where Noom first mentions the existence of the automatic renewal.  *Id*. at 15–16, 21–22.

- **Hard to Cancel** and **Roach Motel**:  Once its users are signed up for the hidden automatically recurring premium subscription, Noom makes it incredibly difficult for them to cancel—and, indeed, to even know cancellation is necessary—by (1) "going quiet" about impending charges shortly after sign up for the trial, and (2)

foreclosing normal and expected avenues of cancellation and instead forcing users to cancel through the unorthodox manner of an in-app live chat feature. Indeed, the overall design of the cancellation process can further be classified as a "roach motel" because users find it easy to get into the automatically recurring premium subscription, but very difficult to get back out. *Id*. at 30, 34–35.

46.     These and other Dark Patterns that Noom employs on its website, in its app, and in email communications with users, work together to exploit human mental biases to create an environment in which a reasonable user (1) can become automatically enrolled in a recurring, non-refundable premium subscription as a result of signing up for a free or low-cost trial without any idea that they have done so; and/or (2) is unable to (or unaware of the need to) cancel that subscription, increasing the length of time that the user is subscribed and contributing to Noom's revenue stream. *See, e.g.*, *id*. at 15–16, 29–30, 35–36.

47.     While discovery is still in its infancy, the user data Noom has produced thus far demonstrates the existence ███████████████ Noom's consumers who were unwittingly auto-enrolled into Noom's weight-loss service. For example, according to Defendants' Second Amended Interrogatory Responses, the Company has had to issue refunds to nearly ██████ unhappy customers out of the approximately ███████ potential class members[34] whom Noom automatically enrolled ██████████████.[35]  This is an extraordinarily high number of disaffected customers.

48.     Defendants are also well aware from their internal data that their high volume of dissatisfied customers is from ████████████████████ who signed up for a trial period but do not use Noom's weight loss service during the trial. Indeed, Noom continually tracks a

---

[34] Defendants' November 24, 2020 Second Amended Interrogatory Reponses refer to █████ auto-enrollees. On December 9 Defendants emailed Plaintiffs a spreadsheet demonstrating ██████ auto-enrollees. On December 10, 2020 Defendants emailed Plaintiffs a spreadsheet demonstrating ████████ auto-enrollees.

[35] This translates to ████████████████ of Noom's ██████████████ in total revenue from auto-enrolled customers disclosed via email from defense counsel A. Reddy on December 9, 2020.

metric called ███████████████████████████████████████

████████████████████████████████████████████ (Nov.

25, email from defense counsel M. Bernstein).[36]   That metric shows that as of the date these

consumers were auto-enrolled following the trial period, █████████████████████████████

█████████████████████████████

    49.    Additionally, the ████████████ Defendants began supplying Plaintiffs

beginning on November 25, 2020 also demonstrate ███████████████ of auto-enrolled

Noom ██████████████████████████████ Defendants' diet app.

Defendants have provided ████████████ from four separate payments sources: ████████

███████████████████████████████████████████

These statistics show that as of the date these consumers were auto-enrolled following the trial,

approximately ████████████████████████████ Defendants' weight

loss app.

    50.    The ramifications of these figures are further elucidated by the ████████

████████████████████████████████████████ who (unlike Plaintiffs and

███ of Noom's other customers) **_did not_** enroll in a trial period that then automatically

converted to a full subscription if the consumer did not manage to successfully cancel prior to

conversion.   Among ███████████████████████████████████

█████████████████████████████████████████—

that is, the very day they signed up for Noom's service—not after their trial period expired.   This

preliminary data supports Plaintiffs' claims that huge numbers of trial customers were

---

[36] During the parties' December 10 meet and confer Defendants clarified that although it is likely that a consumer who ████████████████████████████████████████████████
████████████████████████████

hoodwinked by Defendants.  Plaintiffs believe that additional evidence they will obtain from Defendants—data that Noom thus far refuses to provide—will further support their claims.

51.    Indeed, Noom cannot deny that it is aware of the fact that more than ███████ of its customers were automatically enrolled into and, automatically billed for, a weight loss service that they did not use during the trial period.  As Noom's CEO recently explained in an interview, "we always measure how many users are actively using our service and how much we deliver the efficacy."[37]

52.    Although Noom has produced only limited evidence to date, what it has disclosed about how it designed the autorenewal program firmly supports Plaintiffs' claims that from the earliest possible date Defendants understood Noom's practices are deceptive.  Indeed, Noom's production of what is allegedly ████████████████████████████ ███████████████████████████████ bears this out.  Nov. 6, 2020 Ltr. from A. Reddy to S. Wittels, Ex. B.  This document demonstrates (i) ██████████████ ████████████████████████████████ (*i.e.*, that they would be auto-renewed and immediately charged a multimonth membership if they were unable to navigate Noom's highly unorthodox cancellation method); (ii) that ████████████ ████████████████████████████████████████████████████ ███████████████ ; and (iii) that Noom's profitability for the product Plaintiffs purchased hinged on the percentage of customers that were auto-renewed.

53.    Further, as set forth in more detail below, Defendants were aware of the various ways in which their auto-enrollment scheme was deceiving customers into paying for plans they did not want and in many cases did not even know they had.  This indicia of fraud includes (i)

---

[37] LinkedIn News Live, Jan. 11, 2021 at 22:51 to 24:29, https://www.linkedin.com/video/live/urn:li:ugcPost:6754458828546289664/ (last visited Jan. 15, 2021).

the many thousands of complaints Noom received directly or through the Better Business Bureau and other consumer watchdog websites about its enrollment practices and cancellation difficulties; (ii) the waves of complaints, cancellations and refund requests from angry customers that created backlogs so overwhelming that Noom had to ask non-customer service employees to participate in customer service efforts; (iii) Noom's meticulous tracking of the most minute aspects of its customers' behavior, which reveals, *inter alia*, ██████████████████████ ████████████████████████████████████████████ as well as customers who enroll in multiple identical Noom plans, clearly unaware that they are already paying for them; (iv) Noom's awareness of the fact that customers' complaints to credit cards produced a chargeback rate so high that Noom's payment processor was about to end its business with Noom; and (v) Noom's CEO Saeju Jeong's "Message" to consumers acknowledging the need to "significantly expand[] the size of our customer support team and expand[] the number of support channels where customers can reach us."[38]

## II.   NOOM'S MARKETING AND REPRESENTATIONS TO CONSUMERS

54.    Noom has "an 8-figure monthly ad budget"[39] and aggressively markets its product through a variety of channels, including social media marketing, television, radio, and online streaming commercials, and magazine and other print advertisements.  This tremendous ad budget adds up to as much as "$200M+/year."[40]  The major thrust of Noom's ads are that the Company

---

[38] "A Message from CEO Saeju Jeong," dated Aug. 19, 2020, available at https://web.noom.com/in-the-news/2020/08/a-message-from-ceo-saeju-jeong/ (last visited Jan. 15, 2021).

[39] Senior Product Manager, Marketing & Data, Indeed.com, https://www.indeed.com/viewjob?jk=094c329ea943b943&q=Noom&tk=1elmkbdbqt5dr800&from=web&vjs=3 (last visited Jan. 15, 2021).

[40] Director of Media Strategy, Noom.com, https://www.noom.com/careers/job/2325951 (last visited Jan. 15, 2021).

offers a science-based weight-loss program that works and that customers should "try" Noom's program.

55.      Noom's robust advertising campaigns have yielded impressive results: Noom has seen significant growth since its inception in 2011 and was recognized by Google as "the 3rd most searched diet in 2018."[41]   According to Facebook Business, Noom is an advertising "Success Story," as its "mobile-friendly" advertisements have "reach[ed] a multilingual audience worldwide, leading to a 5X increase in members" since May 2018.[42]   In 2018, an analysis of Google trends showed that Noom ranked as the overall top trending diet program of the year.[43]

56.      Noom's social media, online, television, radio, and print advertisements all direct consumers to visit Noom's website to learn more about its weight loss program.  Noom then uses Facebook tools to track its website traffic, which enables Noom to "reconnect" – through Facebook and other social media channels – "with people who . . . visit[] its website."[44]

57.      As such, Noom's marketing is centered around its website.  The company uses the website to target consumers for its online advertising, and in turn directs consumers who view their ads back to Noom's website.  Indeed, the overwhelming majority of customers who sign up for Noom's app do so via Noom's website.

58.      Noom's website repeatedly states that a) Noom's weight-loss program is based on science, b) as Noom members, customers can expect to receive "personalized coaching" from qualified experts who are easily accessible, c) customers are invited to purchase a 14-day, "no-

---

[41] Noom, https://offers.noom.com/careers/# (last visited Jan. 15, 2021).

[42] Noom, https://www.facebook.com/business/success/noom (last visited Jan. 15, 2021).

[43] Noom Inc., *Noom Ranks as Top Trending Diet in 2018, According to Google – Year in Search* (Dec. 12, 2018), https://www.prnewswire.com/news-releases/noom-ranks-as-top-trending-diet-in-2018-according-to-google---year-in-search-300764426.html (last visited Jan. 15, 2021).

[44] Noom, https://www.facebook.com/business/success/noom (last visited Jan. 15, 2021).

risk" trial for no more than $18.37, and d) if customers decide that they do not want to continue with the program, they may easily cancel the trial membership by simply informing their "coach" that they would like to cancel.

59.     The audience for Noom's marketing has been demonstrated to be one of the most vulnerable consumer groups.   For example, the Federal Trade Commission noted in an October 2019 report that more consumers fell victim to scams involving fraudulent weight loss products in 2017 than to any other type of fraud included in the survey.[45]

### III.    NOOM'S ENROLLMENT PROCESS AND RELATED MATERIAL MISREPRESENTATIONS AND OMISSIONS

60.     The following paragraphs describe the process for enrolling in Defendants' 14-day trial period in or around the time of Plaintiffs' enrollment.  Discovery to date demonstrates that all material aspects of the enrollment process have remained the same throughout the applicable period.

61.     Potential customers can sign up for Noom's 14-day trial through Noom's website or directly through their smartphones by downloading the Noom app from the iTunes App Store (for iPhone users) or Google Play Store (for Android users).  Both the Noom app and the Noom website feature the same sign-up process, contained the same representations and required customers to complete the same health and fitness evaluation.

62.     Noom's website and app both lead customers through a lengthy evaluation which asks for the customer's height, current weight, ideal weight, gender, and age.  The evaluation continues with several multiple-choice questions regarding the customer's fitness goals, eating and exercise habits, medical history, home environment, marital status, weight loss motivations and

---

[45] Federal Trade Commission, *Mass-Market Consumer Fraud in the United States* (Oct. 31, 2019), https://www.ftc.gov/system/files/documents/reports/mass-market-consumer-fraud-united-states-2017-update/p105502massmarketconsumerfraud2017report.pdf (last visited Jan. 15, 2021).

struggles, and food restrictions.

63.     Next, customers are asked to enter an email address "to see how much weight" they can expect to "lose for good with Noom."  After clicking a button labeled "SEE MY RESULT," a graphic appears, stating, "You'll be [**ideal weight entered earlier**] by [**date 4-6 months from current date**]."  Under the graphic is a button labeled, "CLAIM MY PLAN."

64.     By asking customers for substantial information concerning their fitness goals, lifestyle, and medical history, Noom contributes to consumers' net impression that customers can expect to receive a highly personalized course from a dedicated coach at the conclusion of the evaluation.  Noom does not actually use the information supplied to personalize customers' courses and instead designed the enrollment flow as a way of increasing enrollments.

65.     At the conclusion of the evaluation, the 14-day trial offer appears, stating, "Try all of Noom for 2 weeks! . . . Starter fee waived, saving you $20 . . . Risk free 14-day trial."

66.     Customers are then asked at the bottom of the page to "pick" what price they "think is fair" for a 14-day trial.  The typical choices are $1, $3, $10, and $18.37.  However, "$10" is highlighted as the "most popular choice" and is the default option—even though the trial is touted as "free," as depicted below:



67.     On the following page, a countdown clock forces customers to purchase their "customized" plan within 15 minutes, along with the statement, "Your personalized plan has been reserved for the next 15 minutes!"

68.     The payment page, where customers are asked to enter their credit/debit card or PayPal account information under time pressure from the ticking timer, presents contradictory information.  The page is also visually confusing because it uses different font colors, sizes and styles, different-colored logos, different-colored backgrounds, extraneous information, and irrational spacing.  It appears as follows:



69.     This is the first and only time during Noom's multi-step sign-up process or in its marketing materials that the Company provides any information regarding the terms of the trial period or the process of canceling it.  As shown above, this small print information is designed to be overlooked.  It is not underlined, printed in capital letters, or written in a prominent color or in a bigger type size than the rest of the words on the payment page.  To the contrary, it is presented in small font, does not stand out, and is not in visual proximity to the payment information.  Indeed, it is placed so that it sits below colorful and unrelated app-metric information and logos and to the left of other colorful and confusing logos stating "100% RISK FREE GUARANTEED" and "VERIFIED & SECURED."  Together the out-of-the-way placement and small low-contrast print have the effect of both contradicting and detracting attention from the information presented regarding the renewal language.  Adding to the muddle regarding the terms of the offer and the effect of entering payment details is the presence of two contradictory statements: one that sits right below the renewal verbiage and falsely states: "No commitment – cancel any time"; and another that sits above the verbiage, next to the credit card number field outlined in orange, and falsely assures the customer that "You will only be charged $[the price chosen for the trial period] for your 14-day trial."

70.     If a customer decides not to make a payment within 15 minutes and exits the website, Noom will send that customer multiple emails containing links to his or her "customized course" and a motivational video.  In the video, customers are promised a "personalized to-do list every morning," and a "goal specialist" who will keep them accountable as they progress through the program.  Customers are then returned to their "customized course" page, which again invites them to try the 14-day trial, but this time for free.  Noom thus "waives" the $1.00 to $18.37 charge for the 14-day trial for customers who do not immediately sign up for the trial upon initially completing the online evaluation.

71.     Even though Noom sends potential customers numerous emails offering its free 14-day trial, once customers actually sign up for the trial, Noom does not follow up with any emails containing instructions on how to start the program.

72.     Noom also fails to inform customers that Noom's program requires a smartphone, that the trial program can only be accessed and cancelled through the Noom smartphone app, and that the trial will begin even if a customer never even downloads the app.  This causes great confusion for customers who sign up for the trial via Noom's website, therefore expecting to be able to access their "coach" and their "personalized plan" via Noom's website or with a non-app enabled phone.  It also confuses customers who believe their trial could not have ever started since they never accessed the trial.

73.     Moreover, although customers without a smartphone are unable to and never do use the Noom program, view their "personalized plan," or communicate with Noom's "coaches," their trial period begins as soon as Noom captures their payment information.  Yet Noom fails to disclose this and provides no way for such customers to cancel their trial enrollment.

74.     Instead, Noom emails consumers who sign up for its trial a "receipt" that contains contradictory and confusing information and is easily overlooked.  An example of such an email, received by Plaintiff Brewster, is reproduced below and contains substantially the same information as that received by other Noom customers:

**From:** Noom
**Sent:** Sunday, August 11, 2019 10:32 PM
**To:** ███████████
**Subject:** Your Noom Receipt

Noom Inc
229 W 28th St.
New York, NY 10001
www.noom.com

For more information about your account visit: account.noom.com

Order placed on August 12, 2019.

Thanks for signing up for Noom's Healthy Weight program!

Here's a summary of your subscription:

Noom membership: **6 Months**
Special offers: **14-day trial**
Trial start date: **August 12, 2019**
Trial end date: **August 26, 2019**
Payment method: ████████
Renewal date: **Automatic renewal every 6 months after Trial end date**

Your 14-day trial will last until **August 26, 2019**. You can cancel anytime before then and will not be charged the total plan amount. No questions asked, no small print.

If you decide Noom is right for you, on **August 26, 2019** you will be charged one payment of **$164.05** (sales tax of **$15.05** included) for your **6 month** Noom membership (**$27.34/month**).

Noom will automatically charge your card **$164.05** every **6 months** so you don't lose access to your account. No refunds or credits for partial months. To cancel, simply let your coach know.

**After your 14-day trial ends on August 26, 2019, your subscription fee is non-refundable.
See our Refund Policy.**

FAQ

**I have a question about my subscription.**
Check out our handy-dandy Supportal! You can view your subscription details any time at
account.noom.com.

75.     The email is certain to be overlooked because it is one of several emails that Noom sends to customers after they sign up.  For example, Plaintiffs Nichols and Richards each received five different emails from Noom within an hour of signing up for the trial program.  Further, the email often appears only in the recipient's "Promotions" or "Spam" folder.

76.     Even if a customer does read it, the emailed "Receipt" is itself misleading and deceptive in several ways.  First, it is not a "Receipt," as its subject line states, because it does not even contain the amount the recipient just authorized as payment for the trial.

77.     Second, the email states that the customer can "cancel anytime" by "simply let[ting] her] coach know," while also suggesting that s/he wouldn't need to cancel because she would only be charged "[i]f [she] decide[s] Noom is right for [her]."  This is misleading because it leads customers to believe that an affirmative step is required in order for the trial membership to convert to automatic enrollment and does not make it clear that the trial period must be cancelled in order to prevent it from converting to an auto-recurring multi-month membership.

78.     Third, the receipt email fails to disclose critical aspects of Noom's trial subscription, including that it can only be accessed on a smartphone app, that it will begin even if a customer never makes contact with a coach or downloads the app, or that the customer will be interacting with a bot.  It also fails to provide accurate or complete cancellation instructions or a means of cancelling.

79.     Fourth, the receipt email includes undefined and confusing terms like "total plan amount."  In Plaintiff Brewster's case, this term is used before the $164.05 charge is even mentioned, but it is not the same term used when the $164.05 charge is finally referenced. Accordingly, this email can reasonably be read to refer to the $18.37 price of her trial, or the $164.05 price of the first auto-enrollment fee, or the two combined, or the price of multiple $164.05 charges to be imposed in the future.

80.     Fifth, the "receipt" contains the incorrect start and/or end dates for the trial subscription period.  For example, Plaintiff Richards signed up and was charged for the trial program on May 24, 2019, but the "Receipt" she received from Noom states that her "[o]rder [was] placed on May 25, 2019."  Further, her "Receipt" states that May 25, 2019 is her "Trial Start Date,"

but Noom also sent her an email with the subject line "Your Noom trial starts today!" on May 24, 2019, which confusingly states that her "Noom trial starts today and the clock is ticking." Likewise, the "Receipt" sent to Plaintiff Nichols stated that he would be charged on August 20, 2019 but he was not charged until August 28, 2019. This creates confusion about when the trial period will end and when and whether the customer will be charged. Further, even if a customer believes they may need to cancel the trial subscription to avoid being charged, the fact that Noom then does not charge for its subscription the day after the trial period ends leads reasonable consumers to believe no charge is forthcoming and no cancellation was necessary.

81. Additionally, Noom fails to send a "receipt" at the time the first (or any subsequent) auto-enrollment fee is charged to the consumer's payment method or to otherwise provide notification or confirmation of the charge. This serves to further obscure Noom's charges from reasonable consumers.

## IV. NOOM'S "COACHING" PROGRAM AND CANCELLATION POLICY AND RELATED MATERIAL MISREPRESENTATIONS AND OMISSIONS

82. Regardless of whether the consumer purchases the 14-day trial through Noom's website or through the smartphone app, once the trial is purchased, the only way the consumer can access Noom's program—and communicate with their "coach"—is by downloading the Noom app on a smartphone. This fact is not disclosed to consumers at any point prior to the start of their trial period or at any point thereafter.

83. Thus, consumers who might reasonably expect their Noom coach to reach out to them via a phone call or email, or who might expect that the coach will be accessible through the website, are left wondering how to use Noom's program or whether their program has even started. New trial customers are thus left in the dark to figure out, if they can, that Noom's entire program exists only on the app, that it cannot be accessed through Noom's website, that the so-called "coach" in fact exists only on a smart-phone app, and that consumers will need to interact with a

bot to access and use the program.

84.     The Noom app allows users to log their meals and their weight, and access articles and motivational tips for reaching their diet and exercise goals.  Through the app, users are first connected and able to send messages to an artificial intelligence-powered "bot" named "Concierge Eva." This bot is introduced with the name and a picture icon of a person, and sometimes accompanied by a description claiming that it is a "born and raised New Yorker with a background in health psychology" who has "been to 63 countries!"  However, "Eva" is not a reachable human and only interacts with users through impersonal, automated statements.

85.     Customers who access Noom on their app receive a chat message from the "Eva" bot stating "Hi! I'm Eva, your Noom concierge . . . . To get started: chat me 'I'm done!' when you've completed your coaching preference survey.  Then return to your task list – I'll reply soon!" or a substantially similar version of the same message.  Customers receive no further information on whether "Eva" is their coach, what the purpose of the "coaching preference survey" is, how to fill out their "coaching preference survey," where the survey is located, or how they can contact a real person at Noom to get more information about the coaching program.  The "Eva" bot provides superficial answers to users' questions, and sometimes does not respond to questions at all.  The "Eva" bot greets other customers by asking whether "[t]hey are ready to meet [their] goal specialist?"  Customers receive no further information regarding what a goal specialist is, how it is different from Eva, their Coach, or whether the goal specialist is instead their Coach.

86.     Some consumers therefore reasonably assume that "Eva" is their coach, while others suspect "Eva" is only a bot and therefore could not be what Noom refers to as the coach that they need to cancel through.  However, in reality this automated messaging system is the so-called "coach" that Noom touts and refers to when it tells its customers to cancel by "simply let[ting] your coach know."

87.     The customers who jump through the hoops necessary to complete the survey are then also matched with what appears to be an actual human person, but who nevertheless still partly relies on artificial intelligence to communicate with the customer through automated messages and sometimes takes days to respond.  This too is the so-called "coach" that Noom tells its customers to cancel through.

88.     To cancel, customers must message their "coach" via the Noom app and request cancellation.  If the consumer had previously provided Noom with their payment information directly, the bot will process the cancellation.  If customers are unable to figure out that they need to ask the bot to cancel, they remain enrolled in Noom and are charged for a full membership following the end of their 14-day trial.

89.      If the consumer signed up to Noom via the iTunes App Store (for iPhone users) or Google Play Store (for Android users) and they ask the bot to cancel it responds by sending customers a system-generated message directing them to cancel their membership the iTunes App Store or Google Play Store.  If customers are unable to navigate the iTunes/Google Play app cancellation procedure or fail to understand that an additional step is required, they remain enrolled in Noom and are charged for a full membership following the end of their 14-day trial.

90.     Thus, although customers may sign up for the 14-day trial period through Noom's website, the only way that customers can cancel is through the app, and the only way customers who provide their payment information through a mobile app store can cancel is through a multi-step process.  First, customers must be savvy enough to access the Noom smartphone app and try to cancel the membership by sending a message to a bot.  Then at least some of the customers also need to go to a third party to end the subscription through the iTunes App Store or Google Play Store.

