**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MOJO NICHOLS, SUSAN BREWSTER,
DUANE DEA, MARYANNE DERACLEO,
KAREN KELLY, REBECCA RICHARDS,
JENNIFER SELLERS, and STACY
SPENCER,

No. 20 Civ. 3677 (LGS) (KHP)

*Individually and on Behalf of All Others
Similarly Situated*,

Plaintiffs*,*

v.

NOOM, INC., ARTEM PETAKOV, and JOHN
DOES 1 TO 5,

Defendants.

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO COMPEL DOCUMENT PRODUCTION
AND RESPONSES TO WRITTEN DISCOVERY REQUESTS**

---

Dated: July 7, 2021

**WITTELS MCINTURFF PALIKOVIC**

Steven L. Wittels
J. Burkett McInturff
Steven D. Cohen
Ethan D. Roman
Jessica L. Hunter
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile:  (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
sdc@wittelslaw.com
edr@wittelslaw.com
jlh@wittelslaw.com

*Counsel for Plaintiffs and the Class*

## **TABLE OF CONTENTS**

OVERVIEW OF DISCOVERY DISPUTE ...............................................................................1

THE FACTS RELEVANT TO THIS MOTION........................................................................4

I.    PLAINTIFFS' EFFORTS TO OBTAIN THE REQUESTED DISCOVERY ...................4

II.   OVERVIEW OF NOOM'S IMPROPER OBJECTIONS AND RESPONSES .................4

ARGUMENT..............................................................................................................................6

I.    PLAINTIFFS' DISCOVERY REQUESTS ARE PROPER, RELATE TO CRITICAL FACTUAL ISSUES, AND ARE SUPPORTED BY NOOM'S DOCUMENT PRODUCTIONS TO DATE....................................................................................................................6

      a.    Discovery Concerning Apple's and Google's Practices Regarding the Same Healthy Weight Products Plaintiffs Purchased Will Lend Important Context to the Conduct Challenged by This Litigation and Further Demonstrate Noom's Intentional Deceptive Conduct..........................................................................................6

      b.    Noom's Knowledge and Use of Dark Patterns in Its Buyflow is a Critical Issue to Establish Noom's Deception ................................................................................13

      c.    The Requested Financial Metrics Show Noom's Knowledge of the Impact of Its Conduct on Customers and Drive Internal Decision-Making ...............................16

      d.    Identifying Board Members and Data Collected About Named Plaintiffs Are Precisely the Type of Interrogatories Contemplated by the Local Rules ................199

      e.    Consistent with the Local Rules, Plaintiffs' Interrogatories Regarding Slack Channels Seek to Identify the Existence of Discoverable Documents ......................................20

      f.    It Is Efficient—and Benefits Both Parties—to Confirm Whether Documents Responsive to Requests are Subsumed by Noom's Current Efforts .........................24

CONCLUSION.........................................................................................................................25

i

## TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Coca-Cola Co.*,
No. 09 Civ. 0395, 2010 WL 2925955 (E.D.N.Y. July 21, 2010) ...........................................9

*Bartnick v. CSX Transp., Inc.*,
No. 1:11 Civ. 1120, 2012 WL 1565057 (N.D.N.Y. Apr. 27, 2012) .......................................5

*Benney v. Midwest Health, Inc.*,
No. 17 Civ. 2548, 2019 WL 3066425 (D. Kan. July 12, 2019)..............................................5

*Fischer v. Forrest*,
No. 14 Civ. 1304, 2017 WL 773694 (S.D.N.Y. Feb. 28, 2017) .............................................5

*Fort Wayne Books, Inc. v. Indiana*,
489 U.S. 46 (1989) .................................................................................................................9

*FTC v. Cyberspace.com LLC*,
453 F.3d 1196 (9th Cir. 2006) ...............................................................................................9

*Heller v. City of Dallas*,
303 F.R.D. 466 (N.D. Tex. 2014) .........................................................................................18

*In re Sept. 11th Liab. Ins. Coverage Cases*,
243 F.R.D. 114 (S.D.N.Y. 2007) ...........................................................................................2

*Koch v. Greenberg*,
No. 07 Civ. 9600, 2008 WL 4778813 (S.D.N.Y. Oct. 31, 2008) ..........................................9

*Lambda Elecs. Corp. v. Lambda Tech., Inc.*,
515 F. Supp. 915 (S.D.N.Y. 1981).........................................................................................9

*Quinn v. Walgreen Co.*,
958 F. Supp. 2d 533 (S.D.N.Y. 2013).....................................................................................9

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
806 F.3d 71 (2d Cir. 2015) .....................................................................................................9

*Torcasio v. New Canaan Bd. of Educ.*,
No. 3:15 Civ. 53, 2016 WL 299009 (D. Conn. Jan. 25, 2016)..............................................5

*Torres v. S.G.E. Mgmt., L.L.C.*,
838 F.3d 629 (5th Cir. 2016) .................................................................................................8

*U.S. Bank Nat'l Assoc. v. Triaxx Asset Mgmt. LLC*,
No. 18 Civ. 4044, 2020 WL 9549505 (S.D.N.Y. Nov. 30, 2020) .........................................4

*U.S. v. $9,781.41 formerly on deposit at Man Fin. Inc.*,
No. 07 Civ. 6224, 2009 WL 1864695 (S.D.N.Y. Jun. 16, 2009)...........................................5

**Rules**

Fed. R. Civ. P. 30(b)(6) ................................................................................................12

Fed. R. Civ. P. 33 ..........................................................................................................1

Fed. R. Civ. P. 34 ..........................................................................................................1

Fed. R. Civ. P. 34(b)(2)(B) ............................................................................................5

Fed. R. Civ. P. 34(b)(2)(C) ............................................................................................5

Fed. R. Civ. P. 37 ......................................................................................................1, 6

Local Rule 26.4(b) .........................................................................................................4