91.     Knowing that customers may not even have access to the Noom app, having

employed artificial intelligence "bots" as coaches, and having handed off responsibility for

processing certain cancellations to outside companies iTunes and Google Play, Noom thus knows

that its cancellation instruction—telling customers to simply let their coach know—is incorrect

and misleading.

92.     Noom further adds to customer confusion about whether a cancellation is even

necessary by directing its bots to send the following, or a substantially similar, message at the end

the trial period to customers who have not been using Noom:

> "Hey! It's been a little while since I heard from you, so I wanted to
> let you know that I won't be checking in anymore – don't want to
> bug you. :) Feel free to message me whenever you want to pick
> things up again and we'll get you going.  Hope to hear from you
> soon!

This message added to any misimpression that no cancellation is necessary and that an affirmative

step is required in order for the trial membership to convert to automatic enrollment.  Rather than

sending a reminder that the consumer is about to be charged for a multi-month membership, the

Noom bots deliver the exact opposite message that "I won't be checking in anymore" and "feel

free to message me whenever you want to pick things up again and we'll get you going"—in other

words, that no further action is needed to end the trial.

## V.     NOOM'S AWARENESS OF THE DECEPTIVENESS OF ITS AUTOMATIC RENEWAL SCHEME

93.     In continuing to carry out its fraudulent billing and marketing tactics, Defendants

have ignored numerous glaring red flags demonstrating that consumers are being misled, including

abnormally high complaint rates.

### A. Noom Has Received Thousands of Complaints Regarding the Deceptiveness of Its Enrollment Scheme

94.     Through the Better Business Bureau, Noom has received more than *2,300*

complaints from customers complaining about being billed without their authorization. Moreover, the Company has a "D" rating from the BBB due to the fact that it "has failed to resolve underlying cause(s) of a pattern of complaints."[46]

95.     The BBB cautions consumers to be wary of Noom as follows:

> BBB files indicate a Pattern of Complaints concerning free trial conversion billing and customer service practices of Noom, Inc. Consumers are telling BBB about their experiences after signing up for a free trial offer with the company. Many consumers reportedly try to cancel the trial offer before it ends but still end up being billed for the subscription. A number of these consumers say they believed that after the free trial the cost of monthly membership was between $20-$40. They also claim that after the free trial ends they are charged upfront for several months subscription (varying amounts from $120 to $180+) instead of being billed monthly. Nearly all consumers detail the difficulty they encounter when trying to get in contact with the company's customer service to request a refund of charges and must come to BBB for assistance.[47]

96.     The complaints listed on the BBB website echo the Plaintiffs' experience, as consumers complain that they were "unaware" that they would be auto-enrolled, "there is no way to contact support," that Noom "make[s] cancelling in the trial so difficult you can not possibly figure it out," that the "'coach' seems automated," that it is "IMPOSSIBLE to contact the company," that the auto-enrollment is "very deceptive," and that Noom's website "never mentions you must have a smartphone, iPhone or Android device to use [the Noom app and] in order to cancel."[48]

97.     Like Plaintiffs, other Noom customers have expressed similar outrage about Noom's scheme, including in the following complaints recently posted on the BBB's website:[49]

---

[46] Better Business Bureau, https://www.bbb.org/us/ny/new-york/profile/exercise-programs/noom-inc-0121-150555/overview-of-bbb-ratings (last visited Jan. 15, 2021).

[47] Better Business Bureau, https://www.bbb.org/us/ny/new-york/profile/exercise-programs/noom-inc-0121-150555/details#all-alerts (last visited Jan. 15, 2021).

[48] Better Business Bureau, https://www.bbb.org/us/ny/new-york/profile/health-and-wellness/noom-inc-0121-150555/customer-reviews (last visited Jan. 15, 2021).

[49] *Id.*



**Raymond Q**
⭐☆☆☆☆

07/14/2020

They completely fooled this old man, I was asked to authorize a $0.26 ****** payment as i wanted to investigate what the product was. I never wanted to join and didn't want the service. Instead I was charged over $129 (+ tax) for something I felt I never agreed to. I tried to stop the extra ****** charge, but ****** replied it could not reverse the charge. Now, I don't know what to do, and am worried they might find ways to scam me for more money. Can anybody HELP? ******* *



**Julya B**
⭐☆☆☆☆

06/02/2020

They make it IMPOSSIBLE TO CANCEL....IT IS A RACKET



**Ray R**
⭐☆☆☆☆

05/29/2020

***** * I paid $5 to use the ap and then decided to not use the service. I deleted the ap and thought no more about it. 2 weeks later I noticed $129 taken from ****** under their name. I did not authorize any of this. I can't get my money back. Beware of Noom



**Maria**
⭐☆☆☆☆

05/04/2020

They set your account to auto-renew without your knowledge. They've literally gotten hundreds of dollars out of me before I realized it. If I could sue them, I absolutely would. They don't let you get a refund. Oh, and your "noom coach" is just a robot.



**al l**
★★★★★

*04/13/2020*

AVOID AT ALL COSTS! They are a very unethical company. My son worries about my health and wanted to show me Noom. He accessed it through my older LG phone but had a difficult time even looking at what Noom was. They had a "FREE" 14-day program but required a credit card and a $1.00 payment for the "FREE" trial. I DO NOT have the Noom app on my phone, as their program never worked. I wasn't happy to waste the dollar, but gave up trying to make the program load on my phone (IT ONLY WORKS ON A PHONE. THEY CLAIM THEY DON'T HAVE A PC VERSION). GAVE UP AFTER MORE THAN AN HOUR TRYING. Yesterday I looked at my credit card statement, as I was notified I was billed $159 by Noom. I contested the payment through ******, and via computer response was told it is a legitimate charge. I have now filed a complaint with my credit card company. People that are selling a legitimate product don't need to engage in unethical payment practices. IF YOU CLICK ON ANYTHING TO DO WITH NOOM, you begin a process that seem impossible to stop. They have SO many COMPLAINTS I'm amazed the government hasn't stepped in to enforce a change in their business practices. Go to their website and they proudly tell you they are one of the fastest growing companies in the field. Not surprising when you consider how they are doing it.



**JEANETTE C**
★★★★★

*04/15/2020*

This app is misleading.Tricks you to give a "donation" but in reality they are stealing your credit card information and charging you for there "services" which you would find after seeing a redraw in your account for $150 dlls! No contact information, no customer service, just an automated char reply....



**Ann H**
★★★★★

*04/05/2020*

Absolutely Awful! I fell for the free trial and without any warning was charged 129 $. No message, no email, no bill or receipt. I just ended up seeing the charge on my credit card bill. Don't fall for them



**Deanna C**
⭐☆☆☆☆

03/06/2020

The auto-renewal program is a complete scam. The company BY PRACTICE does not notify you when your account will renew, and it is inconsistent regarding whether it shows as a subscription in the app store or whether you must communicate with your "coach". I don't really care if the weight loss stuff is legit or not when it's obvious by shady billing practices that's where they are attempting to make money. How about that psychology?



**Ruth E**
⭐☆☆☆☆

03/09/2020

Do not use this company. I got charged $99 for a 10 day free trial. There was no clear warning that you would need to cancel your subscription after 10 days. I got no notice through email that they would be charging my card. This is an unethical business practice that Is purposefully unclear and counting on people to not have clear information to cancel. There are many, many complaints about this company and their business practices online.



**kba3745**
⭐☆☆☆☆

01/28/2020

Total scam....they do not contact you for anything. Signed up for a trial and was automatically charged $99 for TWO MONTHS without so much of a whisper. Yes they have grown fast and now I know why. They scam people out of a lot of money! Stay Away!



**Alyssa I.**
⭐☆☆☆☆

01/26/2020

I was never told that it would charge immediate after trail. I was charged $140. Now my card is in the negatives and I need to go food shopping! Oh and the "consultant" is like one email a week. This was not at all helpful and I am panicking bc I can not get in touch with anyone for my money back! I am about to dispute !!!!



**Julie K**
★☆☆☆☆

01/20/2020

You have to request cancellation in chat - there is no other way. This is intentional to make it difficult and allow them a chance to change your mind. Their billing practice of multiple months with no refund tells it all. They want your money. Oh, and the "fitness coach" is a text bot - not a real person. So they violate their Own contract terms but will not provide refunds. They are a complex scam.



**Keesha W**
★☆☆☆☆

07/14/2020

This is reviewing the advertisement of a free 2-week trial period. I signed up for the free 2-week trial period and ended up being charged $103.20. I did not see anything that indicated that Noon was going to charge me additional fees other than the $0.32. The kicker is that after trying to cancel and receive a refund, I found out that the $103.20 is a reoccurring payment. I quick tried to contact Noon for about 4 hours with no avail. The way they advertise is definitely not clear and as a consumer, I will ensure that I share my experience to everyone that I know.



**Stacy S**
★☆☆☆☆

01/28/2020

Cancelling is impossible. The APP doesn't work. I can't login. I can't change my password. I can't do anything. When contacting support, they refer me to the APP. But since that doesn't work, there is no way for me to cancel. So frustrating. I wish I would have checked with BBB before I signed up. This is a scam!



**Jacquelyn B**
★☆☆☆☆

07/01/2020

Fraud. Agreed to $10 trial nothing more. They are charging my credit card over $120 every 4 months. Can't get them to stop. Filing complaint with my credit card company next.



Amity
⭐☆☆☆☆                                                              07/01/2020

DONT sign up for the trial. You WILL be charged $179 for a full subscription. The robot on the app that you're forced to cancel through also gives no help, just sends you a ton of links to submit more forms. The phone number doesn't work, it sends you into a loop of website- download app- IM robot - back to website. Insane.

98.    Hundreds more similar complaints on websites such as BirdEye.com[50] and RevDex.com[51], as well as reviews for Noom's app on the Google Play Store[52] have put Noom on further notice that its customers are unwillingly being charged far more than the $0.00 to $18.37 that they agreed to pay for a 14-day trial.

99.    Thus, after receiving thousands of complaints from customers who were unknowingly or unwillingly enrolled into Noom's auto-recurring memberships, Noom knew or should have known that customers were unaware of key aspects of how the trial worked.  Yet Noom has continued the marketing ploy, disregarding the fact that tens of thousands of customers (i) don't know their trial start date, (ii) don't know they need to cancel their trial, or if they do realize they have to cancel, are simply unable to, and/or (iii) don't understand they are going to be charged for a full non-refundable membership instead of a single month.

### B. Noom Acknowledges the Elements of Its Enrollment Scam in Its Communications to Customers

100.    Noom's responses to customers on consumer sites likewise show that Noom was well aware of the effect of its scheme, and even indicate that Noom was taking steps to address

---

[50] BirdEye, https://reviews.birdeye.com/noom-inc-992753024 (last visited Jan. 15, 2021).

[51] RevDex, https://www.revdex.com/reviews/noom-inc/1455649 (last visited Jan. 15, 2021).

[52] Google Play, https://play.google.com/store/apps/details?id=com.wsl.noom&hl=en_US&showAllReviews=true (last visited Jan. 15, 2021).

the deceptiveness of its app and website.  For example, as the below excerpts of Noom's responses to customer complaints on Revdex.com clearly show, Noom knows that:

a.  Customers are unaware that they will be auto-enrolled at the end of the trial period:

"We're so sorry to hear you were caught off guard by your subscription auto-renewing.  **We are actively working on ways to better notify customers** when their subscription will auto-renew."

"We're really sorry to hear you were caught off guard by the $99.00 charge. […] We deeply apologize **this wasn't clear at the time of sign up**."

"We're sorry to hear about the confusion around these charges made to your account."

"We promise we will do our best to make it more apparent that payment has been processed, as it seems it was unclear at the time you purchased."

"We will be **exploring ways we can be more explicit about subscriptions auto-renewing**, and greatly appreciate your feedback and letting us know it wasn't clear."

b.  Customers are unwittingly enrolled in multiple identical weight-loss plans:

"It looks like you accidentally signed up for two subscriptions at the time of purchase."

"It looks like you accidentally signed up twice because we are seeing two subscriptions associated with your email address."

"We are so sorry for the confusion here. You **signed up for three subscriptions** with the same credit card which is why you were charged multiple times."

c.  Noom does not make clear that the charges are non-refundable:

"We apologize that the **refund policy was not made clear**. We include a link to the policy in an email that goes out to customers after they sign up for a trial to try to make them more aware.  We will look into including it in more places going forward."

d.  Noom does not make clear that the trial program and the auto-enrollment are activated even if a customer never downloads or uses the Noom app:

"We're really sorry to hear about the **confusion regarding the start date of your trial** and subscription. The trial is activated the moment a customer submits

payment information, regardless of whether or not they end up taking the necessary steps to activate the trial within their Noom Coach account."

"I'm **sorry it wasn't more clear that you would need to cancel your trial** within two weeks of purchasing (regardless of whether or not you're using the trial) to ensure you're not charged and your subscription is canceled."

e. Noom's cancellation process is unreasonably difficult:

"We're really sorry to hear that you had such a **difficult time cancelling** your subscription."

"We're so sorry the cancellation process was so difficult."

"We deeply apologize for the confusion and that **cancelling wasn't intuitive**."

"We're really sorry to hear that you had such a difficult time cancelling your subscription."

"We deeply apologize for the trouble you've been experiencing getting your subscription canceled."

"**We're aware that there's a bigger problem here** (trial customers getting charged after having requested to cancel) and we are working to resolve it."

"We're so sorry to hear that you had to change your credit card information for fear of being charged."

f. Noom's customers are prevented from cancelling because Noom's customer

service is virtually non-existent:

"First and foremost, we are deeply sorry to hear that your phone calls went unanswered.  Could you please let us know where you saw a phone number listed? We **don't provide phone support**[.]"

"We apologize it was **difficult to reach our Support Team**."

"We're so sorry for the trouble here and that it was **difficult to reach us :(**."

"We completely understand **how frustrating it is to try to reach Customer Service** and not be able to locate a phone number, particularly when your issue is related to finances. Unfortunately, we do not offer phone support."

g. Noom is aware of all customer complaints:

"Rest assured that **we have access to all customer complaints**, and that assuring they are seen by our product teams."

"We're so sorry to hear you're feeling scammed and want to do everything we can to turn your experience around for the better.  We have a dedicated Customer Support team here at Noom that **monitors all refund and cancellation requests**."

(emphases added).[53]

### C. Noom Meticulously Tracks Customer Metrics, Including Cancellation and Complaint Rates, and Knows that It Is Charging Customers Who Are Not Using Its Plan

101.    That Defendants' fraudulent and deceptive conduct was knowing and intentional is also evident from the fact that Noom closely tracks even the most minute customer metrics, many of which show that customers' enrollment into Noom's monthly plans was involuntary and/or unwitting.

102.    For example, as a recent lawsuit filed in the Northern District of California alleges, Noom pays its partner FullStory, Inc. ("FullStory") to wiretap Noom's website to enable Noom to "secretly observe and record website visitors' keystrokes, mouse clicks, and other electronic communications, including the entry of Personally Identifiable Information ('PII') and Protected Health Information ('PHI'), in real time" in violation of California privacy laws.[54]  To capture this information, Noom and FullStory embed computer code that allows them to either record or monitor live any consumer's use of the Noom website, enabling Noom to track things like the amount of time each customer spends on the website, their geographic location, the clicks and movements of their mouse, and the consumer's browser type and the operating system on their devices.[55]

---

[53] RevDex, https://www.revdex.com/reviews/noom-inc/1455649 (last visited Jan. 15, 2021).

[54] *See* Complaint in *Graham v. Noom, Inc. et al.*, Civ. 3:20 No. 06903 (LB) (N.D. Cal.), filed Oct. 2, 2020, ¶ 1.

[55] *See id.* ¶¶ 25–31, 41.

103.    Noom also closely monitors such basic metrics as its cancellation and complaint rates, whether received directly or through third parties, and has tasked members of its customer support team with responding to complaints on the BBB website and Revdex.com.

104.    As noted above, complaints on the BBB website made clear to Noom that customers were unaware that they would be auto-enrolled; that some were unwittingly enrolled into two or even three identical weight-loss plans; that customers did not expect to be charged recurring, advance, non-refundable charges; that they did not expect their "coach" to be a bot; that they either did not know they needed to cancel or were finding it impossibly difficult to cancel; that the Noom app often did not work; and that customers were frustrated by their inability to reach Noom's customer service and stated time and time again that if they had understood how Noom's scheme worked, they never would have signed up for the trial period.

105.    Noom also tracked the "open ping" rate, which revealed, on a daily basis, whether each customer had opened their Noom app.  The open ping rate therefore made patently clear that Noom was charging customers who had not accessed or may not have even installed the Noom app.  In other words, Noom was extracting monthly payments from customers it knew had never used its plan—and is still continuing to do so.

106.    Noom also tracked its program's Net Promoter Score ("NPS"), which is a metric used for tracking customer experience by gauging the likelihood that a customer would recommend Noom to a friend or colleague.  When asked about the Company's low NPS score, Noom management told employees not to work on improving it because the Company was focusing on acquiring more users instead.

107.     Noom tracks these metrics and conducts user research and testing with the explicit goal of "maximiz[ing] revenue per customer."[56]

### D. Complaints About Noom's Enrollment Practices Resulted in an Alarming Chargeback Rate—Which Noom "Solved" by Adding a Small-Dollar Charge for Its Previously Free Trial

108.     In or around the fall of 2018, Noom co-founder and President Defendant Artem Petakov informed Noom employees during a Company meeting that Noom had received notice from its payment processor that because its chargeback rate[57] for its auto-enrollment charges had been unacceptably high for a prolonged period of time, it was jeopardizing Noom's ability to stay with the payment processor and continue to accept credit cards because credit card companies had placed Noom on final notice.  Mr. Petakov announced that his team had come up with a "solution" to this problem: by charging a small-dollar amount for the previously free trial, Noom would effectively double the number of transactions processed for each auto-enrollment, which would appear to cut the chargeback rate in half.

109.     In other words, rather than incurring higher fees by being forced to switch to a more lenient payment processor or cutting the chargeback rate by addressing the substance of customer complaints, Noom devised and implemented a superficial workaround that would allow it to continue extracting advance, non-refundable auto-enrollment charges from customers despite the slew of complaints Noom and the credit card companies were receiving about this practice.

---

[56] Senior Product Manager, Growth, Indeed.com,
https://www.indeed.com/viewjob?jk=6c4219c0a15c330d&q=Noom&tk=1elmk66d6t5ci800&from=web&vjs=3 (last visited Jan. 15, 2021).

[57] A chargeback is a charge that is returned to a payment card after a customer successfully disputes an item on their account statement or transactions report.  The chargeback rate is the metric that shows the ratio between the total number of a merchant's payment transactions and the number of chargebacks.

### E. Noom Has a History of Unlawful Attempts to Enroll Customers in Its Subscription Plans

110.    In 2017, Defendant Petakov announced at a company meeting that Noom would be switching from offering limited-period subscription to open-ended auto-renewing subscriptions to increase its revenue and enrollment numbers.  As part of this effort, he announced that Noom would be "turning on renewals"—in other words, that Noom would be using the payment information previously provided by customers who had made a one-time purchase for a limited-period subscription to enroll those single-purchase customers into auto-renewing open-ended subscriptions.  Defendant Petakov made no effort to pretend that Noom had any right to do so, acknowledging that the Company would provide a refund of all such charges to people who noticed the charges and complained about the unlawful conversion.

111.    Indeed, this stratagem resulted in considerable complaints from customers who were surprised to see an unauthorized charge for a service they never requested and had not used.

### F. Noom Knows Certain Customers Have Inexplicably Opened Multiple Noom Accounts

112.    As detailed above, Noom's customer service reps routinely deal with the fact that Noom customers have duplicate accounts, as evidenced by the following customer service responses from Noom to complaints regarding its auto-enrollment practice on the consumer site Revdex.com:

> "It looks like you accidentally signed up for two subscriptions at the time of purchase."

> "It looks like you accidentally signed up twice because we are seeing two subscriptions associated with your email address."

> "We are so sorry for the confusion here. You signed up for three subscriptions with the same credit card which is why you were charged multiple times."

113.     This is clear indicia from Defendants' own records that consumers do not understand the ramifications of Defendants' trial period practices, as there is no reason for a consumer to sign up for the same weight loss app more than once.

### G. Noom Knows Its Claims of Personalized Coaching Are False and Misleading

114.     Similarly, Noom is well aware that its claims of personalized coaching are untrue. Upon information and belief, when Noom first launched its diet program in 2011 it offered consumers the option to supplement its free artificial intelligence fitness tracker with paid sessions from a human coach.   In or around 2019 Noom discontinued the paid coaching supplement. Instead, Noom began advertising its entire program as if personalized human coaching were an integral part of its customizable diet and exercise program.   But this marketing stratagem is just another come-on.

115.     Noom ceased differentiating between artificial intelligence-powered coaching and human coaching in its advertising.   Indeed, Noom's aggressive marketing campaigns, website, and smartphone app make absolutely no mention of technology-assisted coaching, and instead focus their advertising and messaging solely on the promise of individualized coaching from actual human weight loss experts.

116.     For example, Noom's website claims that Noom's "coaches come from a variety of backgrounds including psychology, nutrition/dietetics, personal training, health coaching, and more" and that they "undergo extensive training in lifestyle and health behavior change."[58]

117.     Indeed, Noom expressly states that "The best thing about your Noom coaches is that they are real, live people!! (Yes, we promise we're not robots)."[59]

---

[58] Noom, https://web.noom.com/support/support-premium-features/my-coaching-team/2019/02/coaches-trained-psychologists (last visited May 12, 2020).

[59] *Id.*

118.    In reality, rather than fulfilling its promise to connect all customers with dedicated human coaches, Noom utilizes the artificial intelligence technology that it used in its original free fitness tracker to deceive consumers into believing that the messages and tips they receive on the Noom smartphone app are exclusively coming from a human coach.

119.    Noom knows from its customer complaints that customers are confused by its instruction to "simply let [their] coach know" if they want to cancel, because customers are not paired with a human coach.

120.    Noom also knows its instruction to "simply let your coach know" in order to cancel is incorrect, because customers who provided their payment information through a mobile app store would need to cancel through the app store and could not simply cancel by letting their coach know, even if they had understood that their "coach" is a bot.

## VI.    HOW NOOM MISLED DISTRICT OF COLUMBIA PLAINTIFF NICHOLS

121.    In or around August 2019, Plaintiff Nichols heard ads for Noom and subsequently downloaded the Noom app to learn more.  He then followed the sign-up flow on Noom's app as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the app were in all material respects the same as those seen by the other named Plaintiffs.

122.    Misled by the representations and omissions outlined above in Noom's advertising, app, and sign-up flow into thinking that he was signing up for a "risk-free" trial that would allow him to see if he liked Noom's weight-loss service, Mr. Nichols signed up to "try" Noom on August 6, 2019.  He authorized a charge for $1.00 and provided Noom his payment information, unaware that Noom would make it unreasonably difficult to cancel the account within the trial period and instead use his payment information to process unauthorized advance charges for a recurring, non-refundable membership.