Local Rule 33.3.........................................................................1, 2, 3, 12, 18, 20, 23

Plaintiffs and the proposed Class ("Plaintiffs) move for an Order pursuant to Fed. R. Civ. P. 33, 34, and 37, Local Rule 33.3, and Your Honor's June 16, 2021 Order and Hr'g Tr. at 50:23–51:6, ECF No. 350 compelling Defendants Noom, Inc. and Artem Petakov ("Noom" or "Defendants") to produce documents responsive to (1) Plaintiffs' Second Request for Production dated March 30, 2021, Nos. 4–5, and 8–11 ("Second RFPs"), and Plaintiffs' Third Amended Request for Production dated April 20, 2021, Nos. 4–6 and 12  ("Third RFPs"); (2) provide substantive responses to Third RFP Nos. 10 and 14; and (3) provide substantive responses to Plaintiffs' Third Set of Interrogatories dated March 30, 2021, Nos. 4, 7–10, and 14–15 ("Third Interrogatories"), and Plaintiffs' Fourth Set of Interrogatories dated April 19, 2021, Nos. 1-4 ("Fourth Interrogatories").

## OVERVIEW OF DISCOVERY DISPUTE

As this Court is aware, the operative Complaint alleges that Noom's trial period and autorenewal practices constitute a uniform and deceptive web designed to trap consumers into paying Noom's multi-month subscription fee.  ECF No. 167 ("TAC") ¶ 13.  To give context to the current dispute, however, it bears repeating that while the web's architecture has different sticking points that can each independently ensnare consumers, taken together the components lead to a common and predictable outcome: droves of consumers unintentionally paying for Noom's diet service.  *Id.* ¶ 14.  The complaint breaks down Noom's autorenewal web into seven separate elements: (1) a ubiquitous advertising campaign encouraging consumers to "try" Noom's diet, *id.* ¶¶ 54–59; (2) deception in Noom's trial sign-up process about what it means to "try" Noom including deception regarding autorenewal, how to cancel, and post-trial charges, *id.* ¶¶ 44–46, 60–70, 73; (3) critical and ongoing omissions about how to access and cancel Noom's services, *id.* ¶¶ 45, 71–72, 78, 82, 90–92; (4) an opaque cancellation process requiring customers to figure out

how to notify someone identified as their "coach" to cancel, but failing to provide a way to contact Noom by standard means, i.e., no phone number, no website chat, no prominent email address, *id.* ¶¶ 10, 16–17, 19, 52, 68–69, 74, 77; (5) deceptive "coach" assignment and other practices that further frustrate cancellation, *id.* ¶¶ 82–92; (6) sneakily assessing the full program charge once the trial ends, *id.* ¶¶ 2, 15, 19–20, 52; and (7) radio silence about impending or recent charges, including no receipt following the charge, *id.* ¶¶ 19, 45, 81.  Finally, the TAC describes the many red flags demonstrating that Noom's scheme was carefully and purposefully designed.  *Id.* ¶¶ 93–120.

The dispute at issue concerns Plaintiffs' most recent March and April 2021 discovery requests which seek evidence about many of the key components of Noom's deceptive autorenewal and trial period practices, including Noom's multi-month charges for the full program, failure to disclose impending or recent charges, and the purposeful design of its enrollment process to trick consumers into unintended purchases.  Plaintiffs also propounded interrogatories that, pursuant to Local Rule 33.3, seek the identity of persons who may have information relevant to this case or the existence and description of relevant documents.

Instead of cooperating and working with Plaintiffs to address any supposed concerns, Noom issued boilerplate responses, dug its heels in, and brushed off Plaintiffs' requests.  Such stonewalling tactics resulted in Noom providing no response whatsoever to over a dozen written discovery requests, as well as refusing to provide any meaningful responses to the discovery that is the subject of this motion.  Noom's approach is plainly improper.  *See In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) ("Discovery is run largely by attorneys, and the court and the judicial process depend upon honesty and fair dealing among attorneys.").  Of the twelve RFPs at issue in this motion, Noom either refused to produce any documents

whatsoever, Declaration of Ethan D. Roman ("Roman Decl.") Exs. A (Second RFPs Nos. 4–5, 9, 11); B (Third RFPs Nos. 4–6), offered to produce non-responsive documents it was already producing, Roman Decl. Ex. A (Second RFPs No. 8), refused to respond whatsoever, Roman Decl. Ex. B (Third RFPs Nos. 10, 12, and 14), or offered to meet and confer but then stood on its objections, Roman Decl. Ex. A (Second RFPs No. 10). Likewise, of the eleven interrogatories at issue in this motion, Noom offered non-responsive information, Roman Decl. Ex. C (Third Interrogatories No. 4), or refused to respond altogether, Roman Decl. Exs. C (Third Interrogatories Nos. 7–10 and 14–15); D (Fourth Interrogatories Nos. 1–4)).

The documents and information Noom is withholding go to the core of the issues in this case, including:

- What Noom's upper-level management and Board knew about Noom's autorenewal and billing practices and when they knew it.

- Noom's use of documented "dark patterns"—i.e., deceptive system designs on websites and apps that prey on human cognitive processing frailties.

- Differences between Noom's trial period and billing practices as opposed to those allowed and used by major app platforms Apple and Google that also sell Noom's Healthy Weight program.

- The calculation of key financial metrics that drive company strategy and, *inter alia*, place a value on each Noom customer based on a prediction regarding how long each customer is expected to continue paying for Noom services.

- The "names of witnesses with knowledge of information relevant to the subject matter of the action . . . and the existence, custodian, location and general description of relevant documents." Local Rule 33.3.

- Noom's refusal to confirm whether certain of Plaintiffs' document requests are subsumed within Noom's current collection, review, and production process.

- Internal company metrics tracking customer engagement ██████████████

This is crucial discovery that is well within the scope of the Federal and Local Rules.  Noom should be compelled to provide the discovery sought by Plaintiffs' written requests.