123.    After Plaintiff Nichols provided Noom his payment information, Noom sent him the contradictory and confusing "receipt" email reproduced below, which indicated that his trial period would end on August 20, 2019:



**Noom**                                                            August 6, 2019 at 12:01 AM
Your Noom Receipt
To: ███████████████
Reply-To:   programsupport@noom.com

Noom Inc
229 W 28th St.
New York, NY 10001
www.noom.com

For more information about your account visit: account.noom.com

Order placed on August 6, 2019.

Thanks for signing up for Noom's Healthy Weight program!

Here's a summary of your subscription:

Noom membership: **6 Months**
Special offers: **14-day trial**
Trial start date: **August 6, 2019**
Trial end date: **August 20, 2019**
Payment method: ███████████
Renewal date: **Automatic renewal every 6 months after Trial end date**

Your 14-day trial will last until **August 20, 2019**. You can cancel anytime before then and will not be charged the total plan amount. No questions asked, no small print.

If you decide Noom is right for you, on **August 20, 2019** you will be charged one payment of **$157.94** (sales tax of $8.94 included) for your **6 month** Noom membership (**$26.32/month**).

Noom will automatically charge your card **$157.94** every **6 months** so you don't lose access to your account. No refunds or credits for partial months. To cancel, simply let your coach know.

**After your 14-day trial ends on August 20, 2019, your subscription fee is non-refundable. See our Refund Policy.**

FAQ

**I have a question about my subscription.**
Check out our handy-dandy Supportal! You can view your subscription details any time at account.noom.com.

124.    After signing up for the trial period, Plaintiff Nichols accessed the app a couple of times during the trial period, but decided he did not want to continue with Noom.  At no point did he understand that Noom's trial period would automatically convert at the end of the trial period because Noom would make it inordinately difficult to cancel his membership.

125.    Plaintiff Nichols attempted to cancel within the trial period, but was unable to do so because, as outlined above, Noom failed to provide a reasonable way to cancel through each of the following:

    a.    Noom failed to provide any customer service contact information for the company, such as a phone number, email, fax, chat-window, or physical address;

    b.    Noom failed to provide trial customers with cancellation instructions on the company's app;

    c.    Noom misrepresented to customers that they could "simply cancel by letting your coach know";

    d.    Noom failed to make clear that a customer could not cancel without first installing the Noom app on a smartphone;

    e.    Noom failed to make clear that deleting the Noom app would not result in cancellation.

126.    On or about March 7, 2020, notwithstanding that the trial period had ended and that he was unable to cancel, Plaintiff Nichols saw on a third-party billing statement that Noom had twice charged him for a recurring subscription.  Noom's unauthorized charges to Plaintiff Nichols amounted to $315.88 for 12 months of a weight-loss service he never wanted or intended to use.  Additionally, the dates Noom imposed the charge were inconsistent with its purported disclosure.

127.    At no point did Plaintiff Nichols receive a receipt or other acknowledgement from Noom that he had been, or was about to be, charged for an automatically recurring subscription.

128.    On or around March 2020, Plaintiff Nichols requested a refund of all unauthorized charges but never received one.

129.    Prior to discovering the charges, Plaintiff Nichols neither accessed his Noom app nor used Noom's weight-loss program after the expiration of his trial period.

130.    If Plaintiff Nichols had known that by signing up for a Noom trial and authorizing a $1.00 payment for a "risk free" trial, he would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, he would not have signed up for a Noom trial.

131.    Plaintiff Nichols intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendants', in furtherance of that pursuit, as long as he can gain some confidence in Noom's representations about its services.

## VII.    HOW NOOM MISLED WASHINGTON PLAINTIFF BREWSTER

132.    In or around August 2019, Plaintiff Susan Brewster saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

133.    Misled by the representations and omissions outlined above in Noom's advertising, website, and sign-up flow into thinking that she was signing up for a "risk-free" trial that would allow her to see if she liked Noom's weight-loss service, Ms. Brewster signed up to "try" Noom on August 12, 2019.  She authorized a charge for $18.37 and provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership.

134.    After Plaintiff Brewster provided Noom her payment information, Noom sent her the contradictory and confusing "receipt" email discussed above, which indicated that her trial period would end on August 26, 2019.

135.    After signing up for the trial period, Plaintiff Brewster downloaded the Noom app. Plaintiff Brewster accessed the app a few times during the trial period, but decided she did not want to continue with Noom.  Plaintiff Brewster did not expect to be charged again and at no point did she understand that Noom's trial period would automatically convert at the end of the trial period.

136.    Having decided not to join the Noom program, Plaintiff Brewster believed that once the trial period was over, she would no longer be a Noom customer.  Indeed, the only sum Plaintiff ever expected to pay Noom was the charge for $18.27, which she had authorized for the trial period.  Noom did not adequately disclose to Plaintiff Brewster that it would automatically enroll her in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $164.05 as soon as her trial period ended.  Additionally, the date Noom imposed the charge was inconsistent with its purported disclosure.

137.    On or about February 27, 2020, notwithstanding that the trial period had ended, Plaintiff Brewster saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Brewster amounted to $328.10 for 12 months of a weight-loss service she never wanted or intended to use.

138.    At no point did Plaintiff Brewster receive a receipt or other acknowledgement from Noom that she had been, or was about to be, charged for an automatically recurring subscription.

139.    On or around April 2020, Plaintiff Brewster requested a refund of her unauthorized charges but never received one.

140.    Prior to discovering the charges, Plaintiff Brewster neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

141.     If Plaintiff Brewster had known that by signing up for a Noom trial and authorizing a $18.27 payment for a "risk free" trial she would instead automatically be enrolled into Noom's

plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

142.     Plaintiff Brewster intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendants', in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

## VIII.    HOW NOOM MISLED CALIFORNIA PLAINTIFF DEA

143.     In or around September 2020, Plaintiff Duane Dea saw ads for Noom and subsequently looked up Noom on his tablet to learn more.  He then followed the sign-up flow as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

144.     Misled by the representations and omissions outlined above in Noom's advertising and sign-up flow into thinking that he was signing up for a "risk-free" trial that would allow him to see if he liked Noom's weight-loss service, Mr. Dea signed up to "try" Noom on September 8, 2020.  He authorized a charge for $0.32 and provided Noom his payment information, unaware that Noom would use his payment information to process unauthorized advance charges for a recurring non-refundable membership.

145.     After Plaintiff Dea provided Noom his payment information, Noom sent him the contradictory and confusing "receipt" email reproduced below, which indicated that his trial period would end on September 23, 2020:

From: **Noom** <updates@message.noom.com>
Date: Tue, Sep 8, 2020, 10:01 PM
Subject: Your Noom Receipt
To: <███████████████>



## Welcome to the Noomily!

Hi! You found us! We're so happy you're here, because we've got a lot of support, knowledge, and expert advice coming your way. This is the beginning of something great. Get pumped!

Some important dates for your subscription:

- Order placed on: **September 9, 2020**
- Noom membership: **5 Months**
- Trial start date: **September 9, 2020**
- Trial end date: **September 23, 2020**
- Payment method: **PayPal**
- Renewal date: **Automatic renewal every 5 months after Trial end date**
- Subscription ID: ███████

Your trial will last until **September 23, 2020**. You can cancel anytime before then and will not be charged the total plan amount. No questions asked, no small print.

If you love Noom, and want to keep going, on **September 23, 2020** you will be charged one payment of **$149** for your **5 month** Noom membership **(this breaks out to $29.80/month).**

Noom will automatically charge your card **$149** every **5 months** so you don't lose access to your account. To cancel, simply let your coach know. Need help canceling? **Click Here.**

If you're unsatisfied with your experience, you may request a refund.

FAQ

**I have a question about my subscription.**
Check out our handy-dandy Supportal! You can view your subscription details any time at
account.noom.com.

146.    Upon information and belief, after signing up for the trial period, Plaintiff Dea did not download the Noom app.  Plaintiff Dea never accessed the app during the trial period and decided he did not want to continue with Noom.  Plaintiff Dea did not expect to be charged again and at no point did he understand that Noom's trial period would automatically convert at the end of the trial period.

147.    Having decided not to join the Noom program, Plaintiff Dea believed that once the trial period was over, he would no longer be a Noom customer.  Indeed, the only sum Plaintiff ever expected to pay Noom was the charge for $0.32, which he had authorized for the trial period. Noom did not adequately disclose to Plaintiff Dea that it would automatically enroll him in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $149.00 as soon as his trial period ended.  Additionally, the date Noom imposed the charge was inconsistent with its purported disclosure.

148.    On or about September 24, 2020, notwithstanding that the trial period had ended, Plaintiff Dea saw on a third-party billing statement that Noom had charged him for a recurring subscription and an initial fee. Noom's unauthorized charges to Plaintiff Dea amounted to $149.00 for 5 months of a weight-loss service he never wanted or intended to use.

149.    At no point did Plaintiff Dea receive a receipt or other acknowledgement from Noom that he had been, or was about to be, charged for an automatically recurring subscription.

150.    Upon information and belief, prior to discovering the charges, Plaintiff Dea never accessed his Noom app or used Noom's weight-loss program.

151.    If Plaintiff Dea had known that by signing up for a Noom trial he would instead automatically be enrolled into Noom's plan and charged advance fees for a Noom subscription, he would not have signed up for a Noom trial.

152.    Plaintiff Dea intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendants', in furtherance of that pursuit, as long as he can gain some confidence in Noom's representations about its services.

IX.    **HOW NOOM MISLED NEW YORK PLAINTIFF DERACLEO**

153.    In or around July 2020, Plaintiff Maryanne Deracleo saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on

Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

154.    Misled by the representations and omissions outlined above in Noom's advertising, website, and sign-up flow into thinking that she was signing up for a "risk-free" trial that would allow her to see if she liked Noom's weight-loss service, Ms. Deracleo signed up to "try" Noom on or around July 16, 2020.  She authorized a charge for $18.37 and provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership.

155.    After Plaintiff Deracleo provided Noom her payment information, Noom sent her the contradictory and confusing "receipt" email reproduced below, which indicated that her trial period would end on July 30, 2020:

**From:** Noom <updates@message.noom.com>
**To:** ███████████████
**Sent:** Thursday, July 23, 2020, 05:57:51 PM EDT
**Subject:** Your Noom Receipt

Noom Inc
229 W 28th St.
New York, NY 10001
www.noom.com

For more information about your account visit: account.noom.com

Order placed on July 16, 2020.

Thanks for signing up for Noom's Healthy Weight program!

Here's a summary of your subscription:

Noom membership: **6 Months**
Trial start date: **July 16, 2020**
Trial end date: **July 30, 2020**
Payment method: **PayPal**
Renewal date: **Automatic renewal every 6 months after Trial end date**

Your trial will last until **July 30, 2020**. You can cancel anytime before then and will not be charged the total plan amount. No questions asked, no small print.

If you decide Noom is right for you, on **July 30, 2020** you will be charged one payment of **$171.72** (sales tax of **$12.72** included) for your **6 month** Noom membership (**$28.62/month**).

Noom will automatically charge your card **$171.72** every **6 months** so you don't lose access to your account. No refunds or credits for partial months. To cancel, simply let your coach know.

**After your trial ends on July 30, 2020, your subscription fee is non-refundable. See our Refund Policy.**

FAQ

**I have a question about my subscription.**
Check out our handy-dandy Supportal! You can view your subscription details any time at account.noom.com.

156.    After signing up for the trial period, Plaintiff Deracleo downloaded the Noom app.

Plaintiff Deracleo accessed the app a couple of times during the trial period, but decided she did

not want to continue with Noom.  Plaintiff Deracleo did not expect to be charged again and at no point did she understand that Noom's trial period would automatically convert at the end of the trial period.

157.   Having decided not to join the Noom program, Plaintiff Deracleo believed that once the trial period was over, she would no longer be a Noom customer.  Indeed, the only sum Plaintiff ever expected to pay Noom was the charge for $18.37, which she had authorized for the trial period.  Noom did not adequately disclose to Plaintiff Deracleo that it would automatically enroll her in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $171.72 on the day her trial period ended.  Additionally, the date Noom imposed the charge was inconsistent with its purported disclosure.

158.   On or about July 30, 2020 notwithstanding that the trial period had ended, Plaintiff Deracleo saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Deracleo amounted to $171.72 for 6 months of a weight-loss service she never wanted or intended to use.

159.   At no point did Plaintiff Deracleo receive a receipt or other acknowledgement from Noom that she had been, or was about to be, charged for an automatically recurring subscription.

160.   On July 30, 2020, Plaintiff Deracleo canceled her subscription and she never received a refund of her charges.

161.   Prior to discovering the charges, Plaintiff Deracleo neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

162.    If Plaintiff Deracleo had known that by signing up for a Noom trial and authorizing a $18.37 payment for a "risk free" trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

163.     Plaintiff Deracleo intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendants', in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

## X.      HOW NOOM MISLED CALIFORNIA PLAINTIFF KELLY

164.     In or around September 2019, Plaintiff Karen Kelly saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

165.     Misled by the representations and omissions outlined above in Noom's advertising, website, and sign-up flow into thinking that she was signing up for a "risk-free" trial that would allow her to see if she liked Noom's weight-loss service, Ms. Kelly signed up to "try" Noom on September 22, 2019.  She did not authorize any charge but provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership.

166.     After Plaintiff Kelly provided Noom her payment information, Noom sent her the contradictory and confusing "receipt" email reproduced below, which indicated that her trial period would end on October 7, 2019:

**Noom**                                                      September 23, 2019 at 1:04 AM

Your Noom Receipt

To: ▉▉▉▉▉▉▉▉▉▉▉

Reply-To:  programsupport@noom.com

Noom Inc
229 W 28th St.
New York, NY 10001
www.noom.com

For more information about your account visit: account.noom.com

Order placed on September 23, 2019.

Thanks for signing up for Noom's Healthy Weight program!

Here's a summary of your subscription:

Noom membership: **6 Months**
Special offers: **14-day trial**
Trial start date: **September 23, 2019**
Trial end date: **October 7, 2019**
Payment method: **PayPal**
Renewal date: **Automatic renewal every 6 months after Trial end date**

Your 14-day trial will last until **October 7, 2019**. You can cancel anytime before then and will not be charged the total plan amount. No questions asked, no small print.

If you decide Noom is right for you, on **October 7, 2019** you will be charged one payment of **$149** for your **6 month** Noom membership (**$24.83/month**).

Noom will automatically charge your card **$149** every **6 months** so you don't lose access to your account. No refunds or credits for partial months. To cancel, simply let your coach know.

**After your 14-day trial ends on October 7, 2019, your subscription fee is non-refundable. See our Refund Policy.**

FAQ

**I have a question about my subscription.**
Check out our handy-dandy Supportal! You can view your subscription details any time at account.noom.com.

167.    After signing up for the trial period, Plaintiff Kelly did not download the Noom

app.  She never accessed the app during the trial period and decided she did not want to continue

with Noom.  Plaintiff Kelly did not expect to be charged again and at no point did she understand that Noom's trial period would automatically convert at the end of the trial period.

168.   Having decided not to join the Noom program, Plaintiff Kelly believed that once the trial period was over, she would no longer be a Noom customer.  Indeed, Plaintiff never expected to pay Noom anything and had not authorized any charge when she provided her payment information for the trial period.  Noom did not adequately disclose to Plaintiff Kelly that it would automatically enroll her in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $149.00 as soon as her trial period ended. Additionally, the date Noom imposed the charge was inconsistent with its purported disclosure.

169.   On or about April 23, 2020, notwithstanding that the trial period had ended, Plaintiff Kelly saw on a third-party billing statement that Noom had charged her for a recurring subscription and an initial fee.  Noom's unauthorized charges to Plaintiff Kelly amounted to $301.00 for 12 months of a weight-loss service she never wanted or intended to use.

170.   At no point did Plaintiff Kelly receive a receipt or other acknowledgement from Noom that she had been, or was about to be, charged for an automatically recurring subscription.

171.   On April 23, 2020, Plaintiff Kelly requested a refund of her unauthorized charges and subsequently, on or around April 24, 2020, she received a refund.

172.   Prior to discovering the charges, Plaintiff Kelly never accessed her Noom app or used Noom's weight-loss program.

173.   If Plaintiff Kelly had known that by signing up for a Noom trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a Noom subscription, she would not have signed up for a Noom trial.

174.   Plaintiff Kelly intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendants', in furtherance of that pursuit, as long as she can gain

some confidence in Noom's representations about its services.

## XI.  HOW NOOM MISLED OHIO PLAINTIFF RICHARDS

175.  In or around May 2019, Plaintiff Rebecca Richards saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

176.  Misled by the representations and omissions outlined above in Noom's advertising, website, and sign-up flow into thinking that she was signing up for a "risk-free" trial that would allow her to see if she liked Noom's weight-loss services, Ms. Richards signed up to "try" Noom on May 25, 2019.  She authorized a charge for $1.00 and provided Noom her payment information, unaware that Noom would make it unreasonably difficult to cancel the account within the trial period and instead use her payment information to process unauthorized advance charges for a recurring, non-refundable membership.

177.  After Plaintiff Richards provided Noom her payment information, Noom sent her the contradictory and confusing "receipt" email discussed above, which indicated that her trial period would end on June 8, 2019:



**Noom**                                          May 25, 2019 at 12:14 AM
Your Noom Receipt
To:
Reply-To:  programsupport@noom.com

---

Noom Inc
229 W 28th St.
New York, NY 10001
www.noom.com

For more information about your account visit: account.noom.com

Order placed on May 25, 2019.

Thanks for signing up for Noom's Healthy Weight program!

Here's a summary of your subscription:

Noom membership: **6 Months**
Special offers: **14-day trial**
Trial start date: **May 25, 2019**
Trial end date: **June 8, 2019**
Payment method:
Renewal date: **Automatic renewal every 6 months after Trial end date**

Your 14-day trial will last until **June 8, 2019**. You can cancel anytime before then and will not be charged the total plan amount. No questions asked, no small print.

If you decide Noom is right for you, on **June 8, 2019** you will be charged one payment of **$149** for your **6 month** Noom membership (**$24.83/month**).

Noom will automatically charge your card **$149** every **6 months** so you don't lose access to your account. No refunds or credits for partial months. To cancel, simply let your coach know.

**After your 14-day trial ends on June 8, 2019, your subscription fee is non-refundable. See our Refund Policy.**

FAQ

**I have a question about my subscription.**
Check out our handy-dandy Supportal! You can view your subscription details any time at account.noom.com.

178.    After signing up for the trial period, Plaintiff Richards downloaded the Noom app.

She accessed the app a couple of times during the trial period, but decided she did not want to

continue with Noom.  At no point did she understand that Noom's trial period would automatically convert at the end of the trial period because Noom would make it inordinately difficult to cancel her membership.

179.    Plaintiff Richards attempted to cancel within the trial period, but was unable to do so because, as outlined above, Noom failed to provide a reasonable way to cancel as follows:

   a.  Noom failed to provide any customer service contact information for the company, such as a phone number, email, fax, chat-window, or physical address;

   b.  Noom failed to provide trial customers with cancellation instructions on the company's app;

   c.  Noom misrepresented to customers that they could "simply cancel by letting your coach know";

   d.  Noom failed to make clear that a customer could not cancel without first installing the Noom app on a smartphone;

   e.  Noom failed to make clear that deleting the Noom app would not result in cancellation.

180.    On or about June 8, 2020, notwithstanding that the trial period had ended and that she was unable to cancel, Plaintiff Richards saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Richards amounted to $447.00 for 18 months of a weight-loss service she never wanted or intended to use. Additionally, the dates Noom imposed the charge were inconsistent with its purported disclosure.

181.    At no point did Plaintiff Richards receive a receipt or other acknowledgement from Noom that she had been, or was about to be, charged for an automatically recurring subscription.

182.    On June 8, 2020, Plaintiff Richards requested a refund of all unauthorized charges but never received one.

183.    Prior to discovering the charges, Plaintiff Richards neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

184.    If Plaintiff Richards had known that by signing up for a Noom trial and authorizing a $1.00 payment for a "risk free" trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

185.    Plaintiff Richards intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendants', in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

**XII.    HOW NOOM MISLED ALABAMA PLAINTIFF SELLERS**

186.    In or around June 2020, Plaintiff Jennifer Sellers saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

187.    Misled by the representations and omissions outlined above in Noom's advertising, website, and sign-up flow into thinking that she was signing up for a "risk-free" trial that would allow her to see if she liked Noom's weight-loss service, Ms. Sellers signed up to "try" Noom on or around June 24, 2020.  She authorized a charge for 32 cents and provided Noom her payment information, unaware that Noom would make it unreasonably difficult to cancel the account within the trial period and instead use her payment information to process unauthorized advance charges for a recurring, non-refundable membership.

188.    After Plaintiff Sellers provided Noom her payment information, Noom sent her the contradictory and confusing "receipt" email reproduced below, which indicated that her trial period would end on July 9, 2020:

From: **Noom** <updates@message.noom.com>
Date: Wed, Jun 24, 2020 at 10:11 PM
Subject: Your Noom Receipt
To: ▪

Noom Inc
229 W 28th St.
New York, NY 10001
www.noom.com

For more information about your account visit: account.noom.com

Order placed on June 25, 2020.

Thanks for signing up for Noom's Healthy Weight program!

Here's a summary of your subscription:

Noom membership: **8 Months**
Trial start date: **June 25, 2020**
Trial end date: **July 9, 2020**
Payment method: **PayPal**
Renewal date: **Automatic renewal every 8 months after Trial end date**

Your trial will last until **July 9, 2020**. You can cancel anytime before then and will not be charged the total plan amount. No questions asked, no small print.

If you decide Noom is right for you, on **July 9, 2020** you will be charged one payment of **$179** for your **8 month** Noom membership (**$22.38/month**).

Noom will automatically charge your card **$179** every **8 months** so you don't lose access to your account. No refunds or credits for partial months. To cancel, simply let your coach know.

**After your trial ends on July 9, 2020, your subscription fee is non-refundable. See our Refund Policy.**

FAQ

**I have a question about my subscription.**
Check out our handy-dandy Supportal! You can view your subscription details any time at account.noom.com.

189.   After signing up for the trial period, Plaintiff Sellers downloaded the Noom app.

She accessed the app a few times during the trial period, but decided she did not want to continue

with Noom.  At no point did she understand that Noom's trial period would automatically convert

at the end of the trial period because Noom would make it inordinately difficult to cancel her membership.

190.    Plaintiff Sellers attempted to cancel within the trial period, but was unable to do so because, as outlined above, Noom failed to provide a reasonable way to cancel as follows:

  a.  Noom failed to provide any customer service contact information for the company, such as a phone number, email, fax, chat-window, or physical address;

  b.  Noom failed to provide trial customers with cancellation instructions on the company's app;

  c.  Noom misrepresented to customers that they could "simply cancel by letting your coach know";

  d.  Noom failed to make clear that a customer could not cancel without first installing the Noom app on a smartphone;

  e.  Noom failed to make clear that deleting the Noom app would not result in cancellation.