## THE FACTS RELEVANT TO THIS MOTION

### I.   PLAINTIFFS' EFFORTS TO OBTAIN THE REQUESTED DISCOVERY

On March 30, 2021, Plaintiffs served Noom with their Second RFPs and Third Interrogatories.  On April 19, 2021, Plaintiffs served their Fourth Interrogatories and on April 20, 2021, Plaintiffs served their Third RFPs.  Noom responded to the Second RFPs on May 6, 2021, responded to the Third RFPs on May 21, 2021, sent amended responses to the Third Interrogatories on July 1, 2021, and responded to the Fourth Interrogatories on May 19, 2021.  Roman Decl. Exs. A–D (respectively).  Plaintiffs notified Noom of the deficiencies in Noom's discovery responses via letters dated May 14 and 21, 2021, Roman Decl. Exs. E–F, and by email on May 21, Roman Decl. Ex. G. The parties met and conferred regarding Noom's deficiencies, but Noom refused to compromise on the requests at issue.  Plaintiffs raised this dispute at the June 16, 2021 discovery conference, where Your Honor directed Plaintiffs to file this discovery motion.  June 16, 2021 Hr'g Tr. at 51:4–8, ECF No. 350.

### II.   OVERVIEW OF NOOM'S IMPROPER OBJECTIONS AND RESPONSES

Although the improper objections and responses in Noom's responses are legion, a representative list follows:

- Specious objections that requests are "vague, ambiguous, and unintelligible" because they lack definitions of certain terms—including words that are clear in context such as "assumptions," "computing," "works," and "related documents and communications"— without providing the meaning Noom attributes to those terms.  *See, e.g.*, Roman Decl. Ex. A at 9–10 (RFP Nos. 4–5); Ex. B at 15–16, 19–20 (RFP Nos. 10, 14); Ex. C at 16–18 (Interrogatory Nos. 9–10).  These discovery requests and the terms therein are clear in the context of the case and Noom's feigned confusion is improper under Local Rule 26.4(b), which requires discovery requests to be "read reasonably in the recognition that the attorney serving them generally does not have the information being sought and the attorney receiving them generally does have such information or can obtain it from the client."  *Cf. U.S. Bank Nat'l Assoc. v. Triaxx Asset Mgmt. LLC*, No. 18 Civ. 4044, 2020

WL 9549505, at *5 (S.D.N.Y. Nov. 30, 2020) (overruling objections that "nontechnical English words or phrases that any litigant of ordinary intelligence . . . ought to have no difficult understanding" were vague and ambiguous).

- Improper counting of discovery requests to avoid responding.  Noom objected to many requests based on the improper contention that the cumulative number of requests exceeded the applicable limits.  But Noom's counting is so clearly wrong that it indicates gamesmanship.  Interrogatory subparts are counted as separate requests only if they are "logically or factually independent of the question posed by the basic interrogatory." *Torcasio v. New Canaan Bd. of Educ.*, No. 3:15 Civ. 53, 2016 WL 299009, at *11 (D. Conn. Jan. 25, 2016); *see also Bartnick v. CSX Transp., Inc.*, No. 1:11 Civ. 1120, 2012 WL 1565057, at *2 (N.D.N.Y. Apr. 27, 2012).  Despite this well-settled law, Defendants repeatedly claim that individual requests addressing discrete subjects were in fact multiple requests without trying to explain why the requests were "logically or factually independent" of the basic question.  The most troubling examples include Noom's responses to Third Interrogatories Nos. 12–13, which made the curious claim that interrogatories seeking information about each custodian or individual listed on Noom's November 17, 2020 ESI repository (22 people in total) should count as <u>22 separate interrogatories</u>.  Noom's improper counting resulted in its *refusal to respond whatsoever* to thirteen of the discovery requests at issue in this Motion.  Noom's actions are clearly improper.  *See U.S. v. $9,781.41 formerly on deposit at Man Fin. Inc.*, No. 07 Civ. 6224, 2009 WL 1864695, at *2 (S.D.N.Y. Jun. 16, 2009) (party's action in objecting—but not responding to—document requests was improper).

- Failure to state whether any responsive materials are being withheld on the basis of any objections.  Fed. R. Civ. P. 34(b)(2)(C).

- The improper use of general objections that are incorporated into every response.  *See Fischer v. Forrest*, No. 14 Civ. 1304, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017) ("[g]eneral objections should rarely be used" because "incorporating all of the General Objections into each response violates [the] specificity requirement" of Fed. R. Civ. P. 34(b)(2)(B)); *see also Benney v. Midwest Health, Inc.*, No. 17 Civ. 2548, 2019 WL 3066425, at *5 (D. Kan. July 12, 2019) ("[A]nswering discovery requests 'subject to' objections . . . has no basis at all in the Federal Rules of Civil Procedure.") (citation omitted).

- Offering to produce documents that are non-responsive to the discovery requests at issue and are subsumed under existing discovery requests.  *See, e.g.*, Roman Decl. Ex. A at 12–14 (RFP Nos. 8–9) (agreeing to produce BBB-related documents in response to discovery requests regarding dark patterns used in Noom's buyflow).

Noom's tactics have led to a wholesale refusal to meaningfully engage with Plaintiffs' discovery requests.  Of the twelve RFPs at issue in this motion, Defendants either stood on their improper objections (Second RFPs Nos. 4–5, 9, 11, Third RFPs Nos. 4–6), offered to produce non-

responsive documents they were already producing (Second RFPs No. 8), refused to respond whatsoever (Third RFPs Nos. 10, 12, and 14), or offered to meet and confer but then refused to compromise (Second RFPs No. 10).  Likewise, of the eleven interrogatories at issue here, Defendants offered non-responsive information (Third Interrogatories No. 4) or refused to provide a response (Third Interrogatories Nos. 7–10 and 14–15, Fourth Interrogatories Nos. 1–4). Plaintiffs bring the instant motion to secure this much needed discovery.