191.    On or about July 9, 2020, notwithstanding that the trial period had ended and that she was unable to cancel, Plaintiff Sellers saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Sellers amounted to $179 for 8 months of a weight-loss service she never wanted or intended to use. Additionally, the date Noom imposed the charge was inconsistent with its purported disclosure.

192.    At no point did Plaintiff Sellers receive a receipt or other acknowledgement from Noom that she had been, or was about to be, charged for an automatically recurring subscription.

193.    On July 9, 2020, Plaintiff Sellers requested a refund of all unauthorized charges but never received one.

194.    Prior to discovering the charges, Plaintiff Sellers neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

195.    If Plaintiff Sellers had known that by signing up for a Noom trial and authorizing a 32 cent payment for a "risk free" trial she would instead automatically be enrolled into Noom's

plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

196.    Plaintiff Sellers intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendants', in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

### XIII.    HOW NOOM MISLED TEXAS PLAINTIFF SPENCER

197.    In or around March 2019, Plaintiff Stacy Spencer saw ads for Noom and subsequently visited Noom's website to learn more.  She then followed the sign-up flow on Noom's website as outlined above and answered a series of Noom's questions.  Upon information and belief, the relevant representations in the sign-up flow on the website were in all material respects the same as those seen by the other named Plaintiffs.

198.    Misled by the representations and omissions outlined above in Noom's advertising, website, and sign-up flow into thinking that she was signing up for a "risk-free" trial that would allow her to see if she liked Noom's weight-loss service, Ms. Spencer signed up to "try" Noom on or around March 9, 2019.  She authorized a charge for $1.00 and provided Noom her payment information, unaware that Noom would use her payment information to process unauthorized advance charges for a recurring non-refundable membership.

199.    Upon information and belief, after Plaintiff Spencer provided Noom her payment information, Noom sent her the contradictory and confusing "receipt" email discussed above, which indicated that her trial period would end on or around March 22, 2019.

200.    After signing up for the trial period, Plaintiff Spencer downloaded the Noom app. Plaintiff Spencer accessed the app a few times during the trial period, but decided she did not want to continue with Noom. Plaintiff Spencer did not expect to be charged again and at no point did she understand that Noom's trial period would automatically convert at the end of the trial period.

201.    Having decided not to join the Noom program, Plaintiff Spencer believed that once the trial period was over, she would no longer be a Noom customer.  Indeed, the only sum Plaintiff ever expected to pay Noom was the charge for $1.00, which she had authorized for the trial period. Noom did not adequately disclose to Plaintiff Spencer that it would automatically enroll her in its weight-loss subscription program and begin charging a non-refundable fee for a multiple-month membership of $99.00 as soon as her trial period ended.  Additionally, upon information and belief, the date Noom imposed the charge was inconsistent with its purported disclosure.

202.    On or about March 24, 2019, notwithstanding that the trial period had ended, Plaintiff Spencer saw on a third-party billing statement that Noom had charged her for a recurring subscription.  Noom's unauthorized charges to Plaintiff Spencer amounted to $99.00 for 2 months of a weight-loss service she never wanted or intended to use.

203.    At no point did Plaintiff Spencer receive a receipt or other acknowledgement from Noom that she had been, or was about to be, charged for an automatically recurring subscription.

204.    On or around March 24, 2019, Plaintiff Spencer requested a refund of her unauthorized charges but never received one.

205.    Prior to discovering the charges, Plaintiff Spencer neither accessed her Noom app nor used Noom's weight-loss program after the expiration of her trial period.

206.    If Plaintiff Spencer had known that by signing up for a Noom trial and authorizing a $1.00 payment for a "risk free" trial she would instead automatically be enrolled into Noom's plan and charged advance fees for a non-refundable Noom subscription, she would not have signed up for a Noom trial.

207.    Plaintiff Spencer intends to continue to pursue a healthy diet and lifestyle and may purchase services, including Defendants', in furtherance of that pursuit, as long as she can gain some confidence in Noom's representations about its services.

## CLASS ACTION ALLEGATIONS

208.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants.  Defendants have engaged in uniform and standardized conduct toward the Class—its marketing and billing tactics—and this case is about the responsibility of Defendants, at law and in equity, for their knowledge and conduct in deceiving Noom's customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in the content of its statements or omissions. The objective facts on these subjects are the same for all Class members.

209.    Plaintiffs sue on their own behalf and on behalf of a Class for damages and injunctive relief under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

210.    The Class, preliminarily defined as two subclasses ("Subclasses"), is as follows:

    a.  The Multistate Class, preliminarily defined as all Noom customers in the United States and territories (including customers of companies Noom acts as a successor to) who were automatically enrolled into and charged for at least one month of Noom membership by Defendants at any time from [applicable statute of limitations period] to the date of judgment.

    b.  The State Classes, preliminarily defined as all Noom customers in the state or territory of [e.g., New York, California, etc.] (including customers of companies Noom acts as a successor to) who were automatically enrolled into and charged for at least one month of Noom membership by Defendants at any time from [applicable statute of limitations period] to the date of judgment.

211.    Excluded from the Class are officers and directors of Noom, members of the immediate families of the officers and directors of Noom, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.  Also excluded are all federal, state and local government entities; and any judge, justice or judicial officer presiding over this action and the members of their immediate families and judicial staff.

212.     Plaintiffs do not know the exact size of the Class, since such information is in the exclusive control of Defendants.  Plaintiffs believe, however, that based on Noom's assertions, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Defendants' records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

213.     The Class is ascertainable because its members can be readily identified using data and information kept by Defendants in the usual course of business and within its control. Plaintiffs anticipate providing appropriate notice to each Class member, in compliance with all applicable federal rules.

214.     The Named Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar marketing, enrollment and billing practices engineered by Defendants.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Defendants' conduct.

215.     Plaintiffs will fairly and adequately protect the interests of all Class members. Plaintiffs have retained competent and experienced class action attorneys to represent her interests and those of the Class.

216.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

    a.     Whether Defendants' representations and/or omissions are fraudulent;

    b.     Whether Defendants' conduct  violates the applicable state or territorial consumer protection statutes;

    c.     Whether Defendants were unjustly enriched as a result of their conduct;

d.     Whether Class Members have been injured by Defendants' conduct;

e.     Whether, and to what extent, equitable relief and/or other relief should be imposed on Defendants, and, if so, the nature of such relief.; and

f.     The extent of class-wide injury and the measure of damages for those injuries.

217.    A class action is superior to all other available methods for resolving this controversy because i) the prosecution of separate actions by Class members will create a risk of adjudications with respect to individual Class members that will, as a practical matter, be dispositive of the interests of the other Class members not parties to this action, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by Class members will create a risk of inconsistent or varying adjudications with respect to individual Class members, which will establish incompatible standards for Defendants' conduct; iii) Defendants have acted or refused to act on grounds generally applicable to all Class members; and iv) questions of law and fact common to the Classes predominate over any questions affecting only individual Class members.

218.    Further, the following issues are also appropriately resolved on a class-wide basis under Fed. R. Civ. P. 23(c)(4):

a.   Whether Defendants' representations and/or omissions are fraudulent;

b.   Whether Defendants' conduct violates the applicable state or territorial consumer protection statutes;

c.   Whether Defendants were unjustly enriched as a result of their conduct;

d.   Whether Class Members have been injured by Defendants' conduct; and

e.   Whether, and to what extent, equitable relief and/or other relief should be imposed on Defendants, and, if so, the nature of such relief.

219.    Accordingly, this action satisfies the requirements set forth under Fed. R. Civ. P. 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

**I.**     **STATE CLASS COUNTS**

     **A. State Consumer Protection Counts**

### COUNT 1

**NEW YORK GENERAL BUSINESS LAW § 349**

**(ON BEHALF THE NEW YORK CLASS AGAINST DEFENDANTS)**

220.     Plaintiff Deracleo incorporates by reference all preceding and subsequent paragraphs .

221.     Plaintiff Deracleo brings this claim under N.Y. GEN. BUS. LAW § 349 on her own behalf and on behalf of each Class member who is a New York resident (the "New York Class").

222.     New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW §349.

223.     Defendants' marketing and billing practices are consumer-oriented in that they are directed at members of the consuming public.

224.     By engineering and implementing fraudulent billing and advertising practices, Defendants engaged in, and continue to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW §349.

225.     Defendants have violated N.Y. GEN. BUS. LAW §349 statute by, *inter alia*:

a.     Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.     Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.     Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling the trial before the last day of the trial period;

d.   Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.   Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.   Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.   Misrepresenting and/or creating the net impression that enrolling in the trial program i) is "risk free;" ii) does not require a smart phone; and iii) costs only between $0.00 to $18.37;  and that the trial program iv) will be easy to cancel; v) can be "cancelled any time;" and vi) will feature individualized coaching from a human weight loss expert.

226.   The aforementioned acts are unfair, unconscionable and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

227.   As a direct and proximate result of Defendants' unlawful and deceptive marketing and billing practices, the New York Class has suffered injury and monetary damages in an amount to be determined at the trial of this action and upon information and belief, believed to exceed $100 million.

228.   Plaintiffs and the members of the New York Class further seek equitable relief against Defendants.  Pursuant to N.Y. GEN. BUS. LAW §349, this Court has the power to award such relief, including but not limited to, an order declaring Defendants' practices to be unlawful, an order enjoining Defendants from engaging in any further unlawful conduct, and an order directing Defendants to refund to Plaintiff and the New York Class all fees wrongfully assessed and/or collected.

## COUNT 2

**CALIFORNIA FALSE ADVERTISING LAW–VIOLATION OF THE CALIFORNIA
AUTOMATIC RENEWAL LAW**

**(ON BEHALF OF THE CALIFORNIA CLASS AGAINST DEFENDANTS)**

229.    Plaintiffs Duane Dea and Karen Kelly incorporate by reference all preceding and subsequent paragraphs.

230.    Plaintiffs Dea and Kelly bring this claim on their own behalf and on behalf of each Class member who is a California resident (the "California Class").

231.    As part of California's False Advertising Law, the California Automatic Renewal Law, CAL. BUS. & PROF. CODE § 17600 *et seq.* became effective on December 1, 2010.

232.    CAL. BUS. & PROF. CODE § 17600, *et seq.*, California's Automatic Purchase Renewal Statute, declares unlawful "the practice of ongoing charging of consumer credit or debit cards or third-party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Defendants' conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17602 because each of the following practices Noom has engaged in is an independent violation of the Automatic Purchase Renewal Statute:

    a.    Noom failed to present the terms of its automatic renewal or continuous service offer in a clear and conspicuous manner before fulfilling the subscription and in visual proximity to the request for consent to the offer, as required by CAL. BUS. & PROF. CODE §§ 17602(a)(1);

    b.    Noom charged Plaintiffs' and the California Class's credit or debit cards, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous offer terms, as required by CAL. BUS. & PROF. CODE §§ 17602(a)(2);

    c.    Noom failed to provide an acknowledgment that includes the automatic renewal offer terms or continuous offer terms, cancellation policy, and information regarding how to cancel, and to allow Plaintiffs and the California Class to cancel, the automatic renewal or continuous service before they paid for it, as required by CAL. BUS. & PROF. CODE §§ 17602(a)(3);

d.   Noom failed to provide a toll-free telephone number, electronic mail address, a postal address or another cost-effective, timely, and easy-to-use mechanism for cancellation described in CAL. BUS. & PROF. CODE §§ 17602(a)(3), as required by CAL. BUS. & PROF. CODE §§ 17602(b);

e.   Noom failed to allow Plaintiffs and the California Class to terminate the automatic renewal or continuous service exclusively online, as required by CAL. BUS. & PROF. CODE §§ 17602(c).

233.   Plaintiffs Dea and Kelly and members of the California Class would not have enrolled in the trial periods if they had known the truth and have suffered injury in fact and lost money as a result of Defendants' violations of the Automatic Purchase Renewal Statute.

234.   As a result of Defendants' misconduct, Plaintiffs Dea and Kelly and the California Class have suffered injury that cannot be remedied without restitution of all amounts that Noom charged or caused to be charged to Plaintiffs' and the California Class members' credit cards, debit cards, or third-party payment accounts during the applicable statute of limitations and continuing until Noom's statutory violations cease.  Pursuant to CAL. BUS. & PROF. CODE § 17535, this Court may award such restitution to Plaintiffs Dea and Kelly and the California Class.

235.   As a result of Defendants' misconduct, pursuant to CAL. BUS. & PROF. CODE § 17535, Plaintiffs and the California Class are entitled to an injunction (a) enjoining Noom from making automatic renewal offers that do not comply with California law, (b) from making charges to credit cards, debit cards, or third-party payment accounts without prior affirmative consent to an agreement containing "clear and conspicuous" disclosures of automatic renewal or continuous service offer terms, (c) enjoining Noom from making automatic renewal offers that fail to provide an acknowledgment that includes "clear and conspicuous" disclosure of automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, and (d) enjoining Noom from making automatic renewal offers that fail to provide an online, easy-to-use mechanism for cancellation.

236.     Pursuant to CAL. BUS. & PROF. CODE § 17535, this Court has the power to award such equitable relief, including but not limited to, an order declaring Defendants' auto-renewal practices to be unlawful, an order enjoining Defendants from engaging in any such further unlawful conduct, and an order directing Defendants to refund to the Plaintiffs and the California Class all monthly fees wrongfully assessed and/or collected.

## COUNT 3

**CALIFORNIA FALSE ADVERTISING LAW–DECEPTIVE PRACTICES**
**(ON BEHALF OF THE CALIFORNIA CLASS AGAINST DEFENDANTS)**

237.     Plaintiffs Dea and Kelly incorporate by reference all preceding and subsequent paragraphs.

238.     Plaintiffs Dea and Kelly bring this claim on their own behalf and on behalf of each Class member of the "California Class."

239.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

240.     Defendants' conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17500 by intentionally making and disseminating statements to consumers in California and the general public concerning Defendants' products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by

Defendants to be untrue or misleading. Defendants have also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

241. Defendants violated CAL. BUS. & PROF. CODE § 17500 by, *inter alia*:

a. Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b. Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c. Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling the trial before the last day of the trial period;

d. Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e. Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f. Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g. Misrepresenting and/or creating the net impression that enrolling in the trial program i) is "risk free;" ii) does not require a smart phone; and iii) costs only between $0.00 to $18.37; and that the trial program iv) will be easy to cancel; v) can be "cancelled any time;" and vi) will feature individualized coaching from a human weight loss expert.

242. Defendants' actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

243. Plaintiffs Dea and Kelly and the members of the California Class were deceived by and relied on Defendants' statements and omissions to their detriment when they signed up for Noom's trial and were subsequently automatically enrolled into Noom's auto-recurring subscription, and there is a strong probability that other California consumers and members of the

public were also or are likely to be deceived as well. Any reasonable consumer would be misled by Defendants' false and misleading statements and material omissions. Plaintiffs Dea and Kelly and other members of the California Class did not learn of Defendants' cancellation and automatic payment policies until after they had already signed up and were forced into paying for Defendants' service.

244.    Plaintiff and the Class lost money or property as a result of Defendants' violations because they would not have enrolled into Noom's trial programs or been charged for monthly subscriptions if the true facts about Noom's trial program and monthly subscriptions were known to them.

245.    As a result of Defendants' misconduct pursuant to CAL. BUS. & PROF. CODE § 17500, Plaintiffs Dea and Kelly and the California Class are entitled to individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendants from continuing with their false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendants' relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

## COUNT 4

### CALIFORNIA UNFAIR COMPETITION LAW–VIOLATION OF THE CALIFORNIA AUTOMATIC RENEWAL LAW AND DECEPTIVE PRACTICES

### (ON BEHALF OF THE CALIFORNIA CLASS AGAINST DEFENDANTS)

246.    Plaintiffs Dea and Kelly incorporate by reference all preceding and subsequent paragraphs.

247.    Plaintiffs Dea and Kelly bring this claim on their own behalf and on behalf of the California Class.

248.    CAL. BUS. & PROF CODE § 17200, *et seq.* (the "UCL") prohibits acts of "unfair competition," including any unlawful and unfair business acts or practices.

249.    Under the "unlawful" prong of the UCL, a violation of another law is treated as unfair competition and is independently actionable.

250.    Defendants committed unlawful practices because it violated CAL. BUS. & PROF. CODE § 17600, *et seq.*, California's Automatic Purchase Renewal Statute, which declares unlawful "the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Defendants' conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17602 because each of the following practices is an independent violation of the Automatic Purchase Renewal Statute:

   a.    Noom failed to present the terms of its automatic renewal or continuous service offer in a clear and conspicuous manner before fulfilling the subscription and in visual proximity to the request for consent to the offer, as required by Cal. Bus. & Prof. Code §§ 17602(a)(1);

   b.    Noom charged the Plaintiffs' and the Class's credit or debit cards, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous offer terms, as required by Cal. Bus. & Prof. Code §§ 17602(a)(2);

   c.    Noom failed to provide an acknowledgment that includes the automatic renewal offer terms or continuous offer terms, cancellation policy, and information regarding how to cancel, and to allow Plaintiffs and the Class to cancel, the automatic renewal or continuous service before they paid for it, as required by Cal. Bus. & Prof. Code §§ 17602(a)(3);

   d.    Noom failed to provide a toll-free telephone number, electronic mail address, a postal address or another cost-effective, timely, and easy-to-use mechanism for cancellation described in Cal. Bus. & Prof. Code §§ 17602(a)(3), as required by Cal. Bus. & Prof. Code §§ 17602(b);

   e.    Noom failed to allow Plaintiffs and the Class to terminate the automatic renewal or continuous service exclusively online, as required by Cal. Bus. & Prof. Code §§ 17602(c).

251.    Defendants also committed unlawful practices because it violated CAL. BUS. & PROF. CODE § 17941, California's Bot Disclosure Law, which declares unlawful "for any person

to use a bot to communicate or interact with another person in California online, with the intent to mislead the other person about its artificial identity for the purpose of knowingly deceiving the person about the content of the communication in order to incentivize a purchase or sale of goods or services in a commercial transaction."   Defendants' conduct as alleged in this Complaint violates CAL. BUS. & PROF. CODE § 17941 because Defendants used bots to communicate or interact with consumers in California online as part of Noom's platform with the intent to mislead consumers into believing that Noom's services included a personal human coach in order to incentivize the purchase of Noom's services.

252.    Under the "unfair" prong of the UCL, a business practice is unfair if that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

253.    Defendants committed unfair acts and practices by, *inter alia*:

a.  Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.  Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.  Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling the trial before the last day of the trial period;

d.  Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.  Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.  Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g. Misrepresenting and/or creating the net impression that enrolling in the trial program i) is "risk free;" ii) does not require a smart phone; and iii) costs only between $0.00 to $18.37; and that the trial program iv) will be easy to cancel; v) can be "cancelled any time;" and vi) will feature individualized coaching from a human weight loss expert.

254.    Plaintiffs Dea and Kelly and the California Class reserve the right to allege other violations of law which constitute unlawful, unfair, or fraudulent business acts or practices as Defendants' conduct is ongoing and continues to this date.

255.    Defendants' acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

256.    There were reasonably available alternatives to further Noom's legitimate business interests, other than the conduct described herein.

257.    Defendants' acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

258.    As a result of Defendants' unlawful and unfair business practices, Plaintiffs Dea and Kelly and the California Class have suffered an injury in fact and have lost money in an amount to be determined at the trial of this action.

259.    Pursuant to CAL. BUS. & PROF CODE §17203 Plaintiffs Dea and Kelly and the other members of the California Class are entitled to an order: (1) requiring Noom to make restitution to Plaintiffs and the Class; (2) enjoining Defendants from charging Plaintiffs' and Class members' credit cards, debit cards, and/or third party payment accounts until such time as Noom obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms; and (3) enjoining Noom from making

automatic renewal or continuous service offers in the State of California that do not comply with California Automatic Renewal Law.

## COUNT 5

### CALIFORNIA CONSUMERS LEGAL REMEDIES ACT–VIOLATION OF THE CALIFORNIA AUTOMATIC RENEWAL LAW

### (ON BEHALF OF THE CALIFORNIA CLASS AGAINST DEFENDANTS)

260. Plaintiffs Dea and Kelly incorporate by reference all preceding and subsequent paragraphs.

261. Plaintiffs Dea and Kelly bring this claim on their own behalf and on behalf of the California Class.

262. The California Consumers Legal Remedies Act (the "CLRA"), CAL. CIV. CODE § 1770(a)(14) , prohibits "[r]epresenting that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law."

263. Defendants violated, and continue to violate the CLRA by representing that Noom has rights and remedies that it does not have, specifically that it has the right to charge Plaintiffs and the California Class' payment methods without first making the statutorily required disclosures under California's Automatic Purchase Renewal Statute and obtaining their affirmative consent to the agreement containing the automatic renewal terms and continuous offer terms, and through other conduct described above, in violation of California's Automatic Purchase Renewal Statute. Noom does not have the legal right to charge for these subscriptions because at all relevant times, it was not in compliance with California's Automatic Purchase Renewal Statute.

264. Plaintiffs Dea and Kelly and the California Class members are "consumers" within the meaning of CAL. CIV. CODE § 1761(d) in that Plaintiffs Dea and Kelly and the California Class members sought or acquired Defendants' services for personal, family, or household purposes.

265.    Defendants' weight-loss and behavioral coaching program constitutes "services" within the meaning of CAL. CIV. CODE § 1761(a) and (b).

266.    Plaintiffs Dea and Kelly have standing to pursue these claims because they have suffered injury in fact and a loss of money and/or property as a result of the wrongful conduct alleged herein.  Plaintiffs would not have enrolled in Noom's trial plans or been enrolled into Noom's monthly subscriptions had they known the truth.

267.    The purchases by Plaintiffs Dea and Kelly and the California Class Members are "transactions" within the meaning of CAL. CIV. CODE § 1761(e)

268.    As a direct and proximate result of result of Defendants' violations of the CLRA, Plaintiffs Dea and Kelly and the California Class were wrongfully charged fees for Noom's monthly weight-loss plans.

269.    Defendants' conduct alleged herein was undertaken by Defendants knowingly, willfully, and with oppression, fraud, and/or malice, within the meaning of CAL. CIV. CODE § 3294(c).

270.    On May 22, 2020, Plaintiffs through counsel, sent a notice and demand letter by registered mail to Noom, pursuant to CAL. CIV. CODE § 1782.  A copy of Plaintiff's CLRA letter was filed as Exhibit A to Plaintiffs' First Amended Complaint, ECF No. 23-1.  Noom failed to comply with the letter within thirty (30) days.

271.    Accordingly, Plaintiffs Dea and Kelly and the California Class Members seek an injunction requiring Defendants to cease its unlawful practices, as well as compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices, as well as any other remedies the Court may deem appropriate.