## ARGUMENT

I.  **PLAINTIFFS' DISCOVERY REQUESTS ARE PROPER, RELATE TO CRITICAL FACTUAL ISSUES, AND ARE SUPPORTED BY NOOM'S DOCUMENT PRODUCTIONS TO DATE**

   i.  **Discovery Concerning Apple's and Google's Practices Regarding the Same Healthy Weight Products Plaintiffs Purchased Will Lend Important Context to the Conduct Challenged by This Litigation and Further Demonstrate Noom's Intentional Deceptive Conduct**

| Discovery Request | Text of Request[1] |
|---|---|
| Second RFPs No. 10 | Internal reports, PowerPoint, presentations, meeting agendas, or other similar materials or communications with Noom's management and/or Noom's Board of Directors regarding comparisons of Noom's trial-period, autorenewal, and cancellation practices for Healthy Weight customers that enrolled via Noom's website versus customers who originally purchased Healthy Weight via Google or Apple. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <br><br> ▮▮▮▮▮▮ *see also* NOOM_59179 (stating that "[u]nlike web subscriptions, users can cancel their Google Play and iTunes subscription from their end," that Apple and Google allow "monthly charges only"); NOOM_59181 ("Google Play subs[criptions] do not come with a trial period and the user is charged right away"). |

---

[1] Noom's lengthy responses to these requests are laden with improper objections, some of which Noom has withdrawn.  Due to their extreme length, Plaintiffs have omitted Noom's responses and objections from this memorandum of law.  Pursuant to Local Rule 37.1, the full text of Noom's responses and objections can be found in Exs. A–D to the Roman Declaration.

| Second RFPs No. 11 | Documents sufficient to show why Google Play does not and did not offer Noom plans without a trial period, including any pertinent communications with Google. |
|---|---|
| Third RFPs No. 4 | Documents sufficient to show the buyflow during the relevant time period for Noom customers who enrolled via Google Play or iTunes, as well as information sufficient to identify all material changes to the buyflow for customers who enrolled via Google Play or iTunes (including effective dates for all such changes). |
| Third RFPs No. 5 | Internal reports, PowerPoint presentations, meeting agendas, or other similar materials or communications with Noom's management and/or Noom's Board of Directors regarding the fact that Google Play and iTunes do not and did not allow Noom to assess lump- sum charges for multi-month Healthy Weight memberships. *See* Plaintiffs' Third Interrogatory No. 15 (citing to relevant confidential Noom document). |
| Third RFPs No. 6 | Internal reports, PowerPoint presentations, meeting agendas, or other similar materials or communications with Noom's management and/or Noom's Board of Directors regarding the fact Google Play did not and does not offer Noom Healthy Weight plans sold via a trial period. |
| Third Interrogatories No. 14 | Explain Noom's understanding of why Google Play did not and does not offer any Noom Healthy Weight plans sold via a trial period. |
| Third Interrogatories No. 15 | Explain Noom's understanding of why Google Play and iTunes only allow Noom's Healthy Weight plans to be billed on a monthly basis. *See* NOOM_59179 (stating that that Google Play and iTunes allow "monthly charges only"). |

███████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

This discovery is common to all Class Members' claims and will be used to show commonality, typicality, and predominance of Plaintiffs' fraud, unjust enrichment, conversion, money had and received, and state consumer protection claims. *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 88 (2d Cir. 2015) ("Plaintiffs may be able to prove class-wide causation based on first-party reliance without an individualized inquiry into whether each class member relied on the defendant's misrepresentation if 'circumstantial evidence' generates a sufficiently strong inference that all class members did, in fact, rely."); *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 639–40 (5th Cir. 2016) (en banc) (That Class members are "the foreseeable victims of the alleged fraud" is the "most straightforward way of demonstrating reliance in a classwide manner . . . .").

This discovery is also relevant to a merits ruling on fraud, deceptive business practices, unjust enrichment, and conversion.  *See Koch v. Greenberg*, No. 07 Civ. 9600, 2008 WL 4778813, at \*5 (S.D.N.Y. Oct. 31, 2008) (that defendant is aware of deception and that there "may be many other victims" are relevant factors in determining the egregiousness of the alleged fraud); *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 543 (S.D.N.Y. 2013) ("[W]hether a particular act or practice is deceptive is usually a question of fact.").[2]

Despite this clear case law, Noom is blocking discovery concerning Apple and Google—*see* Second RFPs No. 10, Third RFPs Nos. 4–6 and 11, Third Interrogatories Nos. 14–15—on multiple grounds, including that the requests are irrelevant because they seek Noom's "state of mind as to comparisons of Noom's trial period," and that Google Play and iTunes products are not at issue.  *See, e.g.*, Roman Decl. Ex. B at 10–11.  As noted above, what Defendants knew and when they knew it is critical discoverable information; Noom's objections as to state of mind are therefore frivolous.  Indeed, throughout the course of discovery, Noom has repeatedly mischaracterized key discovery relating to its "state of mind" as irrelevant, which Your Honor has rejected.  *See, e.g.*, Feb. 4, 2021 Hr'g Tr. at 56:24–57:12 (overruling defense counsel's objection that "what Noom supposedly thought and what it intended" was irrelevant), ECF No. 201.

---

[2] *See also Ackerman v. Coca-Cola Co.*, No. 09 Civ. 0395, 2010 WL 2925955, at \*17 (E.D.N.Y. July 21, 2010) ("[W]hether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides . . . ."); *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 84 n.27 (1989) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.  For normally the actor is presumed to have intended the natural consequences of his deeds.") (citation omitted); *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (while proof of actual deception is not necessary to show deceptive business practices, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances."); *Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F. Supp. 915, 926 (S.D.N.Y. 1981) ("The best evidence of likelihood of confusion is the occurrence of actual confusion and mistakes.").