## COUNT 6

**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT–DECEPTIVE PRACTICES**

**(ON BEHALF OF THE CALIFORNIA CLASS AGAINST DEFENDANTS)**

272.    Plaintiffs Dea and Kelly incorporate by reference all preceding and subsequent paragraphs.

273.    Plaintiffs Dea and Kelly bring this claim on their own behalf and on behalf of the California Class.

274.    The CLRA, CAL. CIV. CODE § 1750, *et seq*., prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

275.    Plaintiffs Dea and Kelly and the California Class members are "consumers" within the meaning of CAL. CIV. CODE § 1761(d) in that Plaintiffs Dea and Kelly and the California Class members sought or acquired Defendants' services for personal, family, or household purposes.

276.    Defendants' weight-loss and behavioral coaching program constitutes "services" within the meaning of CAL. CIV. CODE § 1761(a) and (b).

277.    Plaintiffs Dea and Kelly have standing to pursue these claims because they have suffered injury in fact and a loss of money and/or property as a result of the wrongful conduct alleged herein.  Plaintiffs would not have enrolled in Noom's trial plans or been enrolled into Noom's monthly subscriptions had they known the truth.

278.    The purchases by Plaintiffs Dea and Kelly and the California Class Members are "transactions" within the meaning of CAL. CIV. CODE § 1761(e)

279.    Defendants violated CAL. CIV. CODE § 1770, subdivisions (a)(5), (a)(9), (a)(14) and (a)(16) by, *inter alia*, representing that Noom's goods and services have certain characteristics that they do not have; advertising goods and services with the intent not to sell them as advertised;

representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; and representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

280.    As a direct and proximate result of result of Defendants' violations of the CLRA, Plaintiffs Dea and Kelly and the California Class were wrongfully charged fees for Noom's monthly weight-loss plans.

281.    Defendants' conduct alleged herein was undertaken by Defendants knowingly, willfully, and with oppression, fraud, and/or malice, within the meaning of CAL. CIV. CODE § 3294(c).

282.    On May 22, 2020, Plaintiffs through counsel, sent a notice and demand letter by registered mail to Noom, pursuant to CAL. CIV. CODE § 1782.  A copy of Plaintiff's CLRA letter was filed as Exhibit A to Plaintiffs' First Amended Complaint, ECF No. 23-1.  Noom failed to comply with the letter within thirty (30) days.

283.    Accordingly, Plaintiffs Dea and Kelly and the California Class Members seek an injunction requiring Defendants to cease its unlawful practices, as well as compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices, as well as any other remedies the Court may deem appropriate.

## COUNT 7

### CALIFORNIA'S WEIGHT LOSS CONTRACTS LAW

### (ON BEHALF OF THE CALIFORNIA CLASS AGAINST DEFENDANTS)

284.    Plaintiffs Dea and Kelly incorporate by reference all preceding and subsequent paragraphs.

285.    Plaintiffs Dea and Kelly bring this claim on their own behalf and on behalf of the California Class.

286.    Plaintiffs' subscription with Noom is a "weight loss contract" as used in CAL. CIV. CODE § 1694.5 because it is a membership to a weight loss program, formed for the purposes of providing instruction, counseling, supervision, or assistance in weight reduction, body shaping, diet, and/or eating habits.

287.    Defendants violated CAL. CIV. CODE § 1694.7(b) because the subscriptions entered into by Plaintiffs and the California Class did not contain, on their face and in close proximity to the space reserved for the signature of the buyer (i.e., in close proximity to the "Save Profile" button on the payment page), a conspicuous statement in a size equal to at least 10-point boldface type, as follows: "You, the buyer, may cancel this agreement, without any penalty or obligation, at any time prior to midnight of the original contract seller's third business day following the date of this contract, excluding Sundays and holidays.  To cancel this agreement, mail or deliver a signed and dated notice, or send a telegram which states that you, the buyer, are canceling this agreement," or words of similar effect.  This notice shall be sent to:

> _____ (Name of the business that sold you the contract) _____
>
> _____ (Address of the business that sold you the contract) _____ ."

288.    Plaintiffs Dea and Kelly were also not made aware, at the point of purchase or any time during their Noom subscriptions thereafter, of their right to cancel their Noom subscriptions "without any penalty or obligation, at any time prior to midnight of the original contract seller's third business day following the date of [] contract [formation]" or of how to go about invoking that right.

289.    Defendants also violated CAL. CIV. CODE § 1694.7(c) because the subscription entered into by Plaintiffs and the California Class did not contain, "on the first page, in a type size

no smaller than that generally used in the body of the document, the name and address of the weight loss program operator to which the notice of cancellation is to be mailed; and the date the buyer signed the contract."

290.    Defendants also violated CAL. CIV. CODE § 1694.7(d) because by enrolling Plaintiffs Dea and Kelly into perpetually autorenewing subscriptions they violated the requirement that "[t]he services to be rendered to the buyer under the contract shall not extend for more than three years after the date the contract is entered into."

291.    As a direct result of Defendants' unlawful conduct described above, Plaintiffs Dea and Kelly suffered economic injury.  Had Noom's payment page complied with California's Weight Loss Contracts Law, Plaintiffs would have been able to avoid financial injury.  However, Defendants did not comply with California's Weight Loss Contracts Law, thereby harming Plaintiffs Dea and Kelly.

292.    Defendants' violation of CAL. CIV. CODE §§ 1694.7(b)–(d) renders the subscriptions entered into by Plaintiffs and the California Class void and unenforceable such that they may be cancelled at any time.  CAL. CIV. CODE § 1694.7(e); CAL. CIV. CODE. § 1694.9(a); CAL. CIV. CODE § 1694.9(d).

293.    Further, Defendants' unlawful conduct was willful and/or fraudulent in that they knew or should have known that their sign up flow features misleading statements and outright omissions of material information mandated by both CAL. CIV. CODE § 1694.7(b) and California's Automatic Purchase Renewal Statute, CAL. BUS & PROF. CODE §§ 17601, *et seq.*, that such misrepresentations and/or omissions would and in fact did induce subscribers, including Plaintiffs Dea and Kelly and the California Class, to enter into weight loss subscriptions with Noom.  As such, Defendants' willful and/or fraudulent conduct provides an independent basis for finding that

Defendant's subscriptions with Plaintiffs and the California Class are void and unenforceable such that they may be cancelled at any time.  CAL. CIV. CODE § 1694.9(b).

294.    As a result, Plaintiffs and the California Class seek recovery of actual damages including all membership or installment fees paid by Plaintiffs and the California Class under their void and unenforceable subscriptions with Noom, the trebling thereof, and reasonable attorneys' fees. CAL. CIV. CODE § 1694.9(c).

## COUNT 8

### WASHINGTON CONSUMER PROTECTION ACT

### (ON BEHALF OF THE WASHINGTON CLASS AGAINST DEFENDANTS)

295.    Plaintiff Susan Brewster incorporates by reference all preceding and subsequent paragraphs.

296.    Plaintiff Brewster brings this claim on her own behalf and on behalf of each Class member who is a Washington resident (the "Washington Class").

297.    The Washington Consumer Protection Act (the "Washington CPA"), WASH. REV. CODE ANN. § 19.86, *et seq.*, broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  WASH. REV. CODE ANN. § 19.86.020.

298.    The Washington CPA's stated purpose is "to protect the public and foster fair and honest competition" by preventing, among other things, "unfair, deceptive, and fraudulent acts or practices."  WASH. REV. CODE ANN. § 19.86.920.

299.    Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE ANN. § 19.96.010.

300.    Defendants violated the Washington CPA by, *inter alia*:

a.    Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.      Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.      Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

d.      Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.      Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.      Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.      Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any time;" and (vi) will feature individualized coaching from a human weight loss expert.

301.    As a direct and proximate result of Defendants' unlawful and deceptive marketing and billing practices, Plaintiff Brewster and the Washington Class have suffered injury and monetary damages.

302.    Defendants are liable to Plaintiff Brewster and the Washington Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate pursuant to WASH. REV. CODE ANN. § 19.86.090.

303.    Plaintiff Brewster and the Washington Class also seek equitable relief against Defendants and have complied with WASH. REV. CODE ANN. § 19.86.095.  Plaintiffs served the Washington Attorney General with a copy of the First Amended Complaint, which was the initial pleading alleging a violation of the Washington CPA.

## COUNT 9

## DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT
## (ON BEHALF OF THE WASHINGTON, D.C. CLASS AGAINST DEFENDANTS)

304.    Plaintiff Mojo Nichols incorporates by reference all preceding and subsequent paragraphs .

305.    Plaintiff Nichols brings this claim on his own behalf and on behalf of each Class member who is a resident of the District of Columbia (the "District of Columbia Class") under the District of Columbia Consumer Protection Procedures Act (the "DC CPPA"), D.C. CODE § 28-3901, *et seq.*

306.    The purpose of the DC CPPA is to "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices," to "promote, through effective enforcement, fair business practices throughout the community," and to "educate consumers to demand high standards and seek proper redress of grievances."  D.C. CODE §§ 28-3901(b)(1)-(3).  The DC CPPA's provisions are to be "construed and applied liberally to promote its purpose."  D.C. CODE § 28-3901(c).

307.    The DC CPPA prohibits "unfair or deceptive trade practice[s]," including: "(a) represent[ing] that goods or services have . . . characteristics, . . . uses, benefits or quantities that they do not have;" "(d) represent[ing] that goods or services are of a particular standard, quality or grade . . . if they are of another;" "(e) misrepresent[ing] as to a material fact which has a tendency to mislead;" "(f) fail[ing] to state a material fact if such failure tends to mislead;" "(f-1) us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead;" "(h) advertis[ing] or offer[ing] goods or services . . . without the intent to sell them as advertised;" "(i) advertis[ing] or offer[ing] goods or services without supplying reasonably expected public demand, unless the advertisement or offer discloses a limitation of quantity or other qualifying condition which has

no tendency to mislead;" and "(q) fail[ing] to supply to a consumer a copy of a sales or service contract . . . [.]"  D.C. CODE § 28-3904.  These are considered violations "whether or not any consumer is in fact misled, deceived, or damaged thereby."  D.C. CODE § 28-3904.

308.    The services offered by Noom to Plaintiff Nichols and the Washington, D.C. Class were and are for personal, household, or family purposes within the meaning of D.C. CODE § 28-3905(k)(1)(B).

309.    Defendants violated the DC CPPA by, *inter alia*:

a.      Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.      Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.      Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

d.      Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.      Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.      Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.      Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any time;" and (vi) will feature individualized coaching from a human weight loss expert.

310.    As a direct and proximate result of Defendants' unlawful and deceptive marketing and billing practices, Plaintiff Nichols and the District of Columbia Class have suffered injury and monetary damages.

311.    Plaintiff Nichols and the District of Columbia Class are entitled to monetary damages for treble their actual damages or $1,500 per violation, whichever is greater, as well as attorneys' fees.  D.C. CODE § 28-3905(k)(2)(A)-(B).  Plaintiff Nichols and the District of Columbia Class are also entitled to an award of punitive damages under D.C. CODE § 28-3905(k)(2)(C) and any other relief which the Court determines proper under D.C. CODE § 28-3905(k)(2)(F).  Plaintiff Nichols and the District of Columbia Class are also entitled to equitable relief against Noom pursuant to D.C. CODE § 28-3905(k)(2)(D).

## COUNT 10

### OHIO CONSUMER SALES PRACTICES ACT

### (ON BEHALF OF THE OHIO CLASS AGAINST DEFENDANTS)

312.     Plaintiff Rebecca Richards incorporates by reference all preceding and subsequent paragraphs.

313.    Plaintiff Richards brings this claim on her own behalf and on behalf of each Class member who is an Ohio resident (the "Ohio Class").

314.    The Ohio Consumer Sales Practices Act (the "Ohio CSPA"), OHIO REV. CODE § 1345.01, *et seq.*, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.

315.    Defendants are a "[s]upplier[s]" as that term is defined in OHIO REV. CODE § 1345.01(C).

316.    The Ohio Class members are "[c]onsumer[s]" as defined in OHIO REV. CODE § 1345.01(D), and the transactions with Defendants being complained of herein are "[c]onsumer transaction[s]" within the meaning of OHIO REV. CODE § 1345.01(A).

317.    The Ohio CSPA declares: "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction.  Such an unfair or deceptive act or practice by

a supplier violates this section whether it occurs before, during, or after the transaction."  OHIO REV. CODE § 1345.02(A).

318.    The Ohio CSPA also prohibits suppliers from, *inter alia*, representing "(1) That the subject of a consumer transaction has . . . performance characteristics, . . . uses, or benefits that it does not have;" "(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;" "(4) That the subject of a consumer transaction is available to the consumer for a reason that does not exist;" "(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not . . . ." OHIO REV. CODE § 1345.02(B).

319.    The Ohio CSPA also prohibits suppliers from "commit[ting] an unconscionable act or practice in connection with a consumer transaction . . . whether it occurs before, during, or after the transaction."  OHIO REV. CODE § 1345.03(A).  Included among circumstances used to determine whether an act or practice is unconscionable is "[w]hether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier," [w]hether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction," and "[w]hether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment,"

320.    Defendants violated the Ohio CSPA by, *inter alia*:

a.    Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances and which Defendants knew was misleading consumers;

b.    Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.    Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

d.    Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.    Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.    Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.    Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any time;" and (vi) will feature individualized coaching from a human weight loss expert.

321.    As a direct and proximate result of Defendants' unlawful and deceptive marketing and billing practices, Plaintiff Richards and the Ohio Class have suffered injury and monetary damages.

322.    Due to Defendants' wrongful conduct, Plaintiff Richards and the Ohio Class have been damaged in an amount to be proven at trial.  They seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendants' deceptive, unfair, and unconscionable conduct, treble damages, and reasonable attorneys' fees, pursuant to OHIO REV. CODE § 1345.09.

## COUNT 11

### ALABAMA DECEPTIVE TRADE PRACTICES ACT

### (ON BEHALF OF THE ALABAMA CLASS AGAINST DEFENDANTS)

323.    Plaintiff Jennifer Sellers incorporates by reference all preceding and subsequent paragraphs.

324.     Plaintiff Sellers brings this claim on her own behalf and on behalf of each Class member who is an Alabama resident (the "Alabama Class").

325.     By engineering and implementing fraudulent billing and advertising practices, Defendants engaged in, and continues to engage in, deceptive acts and practices in violation of the Alabama Deceptive Trade Practices Act (the "Alabama DTPA"), ALA. CODE § 8-19-1, *et seq.*

326.     The Alabama DTPA provides that "public health, welfare and interest require a strong and effective consumer protection program to protect the interest of both the consuming public and the legitimate businessperson." ALA. CODE § 8-19-2.

327.     Defendants were and are engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

328.     The Alabama DTPA declares "various deceptive acts or practices in the conduct of any trade or commerce . . . to be unlawful," including: "(5) Representing that goods or services have . . . characteristics, . . . uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," "(9) Advertising goods or services with intent not to sell them as advertised," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5.

329.     Defendants violated the Alabama DTPA by, *inter alia*:

a.     Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

b.     Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

c.     Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

d.   Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e.   Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f.   Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g.   Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any time;" and (vi) will feature individualized coaching from a human weight loss expert.

330.   The aforementioned acts by Defendants are unconscionable, false, misleading, and/or deceptive.

331.   As a direct and proximate result of Defendants' unlawful and deceptive marketing and billing practices, Plaintiff Sellers and the Alabama Class have suffered injury and monetary damages.

332.   Pursuant to ALA. CODE § 8-19-10, the Alabama Class seeks monetary relief against Defendants measured as (a) actual damages or the amount of $100 for each Alabama Class Member, whichever is greater and (b) statutory damages in an amount to be determined at trial.

333.   Plaintiff Sellers and the Alabama Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Alabama DTPA.

## COUNT 12

### TEXAS DECEPTIVE TRADE PRACTICES — CONSUMER PROTECTION ACT
### (ON BEHALF OF THE TEXAS CLASS AGAINST DEFENDANTS)

334.    Plaintiff Stacy Spencer incorporate by reference all preceding and subsequent paragraphs.

335.    Plaintiff Spencer brings this claim on her own behalf and on behalf of each Class member who is a resident of Texas (the "Texas Class") under the Texas Deceptive Trade Practices – Consumer Protection Act (the "Texas DTPA"), TEX. BUS. & COM. CODE § 17.41, *et seq*.

336.    The members of the Texas Class are individuals with assets of less than $25 million. TEX. BUS. & COM. CODE § 17.45.

337.    The Texas DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," TEX. BUS. & COM. CODE § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE §§ 17.45(5), 17.50(a)(3).

338.    Defendants violated the Texas DTPA by, *inter alia*:

    a.    Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;

    b.    Using a billing mechanism that automatically charges customers without their awareness or consent and failing to provide adequate disclosures regarding the charges that will be imposed;

    c.    Omitting material information in order to induce customers into signing up for the trial period and prevent customers from cancelling their trial before the last day of the trial period;

    d.    Failing to provide customers with an "agreement" or "terms of service" adequately disclosing all material terms and cancellation instructions before locking them into a subscription plan;

e. Making false promises to customers concerning the degree of "personalization" they will receive as Noom customers during the trial period and thereafter, and leading them to believe that they will be assigned a human coach at the start of their trial period;

f. Curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period; and

g. Misrepresenting and/or creating the net impression that enrolling in the trial program (i) is "risk free;" (ii) does not require a smartphone; (iii) costs only between $0.00 and $18.37; (iv) will be easy to cancel; (v) can be "cancelled any time;" and (vi) will feature individualized coaching from a human weight loss expert.

339.   Defendants knew or should have known that their conduct violated the Texas DTPA.

340.   As a direct and proximate result of Defendants' unlawful and deceptive marketing and billing practices, Plaintiff Spencer and the Texas Class have suffered injury and monetary damages.

341.   Pursuant to TEX. BUS. & COM. CODE § 17.50(a)(1) and (b), the Texas Class seeks monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

342.   For those Texas Class members who wish to rescind their purchases, they are entitled under TEX. BUS. & COM. CODE § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

343.   Plaintiff Spencer and the Texas Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

344.   On November 5, 2020, Plaintiff Spencer sent Defendants a letter complying with TEX. BUS. & COM. CODE § 17.505(a).  Plaintiff Spencer presently does not claim relief for damages

under the Texas DTPA until and unless Defendants fail to remedy their unlawful conduct towards the Texas Class within the requisite time period, after which Plaintiff Spencer seeks all damages and relief to which she and the Texas Class are entitled.

345.     Upon filing this Complaint and as required by Tex. Bus. & Com. Code § 17.501, Plaintiffs will provide the consumer protection division of the Attorney General's office a copy of this Second Amended Complaint.

## COUNT 13

## ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
## (ON BEHALF OF THE ALASKA CLASS AGAINST DEFENDANTS)

346.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

347.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Alaska Class.

348.     The Alaska Unfair Trade Practices and Consumer Protection Act, among other things, makes it unlawful to (1) represent that goods or services "have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have" or "are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," or (2) "us[e] or employ[] deception, fraud, false pretense, false promise, misrepresentation, or knowingly conceal[], suppress[], or omit[] a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged." Alaska Stat. § 45.50.471.

349.     Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices, deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression, or omission of a material fact with intent that others rely upon that

concealment, suppression, or omission, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Alaska Class Members, in violation of Alaska Stat. §§ 45.50.471, *et seq.*, including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing to engage in fair and upright business practices.

350.   The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in connection with the sale or advertisement of "goods," as defined Alaska Stat. §§ 45.50.561(a)(9).

351.   The above unlawful acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

352.   Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Alaska Class Members.

353.   Defendants' actions were material to Plaintiffs and the Alaska Class Members, who relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

354.   As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and the Alaska Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

355.   Plaintiffs and the Alaska Class Members seek relief under Alaska Stat. § 45.50.531 and 45.50.537(a), including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, and attorneys' fees and costs.

### COUNT 14

### ARIZONA CONSUMER FRAUD ACT

### (ON BEHALF OF THE ARIZONA CLASS AGAINST DEFENDANTS)

356.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

357.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Arizona Class.

358.    The Arizona Consumer Fraud Act prohibits "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged." A.R.S. § 44-1522.

359.    Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Arizona Consumer Fraud Act.

360.    Defendants participated in unfair or deceptive trade practices that violated the Arizona Consumer Fraud Act as described below and alleged throughout this Complaint.  By concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with Noom's trial period. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to Noom's trial period in the course of their business.

361.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with Noom's trial period.

362.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

363.    Defendants knew or should have known that their conduct violated the Arizona Consumer Fraud Act.

364.    Had Plaintiffs and the Arizona Class Members known the truth about Noom's trial period, they would not have tried Noom. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

365.    Defendants owed Plaintiffs and the Arizona Class Members a duty to disclose the truth about "trying" Noom because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of Noom's trial period; (b) intentionally concealed the foregoing from Plaintiffs and the Arizona Class Members; and/or (c) made incomplete representations regarding the trial period, while purposefully withholding material facts from Plaintiffs and the Arizona Class Members that contradicted these representations.

366.    Plaintiffs and the Arizona Class Members suffered monetary damages as a result of Defendants' conduct.

367.    Defendants' violations present a continuing risk to Plaintiffs and the Arizona Class Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

368.    Defendants are liable to Plaintiffs and the Arizona Class Members for their damages, punitive damages, and attorneys' fees and costs.

## COUNT 15

**ARKANSAS DECEPTIVE TRADE PRACTICES ACT**

**(ON BEHALF OF THE ARKANSAS CLASS AGAINST DEFENDANTS)**

369.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

370.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Arkansas Class

371.    The Arkansas Deceptive Trade Practices Act prohibits deceptive and unconscionable trade practices, including, among other things, "[k]nowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model" or "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107.

372.    The Arkansas Deceptive Trade Practices Act makes it unlawful to engage in "any deception, fraud, or false pretense" or "[t]he concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission . . . ." Ark. Code Ann. § 4-88-108.

373.    Defendants engaged in unlawful deceptive and unconscionable trade practices, deception, fraud, or false pretense, and the concealment, suppression, or omission of material facts with intent the that others rely upon that concealment, suppression, or omission, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Arkansas Class Members, in violation of Ark. Code Ann. §§ 4-88-101, *et seq.*, including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing to engage in fair and upright business practices.

374.    The above unlawful acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

375.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Arkansas Class Members.

376.    Defendants' actions were material to Plaintiffs and the Arkansas Class Members, who relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

377.    As a direct and proximate result of Defendants' unlawful deceptive and unconscionable acts or practices, Plaintiffs and the Arkansas Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

378.    Plaintiffs and the Arkansas Class Members seek relief under Ark. Code Ann. § 4-88-113(f)(1)(A), including, but not limited to, injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT 16

### COLORADO CONSUMER PROTECTION ACT

### (ON BEHALF OF THE COLORADO CLASS AGAINST DEFENDANTS)

379.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

380.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Colorado Class.