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████    ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ Noom's review of and reaction to Google policy changes such as these and other autorenewal policy-related communications from or regarding Apple and Google—including any discussions of why Noom decided not to provide the same disclosures or procedures as Google and Apple despite being aware of such disclosures and procedures—are clearly relevant here.

Another example of why documents concerning Apple and Google are germane comes from ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

Further, it is unfair for Noom withhold documents regarding Noom's considerations of Apple's and Google's practices given that Noom's own motion to dismiss relies on its Apple rating.  ECF No. 206 at 3.  ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████ [3]  Noom's internal analysis of the implications of what Apple and Google would or would not permit is therefore germane to Plaintiffs' allegations.

---

[3] All websites cited in this motion were last visited on July 6, 2021.



Roman Decl. Ex. M.  Nancy Sidnam, Noom's Coach Program Director, responded ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Apple and Google discovery will likely shed further light on documents like this, including documents acknowledging the stark differences in renewal practices between the Noom website versus Google Play and iTunes.  *Id.*

Finally, as for the interrogatories Plaintiffs issued regarding Apple and Google, this discovery is clearly more practical than "obtaining the information sought than a request for production or a deposition" as required by Local Rule 33.3.  For example, Interrogatory No. 14 seeking Noom's understanding of why Google Play did not and does not offer any Noom Healthy Weight plans sold via a trial period is practical because, *inter alia*, it accompanies and aligns with document requests (Second RFPs No. 10–11, Third RFPs No. 6).  The same is true for Interrogatory No. 15 seeking Noom's understanding of why Google Play and iTunes only allow Noom's Healthy Weight plans to be billed on a monthly basis, which addresses similar facts as Third RFPs No. 5.  Furthermore, Plaintiffs' Apple and Google discovery (including the two interrogatories) target a discrete issue that should not require a Rule 30(b)(6) deposition.  In fact, Plaintiffs' two interrogatories are superior to a deposition because Noom will need to search for

documents responsive to Plaintiffs' document requests and can therefore simultaneously and efficiently respond to these interrogatories.

Because these discovery requests lend important context to the conduct challenged by this litigation and will serve to demonstrate Noom's knowledge of its deceptive sales and marketing practices, the Court should compel Noom to produce documents responsive to the RFPs identified above and respond to the accompanying interrogatories.

b.  **Noom's Knowledge and Use of Dark Patterns in Its Buyflow is a Critical Issue to Establish Noom's Deception**

| Discovery Request | Text of Request |
|---|---|
| Second RFPs No. 8 | Internal reports, PowerPoint, presentations, meeting agendas, or other similar materials or communications with Noom's management and/or Noom's Board of Directors regarding development of, and decision to use, a countdown timer in Noom's sign-up flow. |
| Second RFPs No. 9 | Internal reports, PowerPoint, presentations, meeting agendas, or other similar materials or communications with Noom's management and/or Noom's Board of Directors regarding the length of Noom's sign-up flow as well as any delays embedded therein including Noom's "connecting to a database" and "building plan" delays. |
| Third RFPs No. 12 | Documents and communications concerning or discussing Dark Patterns and/or the concept of Dark Patterns. |

While Plaintiffs have gone to great lengths to build their case thus far, they are not writing on a blank slate. Their challenge to Noom's unlawful conduct is part of a decades-long effort by consumers and consumer watchdogs to rid the marketplace of similar negative option auto-renewal scams. For example, after this case was filed, on September 2, 2020 the FTC announced a $10 million civil penalty and substantial injunctive relief against the children's online learning company ABCmouse because of that company's identical tactic of combining a hidden

autorenewal feature with making "it difficult for consumers to cancel."[4]  As FTC Commissioner Rohit Chopra noted in announcing the crackdown, the automatic renewal scam is simply "the online successor to decades of dirty dealing in direct mail marketing."[5]  Worse, automatic renewal scams "pose an even bigger menace than their paper precursors" because they are "not limited by physical constraints and costs."  *Id.*  Using the "Dark Patterns" rubric created by Plaintiffs' expert Dr. Harry Brignull, PhD, Commissioner Chopra emphasized that "researchers have identified a wide variety of dark patterns" that foster outcomes that "could not be achieved without deception," and that (like here) such practices "scammed millions of dollars from families through dark patterns" by "making it extremely difficult to cancel recurring subscription fees."  *Id.*

Plaintiffs' expert Harry Brignull has provided Plaintiffs with a preliminary, yet comprehensive analysis of the dark patterns Noom uses in its online trial period buyflow.  *See* Roman Decl. Ex. N ("Brignull Report").  For example, Dr. Brignull's report notes that the countdown timer that is the subject of RFP No. 8 is "fake and serves no technical purpose" and its purpose is to "add psychological pressure to the user."  *Id.* at 21–22.  Dr. Brignull further notes that the use of such timers causes consumers to "read less content on the page and engage in less thorough critical reasoning about the information presented to them."  *Id.* at 22.  Frequently, this results in consumers not understanding the terms of signing up for a Noom trial.  *Id.*

---

[4] Press Release, Federal Trade Commission, Children's Online Learning Program ABCmouse to Pay $10 Million to Settle FTC Charges of Illegal Marketing and Billing Practices (Sept. 2, 2020) https://www.ftc.gov/news-events/press-releases/2020/09/childrens-online-learning-program-abcmouse-pay-10-million-settle.

[5] Statement of Rohit Chopra Regarding Dark Patterns in the Matter of Age of Learning, Inc., Commission File Number 1723186, at 1, September 2, 2020 https://www.ftc.gov/system/files/documents/public_statements/1579927/172_3086_abcmouse_-_rchopra_statement.pdf.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Roman Decl. Ex. P at 4.

With respect to "connecting to a database" and "building plan" delays in RFP No. 9, Dr. Brignull highlights that such buyflow delays cause mental fatigue, leading users to "spend less time and effort evaluating the information presented on the [payment] page."  Brignull Report at 23. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████  It cannot be reasonably disputed that items like this that are obviously targeted by Second RFPs No. 9 are relevant discovery here.