381.    The Colorado Consumer Protection Act prohibits unfair or deceptive acts or practices, including, "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6-1-105(u). Defendants engaged in deceptive acts or practices that violated the Colorado Consumer Protection Act.

382.    Defendants participated in unfair or deceptive trade practices that violated the Colorado Consumer Protection Act as described below and alleged throughout this Complaint. By concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with Noom's trial period. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to Noom's trial period in the course of their business.

383.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with Noom's trial period.

384.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

385.    Defendants knew or should have known that their conduct violated the Colorado Consumer Protection Act.

386.    Had Plaintiffs and the Colorado Class Members known the truth about Noom's trial period, they would not have tried Noom. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

387.    Defendants owed Plaintiffs and the Colorado Class Members a duty to disclose the truth about "trying" Noom because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of Noom's trial period; (b) intentionally concealed the foregoing from Plaintiffs and the Colorado Class Members; and/or (c) made incomplete representations regarding the trial period, while purposefully withholding material facts from Plaintiffs and the Colorado Class Members that contradicted these representations.

388.    Plaintiffs and the Colorado Class Members suffered monetary damages as a result of Defendants' conduct.

389.    Defendants' violations present a continuing risk to Plaintiffs and the Colorado Class Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

390.    Defendants are liable to Plaintiffs and the Colorado Class Members for actual damages sustained.

## COUNT 17

### CONNECTICUT UNFAIR TRADE PRACTICES ACT

### (ON BEHALF OF THE CONNECTICUT CLASS AGAINST DEFENDANTS)

391.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

392.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Connecticut Class.

393.    The Connecticut Unfair Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110(b)(a).

394.    Defendants participated in unfair or deceptive trade practices that violated the Connecticut Unfair Trade Practices Act as described below and alleged throughout this Complaint. By concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with Noom's trial period. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to Noom's trial period in the course of their business.

395.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with Noom's trial period.

396.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

397.    Defendants knew or should have known that its conduct violated the Connecticut Unfair Trade Practices Act.

398.    Had Plaintiffs and the Connecticut Class Members known the truth about Noom's trial period, they would not have tried Noom. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

399.    Defendants owed Plaintiffs and the Connecticut Class Members a duty to disclose the truth about "trying" Noom because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of Noom's trial period; (b) intentionally concealed the foregoing from Plaintiffs and the Connecticut Class Members; and/or (c) made incomplete representations regarding the trial period, while purposefully withholding material facts from Plaintiffs and the Connecticut Class Members that contradicted these representations.

400.    Plaintiffs and the Connecticut Class Members suffered monetary damages as a result of Defendants' conduct.

401.    Defendants' violations present a continuing risk to Plaintiffs and the Connecticut Class Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

402.    Defendants are liable to Plaintiffs and the Connecticut Class Members for actual damages, punitive damages, equitable relief, and attorneys' fees and costs.  Conn. Gen. Stat. § 42-110g(a), (d).

403.    A copy of this complaint is being mailed to the Connecticut Attorney General and the Connecticut Commissioner of Consumer Protection.  Conn. Gen. Stat. § 42-110g(d).

## COUNT 18

### DELAWARE CONSUMER FRAUD ACT

### (ON BEHALF OF THE DELAWARE CLASS AGAINST DEFENDANTS)

404.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

405.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Delaware Class.

406.     The Delaware Consumer Fraud Act prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise."  Del. Code Ann. § 2513.

407.     Defendants participated in unfair or deceptive trade practices that violated the Delaware Consumer Fraud Act as described below and alleged throughout this Complaint.  By concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with Noom's trial period. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to Noom's trial period in the course of their business.

408.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with Noom's trial period.

409.     Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

410.     Defendants knew or should have known that its conduct violated the Delaware Consumer Fraud Act.

411.     Had Plaintiffs and the Delaware Class Members known the truth about Noom's trial period, they would not have tried Noom. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

412.     Defendants owed Plaintiffs and the Delaware Class Members a duty to disclose the truth about "trying" Noom because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of Noom's trial period; (b) intentionally concealed the foregoing from Plaintiffs and the Delaware Class Members; and/or (c) made incomplete representations regarding the trial period, while purposefully withholding material facts from Plaintiffs and the Delaware Class Members that contradicted these representations.

413.     Plaintiffs and the Delaware Class Members suffered monetary damages as a result of Defendants' conduct.

414.     Defendants' violations present a continuing risk to Plaintiffs and the Delaware Class Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

415.     Defendants are liable to Plaintiffs and the Delaware Class Members for all damages sustained.  Del. Code Ann. § 2525.

## COUNT 19

### FLORIDA DECEPTIVE TRADE PRACTICES ACT

### (ON BEHALF OF THE FLORIDA CLASS AGAINST DEFENDANTS)

416.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

417.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Florida Class.

418. Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq*. ("FDUTPA").

419. At all relevant times, Plaintiffs and the Florida Class Members were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

420. Defendants' conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

421. Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the Florida Class Members, acting reasonably under the circumstances, to their detriment. By failing disclose the true risks of "trying" Noom and failing to engage in fair and upright business practices, Defendants violated FDUTPA.

422. Defendants failed to reveal facts that were material to Plaintiffs and the Florida Class Members' decisions to try Noom, and Defendants intended that Plaintiffs and the Florida Class Members would rely upon the omissions.

423. Defendants' actions impact the public interest because Plaintiffs and the Florida Class Members were injured in exactly the same way as hundreds or thousands of others trying Noom as a result of and pursuant to Defendants' generalized course of deception.

424. Had Plaintiffs and the Florida Class Members known the truth about Noom's trial period, they would not have tried Noom.

425. The foregoing acts, omissions and practices proximately caused Plaintiffs and the Florida Class Members to suffer actual damages for which they are entitled to recover such damages, together with attorneys' fees and costs of suit.

## COUNT 20

## GEORGIA FAIR BUSINESS PRACTICES ACT

## (ON BEHALF OF THE GEORGIA CLASS AGAINST DEFENDANTS)

426.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

427.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Georgia Class.

428.    The Georgia Fair Business Practices Act prohibits "unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices." Ga. Code § 10-1-393(a).

429.    Defendants participated in unfair or deceptive trade practices that violated the Georgia Fair Business Practices Act as described below and alleged throughout this Complaint. By concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with Noom's trial period. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to Noom's trial period in the course of their business.

430.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with Noom's trial period.

431.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

432.    Defendants knew or should have known that its conduct violated the Georgia Fair Business Practices Act.

433.    Had Plaintiffs and the Georgia Class Members known the truth about Noom's trial period, they would not have tried Noom. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

434.    Defendants owed Plaintiffs and the Georgia Class Members a duty to disclose the truth about "trying" Noom because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of Noom's trial period; (b) intentionally concealed the foregoing from Plaintiffs and the Georgia Class Members; and/or (c) made incomplete representations regarding the trial period, while purposefully withholding material facts from Plaintiffs and the Georgia Class Members that contradicted these representations.

435.    Plaintiffs and the Georgia Class Members suffered monetary damages and ascertainable losses as a result of Defendants' conduct.

436.    Defendants' violations present a continuing risk to Plaintiffs and the Georgia Class Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

437.    Defendants are liable to Plaintiffs and the Georgia Class Members for actual damages, exemplary damages, equitable relief, and attorneys' fees and costs. Ga. Code. § 10-1-399.

438.    Defendants do not maintain a place of business or keep assets in the state of Georgia thus obviating the need for any pre-suit notice.

## COUNT 21

## HAWAII UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
## (ON BEHALF OF THE HAWAII CLASS AGAINST DEFENDANTS)

439.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

440.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Hawaii Class.

441.    The Hawaii Unfair and Deceptive Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Haw. Rev. Stat. § 480-2(a).

442.    Defendants participated in unfair or deceptive trade practices that violated the Hawaii Unfair and Deceptive Trade Practices Act as described below and alleged throughout this Complaint. By concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with Noom's trial period. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to Noom's trial period in the course of their business.

443.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with Noom's trial period.

444.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

445.    Defendants knew or should have known that their conduct violated the Hawaii Unfair and Deceptive Trade Practices Act

446.    Had Plaintiffs and the Hawaii Class Members known the truth about Noom's trial period, they would not have tried Noom. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

447.    Defendants owed Plaintiffs and the Hawaii Class Members a duty to disclose the truth about "trying" Noom because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of Noom's trial period; (b) intentionally concealed the foregoing from Plaintiffs and the Hawaii Class Members; and/or (c) made incomplete representations regarding the trial period, while purposefully withholding material facts from Plaintiffs and the Hawaii Class Members that contradicted these representations.

448.    Plaintiffs and the Hawaii Class Members suffered monetary damages as a result of Defendants' conduct.

449.    Defendants' violations present a continuing risk to Plaintiffs and the Hawaii Class Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

450.    Defendants are liable to Plaintiffs and the Hawaii Class Members for actual damages, treble damages, equitable relief, attorneys' fees and costs.  Haw. Rev. Stat. § 480-13.

## COUNT 22

### IDAHO CONSUMER PROTECTION ACT

### (ON BEHALF OF THE IDAHO CLASS AGAINST DEFENDANTS)

451.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

452.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Idaho Class.

453.    The purpose of the Idaho Consumer Protection Act is to "protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce." Idaho Code Ann. § 48-601.

454.    The Idaho Consumer Protection Act prohibits methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, including, among other

things, "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have" or "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Idaho Code Ann. § 48-603.

455.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and Idaho Class Members, in violation of Idaho Code Ann. §§ 48-601, *et seq.*, including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing engage in fair and upright business practices.

456.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted as part of "trade" or "commerce" as defined by Idaho Code Ann. § 48-602(2).

457.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

458.    Defendants' actions were negligent, knowing and willful, and/or wanton, and reckless with respect to the rights of Plaintiffs and the Idaho Class Members.

459.    Plaintiffs and the Idaho Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

460.    As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and the Idaho Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

461.     Plaintiffs and the Idaho Class Members seek relief under Idaho Code Ann. § 48-608, including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, treble damages, civil penalties, and attorneys' fees and costs.

**COUNT 23**

**ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT**

**(ON BEHALF OF THE ILLINOIS CLASS AGAINST DEFENDANTS)**

462.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

463.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Illinois Class.

464.     Defendants engaged in unlawful, unfair, and deceptive acts and practices, with respect to the sale and advertisement of the products purchased by Plaintiffs and the Illinois Class Members, in violation of 815 ILCS § 505/2, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices. These injuries outweigh any benefits to consumers or to competition.

465.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

466.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Illinois Class Members.

467.     Plaintiffs and the Illinois Class members would not have tried Noom had they known the truth about Noom's trial period.

468.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Illinois Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

469.     Plaintiffs and the Illinois Class Members seek relief under 815 ILCS § 505/10a, including, but not limited to injunctive relief, damages, restitution, punitive damages and attorneys' fees and costs.

**COUNT 24**

**INDIANA DECEPTIVE TRADE PRACTICES LAWS**

**(ON BEHALF OF THE INDIANA CLASS AGAINST DEFENDANTS)**

470.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

471.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Indiana Class.

472.     Indiana's deceptive trade practices laws generally adhere to the Uniform Deceptive Trade Practices Act.  The purpose of these laws is to "protect consumers from suppliers who commit deceptive and unconscionable sales acts."  Ind. Code Ann. § 24-5-0.5.1 (b)(2).

473.     Defendants engaged in unfair, false, misleading, or deceptive acts or practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Indiana Class Members, in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

474.     Defendants' actions described above demonstrate their knowledge of their deceptive acts and its intent to defraud Plaintiffs and the Indiana Class Members.

475.     The above unfair, false, misleading, or deceptive acts or practices by Defendants were conducted as part of a "consumer transaction" as defined by Ind. Code Ann. § 24-5-0.5.2(a)(1).

476.     The above unfair, false, misleading, or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

477.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Indiana Class Members.

478.     Plaintiffs and Indiana Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

479.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Indiana Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

480.     Plaintiffs and the Indiana Class Members seek relief under Ind. Code Ann. § 24-5-0.5.1, *et seq*., including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, treble damages, civil penalties and attorneys' fees and costs.

## COUNT 25

### IOWA CONSUMER FRAUD ACT

### (ON BEHALF OF THE IOWA CLASS AGAINST DEFENDANTS)

481.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

482.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Iowa Class.

483.     The Iowa Consumer Fraud Act prohibits a "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes."  Iowa Code § 714H.3.

484.    Defendants participated in unfair or deceptive trade practices that violated the Iowa Consumer Fraud Act as described below and alleged throughout this Complaint.  By concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with Noom's trial period. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to Noom's trial period in the course of their business.

485.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with Noom's trial period.

486.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

487.    Defendants knew or should have known that their conduct violated the Iowa Consumer Fraud Act.

488.    Had Plaintiffs and the Iowa Class Members known the truth about Noom's trial period, they would not have tried Noom. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

489.    Defendants owed Plaintiffs and the Iowa Class Members a duty to disclose the truth about "trying" Noom because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of Noom's trial period; (b) intentionally concealed the foregoing from Plaintiffs and the Iowa Class Members; and/or (c) made incomplete representations regarding the trial period, while purposefully withholding material facts from Plaintiffs and the Iowa Class Members that contradicted these representations.

490.    Plaintiffs and the Iowa Class Members suffered monetary damages and ascertainable losses as a result of Defendants' conduct.

491.    Defendants' violations present a continuing risk to Plaintiffs and the Iowa Class Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

492.    Defendants are liable to Plaintiffs and the Iowa Class Members for actual damages, treble damages, equitable relief, and attorneys' fees and costs.  Iowa Code § 714H.5.

493.    A copy of this complaint is being sent to the Iowa Attorney General.  Iowa Code § 714H.6.

## COUNT 26

## KANSAS CONSUMER PROTECTION ACT

## (ON BEHALF OF THE KANSAS CLASS AGAINST DEFENDANTS)

494.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

495.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Kansas Class.

496.    A key policy purpose of the Kansas Consumer Protection Act, which is to be "construed liberally," is "to protect consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. Ann. § 50-623.

497.    The Kansas Consumer Protection Act prohibits suppliers from engaging in deceptive acts and practices "in connection with a consumer transaction," which include, among other things, (1) representations made knowingly or with reason to know that "[p]roperty or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have," (2) representations made knowingly or with reason to know that "property or services are of particular standard, quality, grade, style or model, if they are of another

which differs materially from the representation," (3) "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact," and (4) "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." Kan. Stat. Ann. § 50-626(b)(1-3).

498.    The services purchased by Plaintiffs and the Kansas Class Members are "property" as defined by Kan. Stat. Ann. § 50-624(j).

499.    Defendants are a "supplier" as defined by Kan. Stat. Ann. § 50-624(l).

500.    Defendants engaged in deceptive acts or practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Kansas Class Members, in violation of Kan. Stat. Ann. §§ 50-623, *et seq.*, including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing to engage in fair and upright business practices.

501.    The above deceptive acts or practices by Defendants were conducted in connection with "consumer transactions" as defined by Kan. Stat. Ann. § 50-624(c).

502.    The above unlawful deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

503.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Kansas Class Members.

504.    Plaintiffs and the Kansas Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

505.    As a direct and proximate result of Defendants' deceptive acts or practices, Plaintiffs and the Kansas Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

506.     Plaintiffs and the Kansas Class Members seek relief under by Kan. Stat. Ann. § 50-634, including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, civil penalties and attorneys' fees and costs.

## COUNT 27

### KENTUCKY CONSUMER PROTECTION ACT

### (ON BEHALF OF THE KENTUCKY CLASS AGAINST DEFENDANTS)

507.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

508.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Kentucky Class.

509.     The Kentucky Consumer Protection Act was passed after its legislature found that "the public health, welfare and interest require a strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services" and declared unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

510.     Defendants engaged in unfair, false, misleading, or deceptive acts or practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Kentucky Class Members, in violation of Ky. Rev. Stat. Ann. § 367.170, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

511.     The above unfair, false, misleading, or deceptive acts or practices by Defendants were conducted in "trade" or "commerce," as defined by Ky. Rev. Stat. Ann. § 367.110(2).

512.     The above unfair, false, misleading, or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

513.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Kentucky Class Members.

514.     Plaintiffs and the Kentucky Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

515.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Kentucky Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

516.     Plaintiffs and the Kentucky Class Members seek relief under Kentucky Ky. Rev. Stat. Ann. § 367.220, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

## COUNT 28

### LOUISIANA UNFAIR TRADE PRACTICES ACT

### (ON BEHALF OF THE LOUISIANA CLASS AGAINST DEFENDANTS)

517.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

518.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Louisiana Class.

519.     Noom had the duty to refrain from the use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce. This includes the duty to refrain from knowingly exploiting consumers in an effort to gain an unfair advantage over them.

520.     Noom's sale of services to Plaintiffs and the Louisiana Class Members was a "consumer transaction" within the scope of the Louisiana Unfair Trade Practices Act, La. Rev. Stat. Ann. §§ 51: 1401, *et seq*. The transactions involved commerce with a natural person, the subject of which transactions was primarily intended for personal, family or household use and

resulted in an ascertainable loss of money or property, as a result of the unfair or deceptive act or practice.

521.    Noom's omissions concealing the true risks of "trying" Noom, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase Noom's services.

522.    Noom intended for Plaintiffs and the Louisiana Class Members to rely on these omissions regarding Noom's services. Noom failed to give Plaintiffs and the Louisiana Class Members sufficient notice or warning regarding the true risks of "trying" Noom.

523.    Plaintiffs and the Louisiana Class Members were deceived by Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

524.    Noom's omissions have deceived Plaintiffs and the Louisiana Class Members, and those same business practices have deceived or are likely to deceive members of the consuming public.

525.    In addition to being deceptive, the business practices of Noom were unfair because Noom knowingly sold Plaintiffs and the Louisiana Class Member services while concealing the true risks of "trying" Noom. The injuries to Plaintiffs and the other Louisiana Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Louisiana Class Members or to competition under all of the circumstances. Moreover, in light of Noom's exclusive knowledge of the services it offers, the injury is not one that Plaintiffs or the Louisiana Class Members could have reasonably avoided.

526.    As a direct and proximate result of Noom's unfair and deceptive trade practices, Plaintiffs and the Louisiana Class Members have suffered ascertainable loss and actual damages. Plaintiffs and the Lousiana Class Members would not have purchased Noom's services had the

truth about these services been disclosed.  Plaintiffs and the Louisiana Class Members are entitled to recover actual damages, treble and/or punitive damages, attorneys' fees and costs, and all other relief allowed under La. Rev. Stat. Ann. §§ 51: 1401, *et seq.*

527.     Plaintiffs and the Louisiana Class Members are also entitled to and hereby seek an order directing Noom to pay Plaintiffs' reasonably attorneys' fees and costs of suit, as awarded by the Court.

528.     A copy of this complaint is being sent to the Louisiana Attorney General.

## COUNT 29

## MAINE UNFAIR TRADE PRACTICES ACT

## (ON BEHALF OF THE MAINE CLASS AGAINST DEFENDANTS)

529.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

530.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Maine Class.

531.     The Maine Unfair Trade Practices Act prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Me. Rev. Stat. Ann. Tit. 5, § 207.

532.     The Maine Unfair Trade Practices Act adopts the interpretations given by the Federal Trade Commission and the Federal Courts to Section 45(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) to determine what conduct constitutes unfair or deceptive acts and practices. Me. Rev. Stat. Ann. Tit. 5, § 207.

533.     To justify a finding of unfairness, Maine courts have held that an act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition. *State v. Weinschenk*, 868 A.2d 200, 206 (Me. 2005).

534.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices with respect to the sale and advertisement of the services purchased by Plaintiffs and the Maine Class Members, in violation of Me. Rev. Stat. Ann. Tit. 5, §§ 205A, *et seq.*, including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing engage in fair and upright business practices.

535.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted as part of "trade and commerce" as defined by Me. Rev. Stat. Ann. Tit. 5, § 206(3).

536.    The above unlawful acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

537.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Maine Class Members.

538.    Defendants' actions were material to Plaintiffs and the Maine Class Members, who relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

539.    As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and the Maine Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

540.    Plaintiffs and the Maine Class Members seek relief under Me. Rev. Stat. Ann. Tit. 5, § 213, including, but not limited to injunctive relief, restitution, compensatory damages, and attorneys' fees and costs.

541.    Plaintiffs and the Maine Class Members have put Defendants on notice at least 30 days prior to filing suit pursuant to Me. Rev. Stat. Ann. Tit. 5, § 213(1-A).

**COUNT 30**

**MARYLAND CONSUMER PROTECTION ACT**

**(ON BEHALF OF THE MARYLAND CLASS AGAINST DEFENDANTS)**

542.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

543.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Maryland Class.

544.     Under the Maryland Consumer Protection Act, "[a] person may not engage in any unfair, abusive, or deceptive trade practice" in the sale of any consumer services. Md. Code Ann., Com. Law § 13-303(1).

545.     Under the Maryland Consumer Protection Act, unfair, abusive, or deceptive trade practices include, among other things, representations that consumer services "have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have" or "are of a particular standard, quality, grade, style, or model which they are not"; "[f]ailure to state a material fact if the failure deceives or tends to deceive; or "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with…[t]he promotion or sale of any . . . consumer services." Md. Code Ann., Com. Law § 13-301.

546.     Defendants engaged in unfair, abusive, or deceptive trade practices with respect to the sale and advertisement of the services purchased by Plaintiffs and the Maryland Class Members, in violation of Md. Code Ann., Com. Law §§ 13-101, *et seq*., including by knowingly making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of the services, and failing engage in fair and upright business practices.

547.    The above unfair, abusive, or deceptive trade practices by Defendants were conducted in connection with the sale of "consumer services," as defined by Md. Code Ann., Com. Law § 13-101(d)(1).

548.    The above unfair, abusive, or deceptive trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

549.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Maryland Class Members.

550.    Plaintiffs and the Maryland Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

551.    As a direct and proximate result of Defendants' unfair, abusive, or deceptive trade practices, Plaintiffs and the Maryland Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

552.    Plaintiffs and the Maryland Class Members seek relief under Md. Code Ann., Com. Law § 13-408, including, but not limited to compensatory damages, and attorneys' fees and costs.

## COUNT 31

### MASSACHUSETTS CONSUMER PROTECTION ACT

### (ON BEHALF OF THE MASSACHUSETTS CLASS AGAINST DEFENDANTS)

553.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

554.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Massachusetts Class.

555.    Under the Massachusetts Consumer Protection Act, "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Mass. Gen. Laws Ann. ch. 93A, § 2.

556.     Defendants engaged in unfair, abusive, or deceptive trade practices with respect to the sale and advertisement of the services purchased by Plaintiffs and the Massachusetts Class Members, including by knowingly making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of the services, and failing to engage in fair and upright business practices.

557.     The above unfair, abusive, or deceptive trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

558.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Massachusetts Class Members.

559.     Plaintiffs and that Massachusetts Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

560.     As a direct and proximate result of Defendants' unfair, abusive, or deceptive trade practices, Plaintiffs and the Massachusetts Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

561.     Plaintiff and the Massachusetts Class Members seek relief under Mass. Gen. Laws Ann. ch. 93A, § 2, including, but not limited to injunctive relief, compensatory damages, statutory damages, and attorneys' fees and costs.