Dr. Brignull has made clear that Noom's buyflow is filled with dark patterns, including the Hidden Subscription, Trick Wording, Visual Interference, Deceptive Countdown Timer, Mental Fatigue, Trick Wording, and Hard to Cancel dark patterns. Brignull Report at 18–35. Documents and communications about these (and other) dark patterns, as requested in Third RFP No. 12, will illuminate the Court and the jury's understanding of the conduct challenged in this litigation and demonstrate Noom's knowledge of and intention to use these deceptive tactics.

Nevertheless, Noom objected to Plaintiffs' requests regarding dark patterns—*see* Second RFPs Nos. 8–9, Third RFPs No. 12—claiming that the requests were not targeted at the Healthy Weight program and that Noom would only produce the discovery Your Honor has already ordered it to produce. *See, e.g.*, Roman Decl. Ex. A at 12–13. Noom's objections are improper, wrong, and completely ignore the report submitted by Plaintiffs' expert (which Noom has had since December 14, 2020). Noom should be ordered to produce the documents sought by these RFPs.

      **c.** **The Requested Financial Metrics Show Noom's Knowledge of the Impact of Its Conduct on Customers and Drive Internal Decision-Making**

| Discovery Request | Text of Request |
|---|---|
| Second RFPs No. 4 | The probability tables and assumptions used for computing eRev, eCLTV, and/or eLTV. |
| Second RFPs No. 5 | Documents sufficient to show how Noom's ████████████████, *see* Schaffer Tr. 158:1-8. |
| Third Interrogatories No. 9 | Identify all input variables and assumptions used by Noom to project or forecast Noom customer tenure and/or payments made by Noom customers, including the input variables and assumptions that are used to determine, calculate, or project: (a) eRev; (b) eCLTV; or (c) eLTV. |

| Third Interrogatories No. 10 | Explain how Noom's ██████████████████, *see* Schaffer Tr. 158:1-8. |

eRev stands for "estimated revenue."   Roman Decl. Ex. Q.   eLTV likely stands for "expected long term value" and eCLTV likely stands for "expected customer long term value." When Plaintiffs deposed Noom Lead Data Scientist Paul Schaffer in December 2020, he testified that ████████████████████████████████████████████████████████ ████████████████ Roman Decl. Ex. R at 157:19–25.  Mr. Schaffer ████████████ ████████████████████████████████████████████████████████ ████████████████ *Id.* at 158:1–20.

████████████████████████████████████████████████

████████████████████████████████████████████████

*See, e.g.*, Roman Decl. Ex. S at 12 ██████████████████████████ ████████████████████████████████

Furthermore, these metrics were used to inform the conduct challenged in this lawsuit.  For example, ████████████████████████████████████████████████ ██████████████████████████████████████  ████████ ████████████████████████████████████████████████ ████████████████████████████ Roman Decl. Ex. T.  Discovery regarding these metrics will further illuminate Noom's conduct and its knowledge of the effect of its practices on consumers, including how much money Noom expects to extract.

Additionally, Noom's built-in probability assumptions for how long each customer would be expected to remain a Noom customer and how those assumptions are derived are critical facts for determining Noom's knowledge of the customer lifecycle and the extent to which changes in

the buyflow or other autorenewal practices changed Noom's assumptions over time.   Noom's discussions regarding those probability assumptions could easily lead to discussions regarding the types of customers (age, gender, etc.) that Noom identified as most likely to be duped by its autorenewal practices.

The financial metrics interrogatories are likewise appropriate under the Local Rules and Your Honor's rulings.   First, Your Honor already instructed Defendants that "the money is going to drive the whole thing" and that financial discovery is "part and parcel" of what the Court expects to be produced.   Feb. 4, 2021 Hr'g Tr. at 37:14–38:6, ECF No. 201.   Second, Plaintiffs *already deposed a Noom employee* ██████████████████████████████████████ ████████████████████████████████████████████   Roman Decl. Ex. R. Plaintiffs' Interrogatories are thus the most practical method of obtaining this information.

Nevertheless, Noom objected to Plaintiffs' requests regarding financial metrics eRev, eCLTV, and eLTV—*see* Second RFPs Nos. 4–5, Third Interrogatories Nos. 9–10—claiming the requests were vague and ambiguous, better suited to other forms of discovery, and that the interrogatories violated Local Rule 33.3.   *See* Roman Decl. Ex. A at 9–10; Roman Decl. Ex. C at 16–18.   Noom is wrong.   Nothing about the requests are ambiguous and defense counsel never tried to clarify any of their supposed confusion.   *See, e.g.*, *Heller v. City of Dallas*, 303 F.R.D. 466, 492 (N.D. Tex. 2014) ("[i]f a party believes that the request is vague, that party [should] attempt to obtain clarification prior to objecting on this ground.") (collecting cases).   Similarly, Plaintiffs have already tried to get clarification on these metrics via depositions, which Noom's witnesses were unable to provide.   Noom should not be allowed to further block this important discovery.

**d. Identifying Board Members and Data Collected About Named Plaintiffs Are Precisely the Type of Interrogatories Contemplated by the Local Rules**

| Discovery Request | Text of Request |
|---|---|
| Third Interrogatories No. 4 | Identify and describe the categories of data Noom collected on the Named Plaintiffs. *See* ECF No. 201 at 10. |
| Third Interrogatories No. 7 | Identify the names of each current or former member of Noom's Board of Directors, their dates of service, and last known contact information (address, phone, and email).[6] |
| Third Interrogatories No. 8 | Identify the names of each current or former member of Noom's Advisory Board or nonemployee advisors, their dates of service, and last known contact information (address, phone, and email).[7] |

Plaintiffs' interrogatories seeking the identity and dates of service of Noom's Board of Directors and its "Advisory Board"—Roman Decl. Ex. C at 14–15—hew closely with Local Rule 33.3's provision for interrogatories "seeking names of witnesses with knowledge of information relevant to the subject matter of the action." These interrogatories seek the identities of potential witnesses, and Noom should be ordered to provide the requested information, especially considering Your Honor's July 1 order requiring the production of Noom CEO Saeju Jeong's communications with the Board and investors. July 1, 2021 Hr'g Tr. at 32:17–24. Noom's identification of Board members and advisors will provide critical context for this forthcoming discovery.