## COUNT 32

## MICHIGAN CONSUMER PROTECTION ACT

### (ON BEHALF OF THE MICHIGAN CLASS AGAINST DEFENDANTS)

562.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

563.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Michigan Class.

564.     The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.…" Mich. Comp. Laws § 445.903(1). Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have… characteristics… that they do not have.…;" "(e) Representing that goods or services are of a particular standard… if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

565.     Defendants engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Michigan Class Members, in violation of Mich. Comp. Laws § 445.903, including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing engage in fair and upright business practices.

566.     The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in "[t]rade or commerce," as defined by Mich. Comp. Laws § 445.902(1)(g).

567.     The above unfair and deceptive practices and acts by Defendants were material misrepresentations of a presently existing or past fact.

568.     The representations by Defendants regarding the quality of the services was false.

569.    Defendants knew the representations were false or made them recklessly as a positive assertion without knowledge of their truth.

570.    Defendants intended that persons rely on the above misrepresentation regarding the quality of the services.

571.    Plaintiffs and Michigan Class Members acted in reliance on Defendants' representations.

572.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

573.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Michigan Class Members.

574.    Plaintiffs and the Michigan Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

575.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Michigan Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

576.    Plaintiffs and the Michigan Class Members seek relief under Mich. Comp. Laws § 445.911, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

## COUNT 33

### MINNESOTA CONSUMER FRAUD ACT, UNLAWFUL TRADE PRACTICES ACT, AND UNIFORM DECEPTIVE TRADE PRACTICES ACT

### (ON BEHALF OF THE MINNESOTA CLASS AGAINST DEFENDANTS)

577.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

578.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Minnesota Class.

579.     The MPCFA makes unlawful "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1). The MPCFA further provides that "any person injured by a violation of [the MPCFA] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Minn. Stat. § 8.31(3a).

580.     Defendants engaged in unlawful, unfair, and deceptive acts and practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Minnesota Class Members, in violation of Minn. Stat. §§ 325F.69; 325D.13; and 325D.44, including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing to engage in fair and upright business practices.

581.     The above unfair and deceptive practices and acts by Defendants involved the "sale" of "merchandise," as defined by Minn. Stat. § 325F.68.

582.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

583.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Minnesota Class Members.

584.     Plaintiffs and the Minnesota Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

585.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Minnesota Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

586.    Plaintiffs and the Minnesota Class Members seek relief under Minn. Stat. § 8.31, subd. 3a; and § 325D.45, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

**COUNT 34**

**MISSISSIPPI CONSUMER PROTECTION ACT**

**(ON BEHALF OF THE MISSISSIPPI CLASS AGAINST DEFENDANTS)**

587.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

588.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Mississippi Class.

589.    The Mississippi Consumer Protection Act prohibits, among other things, misrepresentations "of the source, sponsorship, approval, or certification of goods or services"; "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have"; and "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Miss. Code Ann. § 75-24-5

590.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and Mississippi Class Members, in violation of Mississippi Consumer Protection Act, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

591.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

592.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Mississippi Class Members.

593.    Plaintiffs and the Mississippi Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

594.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Mississippi Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

595.    Plaintiffs and Mississippi Class Members seek relief under the Miss. Code. Ann. § 75-24-5, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

**COUNT 35**

**MISSOURI MERCHANDISING PRACTICES ACT**

**(ON BEHALF OF THE MISSOURI CLASS AGAINST DEFENDANTS)**

596.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

597.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Missouri Class.

598.    The Missouri Merchandising Practices Act ("MMPA") was created to protect Missouri consumers from deceptive and unfair business practices.

599.    The MMPA makes it unlawful to engage in any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1.

600.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Missouri Class Members, in violation of Mo. Rev. Stat. § 407.010, *et seq*., including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

601.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce," as defined by of Mo. Rev. Stat. § 407.010(7).

602.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

603.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Missouri Class Members.

604.    Plaintiffs and the Missouri Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

605.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Missouri Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

606.    Plaintiffs and Missouri Class Members seek relief under the MMPA, Mo. Rev. Stat. § 407.010, *et seq*., including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, civil penalties and attorneys' fees and costs.

## COUNT 36

**MONTANA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION ACT OF 1973**

**(ON BEHALF OF THE MONTANA CLASS AGAINST DEFENDANTS)**

607.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

608.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Montana Class.

609.    The Montana Unfair Trade Practices and Consumer Protection Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

610.    Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Montana Class Members in violation of Mont. Code Ann. §§ 30-14-103, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

611.    The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce," as defined by *id.,* § 30-14-102(8).

612.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

613.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Montana Class Members.

614.    Plaintiffs and the Montana Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

615.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Montana Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

616.    Plaintiffs and the Montana Class Members seek relief under Mont. Code Ann. § 30-14-133, including, but not limited, to injunctive relief, damages, treble damages, and attorneys' fees and costs.

**COUNT 37**

**NEBRASKA CONSUMER PROTECTION ACT**

**(ON BEHALF OF THE NEBRASKA CLASS AGAINST DEFENDANTS)**

617.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

618.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Nebraska Class.

619.    The Nebraska Consumer Protection Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

620.    Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Nebraska Class Members, in violation of Neb. Rev. Stat. § 59-1602, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

621.    The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce."

622.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

623.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Nebraska Class Members.

624.    Plaintiffs and the Nebraska Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

625.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Nebraska Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

626.    Plaintiffs and Nebraska Class Members seek relief under Neb. Rev. Stat. § 59-16-0, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

**COUNT 38**

**NEVADA DECEPTIVE TRADE PRACTICES ACT**

**(ON BEHALF OF THE NEVADA CLASS AGAINST DEFENDANTS)**

627.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

628.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Nevada Class.

629.    The Nevada Deceptive Trade Practices Act, among other things, makes it unlawful to make "a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith" and represent "that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model." Nev. Rev. Stat. § 598.0915.

630.    Defendants engaged in deceptive trade practices in the course of their business, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Nevada Class Members in violation of Nev. Rev. Stat. § 598.0915, including by making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

631.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

632.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Nevada Class Members.

633.    Plaintiffs and the Nevada Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

634.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Nevada Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

635.    Plaintiffs and Nevada Class members seek relief under Nev. Rev. Stat. § 41.600, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

## COUNT 39

### NEW HAMPSHIRE CONSUMER PROTECTION ACT

### (ON BEHALF OF THE NEW HAMPSHIRE CLASS AGAINST DEFENDANTS)

636.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

637.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the New Hampshire Class.

638.    The New Hampshire Consumer Protection Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." N.H. Rev. Stat. Ann. § 358-A:2.

639.    Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and the New Hampshire Class Members, in violation of N.H. Rev. Stat. Ann. § 358-A:2, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

640.    The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce."

641.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

642.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the New Hampshire Class members.

643.    Plaintiffs and New Hampshire Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

644.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the New Hampshire Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

645.    Plaintiffs and New Hampshire Class members seek relief under N.H. Rev. Stat. Ann. § 358-A:10, including, but not limited to injunctive relief, damages, treble damages, nd attorneys' fees and costs.

646.    A copy of this complaint is being sent to the New Hampshire Attorney General.

## COUNT 40

## NEW JERSEY CONSUMER FRAUD ACT

## (ON BEHALF OF THE NEW JERSEY CLASS AGAINST DEFENDANTS)

647.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

648.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the New Jersey Class.

649.     The New Jersey Consumer Fraud Act ("NJCFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . is declared to be an unlawful practice."  N.J. Stat. Ann. §§ 56:8-2.

650.     Defendants engaged in unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact, with respect to the sale and advertisement of the services purchased by Plaintiffs and the New Jersey Class Members, in violation of  N.J. Stat. Ann. §§ 56:8-2, including by making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

651.     The above unfair and deceptive practices and acts by Defendants were material misrepresentations of a presently existing or past fact.

652.     Defendants knew or believed that the above unfair and deceptive practices and acts were material misrepresentations.

653.    Defendants intended that other persons rely on the above unfair and deceptive practices and their reliance was reasonable.

654.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

655.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the New Jersey Class Members.

656.    Plaintiffs and the New Jersey Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

657.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the New Jersey Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

658.    Plaintiffs and the New Jersey Class members seek relief under N.J. Stat. Ann. §§ 56:8-2.11 and 56:8-19, including, but not limited to a refund of all moneys acquired by Defendants for the services, injunctive relief, damages, treble damages, and attorneys' fees and costs.

659.    Plaintiffs will comply with N.J. Stat. Ann. § 56:8-20, as Plaintiffs will mail a copy of this complaint to New Jersey's Attorney General.

## COUNT 41

### NEW MEXICO UNFAIR PRACTICES ACT

### (ON BEHALF OF THE NEW MEXICO CLASS AGAINST DEFENDANTS)

660.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

661.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the New Mexico Class.

662.     The New Mexico Unfair Trade Practices Act, N.M. STAT. ANN. §§ 57-12-1, *et seq.* ("New Mexico UTPA") makes unlawful any "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M. STAT. ANN. § 57:12-3. Trade or commerce includes the "sale or distribution of any services." N.M. STAT. ANN. § 57-12-2(C).

663.     Defendants engaged in unfair or deceptive trade practices and unconscionable trade practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and the New Mexico Class Members, in violation of  N.M. Stat. Ann. § 57-12-3, including by making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

664.     The above unfair or deceptive acts or practices by Defendants were conducted in or affecting "commerce," as defined by *id.,* § 57-12-2(C).

665.     The above unfair or deceptive trade practices and unconscionable trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous, and the type that may, tend to, or does deceive or mislead any person.

666.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the New Mexico Class Members.

667.     Plaintiffs and the New Mexico Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

668.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the New Mexico Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

669.    By engaging in the practices discussed above, including, but not limited to, Defendants' undisclosed defects, Defendants haver violated N.M. Stat. Ann. § 57-12-2.

670.    Plaintiffs and the New Mexico Class Members seek relief under N.M. Stat. Ann. § 57-12-10, including, but not limited to injunctive relief, damages, and attorneys' fees and costs.

## COUNT 42

### NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

### (ON BEHALF OF THE NORTH CAROLINA CLASS AGAINST DEFENDANTS)

671.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

672.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the North Carolina Class.

673.    North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq. ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

674.    Defendants engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and the North Carolina Class Members, in violation of N.C. Gen. Stat. § 75-1.1(a), including by making false representations or concealing the true risks of "trying" Noom, failing to engage in fair and upright business practices, and failing to engage in fair and upright business practices.

675.    The above unfair or deceptive acts or practices by Defendants were conducted in or affecting "commerce," as defined by *id.,* § 75-1.1(b).

676.    The above unfair or deceptive acts or practices by Defendants were reasonably and intentionally calculated to deceive class members and other consumers.

677.    The above unfair or deceptive acts or practices by Defendants did in fact deceive class members and other consumers, causing them damage.

678.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

679.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the North Carolina Class Members.

680.    Plaintiffs and the North Carolina Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

681.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the North Carolina Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

682.    Plaintiffs and the North Carolina Class Members seek relief under N.C. Gen. Stat. §§ 75-16 and 75-16.1, including, but not limited to injunctive relief, damages, treble damages, and attorneys' fees and costs.

## COUNT 43

### NORTH DAKOTA CONSUMER PROTECTION ACT

### (ON BEHALF OF THE NORTH DAKOTA CLASS AGAINST DEFENDANTS)

683.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

684.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the North Dakota Class.

685.    Under North Dakota law, the use of deceptive or unconscionable acts or practices in connection with the sale or advertisement of any merchandise is unlawful.  N.D. Cent. Code § 51-15-02.

686.    Defendants engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and the North Dakota Class Members, in violation of N.D. Cent. Code § 51-15-01, *et. seq.*, including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing engage in fair and upright business practices.

687.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

688.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the North Dakota Class Members.

689.    Plaintiffs and the North Dakota Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

690.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the North Dakota Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

691.    Plaintiffs and the North Dakota Class Members seek relief under N.D. Cent. Code. § 51-15-09, *et seq*., including, but not limited to injunctive relief, compensatory damages, treble damages, and attorneys' fees and costs. N.D. Cent. Code. § 51-15-09.

## COUNT 44

**OKLAHOMA CONSUMER PROTECTION ACT**

**(ON BEHALF OF THE OKLAHOMA CLASS AGAINST DEFENDANTS)**

692.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

693.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Oklahoma Class.

694.    The Oklahoma Consumer Protection Act makes it unlawful to make a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person," or engage in "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Okla. Stat. tit. 15, § 752.

695.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Oklahoma Class Members, in violation of Okla. Stat. tit. 15, § 752, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

696.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted as part of a "consumer transaction," as defined by Okla. Stat. tit. 15, § 752.

697.    The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

698.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Oklahoma Class Members.

699.    Plaintiffs and Oklahoma Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

700.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Oklahoma Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

701.    Plaintiffs and the Oklahoma Class Members seek relief under Okla. Stat. tit. 15, § 75, *et seq*., including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, civil penalties and attorneys' fees and costs.

## COUNT 45

## OREGON UNLAWFUL TRADE PRACTICES LAW

## (ON BEHALF OF THE OREGON CLASS AGAINST DEFENDANTS)

702.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

703.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Oregon Class.

704.    Oregon law makes it unlawful for any person to employ "any unconscionable tactic in connection with selling, renting or disposing of real estate, goods or services, or collecting or enforcing an obligation." Or. Rev. Stat. § 646.607(1).

705.    Defendants engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Oregon Class Members, in violation of Or. Rev. Stat. §§ 646.605, *et seq*., including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing engage in fair and upright business practices.

706.     The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in "[t]rade" and/or "commerce," as defined by Or. Rev. Stat. § 646.605(8).

707.     The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

708.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Oregon Class Members.

709.     Plaintiffs and the Oregon Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

710.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Oregon Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

711.     Plaintiffs and the Oregon Class Members seek relief under Or. Rev. Stat. § 646.638, *et seq.*, including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, civil penalties and attorneys' fees and costs.

712.     A copy of this complaint is being sent to the Oregon Attorney General.

## COUNT 46

### PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (ON BEHALF OF THE PENNSYLVANIA CLASS AGAINST DEFENDANTS)

713.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

714.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Pennsylvania Class.

715.    Plaintiffs and the Pennsylvania Class Members signed up for Noom's services primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

716.    All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

717.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including, "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

718.    Defendants participated in unfair or deceptive trade practices that violated the Pennsylvania CPL as described below and alleged throughout this Complaint.  By concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with Noom's trial period. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to Noom's trial period in the course of their business.

719.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with Noom's trial period.

720.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

721.    Defendants knew or should have known that its conduct violated the Pennsylvania CPL.

722.     Had Plaintiffs and the Pennsylvania Class Members known the truth about Noom's trial period, they would not have tried Noom. Plaintiffs and the Pennsylvania Class Members did not receive the benefit of their bargain as a result of Defendants' misconduct.

723.     Defendants owed Plaintiffs and the Pennsylvania Class Members a duty to disclose the truth about "trying" Noom because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of Noom's trial period; (b) intentionally concealed the foregoing from Plaintiffs and the Pennsylvania Class Members; and/or (c) made incomplete representations regarding the trial period, while purposefully withholding material facts from Plaintiffs and the Pennsylvania Class Members that contradicted these representations.

724.     Plaintiffs and the Pennsylvania Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Plaintiffs and the Pennsylvania Class Members were harmed and suffered actual damages.

725.     Defendants' violations present a continuing risk to Plaintiffs and the Pennsylvania Class Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

726.     Defendants are liable to Plaintiffs and the Pennsylvania Class Members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a). Plaintiffs and the Pennsylvania Class Members are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT 47

**RHODE ISLAND UNFAIR TRADE PRACTICE
AND CONSUMER PROTECTION ACT**

**(ON BEHALF OF THE RHODE ISLAND CLASS AGAINST DEFENDANTS)**

727.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

728.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Rhode Island Class.

729.     The Rhode Island Unfair Trade Practice and Consumer Protection Act ("Rhode Island Act") identifies several types of "unfair" and/or "deceptive trade practices, but also incorporates by reference "the Federal Trade Commission's and federal courts' interpretations of section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1)," rather than setting forth specific definitions of those operative terms.  R.I. Gen. Laws § 6-13.1-2.

730.     Rhode Island has adopted a three-part test to determine whether an act is "deceptive": (1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3), the representation, omission, or practice is material," meaning the representation is important to the consumer and likely to affect their decisions with respect to the product.

731.     Defendants engaged in unlawful, unfair, and deceptive acts and practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and the Rhode Island Class Members, in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq*., including by misrepresenting the true quality of Noom's trial period, concealing the true risks of "trying" Noom, and failing engage in fair and upright business practices.

732.     The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in "[t]rade" and/or "commerce," as defined by R.I. Gen. Laws § 6-13.1-1(5).

733.     The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

734.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Rhode Island Class Members.

735.    Defendants' actions were material to Plaintiffs and Rhode Island Class Members, who relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

736.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the Rhode Island Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

737.    Plaintiffs and the Rhode Island Class Members seek relief under R.I. Gen. Laws §§ 6-13.1-5.2, including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, and attorneys' fees and costs.

**COUNT 48**

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**

**(ON BEHALF OF THE SOUTH CAROLINA CLASS AGAINST DEFENDANTS)**

738.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

739.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the South Carolina Class.

740.    The South Carolina Unfair Trade Practices Act adopts the interpretations given by the Federal Trade Commission and the Federal Courts to Section 5(a) (1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) to determine what conduct constitutes unfair or deceptive acts and practices.  S.C. Code Ann. § 39-5-20.

741.    Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and the South Carolina Class Members, in violation of S.C. Code Ann. § 39-5-20, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

742.     The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce," as defined by S.C. Code Ann. § 39-5-10(b).

743.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

744.     The above unfair and deceptive practices and acts by Defendants has impacted the South Carolina public at large if Defendants is not forced to cease engaging in such acts and practices, they are likely to continue.

745.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the South Carolina Class Members.

746.     Plaintiffs and the South Carolina Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

747.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and the South Carolina Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

748.     Plaintiffs and the South Carolina Class members seek relief under S.C. Code § 39-5-140, including, but not limited to restitution, statutory damages, compensatory damages, punitive damages, civil penalties and attorneys' fees and costs.

## COUNT 49

### SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (ON BEHALF OF THE SOUTH DAKOTA CLASS AGAINST DEFENDANTS)

749.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

750.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the South Dakota Class.

751.    The South Dakota Deceptive Trade Practices and Consumer Protection Law, among other things, makes it unlawful to "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

752.    Defendants engaged in deceptive trade practices in the course of their business, with respect to the sale and advertisement of the services purchased by Plaintiffs and South Dakota Class Members, in violation of S.D. Codified Laws §§ 37-24-1, *et seq*., including by making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

753.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

754.    Defendants' actions were negligent, knowing and willful, and/or intentional, wanton and reckless with respect to the rights of Plaintiffs and the South Dakota Class members.

755.    Plaintiffs and South Dakota Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

756.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and South Dakota Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

757.     Plaintiffs and South Dakota Class members seek relief under S.D. Codified Laws §§ 37-24-1, *et seq*., including, but not limited to injunctive relief, compensatory damages, statutory damages, civil penalties and attorneys' fees and costs.

## COUNT 50

### TENNESSEE CONSUMER PROTECTION ACT

### (ON BEHALF OF THE TENNESSEE CLASS AGAINST DEFENDANTS)

758.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

759.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Tennessee Class.

760.     The Tennessee Consumer Protection Act ("TNCPA") was enacted to "protect consumers . . . . from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within [Tennessee]." Tenn. Code Ann. § 47-18-102(2).

761.     The TNCPA makes unlawful, among other things, "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have" and "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." Tenn. Code Ann. § 47-18-104.

762.     Defendants engaged in unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact, with respect to the sale and advertisement of the services purchased by Plaintiffs and Tennessee Class Members, in violation of Tenn. Code Ann. §§ 47-18-101, *et seq*., including by making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

763.   Defendants intended that other persons rely on the above unfair and deceptive practices and acts. These actions by Defendants were material misrepresentations of a presently existing or past fact, and their reliance was reasonable.

764.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

765.   Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Tennessee Class members.

766.   Plaintiffs and Tennessee Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

767.   As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Tennessee Class members suffered an ascertainable loss of money or property, real or personal, as described above.

768.   Plaintiffs and Tennessee Class members seek relief under Tenn. Code § 47-18-108-109, including, but not limited to injunctive relief, compensatory damages, statutory damages, punitive damages, statutory damages, civil penalties and attorneys' fees and costs.

## COUNT 51

### UTAH CONSUMER SALES PRACTICES ACT

### (ON BEHALF OF THE UTAH CLASS AGAINST DEFENDANTS)

769.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

770.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Utah Class.

771.   The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, *et seq*. makes it unlawful to, among other things, "knowingly or intentionally" "indicate[] that the subject of a

consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."  Utah Code Ann. § 13-11-4.

772.    A "Consumer transaction" means a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible (except securities and insurance) to, or apparently to, a person for…primarily personal, family, or household purposes." Utah Code Ann. § 13-11-3.

773.    Defendants engaged in unfair or deceptive trade practices and unconscionable trade practices, with respect to the sale and advertisement of the services purchased by Plaintiffs and Utah Class Members, in violation of Utah Code Ann. §§ 13-11-1, *et seq*., including by making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

774.    The above unfair or deceptive trade practices and unconscionable trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous, and the type that may, tend to, or does deceive or mislead any person.

775.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Utah Class members.

776.    Plaintiffs and Utah Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

777.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Utah Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

778. By engaging in the practices discussed above, including, but not limited to, Defendants' undisclosed defects, Defendants has violated Utah Code Ann. §§ 13-11-1, *et seq*.

779. Plaintiffs and Utah Class members seek relief under Utah Code Ann. § 13-11-17 and -19, including, but not limited to injunctive relief, compensatory damages, statutory damages, civil penalties and attorneys' fees and costs.

### COUNT 52

### VERMONT CONSUMER FRAUD ACT

### (ON BEHALF OF THE VERMONT CLASS AGAINST DEFENDANTS)

780. Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

781. Plaintiffs bring this claim on their own behalf and on behalf of each member of the Vermont Class.

782. The Vermont Consumer Fraud Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in commerce." Vt. Stat. Ann. tit. 9, § 2453, et. seq.

783. Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and Vermont Class Members, in violation of Vt. Stat. Ann. tit. 9, § 2453 including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

784. The above unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce."

785. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

786.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Vermont Class members.

787.    Plaintiffs and Vermont Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

788.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Vermont Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

789.    Plaintiffs and Vermont Class members seek relief Vt. Stat. Ann. tit. 9, § 2461(b). including, but not limited to injunctive relief, damages, treble damages, and attorneys' fees and costs.

## COUNT 53

### VIRGINIA CONSUMER PROTECTION ACT

### (ON BEHALF OF THE VIRGINIA CLASS AGAINST DEFENDANTS)

790.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

791.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Virginia Class.