---

[6] In response to Noom's objection, Plaintiffs withdrew their request for contact information.

[7] *See* https://www.crunchbase.com/organization/noom/people (listing Tom Hildebrandt, Steve Brotman, and Logan Merriam as non-board member "advisors"); *see also* https://www.linkedin.com/in/thomas-hildebrandt-31264b4/ (Tom's Hildebrant's LinkedIn profile stating that he has been on Noom's "Advisory Board" since April 2010).

Likewise, Plaintiffs seek identification of all categories of data that Noom collected on the

Named Plaintiffs, not just the user engagement and billing data Your Honor has ordered Noom to

produce. *Id.* at 9. This request is squarely in line with Local Rule 33.3, as it seeks "the existence,

custodian, location and general description of relevant documents." Furthermore, the data Noom

has provided to date contains ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ A full

response to this interrogatory is critical to begin clearing up these data issues and to provide

Plaintiffs with a full picture as to what data is available for analyzing Class Members' response to

the conduct that is challenged in this litigation.

e. **Consistent with the Local Rules, Plaintiffs' Interrogatories Regarding Slack Channels Seek to Identify the Existence of Discoverable Documents**

| Discovery Request | Text of Request |
|---|---|
| Fourth Interrogatories No. 1 | State the number of private Slack channels in Noom's Slack account and identify the name and all channel owners of each private Slack channel that was not being fully preserved as of May 12, 2020. *See* ECF No. 48-1 at 7. |
| Fourth Interrogatories No. 2 | For any private Slack channel that was not being fully preserved as of May 12, 2020, but was later fully preserved, identify the date Noom began fully preserving that private Slack channel. |
| Fourth Interrogatories No. 3 | Identify the names and all channel owners of any private Slack channels that at any point during the relevant time period had the default preservation settings overridden, the dates during which the default preservation settings were not in effect, and what settings (i.e. auto-deletion or other settings) were in effect. *See* ECF No. 48-3 at 1. |
| Fourth Interrogatories No. 4 | Identify the names of any public Slack channels that at any point during the relevant time period had the default preservation settings overridden, the dates during which the default preservation settings were not in effect, and what settings (i.e. auto-deletion or other settings) were in effect. *See* ECF No. 48-3 at 1. |

On July 23, 2020, Defendants disclosed that "Noom employees primarily use the instant messaging service Slack to communicate with one another."  ECF No. 48-1 at 6.  Relevant here are Slack's "channels."  A channel is a single place for a team to share messages, tools, and files.  Channels can be organized around any topic and there is no limit on channels.  Channels can be either "public" or "private."  Public channels are open for all members to join, and anything posted is searchable by others.  Slack's website describes public channels as "promot[ing] transparency and inclusivity" whereas private channels "are for conversations that should not be open to all members."  Slack Help Center, *What is a channel?*, https://slack.com/help/articles/360017938993-What-is-a-channel.  "People must be added to a private channel by someone who's already a member of the channel."  *Id.*  When a channel is created, the creator "can decide if it will be public or private."  *Id.*  Channels "can later be converted from public to private, but for privacy reasons, it can't be made public if it's a private channel."  *Id.*

Noom's July 23 letter also stated that "there are no automatic deletion or purging protocols in place that would affect potentially responsive ESI ***except*** that "Noom's slack permissions are such that channel owners have permission to override the default controls (which keep all messages for the lifetime of Noom's workspace) and implement auto-deletion protocols."  ECF No. 48-1 at 7.  Defense counsel assured that "[w]e believe it is highly unlikely that the default settings have been modified and, out of an abundance of caution, we are confirming this information with individual Slack channel owners."  *Id.*

After ignoring Plaintiffs' repeated requests that it confirm all Slack channels were being preserved, on August 26 Noom again reiterated that "default settings for both public and private Slack channels are such that all messages are preserved for the life of the workspace" but that counsel could only confirm that "the default settings had not been altered for any ***public*** slack

channels (except for a small number we deemed non-responsive)."  ECF No. 48-3 at 2.  In other words, counsel refused to confirm whether any ***private*** slack channels' default settings had been overridden and made the undisclosed judgment call at the outset of the litigation that the public slack channels that had experienced default overrides were "non-responsive."  *Id.*  These revelations directly contradicted the claims in Defendant's July 23 letter.

Then, on September 4, 2020, Noom changed tack again and disclosed that three public Slack channels had been set to automatic deletion and that "Noom determined that one of those channels may have information that Plaintiffs would consider responsive (Noom does not) and thus returned that channel to the default settings."  ECF No. 50 at 5.  Noom further disclosed that "Noom ***had not*** separately confirmed that each individual Noom employee had not altered his or her default settings to turn on autodeletion on their own ***private*** Slack messages" because "it had no ability to do so on an automated basis."  *Id.*  Nevertheless, Noom still claimed that it was "unlikely" any private channel owner would have overridden the default preservation settings.  *Id.* At the September 9 conference, Your Honor asked defense counsel point blank whether it had looked at the issue of overrides and asked Noom to confirm that no one on Noom's litigation "hold list has overridden" any public or private channels' default preservation settings.  Sept. 9, 2020 Hr'g Tr. at 15:20–21, ECF No. 55.  Notably, defense counsel did not answer Your Honor's question.