792.    The Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq*. ("VCPA") was enacted to "promote fair and ethical standards of dealings between suppliers and the consuming public."

793.    The VCPA makes unlawful, among other things, any "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.

794.    Defendants engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, with respect to the sale and advertisement of the services purchased by Plaintiffs and Virginia Class Members, in violation of Va. Code Ann. §§ 59.1-196, including by making false representations or concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

795.    The above unfair or deceptive acts or practices by Defendants were conducted as part of a "consumer transaction" as defined by Va. Code Ann. § 59.1-198.

796.    The above unfair or deceptive acts or practices by Defendants were reasonably calculated to deceive class members and other consumers and made with intent to deceive.

797.    The above unfair or deceptive acts or practices by Defendants did in fact deceive class members and other consumers, causing them damage.

798.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

799.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Virginia Class members.

800.    Plaintiffs and Virginia Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

801.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Virginia Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

802.    Plaintiffs and Virginia Class members seek relief under Va. Code Ann. §§ 59.1-196, *et seq*., including, but not limited to injunctive relief, compensatory damages, statutory damages, treble damages, civil penalties and attorneys' fees and costs.

**COUNT 54**

**WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT**

**(ON BEHALF OF THE WEST VIRGINIA CLASS AGAINST DEFENDANTS)**

803.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

804.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the West Virginia Class.

805.    The West Virginia Consumer Credit and Protection Act shall be construed liberally to "complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest competition." W. Va. Code § 46A-6-101.

806.    The West Virginia Consumer Credit and Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104.

807.    The West Virginia Consumer Credit and Protection Act directs that, in construing the Act, "courts be guided by the policies of the Federal Trade Commission and interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U. S. C. § 45(a)(1))." W. Va. Code § 46A-6-101.

808.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices with respect to the sale and advertisement of the services purchased by Plaintiffs and West Virginia Class Members, in violation of W. Va. Code §§ 46A-6-101, *et seq.*, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

809.     The above unfair methods of competition and unfair or deceptive acts or practices by Defendants were conducted in "trade" or "commerce," as defined by W. Va. Code § 46A-6-102(6).

810.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

811.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the West Virginia Class members.

812.     Plaintiffs and West Virginia Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

813.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and West Virginia Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

814.     Plaintiffs and West Virginia Class members seek relief under W. Va. Code § 46A-6-106, including, but not limited to injunctive relief, restitution, statutory damages, compensatory damages, and attorneys' fees and costs.

815.     Plaintiffs and West Virginia Class members have informed Defendants of the alleged violation pursuant to W. Va. Code § 46A-6-106(c).

## COUNT 55

### WISCONSIN FALSE ADVERTISING ACT

### (ON BEHALF OF THE WISCONSIN CLASS AGAINST DEFENDANTS)

816.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

817.     Plaintiff brings this cause of action on her behalf and on behalf of the members of the Wisconsin Class.

818.    Wisconsin law prohibits companies from making "untrue, deceptive, or misleading" statements in any "notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, [or] label" in selling merchandise. Wis. Stat. § 100.18(1).

819.    Defendants made "untrue, deceptive or misleading" statement with respect to the sale and advertisement of the services purchased by Plaintiffs and Wisconsin Class Members, in violation of Wash. Rev. Code §§ 19.86.010, *et seq.*, including by concealing the true risks of "trying" Noom and failing to engage in fair and upright business practices.

820.    The above untrue, deceptive, or misleading acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

821.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Wisconsin Class members.

822.    Plaintiffs and Wisconsin Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

823.    As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and Wisconsin Class Members suffered an ascertainable loss of money or property, real or personal, as described above.

824.    Plaintiffs and Wisconsin Class members have suffered pecuniary loss and seek damages, including double damages, costs, and attorneys' fees.  Wis. Stat. § 108.18(11)(b).

## COUNT 56

### WISCONSIN CONSUMER PROTECTION ACT

### (ON BEHALF OF THE WYOMING CLASS AGAINST DEFENDANTS)

825.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

826.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Wyoming Class.

827.      The Wyoming Consumer Protection Act makes it unlawful to "engage[] in a deceptive trade practice…in the course of his business and in connection with a consumer transaction," which includes knowingly "[r]epresent[ing] that merchandise is of a particular standard, grade, style or model, if it is not." Wyo. Stat. Ann. § 40-12-105.

828.     Defendants engaged in unlawful deceptive trade practices and acts with respect to the sale and advertisement of the services purchased by Plaintiffs and Wyoming Class Members, in violation of  Wyo. Stat. Ann. §§ 40-12-101, *et seq*., including by knowingly making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of the services, and failing engage in fair and upright business practices.

829.     The above deceptive acts or practices by Defendants were conducted in connection with a "consumer transaction," as defined by Wyo. Stat. Ann. § 40-12-102(ii).

830.     The above deceptive trade practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

831.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Wyoming Class members.

832.     Plaintiffs and Wyoming Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

833.     As a direct and proximate result of Defendants' deceptive trade practices and acts, Plaintiffs and Wyoming Class members suffered an ascertainable loss of money or property, real or personal, as described above.

834.     Plaintiffs and Wyoming Class members seek relief under Wyo. Stat. Ann. § 40-12-108, including, but not limited to injunctive relief, compensatory damages, punitive damages, statutory damages, civil penalties and attorneys' fees and costs.

835.     Plaintiffs and Wyoming Class members have put Defendants on notice prior to filing suit pursuant to Wyo. Stat. Ann. §§ 40-12-109 and 40-12-102(a)(ix).

## COUNT 57

### GUAM CONSUMER PROTECTION ACT

### (ON BEHALF OF THE GUAM CLASS AGAINST DEFENDANTS)

836.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

837.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Guam Class.

838.     Under the Guam Consumer Protection Act, "false, misleading, or deceptive acts or practices . . . [are] unlawful." 5 G.C.A. § 32201.

839.     Defendants engaged in false, misleading, or deceptive acts or practices with respect to the sale and advertisement of the services purchased by Plaintiffs and Guam Class Members, including by knowingly making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of the services, and failing engage in fair and upright business practices.

840.     The above unfair, abusive, or deceptive trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

841.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Guam Class members.

842.    Plaintiffs and Guam Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

843.    As a direct and proximate result of Defendants' false, misleading, unfair or deceptive trade practices, Plaintiffs and Guam Class members suffered an ascertainable loss of money or property, real or personal, as described above.

844.    Plaintiffs and Guam Class members seek relief under 5 G.C.A. § 32112, including, but not limited to actual damages, treble damages, punitive damages, and attorneys' fees and costs.

## COUNT 58

### U.S. VIRGIN ISLAND CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

### (ON BEHALF OF THE U.S. VIRGIN ISLANDS CLASS AGAINST DEFENDANTS)

845.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

846.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the U.S. Virgin Islands Class.

847.    Under the Consumer Fraud and Deceptive Business Practices Act, "unfair or deceptive trade acts or practices" are unlawful.  12A V.I.C.§ 304.

848.    Defendants engaged in false, misleading, unfair or deceptive acts or practices with respect to the sale and advertisement of the services purchased by Plaintiffs and U.S. Virgin Islands Class Members, including by knowingly making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of the services, and failing engage in fair and upright business practices.

849.    The above unfair, abusive, or deceptive trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

850.     Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the U.S. Virgin Island Class members.

851.     Plaintiffs and U.S. Virgin Island Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

852.     As a direct and proximate result of Defendants' false, misleading, unfair or deceptive trade practices, Plaintiffs and the U.S. Virgin Island Class members suffered an ascertainable loss of money or property, real or personal, as described above.

853.     Plaintiffs and Virgin Island Class members seek relief under 12A V.I.C. § 331, including, but not limited to compensatory, consequential, punitive, equitable, treble damages, and attorneys' fees and costs.

## COUNT 59

### NORTHERN MARIANA ISLANDS CONSUMER PROTECTION ACT

### (ON BEHALF OF THE NORTHERN MARIANA ISLANDS CLASS AGAINST DEFENDANTS)

854.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

855.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Northern Mariana Islands Class.

856.     Under the Consumer Protection Act, it is unlawful, among other things, to engage "in any act of practice which is unfair or deceptive to the consumer."  4 CMC § 5105.

857.     Defendants engaged in false, misleading, or deceptive acts or practices with respect to the sale and advertisement of the services purchased by Plaintiffs and Northern Mariana Islands Class Members, including by knowingly making statements or representations that were false or misleading regarding the quality of the services, concealing the true risks of the services, and failing engage in fair and upright business practices.

858.    The above unfair, abusive, unfair, or deceptive trade practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

859.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Northern Mariana Islands Class members.

860.    Plaintiffs and Northern Mariana Islands Class members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Noom's services had they known the truth about the risks of "trying" Noom.

861.    As a direct and proximate result of Defendants' false, misleading, unfair or deceptive trade practices, Plaintiffs and Northern Mariana Islands Class members suffered an ascertainable loss of money or property, real or personal, as described above.

862.    Plaintiffs and Northern Mariana Islands Class members seek relief under 4 CMC § 5112, including, but not limited to actual and liquidated damages, consequential, and attorneys' fees and costs.

### B.  State Common Law Counts

### COUNTS 60 – 113

### COMMON LAW FRAUD

### (ON BEHALF OF EACH STATE CLASS AGAINST DEFENDANTS)

863.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

864.    Plaintiffs bring these claims on their own behalf and on behalf of each member of each State Class under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island,

South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, Guam, U.S. Virgin Islands, and Northern Mariana Islands.

865.   As discussed above, Defendants made several materially misleading statements and/or omissions in the marketing and billing of its monthly subscriptions, including:

a. Stating and creating the net impression in Noom's trial period sign up flow that the trial was "risk free" even though Noom knows that many consumers end up unwittingly or unwillingly becoming full-fledged customers via automatic-renewal;

b. Failing to adequately disclose to consumers that the trial period will automatically convert to an auto-recurring membership;

c. Failing to adequately disclose to consumers how they can cancel the trial membership;

d. Failing to adequately disclose that automatic renewal will be activated even if trial customers (i) never access the service during the trial period, (ii) are never assigned a coach, (iii) never download the Noom app, or (iv) download the Noom app but delete it or find that it doesn't work;

e. Omitting from Noom's trial period sign up flow the fact that even though consumers can sign up for the trial period on Noom's website, a smartphone is necessary to access its program;

f. Omitting from Noom's trial period sign up flow the fact that even though consumers can sign up for the trial period on Noom's website, a smartphone is necessary to cancel the trial period;

g. Stating and creating the net impression in Noom's trial period sign up flow that customers' payment information will only be used to pay for the cost of the trial program;

h. Stating and creating the net impression in Noom's trial period sign up flow that customers either do not need to cancel or are able to easily cancel while curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period;

i. Stating and creating the net impression in Noom's trial period sign up flow that customers can "cancel anytime" and that there is "no commitment;"

j. Stating and creating the net impression in Noom's trial period sign up flow that customers would be paired with and receive individualized coaching from a human weight loss expert once they enroll in the trial period and that they will be able to cancel simply by letting their personal coach know;

k.   Omitting from Noom's trial period sign up flow the fact that customers could neither cancel their enrollment on Noom's website, nor contact a customer service representative by mail, email, phone or fax to cancel;

l.   Omitting from the trial period sign up flow the fact that customers would not be assigned a human coach once they enroll in the trial period;

m.   Failing to disclose in the Noom trial period sign up flow that the trial period starts even if customers never access or use the trial program;

n.   Failing to adequately disclose that the charge assessed following the trial period will be an advance payment for multiple months of membership;

o.   Failing to adequately disclose to customers that the advance charge assessed following the trial period will be non-refundable; and

p.   On the last day of the trial period Noom sends a message to its customers that fails to disclose that customers who have not yet canceled are about to be charged for multi-month plans.  Instead, Noom's message is simply that it "won't be checking in anymore."  With this curt and misleading message, Defendants fail to provide critical information about the trial, including that: (i) the customer's auto-enrollment is about to begin, (ii) that they will be charged, (iii) that the charge will be for many months in advance, and (iv) that the charge will be non-refundable.

866.   In deciding to enroll in Noom's trial period, Plaintiffs and the Class reasonably relied on these misrepresentations and/or omissions to form the mistaken belief that their enrollment in a trial was risk-free, that it would not require the purchase or use of a smart-phone, that they were not authorizing anything other than whatever the user had selects as a "fair" price, which is no higher than $18.37, that they could easily cancel during the trial period, and that they would be assigned a human coach through whom they could cancel their enrollment.

867.   Defendants' fraudulent conduct was knowing and intentional.  The omissions and misrepresentations made by Defendants were intended to induce and actually induced Plaintiffs and Class Members to become Noom customers.

868.   Defendants' fraud caused damage to Plaintiffs and the Class, who are entitled to damages and other legal and equitable relief as a result.

171

869.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNTS 114 – 167

### UNJUST ENRICHMENT

### (ON BEHALF OF EACH STATE CLASS AGAINST DEFENDANTS)

870.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

871.    Plaintiffs bring these claims on their own behalf and on behalf of each member of each State Class under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, Guam, U.S. Virgin Islands, and Northern Mariana Islands.

872.    As a result of their unjust conduct, Defendants have been unjustly enriched.

873.    By reason of Defendants' wrongful conduct, Defendants have benefited from receipt of improper funds, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

874.    As a result of Defendants' conduct it would be unjust and/or inequitable for Defendants to retain the benefits of its conduct without restitution to Plaintiffs and the Class. Accordingly, Defendants must account to Plaintiffs and the Class for its unjust enrichment.

**COUNTS 168 – 221**

**CONVERSION**

**(ON BEHALF OF EACH STATE CLASS AGAINST DEFENDANTS)**

875.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

876.    Plaintiffs bring these claims on their own behalf and on behalf of each member of each State Class under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, Guam, U.S. Virgin Islands, and Northern Mariana Islands.

877.    Plaintiffs and the members of the State Classes own and have a right to possess the money that is in their respective bank accounts, internet payment accounts, and/or credit cards.

878.    Defendants interfered with Plaintiffs' and the State Class's possession of this money by making unauthorized charges to their bank accounts, internet accounts, and/or credit cards for multiple-month Noom subscriptions.  Plaintiffs and the Class never consented to Noom's taking of this money from their bank accounts, internet payment accounts, and/or credit cards.

879.    Noom wrongfully retained dominion over this monetary property and/or the time-value of the monetary property.

880.    Plaintiffs and the State Classes have been damaged by Noom's wrongful taking of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Plaintiffs' and Noom's records.

881.    By reason of the foregoing, Noom is liable to Plaintiffs and the State Classes for conversion in an amount to be proved at trial.

**COUNTS 222 – 275**

**MONEY HAD AND RECEIVED**

**(ON BEHALF OF EACH STATE CLASS AGAINST DEFENDANTS)**

882.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

883.    Plaintiffs bring these claims on their own behalf and on behalf of each member of each State Class under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, Guam, U.S. Virgin Islands, and Northern Mariana Islands.

884.    Defendants received money from Plaintiffs and from each member of the State Classes.

885.    The monies below to Plaintiffs and each member of the State Classes.

886.    Defendants have not returned the money.

887.    Plaintiffs, on behalf of themselves and the members of the State Classes seek the return of the money in an amount to be proved at trial.

## II.    MULTISTATE CLASS COUNTS

### COUNT 276

### COMMON LAW FRAUD

### (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE AGAINST DEFENDANTS)

888.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

889.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class under New York law or, alternatively, under the laws of each of the states where Defendants do business.

890.    As discussed above, Defendants made several materially misleading statements and/or omissions in the marketing and billing of its monthly subscriptions, including:

a.  Stating and creating the net impression in Noom's trial period sign up flow that the trial was "risk free" even though Noom knows that many consumers end up unwittingly or unwillingly becoming full-fledged customers via automatic-renewal;

b.  Failing to adequately disclose to consumers that the trial period will automatically convert to an auto-recurring membership;

c.  Failing to adequately disclose to consumers how they can cancel the trial membership;

d.  Failing to adequately disclose that automatic renewal will be activated even if trial customers (i) never access the service during the trial period, (ii) are never assigned a coach, (iii) never download the Noom app, or (iv) download the Noom app but delete it or find that it doesn't work;

e.  Omitting from Noom's trial period sign up flow the fact that even though consumers can sign up for the trial period on Noom's website, a smartphone is necessary to access its program;

f.  Omitting from Noom's trial period sign up flow the fact that even though consumers can sign up for the trial period on Noom's website, a smartphone is necessary to cancel the trial period;

g. Stating and creating the net impression in Noom's trial period sign up flow that customers' payment information will only be used to pay for the cost of the trial program;

h. Stating and creating the net impression in Noom's trial period sign up flow that customers either do not need to cancel or are able to easily cancel while curtailing customers' ability to cancel their subscription to Noom prior to the expiry of the trial period;

i. Stating and creating the net impression in Noom's trial period sign up flow that customers can "cancel anytime" and that there is "no commitment;"

j. Stating and creating the net impression in Noom's trial period sign up flow that customers would be paired with and receive individualized coaching from a human weight loss expert once they enroll in the trial period and that they will be able to cancel simply by letting their personal coach know;

k. Omitting from Noom's trial period sign up flow the fact that customers could neither cancel their enrollment on Noom's website, nor contact a customer service representative by mail, email, phone or fax to cancel;

l. Omitting from the trial period sign up flow the fact that customers would not be assigned a human coach once they enroll in the trial period;

m. Failing to disclose in the Noom trial period sign up flow that the trial period starts even if customers never access or use the trial program;

n. Failing to adequately disclose that the charge assessed following the trial period will be an advance payment for multiple months of membership;

o. Failing to adequately disclose to customers that the advance charge assessed following the trial period will be non-refundable; and

p. On the last day of the trial period Noom sends a message to its customers that fails to disclose that customers who have not yet canceled are about to be charged for multi-month plans. Instead, Noom's message is simply that it "won't be checking in anymore." With this curt and misleading message, Defendants fail to provide critical information about the trial, including: (i) the customer's auto-enrollment is about to begin, (ii) that they will be charged, (iii) that the charge will be for many months in advance, and (iv) that the charge will be non-refundable.

891. In deciding to enroll in Noom's trial period, Plaintiffs and the Class reasonably relied on these misrepresentations and/or omissions to form the mistaken belief that their enrollment in a trial was risk-free, that it would not require the purchase or use of a smart-phone,

that they were not authorizing anything other than whatever the user had selects as a "fair" price, which is no higher than $18.37, that they could easily cancel during the trial period, and that they would be assigned a human coach through whom they could cancel their enrollment.

892.    Defendants' fraudulent conduct was knowing and intentional.  The omissions and misrepresentations made by Defendants were intended to induce and actually induced Plaintiffs and Class Members to become Noom customers.

893.    Defendants' fraud caused damage to Plaintiffs and the Class, who are entitled to damages and other legal and equitable relief as a result.

894.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT 277**

**UNJUST ENRICHMENT**

**(ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE AGAINST DEFENDANTS)**

895.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

896.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class under New York law or, alternatively, under the laws of each of the states where Defendants do business.

897.    This claim is brought under the laws of all states where Noom does business that allow a plaintiff to recover under the common law theory of unjust enrichment, as there is no material difference in the law of unjust enrichment as applied to the claims and questions in this case.

898.    As a result of their unjust conduct, Defendants have been unjustly enriched.

899.     By reason of Defendants' wrongful conduct, Defendants have benefited from receipt of improper funds, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

900.     As a result of Defendants' conduct it would be unjust and/or inequitable for Defendants to retain the benefits of its conduct without restitution to Plaintiffs and the Class. Accordingly, Defendants must account to Plaintiffs and the Class for its unjust enrichment.

## COUNT 278

### CONVERSION

### (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE AGAINST DEFENDANTS)

901.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

902.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class under New York law or, alternatively, under the laws of each of the states where Defendants do business.

903.     This claim is brought under the laws of all states where Noom does business that allow a plaintiff to recover under the common law theory of conversion, as there is no material difference in the law of conversion as applied to the claims and questions in this case.

904.     Plaintiffs and the Class own and have a right to possess the money that is in their respective bank accounts, internet payment accounts, and/or credit cards.

905.     Defendants interfered with Plaintiffs' and the Class's possession of this money by making unauthorized charges to their bank accounts, internet payment accounts, and/or credit cards for multiple-month Noom subscriptions.  Plaintiffs and the Class never consented to Noom's taking of this money from their bank accounts, internet payment accounts, and/or credit cards.

906.     Noom wrongfully retained dominion over this monetary property and/or the time-value of the monetary property.

907.     Plaintiffs and the Class have been damaged by Noom's wrongful taking of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Plaintiffs' and Noom's records.

908.     By reason of the foregoing, Noom is liable to Plaintiffs and the Class for conversion in an amount to be proved at trial.

## COUNT 279

### MONEY HAD AND RECEIVED

### (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW OR, ALTERNATIVELY, THE LAWS OF EACH STATE AGAINST DEFENDANTS)

909.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

910.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Multistate Class under New York law or, alternatively, under the laws of each of the states where Defendants do business.

911.     This claim is brought under the laws of all states where Noom does business that allow a plaintiff to recover under the common law theory of money had and received, as there is no material difference in the law of money had and received as applied to the claims and questions in this case.

912.     Defendants received money from Plaintiffs and from each member of the Multistate Class.

913.     The monies below to Plaintiffs and each member of the Multistate Class.

914.     Defendants have not returned the money.

915.     Plaintiffs, on behalf of themselves and the members of the Multistate Class seek the return of the money in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Issue an order certifying the Classes defined above, appointing Plaintiffs as Class representatives, and designating Wittels McInturff Palikovic as Class Counsel;

(b)    Find that Defendants have committed the violations of law alleged herein;

(c)    Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Multistate Class or, alternatively, the State Classes;

Determine that Defendants committed fraud, and enter an appropriate order awarding damages to the Multistate Class or, alternatively, the State Classes;

(d)    Enter an order granting all appropriate relief including injunctive relief on behalf of the State Classes under the applicable state laws;

(e)    Render an award of compensatory damages of at least $100,000,000, the exact amount of which is to be determined at trial;

(f)    Render an award of punitive damages;

(g)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(h)    Grant all such other relief as the Court deems appropriate.

Dated:  January 15, 2021
         Armonk, New York

                       **WITTELS MCINTURFF PALIKOVIC**

By:     /s/ Steven L. Wittels_____
           Steven L. Wittels (SW-8110)
           J. Burkett McInturff (JM-4564)
           Tiasha Palikovic (TP-5697)
           Steven D. Cohen (SC-7243)
           Jessica L. Hunter (JH-0025)

           18 HALF MILE ROAD
           ARMONK, NEW YORK 10504
           Telephone: (914) 319-9945
           Facsimile: (914) 273-2563
           slw@wittelslaw.com
           jbm@wittelslaw.com
           tpalikovic@wittelslaw.com
           sdc@wittelslaw.com
           jlh@wittelslaw.com

           *Counsel for Plaintiffs and the Class*