The table below outlines the unanswered questions raised by Noom's shifting accounts of the data in Noom's Slack account that was (or was not) being preserved during the relevant period.

| Source | What is known? | Outstanding Questions |
|---|---|---|
| Private Channels | Noom claims it was able to begin systematically preserving these | 1.  Which private channels had their default preservation settings overridden at any point during the relevant period before this case was filed in May 2020? |

| | messages as of August 2020. ECF No. 50 at 5. | 2. For any private channels that had their default preservation settings overridden before May 2020, what was the setting applied (i.e. auto-deletion or other settings), and during which time period?<br><br>3. The names of the owners and participants in any private channel that had its default preservation settings overridden at any point before May 2020.<br><br>4. Your Honor's question as to whether any litigation hold recipient had overridden the default preservation settings of a private slack channel. |
|---|---|---|
| Public Channels | On September 4, 2020, Noom claimed that "only three public channels were set to automatic deletion" and that "Noom determined that one of those channels may have information that Plaintiffs would consider responsive (Noom does not) and thus returned that channel to the default settings." ECF No. 50 at 5. | 1. The names of the three public channels referenced in Noom's September 4 letter, including the name of the of the channel Noom returned to preservation.<br><br>2. The names of any other public channels that at any point during the relevant time period had the default preservation settings overridden, the dates during which the default preservation settings were not in effect, and what settings (i.e. auto-deletion or other settings) were in effect.<br><br>3. Your Honor's question as to whether any litigation hold recipient had overridden the default preservation settings of a public slack channel. |

Plaintiffs' interrogatories regarding the identification of Slack channels that were not being preserved—Fourth Interrogatories Nos. 1–4, Roman Decl. Ex. D at 4–9—seek answers to these questions, which are permitted under the Local Rules to determine "the existence, custodian, location and general description of relevant documents." Local Rule 33.3.

Noom objected to these requests on the ground that they "seek[] to re-litigate a discovery issue Plaintiffs have already lost," *see, e.g.*, Roman Decl. Ex. D at 4. This is incorrect. After learning about the existence of Slack channels that were not being preserved, during the September

9, 2020 initial conference, Plaintiffs requested a preservation order regarding these Slack channels.

Your Honor denied that request as "premature," but further noted that discovery is an "iterative

process, and more information may be learned after some initial period of discovery."  Sept. 9,

2020 Hr'g Tr. at 20:11–21:16, ECF No. 55.  In truth, Your Honor directed Noom to provide the

information sought in these interrogatories with respect to the custodians in this case.  *Id.* at 36:22–

37:5 ("I do think that for the individuals identified thus far, all of them need to have preservation

. . . and you should at least provide for those individuals, provide plaintiffs with the types of

accounts that they were using.  So, you know, maybe they accessed five public Slacks and had one

private Slack.  I don't know . . . what they are, but if there's titles to those, there is some kind of

list, *I think you should categorize those and provide it to the plaintiffs.*") (emphasis added).  Despite

Your Honor's clear directive, Noom has not identified any custodial Slack channels that were not

fully preserved at all relevant times.

Plaintiffs' interrogatories are discrete, focused requests that seeks to identify the existence

of discoverable information and may inform Plaintiffs' strategy as the case proceeds with respect

to reviewing and uncovering responsive documents.

### f.   It Is Efficient—and Benefits Both Parties—to Confirm Whether Documents Responsive to Requests are Subsumed by Noom's Current Efforts

| Discovery Request | Text of Request |
|---|---|
| Third RFPs No. 10 | Design documents and related documents and communications concerning the experiments Noom conducted that tested trial conversion and/or customer retention. |
| Third RFPs No. 14 | Internal reports, PowerPoint presentations, meeting agendas, or other similar materials or communications with Noom's management and/or Noom's Board of Directors regarding Noom customers who paid for a Healthy Weight plan, but (1) never enrolled; (2) never installed the app; (3) never opened the app; (4) never engaged with the app; (5) did not open the app during a trial period; (6) did not engage with the app during a trial period; (7) |

| | did not open the app during a certain amount of time after the trial period; or (8) did not engage with the app during a certain amount of time after the trial period. |
|---|---|

Lastly, there are two requests—Third RFPs Nos. 10 and 14—that Plaintiffs believe may be subsumed within Noom's current document collection and review, but because Noom refused to respond (claiming Plaintiffs had exceeded the number of allowable requests), Plaintiffs are in the dark as to whether Noom is deliberately preventing the production of relevant documents. Plaintiffs simply seek Defendants to provide a proper response to these requests that would confirm whether these documents are already being searched for and produced, or whether additional steps are needed for Defendants to comply fully with these requests.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully ask the Court for an Order compelling Defendants to: (1) produce documents responsive to RFP Nos. 4–5, and 8–11 from Plaintiffs' Second RFPs and RFP Nos. 4–6 and 12 from Plaintiffs' Third RFPs; (2) provide substantive responses to RFP Nos. 10 and 14 from the Third RFPs; (3) provide substantive responses to Interrogatory Nos. 4, 7–10, and 14–15 from Plaintiffs' Third Interrogatories and Interrogatory Nos. 1–4 from Plaintiffs' Fourth Interrogatories; and (4) for other such relief the Court deems just and proper.

Dated:  July 7, 2021                              Respectfully submitted,

                                                **WITTELS MCINTURFF PALIKOVIC**

By:    /s/ Ethan D. Roman
           Steven L. Wittels
           J. Burkett McInturff
           Steven D. Cohen
           Ethan D. Roman
           Jessica L. Hunter
           18 HALF MILE ROAD
           ARMONK, NEW YORK 10504
           Telephone:  (914) 319-9945
           Facsimile:  (914) 273-2563
           slw@wittelslaw.com
           jbm@wittelslaw.com
           sdc@wittelslaw.com
           edr@wittelslaw.com
           jlh@wittelslaw.com

           *Counsel for Plaintiffs and*
           *the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Plaintiffs' Motion to Compel Document Production and Responses to Written Discovery Requests was served via ECF this 7th day of July 2021 upon all counsel of record.

/s/_ Ethan D. Roman _
Ethan D. Roman