**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MOJO NICHOLS, SUSAN BREWSTER, DUANE DEA, MARYANNE DERACLEO, KAREN KELLY, REBECCA RICHARDS, JENNIFER SELLERS, and STACY SPENCER, <br><br> *Individually and on Behalf of All Others Similarly Situated*, <br><br> Plaintiffs, <br><br> v. <br><br> NOOM, INC., ARTEM PETAKOV, and JOHN DOES 1 TO 5, <br><br> Defendants. | No. 20 Civ. 3677 (KHP) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT AND RELATED RELIEF**

**WITTELS MCINTURFF PALIKOVIC**
Steven L. Wittels
J. Burkett McInturff
Tiasha Palikovic
Steven D. Cohen
Ethan D. Roman
Jessica L. Hunter

18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile:  (914) 273-2563

*Lead Counsel for Plaintiffs and the Class*

Dated: June 10, 2022

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................. 5

I.     SUMMARY OF THE ACTION, SETTLEMENT NEGOTIATIONS, AND NOTICE ................................................................................................................ 5

     A.     Factual Allegations ........................................................................................ 5

     B.     Plaintiffs' Investigation ................................................................................ 5

     C.     Litigation and Settlement Negotiations ...................................................... 6

     D.     The Notice Campaign .................................................................................... 8

II.     SUMMARY OF SETTLEMENT TERMS ......................................................... 9

     A.     Eligible Class Members ................................................................................. 9

     B.     The Settlement Amount and Allocation Plan ........................................... 10

     C.     Business Practice Changes .......................................................................... 11

           1.    Programmatic Relief Benefiting Class Members Who Are Current Customers .................................................................................... 11

           2.    Programmatic Relief Benefiting All Class Members and the Consuming Public .................................................................................... 11

           3.    The Cash Value of the Programmatic Relief Secured by the Settlement ....... 15

III.    CLASS MEMBERS' POSITIVE RESPONSE TO THE SETTLEMENT ........................ 15

ARGUMENT ..................................................................................................................... 16

I.     LEGAL STANDARD FOR FINAL CLASS ACTION SETTLEMENT APPROVAL ............................................................................................................ 16

II.     THE SETTLEMENT SATISFIES THE CRITERIA FOR FINAL APPROVAL ............. 17

     A.     The Settlement Is Procedurally Fair ........................................................ 17

           1.    Rule 23(e)(2)(A)'s Adequacy of Representation Requirement: Plaintiffs and Their Counsel Are Zealous and Qualified Advocates for the Class ...................................................................................... 17

2.   Rule 23(e)(2)(B)'s Requirement of Arm's-Length Negotiations: The Parties' Vigorous Negotiations Were Arm's Length at All Times and Overseen by Experienced Neutrals ......................................................... 19

B.   The Settlement Is Substantively Fair ...................................................................... 19

1.   Rule 23(e)(2)(C)(i) and the Grinnell Factors: The Settlement Amount Is Substantial, Even Considering the Best Possible Recovery .......................... 20

a.   Litigation Through Trial Would Be Complex and Costly (*Grinnell* Factor 1) ................................................................ 20

b.   The Class's Reaction Is Overwhelmingly Positive (*Grinnell* Factor 2) ................................................................ 21

c.   Discovery Has Advanced Far Enough to Allow the Parties to Resolve the Case Responsibly (*Grinnell* Factor 3) .................................... 21

d.   Plaintiffs Face Real Risks if the Case Proceeds (*Grinnell* Factors 4 to 6) ................................................................ 21

e.   Although Noom Likely Could Withstand a Greater Judgment, That Does Not Suggest the Settlement Is Unfair (*Grinnell* Factor 7) ....... 23

f.   The Settlement Is Substantial, Even Considering the Best Possible Recovery (*Grinnell* Factors 8 and 9) ........................................ 24

2.   The Remaining Rule 23(e)(2)(C) Factors Are Easily Satisfied ..................... 24

a.   The Proposed Distribution Method Is Effective (Rule 23(e)(2)(C)(ii)) .... 24

b.   Class Counsel's Fee and Expense Award Is Well Within the Norms of this Circuit (Rule 23(e)(2)(C)(iii)) ........................................ 26

3.   Rule 23(e)(2)(D)'s Equitable Treatment Requirement:  The Parties' Allocation Plan Correlates with Actual Damages and Is Reasonable ........... 27

III.   NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS .................... 28

IV.   CERTIFICATION OF THE RULE 23 SETTLEMENT CLASS IS APPROPRIATE ..... 28

V.   THE COURT SHOULD DIRECT SERVICE AWARDS TO PLAINTIFFS .................. 29

VI.   THE COURT SHOULD GRANT THE REQUESTED FEES AND EXPENSES .......... 30

A.   Class Counsel Should Be Adequately Compensated for their Substantial Efforts and the Tremendous Financial Risk They Took for the Class's Benefit ................................................................ 32

B.      The Standard for Awarding Attorneys' Fees in Class Actions ............................... 33

    1.   The *Goldberger* Factors Support Plaintiffs' One-Third Requested Fee
         Award ............................................................................................................. 34

         a.   Class Counsel's Time and Labor ............................................................. 34

         b.   Magnitude and Complexity of the Litigation............................................. 34

         c.   Risks of the Litigation.............................................................................. 35

         d.   Quality of Representation ......................................................................... 37

         e.   The Requested Fee Is Reasonable in Relation to the Settlement.............. 39

         f.   Public Policy Considerations ................................................................... 39

    2.   The Lodestar Cross Check Further Supports Class Counsel's Fee and
         Expense Request ............................................................................................. 41

CONCLUSION ............................................................................................................. 45

## **<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Adams v. Rose*,
   No. 03 Civ. 7011, 2003 WL 21982207 (2d Cir. Aug. 20, 2003) ............................................ 36

*Alleyne v. Time Moving & Storage Inc.*,
   264 F.R.D. 41, 60 (E.D.N.Y. 2010) ...................................................................................... 40

*Anwar v. Fairfield Greenwich Ltd.*,
   No. 09 Civ. 118 (VM), 2012 WL 1981505 (S.D.N.Y. June 1, 2012) ...................................... 31

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty.*
   *Bd. of Elections*, 522 F.3d 182 (2d Cir. 2008) ............................................................... 43, 44

*Asare v. Change Grp. of New York, Inc.*,
   No. 12 Civ. 3371 (CM), 2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013) .................................. 40

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) .................................................................................................... 17

*Beckman v. KeyBank, N.A.*,
   293 F.R.D. 467 (S.D.N.Y. 2013) ........................................................................................... 43

*Bryant v. Potbelly Sandwich Works*,
   No. 17 Civ. 7638 (CM) (HBP), 2020 WL 563804 (S.D.N.Y. Feb. 4, 2020) ........................... 20

*Cates v. Trustees of Columbia Univ. in City of N.Y.*,
   No. 16 Civ. 6524 (GBD), 2021 WL 4847890 (S.D.N.Y. Oct. 18, 2021) ........................... 35, 42

*Christine Asia Co. v. Yun Ma*,
   No. 15 MD 631, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) .................................. 17, 20, 26

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ......................................................................................... *passim*

*Cruz v. Local Union No. 3 of IBEW*,
   34 F.3d 1148 (2d Cir. 1994) .................................................................................................. 43

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) .............................................................................................. 20, 23

*Davenport v. Elite Model Mgmt. Corp.*,
   No. 13 Civ. 01061 (AJN), 2014 WL 12756756 (S.D.N.Y. May 12, 2014) .............................. 44

*Davis v. J.P. Morgan Chase & Co.*,
   827 F. Supp. 2d 172 (W.D.N.Y. 2011) ...................................................................................... 43

*Dea, et al. v. Noom, Inc.*,
   No. RG21101244 (Cal. Super. Ct.) ............................................................................................. 6

*DeLeon v. Wells Fargo Bank, N.A.*,
   No. 12 Civ. 4494 (RLE), 2015 WL 2255394 (S.D.N.Y. May 11, 2015) .......................... 32, 35

*Delgado v. Ocwen Loan Servicing LLC, et al.*,
   No. 13 Civ. 4427 (E.D.N.Y. Aug. 20, 2019), ECF No. 429 ..................................................... 45

*Delijanin v. Wolfgang's Steakhouse Inc.*,
   No. 18 Civ. 7854 (LJL) (KHP), 2021 WL 535635 (S.D.N.Y. Feb. 12, 2021) ................... 21, 22

*Denney v. Deutsche Bank AG*,
   443 F.3d 253, 268 (2d Cir. 2006) .............................................................................................. 18

*Deracleo, et al. v. Noom, Inc.*,
   No. 653475/2021 (Sup. Ct. N.Y. Cnty.) ...................................................................................... 6

*Dornberger v. Metropolitan Life Ins. Co.*,
   203 F.R.D. 118 (S.D.N.Y. 2001) ............................................................................................... 28

*Emeterio v. A&P Rest. Corp.*,
   No. 20 Civ. 970 (KHP), 2022 WL 274007 (S.D.N.Y. Jan. 26, 2022) ............................... *passim*

*Espinosa v. Perez*,
   No. 18 CV 8855 (LGS) (SN), 2020 WL 2950978 (S.D.N.Y. Jan. 27, 2020) .......................... 44

*Ferrick v. Spotify USA Inc.*,
   No. 16 Civ. 8412 (AJN), 2018 WL 2324076 (S.D.N.Y. May 22, 2018) .................................. 15

*Ferrington v. McAfee, Inc.*,
   No. 10 Civ. 1455, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) ................................................. 4

*Fleisher v. Phoenix Life Ins. Co.*,
   No. 14 Civ. 8714 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ..................... 15, 27, 38

*Flores v. One Hanover, LLC*,
   No. 13 Civ. 5184 (AJP), 2014 WL 2567912 (S.D.N.Y. June 9, 2014) ..................................... 32

*FTC v. Age of Learning, Inc.*,
   No. 20 Civ. 7996, ECF No. 4-1 (C.D. Cal. Sept. 1, 2020)................................... 30. 31

*FTC v. Bunzai Media Grp., Inc.*,
   No. 15 Civ. 4527 (GW) (PLA), ECF No. 676 (C.D. Cal. June 27, 2018) ............................... 31

*FTC v. Triangle Media Corp.*,
   No. 18 Civ. 1388 (LAB), ECF Nos. 126–27 (S.D. Cal. May 30, 2019) ................................... 31

*FTC v. Wilms*,
   No. 11 Civ. 828 (MP), ECF No. 117 (W.D. Wash. Mar. 6, 2012) ........................................... 31

*FTC v. XXL Impressions LLC*,
   No. 17 Civ. 67 (NT), ECF No. 42 (D. Me. Sept. 13, 2017)...................................................... 31

*Gascho v Glob. Fitness Holdings, LLC*,
   822 F3d 269 (6th Cir 2016)..................................................................................................... 33

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)...............................................................................................*passim*

*Habelito v. Guthy-Renker*,
   No. BC499558 (Sup. Ct. Los Angeles Cty. Feb. 1, 2017) ....................................................... 30

*Hicks v. Stanley*,
   No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005)...................... 39

*In re Abrams & Abrams, P.A.*,
   605 F.3d 238 (4th Cir. 2010)................................................................................................... 36

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
   No. 02 Civ. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006).................................... 22

*In re Austrian & German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000)....................................................................................... 20

*In re Brown Co. Sec. Litig.*,
   355 F. Supp. 574 (S.D.N.Y. 1973).......................................................................................... 35

*In re Buspirone Antitrust Litig.*,
   No. 01 Civ. 7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003)......................... 43

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   343 F. Supp. 3d 394 (S.D.N.Y. 2018)............................................................................... 22, 23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   No. 02 Civ. 3400 (CM) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) .................. 39, 42

*In re GSE Bonds Antitrust Litig.*,
   414 F. Supp. 3d 686 (S.D.N.Y. 2019) ............................................................................. *passim*

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ....................................................... 45

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) ...................................................... 23

*In re Lloyd's Am. Trust Fund Litig.*,
   No. 96 Civ. 1262 (RWS), 2002 WL 31663577, at *26 (S.D.N.Y. Nov. 26, 2002) ................. 32

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128, 148 (S.D.N.Y. 2010) ................................................... 37

*In re Namenda Direct Purchaser Antitrust Litig.*,
   462 F. Supp. 3d 307 (S.D.N.Y. 2020) ................................................ 22

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   330 F.R.D. 11 (E.D.N.Y. 2019) ...................................................... 17, 27

*In re Polaroid*,
   No. 03 Civ. 8335 (WHP), 2007 WL 2116398 (S.D.N.Y. July 19, 2007) ............................ 30

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005) ...................................................... 42

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ................................................ 43

*In re Veeco Instruments*,
   No. 05 MDL 1695 (CM), 2007 WL 4115808, at *6 (S.D.N.Y. Nov. 7, 2007) ....................... 35

*Jackson v. Bloomberg, L.P.*,
   298 F.R.D. 152 (S.D.N.Y. 2014) ...................................................... 17

*Karic v. Major Automotive Companies, Inc.*,
   No. 09 Civ. 5708 (CLP), 2016 WL 1745037 (E.D.N.Y. Apr. 27, 2016) ................................ 30

*King v. Bumble Trading Inc.*,
   No. 18 Civ. 6868 (NC), ECF No. 108-1 (N.D. Cal. June 22, 2020) ........................... 30

*Lea v. Tal Educ. Grp.*,
No. 18 Civ. 5480 (KHP), 2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) ......................... *passim*

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748, 764 (2d Cir. 1998) ............................................................................. 45

*Little v. Ambit Energy Holdings, LLC*,
No. 16 Civ. 8800 (D.N.J. July 2, 2020), ECF No. 94 ................................................. 44

*Lopez v. Fashion Nova*,
No. 20 Civ. 9238 (LGS), 2021 WL 4896288 (S.D.N.Y. Oct. 19, 2021) .................................. 43

*Maley v. Del Glob. Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ........................................................................ *passim*

*McCoy v. Health Net, Inc.*,
569 F. Supp. 2d 448 (D.N.J. 2008) ............................................................................ 38

*Med. Soc'y of the State of N.Y. v. UnitedHealth Grp. Inc.*,
No. 16 Civ. 5265 (JPO), 2021 WL 4263717 (S.D.N.Y. Sept. 20, 2021) .......................... 22

*Medvedeva v. Assistcare Home Health Servs. LLC*,
No. 17 Civ. 5739 (E.D.N.Y. June 1, 2021), ECF No. 151 ........................................ 44

*Mirkin v. Viridian Energy, Inc.*,
No 15 Civ. 1057 (SRU) (D. Conn. June 27, 2018), ................................................ 44

*Morrell v. WW Int'l, Inc.*,
No. 20 Civ. 9912 (JGK) (S.D.N.Y.) ......................................................................... 23

*Morrel v. WW Intl'l, Inc.*,
551 F. Supp. 3d 173 (S.D.N.Y. 2021) ....................................................................... 23

*Newman v. Caribiner Int'l Inc.*,
No. 99 Civ. 2271 (GEL) (S.D.N.Y. Oct. 25, 2001) ................................................. 43

*Oleniak v. Time Warner Cable Inc.*,
No. 12 Civ. 3971 (KPF), 2013 WL 12447094 (S.D.N.Y. Dec. 17, 2013) .................. 36

*Puddu v. 6D Global Techs., Inc.*,
No. 15 Civ. 8061 (AJN), 2021 WL 1910656 (S.D.N.Y. May 12, 2021) ......................... *passim*

*Puglisi v. TD Bank, N.A.*,
2015 WL 4608655 (E.D.N.Y. July 30, 2015) ........................................................... 30

*Quow v. Accurate Mech. Inc.*,
No. 15 Civ. 9852 (KHP), 2018 WL 3368673 (S.D.N.Y. July 10, 2018) ........................... 21, 23

*Rasulev v. Good Care Agency, Inc.*,
No. 16 Civ. 1993 (LDH) (CLP) (E.D.N.Y. July 28, 2017), ECF No. 70 ................................ 44

*Riveras v. Bilboa Rest. Corp.*,
No. 17 Civ. 4430 (LTS) (BCM), 2018 WL 8967112 (S.D.N.Y. Dec. 14, 2018) .................... 43

*Saldana v. Middletown Car-G-Cam Uni Corp.*,
No. 15 Civ. 3651 (S.D.N.Y. Jan. 8, 2016), ECF No. 22 ......................................................... 44

*Shapiro v. JPMorgan Chase & Co.*,
No. 11 Civ. 7961 (CM), 2014 WL 1224666, at *24 (S.D.N.Y. Mar. 24, 2014)...................... 42

*Sheppard v. Consol. Edison Co. v. N.Y., Inc.*,
No. 94 Civ. 0403 (JG), 2002 WL 2003206 (E.D.N.Y. Aug. 1, 2002) ..................................... 38

*Simmons et al. v. Ambit Energy Holdings, LLC*,
No. 503285/2015, NYSCEF No. 205 (N.Y. Sup. Ct. July 16, 2018) ....................................... 44

*Solis v. OrthoNet LLC*,
No. 19 Civ. 4678 (VSB), 2021 WL 2678651 (S.D.N.Y. June 30, 2021) ................................. 41

*Spicer v. Pier Sixty LLC*,
No. 08 Civ. 10240 (LBS), 2012 WL 4364503 (S.D.N.Y. Sept. 14, 2012) .............................. 43

*Steiner v. Williams*,
No. 99 Civ. 10186 (JSM), 2001 WL 604035 (S.D.N.Y. May 31, 2001).................................. 32

*Sykes v. Harris*,
No. 09 Civ 8486 (DC), 2016 WL 3030156 (S.D.N.Y. May 24, 2016)..................................... 38

*Taft v. Ackermans*,
No. 02 Civ. 7951 (PKL), 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007).................................... 37

*Tennille v. W. Union Co.*,
No. 09 Civ. 00938, 2013 WL 6920449 (D. Colo. Dec. 31, 2013) ........................................... 38

*Vaccariello v. XM Satellite Radio, Inc.*,
295 F.R.D. 62 (S.D.N.Y. 2013) ............................................................................................... 36

*Velez v. Novartis Pharm. Corp.*,
No. 04 Civ. 09194 (GEL), 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010).............................. 15

*Wal-Mart Stores v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ................................................................................. 16, 28, 41, 43

*Williamson v. McAfee, Inc.*,
   No. 14 Civ. 158 (EJD), ECF No. 114 (N.D. Cal. Feb. 3, 2017) ........................................ 30, 31

*Zeltser v. Merrill Lynch & Co., Inc.*,
   No. 13 Civ. 1531 (FM), 2014 WL 4816134 (S.D.N.Y. Sept. 23, 2014) ........................... 29, 43

**Statutes**

Cal. Bus. & Prof. Code § 17600 *et seq.* ...................................................................... 5

N.Y. Gen. Bus. L. § 349 .......................................................................................... 5

**Other Authorities**

Christine P. Bartholomew, *E-Notice*, 68 Duke L.J. 217 (2018) ..................................... 25

William B. Rubenstein, *On What A "Private Attorney General" Is—and Why It Matters*,
   57 Vand. L.Rev. 2129 (2004) .................................................................................. 33

William B. Rubenstein, *Why Enable Litigation?: A Positive Externalities Theory of the
   Small Claims Class Action*, 74 UMKC L.Rev. 709 (2006) ........................................... 33

**Rules**

Fᴇᴅ. R. Cɪᴠ. P. 23 .................................................................................................. *passim*

**Treatises**

Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*,
   Federal Judicial Center (3d ed. 2010) ...................................................................... 38

Principles of the Law of Aggregate Litigation § 3.13(b) (2010) ............................... 27, 38

Plaintiffs Mojo Nichols, Susan Brewster, Duane Dea, Maryanne Deracleo, Karen Kelly, Rebecca Richards, Jennifer Sellers, and Stacy Spencer ("Plaintiffs") hereby submit this Memorandum of Law supporting their unopposed motion for class action settlement approval.

## INTRODUCTION

Plaintiffs filed this consumer protection action to reform Noom's trial period and autorenewal billing practices and to recover customers' unintended payments stemming from those practices. Following more than two years of extensive investigation and vigorous litigation, the parties have reached a resolution that substantially achieves this lawsuit's goal: a $56,000,000 cash fund, a further $6,000,000 in subscription fee credits, and robust programmatic relief valued at between $31,000,000 and $120,000,000.

As the Court is well aware, this settlement was no easy feat. It is the result of extensive discovery (the production of more than 100,000 documents and the analysis of *billions* of data points), and the contributions of fifteen consultants and experts in the fields of autorenewal litigation, database discovery and data science, statistics, ESI discovery, consumer behavior, and customer satisfaction. The settlement was also reached only after a dozen depositions, fourteen hearings on contested matters, twenty contested discovery motions and applications, ten joint or simultaneous discovery-related letter briefs, and more than a year of arm's length negotiations overseen by both Southern District of New York Magistrate Judge Katharine H. Parker and a noted JAMS mediator and former Chief Magistrate Judge of the Northern District of California, Edward A. Infante. As set forth below, these informed and thorough negotiations overseen by experienced and forceful neutrals yielded an excellent result for proposed class members ("Class Members").

The settlement also satisfies all criteria for final approval under governing law. The settlement achieves a substantial percentage of Plaintiffs' "best case" scenario, Wittels Decl. ¶ 63,

and avoids the risks, costs, and delays of continued litigation, *id*. ¶¶ 65–66.  The parties' plan for allocating the settlement's cash benefits also fairly accounts for the value of Class Members' individual damages claims, and the settlement has achieved an overwhelmingly positive reaction from the Class, with a participation rate well above average for consumer class action settlements.

Specifically, following the Court's February 23, 2022 preliminary approval order (ECF No. 500), the parties implemented a state-of-the-art notice campaign designed to garner the attention of Class Members and inform them about the settlement.  On April 22, 2022, after establishing a settlement website and call center, multiple forms of notice were issued to Class Members.  June 10, 2022 Declaration of Lead Class Counsel Steven L. Wittels ("Wittels Decl.") ¶¶ 49, 51, ECF No. 507.  The forms of notice included direct email, banner ads that were displayed in Class Members' specific social media accounts, follow-up emails, mailed notice, paid search engine advertising, dissemination of notice via noted class action settlement websites, and a reminder email and mail campaign.  *Id.* ¶¶ 51, 53–55, 59.

The notice process was also designed streamline and facilitate Class Member claims.  Consumers were not required to submit any evidence supporting their liability claims and were able to seamlessly navigate from the electronic notice documents to submit claims directly from their smartphones, tablets, and desktops, and via email and mail.  *Id.* ¶ 52.  The straightforward online claims process is excerpted on the next page:



*Id*. ¶ 56.  Class Members were also given the option to elect a physical check or one of four easy

electronic payment methods; after settlement approval, Class Members selecting electronic pay

will find their money seamlessly deposited without any further effort required.  *Id*.  An image of

the claim form, designed to take less than 3 minutes to complete, is excerpted below:

**Instructions:** To submit a claim for payment from this settlement, please complete this form.

**YOUR CONTACT INFORMATION**

First Name *

Last Name *

TEST@TEST.COM

Best Email to Reach You *

* Required Fields

**WHERE TO SEND MY PAYMENT (PICK ONLY ONE)**

Payment Options

**venmo**

No bank account required

USE VENMO

**DIRECT DEPOSIT**

Direct to your bank account

USE DIRECT DEPOSIT

**Zelle**

Direct to your bank account

USE ZELLE

**PayPal**

No bank account required

USE PAYPAL

If you prefer to receive a paper check instead of a faster and more convenient option listed above, click this link.

**SIGNATURE**

By submitting this claim form, I consent to the use of this information to process my claim.

Signature *

06/09/2022   Date

*Id*. ¶ 51.   This comprehensive notice campaign has to date yielded 282,093 claims, which constitutes a 15.4% take rate—three times the established average in consumer class actions. Wittels Decl. ¶ 58; *Ferrington v. McAfee, Inc.*, No. 10 Civ. 1455, 2012 WL 1156399, at *4 (N.D. Cal. Apr. 6, 2012) ("[T]he prevailing rule of thumb with respect to consumer class actions is [a participation rate of] 3–5 percent.").   The absence of objections, coupled with a participation rate that is three times that of a typical consumer class action, weighs heavily in favor of the settlement.

The cash amounts to be distributed to Class Members are also substantial.   Here, claiming Class Members will receive *net* settlement payments that range from 13.2% to 96.7% of their total Noom subscription payments *after* deducting administration expenses and attorneys' fees and costs.   Wittels Decl. ¶ 38.   The expected average net settlement payment to Subclass A members (the consumers with the strongest claims) is $216.60, which represents on average 96.7% of these consumers' total payments to Noom.   The expected average net settlement payment to Subclass B members (the consumers with weaker claims) is $30.14, which represents on average 13.2% of these Class Members' total payments to Noom.   *Id*.   This is real money in Class Members' pockets.

Further, the claims period is ongoing and more claims will come in following the kickoff of the reminder notice campaign earlier this week.   *Id.* ¶ 59.   Yet there is more.   For Class Members who have a reasonable explanation for missing the June 24 claim deadline, a reserve fund will remain open for an additional 18 months to pay untimely claims.   *Id.*; Settlement Agreement ¶ 55. Notice was indeed robust; there have been no objections to the settlement, and only 5 individuals (or 0.00026% of the Class) have asked to be excluded.   Wittels Decl. ¶ 58.

Accordingly, to achieve finality and effectuate the settlement's substantial monetary and non-monetary benefits, Plaintiffs ask that the Court endorse the proposed Order and Final Judgment (Wittels Decl. Exhibit A, ECF No. 507-1).   Signing the proposed Order and Final

Judgment will have the effect of (1) granting final certification to the Class under Rule 23, for settlement purposes; (2) granting final approval of all terms applicable to the Class set forth in the settlement agreement; (3) finding that notice was the best notice practicable under the circumstances; (4) approving the service awards to the Class Representatives; (5) awarding Class Counsel reimbursement of litigation expenses and attorneys' fees; (6) approving the parties' proposed final settlement procedure; (7) incorporating all terms of the settlement agreement, including the release; and (8) dismissing this action with prejudice and entering final judgment. The settlement is in the best interests of the Class and provides that the first round of payments will be issued within 30 days from the settlement's effective date.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     SUMMARY OF THE ACTION, SETTLEMENT NEGOTIATIONS, AND NOTICE**

**A.     Factual Allegations**

The Class consists of consumers from across the U.S. who were charged for autorenewing subscriptions to Defendants Noom, Inc. and Artem Petakov's (collectively, "Noom" or "Defendants") Healthy Weight program.  Plaintiffs allege that Noom's enrollment, renewal, and cancellation practices violated, *inter alia*, California's Automatic Purchase Renewal Statute, Cal. Bus. & Prof. Code § 17600, *et seq.* (the "ARL"), New York's General Business Law § 349 ("GBL § 349"), and the common law.  Fourth Am. Class Action Compl. ¶¶ 217–233, ECF No. 493.

**B.     Plaintiffs' Investigation**

Beginning in August 2019, Class Counsel conducted a thorough investigation into the Class's claims, damages, and the likelihood of obtaining class certification.  Wittels Decl. ¶ 24. Further, Class Counsel performed extensive background research on Noom and its business practices.  *Id.*  Class Counsel also studied consumer responses to Noom's practices and conducted

5

in-depth interviews with current and former customers concerning, *inter alia*, Noom's trial period and autorenewal disclosures, cancellation and customer service practices, refund practices and policies, and other pertinent information.  *Id.*  Counsel obtained and analyzed documents from Plaintiffs and other Noom customers and performed extensive factual and legal research into potential experts.  *Id.* ¶ 25.  Counsel also conducted extensive research of the case law and other public and private enforcement actions challenging autorenewal practices, as well as comprehensive legal research concerning autorenewal class actions.  *Id.*

### C.   Litigation and Settlement Negotiations

On May 12, 2020, California resident Geraldine Mahood filed this case on behalf of herself and a proposed class.  *Id.* ¶ 26.  She sought restitution, compensatory and punitive damages, interest, and injunctive relief.  ECF No. 1 at 34–35.  Plaintiffs later amended their complaint four times and survived Noom's motion to dismiss.  Wittels Decl. ¶¶ 26–27; ECF No. 415 (Judge Schofield sustaining 274 of Plaintiffs' 279 counts).  Plaintiffs also filed two injunctive actions in state court on May 27, 2021, *Dea, et al. v. Noom, Inc.*, No. RG21101244 (Cal. Super. Ct.), and *Deracleo, et al. v. Noom, Inc.*, No. 653475/2021 (Sup. Ct. N.Y. Cnty.).  Wittels Decl. ¶ 26.

Discovery began in earnest on July 9, 2020, and from the get-go this case has been distinguished by its intensely litigated proceedings.  *Id.* ¶ 28.  The parties appeared before Judge Parker fourteen times to litigate complex issues including the scope of class and merits discovery, complex ESI matters, and the timing of document production and depositions.  *Id.*; Settlement Agreement ¶ 11.  The parties filed more than ten substantive joint and/or simultaneous letters arguing their positions to Judge Parker in advance of these conferences.  *See, e.g.*, ECF Nos. 65, 70, 90, 120, 141, 142, 186, 225, 243, 247, 290, 293, 338, 356, 422.

In addition to the letters, there were more than 20 contested discovery motions and other applications, involving, *inter alia*: (i) novel and complex ESI motions, including the treatment of hyperlinked documents, *see* ECF Nos. 105, 214, 260; (ii) bellwether process applications, ECF Nos. 110, 153; (iii) motion practice to amend the protective order for the injunctive actions, ECF Nos. 209, 334; (iv) sampling Noom's customer communication repositories, ECF No. 241; (v) absent Class Member contact, ECF No. 362; (vi) conduct at depositions, ECF Nos. 388, 422, 459; and (vii) third-party subpoenas and apex depositions, ECF No. 391. *See also* Wittels Decl. ¶ 29.

Aware of their duty to explore resolution of this contested matter while maintaining a vigorous litigation schedule, in the fall of 2020 the parties set this case on a second and simultaneous mediation track. Wittels Decl. ¶ 31. The parties first engaged JAMS mediator Judge Edward Infante (Ret.) through the winter of 2020 and held a full-day mediation on December 18, 2020, followed by written correspondence and multiple conferences with Judge Infante in early 2021. *Id.* In the spring of 2021, negotiations were shifted to Judge Parker who, having actively overseen discovery, was ideally suited to provide guidance on the highly technical impasses that emerged in earlier settlement talks. *Id.* During this same period, Plaintiffs obtained three reports from consumer behavior and consumer complaint experts, which were disclosed to Judge Parker in advance of the May 13, 2021 mediation. *Id.* ¶ 32. Judge Parker also recognized the importance of using Class Member data to both assess class-wide merits arguments and to build a damages model for mediation purposes, *see generally* ECF No. 332, and requested production of over 2 billion engagement and transaction records for the proposed Class. *Id.* Plaintiffs then hired database and data science experts to assist Class Counsel in studying this voluminous data. *Id.* After deposing a Noom data scientist in August 2021, Class Counsel and their experts constructed

a comprehensive damages model. *Id.* This model formed the basis of the negotiations at the two-day in-person September 13–14, 2021 mediation conducted by Judge Parker. *Id.*

As a result of the parties' and the Court's efforts, and following two days of negotiations, on September 14, 2021, the parties reached agreement in principle on certain material terms and executed a term sheet. *Id.* ¶ 33. The parties then spent the period from mid-September 2021 to January 20, 2022 negotiating final terms. *Id.* As with all prior negotiations, these discussions were adversarial, at arm's length, and included comprehensive written correspondence and discussions among counsel on September 15, 17, 23–24, October 7–8, 13, 24–26, November 5, 9, 19, 23, December 6 and 21, January 18, 20, 31 and February 2–3. *Id.*

### D.    The Notice Campaign

Following the Court's preliminary approval order the parties and the Settlement Administrator implemented a comprehensive notice campaign. *Id.* ¶ 49. Specifically, Plaintiffs' data scientist used the previously produced data for Plaintiffs' damages model and supplemented identifying data to generate an up-to-date class list containing each Class Member's email address, subclass, total dollar amount paid to Noom, and proportionate share of the cash fund. *Id.* ¶ 50. Noom also certified that the class list contains the "most current and up to date information that Defendant has for Class Members." Settlement Agreement ¶ 106(d); Wittels Decl. Ex. D. Following additional quality control, the parties finalized the email notice, claim forms, the recording to greet hotline callers, and the settlement website. Wittels Decl. ¶ 50.

On April 22, 2022, direct notice was issued to the Class. *Id.* ¶ 51. While some e-mails were returned as undeliverable, the Settlement Administrator promptly undertook to obtain mailing addresses and re-issued notice by mail to 24,553 Class Members. *Id.* ¶ 53. For the small

percentage of Class Members (1.68%) for whom Noom did not originally have email addresses, an address search was performed and paper notices were mailed to available addresses. *Id*.

Shortly thereafter, the parties implemented banner ads that displayed in Class Members' specific social media accounts, a follow-up email campaign, and paid search engine advertising to drive Class Members to the settlement website. *Id*. ¶ 54. The parties also disseminated notice via noted class action settlement websites. *Id*. The reminder notice campaign began in earnest earlier this week, two weeks in advance of the June 24 claims deadline. *Id*.

In sum, a first-in-class notice process was implemented and Class Members have had an overwhelmingly positive response. As noted above, to date only 5 Class Members have submitted opt-out statements, no objections have been received, and the current participation rate is three times that achieved in comparable settlements. *Id*. ¶ 58.

## II.     SUMMARY OF SETTLEMENT TERMS

### A.     <u>Eligible Class Members</u>

The Class is defined as all natural persons who purchased a Noom Healthy Weight Subscription in the United States via the Noom website or Noom mobile app from May 12, 2016 to October 6, 2020 and who (i) were charged by Noom for a Healthy Weight Subscription and (ii) did not receive a full refund or chargeback of all Noom Healthy Weight Subscription charges. Settlement Agreement ¶ 27. Persons who purchased a subscription via the Apple App Store or Google Play Store are excluded from the Class.[1] *Id*.

---

[1] Also excluded are (a) Noom and any and all of its predecessors, successors, assigns, parents, subsidiaries, affiliates, directors, officers, employees, agents, representatives, and attorneys, and any and all of its parents', subsidiaries', and affiliates' present and former predecessors, successors, assigns, directors, officers, employees, agents, representatives, and attorneys; (b) any judicial officer presiding over this case, or any member of his or her immediate family or of his or her judicial staff; and (c) any Class Member who opts out of the Class. Settlement Agreement ¶ 29.

The Class is further divided into two groups of consumers based on the parties' assessment (with the Court's input) of the relative strength of these consumers' claims. Wittels Decl. ¶ 35. Specifically, during contested settlement negotiations overseen by Judge Parker and later joint discussions between counsel, the parties applied the seven criteria identified by Class Counsel and their data scientists prior to the September 13–14, 2021 mediation as the best indicia of potentially unintended purchases or legal entitlement to a refund and divided the Class into two subgroups. *Id.* "Subclass A" consists of all Class Members who either (i) never enrolled in Noom, (ii) enrolled but never engaged, (iii) engaged during the trial but not thereafter, (iv) engaged two times or fewer post-trial, (v) had zero engagement after day 58 of their subscription, (vi) received a partial refund of any payments for the Healthy Weight Subscription, or (vii) any other Class Member who is a resident of California. Settlement Agreement ¶ 62. "Subclass B" consists of all Class Members who are not part of Subclass A. *Id.* ¶ 63.

### B.      The Settlement Amount and Allocation Plan

Under the settlement agreement, Noom will deposit $56,000,000 into a non-reversionary fund ("Settlement Fund"). *Id.* ¶ 60. This amount is comprised of $46,000,000 for Subclass A and $10,000,000 for Subclass B. *Id.* The difference in the payment amounts between Subclasses A and B reflects the strength of these Class Members' claims and tracks the damages model used at mediation. Wittels Decl. ¶ 36. Cash payments will be distributed to Class Members in proportion to the amounts they paid Noom. Settlement Agreement ¶ 83(b)–(c). In other words, the more a Class Member paid Noom, the more they stand to recover from the settlement. Wittels Decl. ¶ 36.

Noom will also distribute 100,000 free one-month (non-recurring) Healthy Weight memberships to the first 100,000 Subclass B members who request a credit when they submit their claim. Settlement Agreement ¶ 83(c). Akin to a sports team's "giveaway" of merchandise to the

fans first arriving at the stadium, this credit will incentivize Subclass B members to claim their cash awards. Wittels Decl. ¶ 37. And just like a sports "giveaway," the credit is *in addition* to any cash award and will not reduce cash payments. *Id.*; Settlement Agreement ¶ 83(c). Current subscribers will have the credit added to their memberships once it is redeemed and past customers will be given a voucher or promo-code to access a one-month subscription. *Id.* Because Noom's one-month membership costs $60, the parties valued each credit at $60. Wittels Decl. ¶ 37. These 100,000 credits are cumulatively valued at $6,000,000. Settlement Agreement ¶ 65. To date, 55,084 credits have been claimed and any unclaimed credits will be distributed to Subclass B members. Wittels Decl. ¶ 37.

### C.    Business Practice Changes

The settlement also secures robust programmatic relief that will prevent Class Members' future unintended purchases and gives the consuming public added safeguards against inadvertent purchases as summarized below. *See* Settlement Agreement ¶¶ 72–74 (detailing programmatic relief spanning at least two years after final settlement approval).

#### 1.    *Programmatic Relief Benefiting Class Members Who Are Current Customers*

Critically, Noom will not continue to charge Class Members with active subscriptions who did not use Noom in the twelve months following their conversion from free or low-cost trials to full-fledged customers, unless the Class Member *expressly* consents to renewal after being advised that additional charges will not occur absent this consent. Settlement Agreement ¶ 72(j). In other words, in addition to being eligible for a substantial cash payment, these Class Members will not be charged again unless they affirmatively elect recurring charges. Wittels Decl. ¶ 40.

#### 2.    *Programmatic Relief Benefiting All Class Members and the Consuming Public*

The settlement also ensures that Noom's autorenewing subscriptions (i) are only entered into following informed affirmative consent, and (ii) can be more easily cancelled. Noom has

already substantially enhanced its disclosures and requires consumers to take a separate action through a check box or digital signature to accept autorenewal.  *Id.* ¶ 72(a); Wittels Decl. ¶ 41. Pre-checked boxes will not be used, and the extra autorenewal assent is separate from the underlying transaction and applies regardless of the payment method chosen.   Settlement Agreement ¶ 72(a).  For example, a consumer who chooses to use PayPal as her payment method will not be able to bypass the acknowledgement.  Wittels Decl. ¶ 41.

Noom's purchase-related disclosures have also been revised.  Those disclosures must be clear and conspicuous and set forth in bullet-point format within a text box adjacent to the autorenewal check box.   Settlement Agreement ¶ 72(a).   Those disclosures must include the statements "[t]his is an autorenewing subscription," "[i]f I don't cancel during my [X] day trial, Noom will charge me [X]," and "Noom will charge my payment method on file [X] plus [sales tax] in [sales tax state] sales tax automatically every [X] months thereafter until I cancel."  *Id.* Consumers will also be told upfront how to cancel:  they "can cancel using the cancel button in my account page, accessible on Noom's website or through the settings section in the app."  *Id.* Noom will also refrain from using the language "no commitment" and "100% risk free" on its Healthy Weight payment page.  *Id.*  These new disclosures and the mandatory check box have already been implemented, as shown in the image of Noom's website on the next page:

*Autorenewal and Cancellation Disclosures in May 2022*

- This is an autorenewing subscription.
- If I don't cancel during my 7-day trial, Noom will charge me $169 after the trial ends on May 25, 2022.
- Noom will charge my payment method on file $169 automatically every 6 months thereafter until I cancel. Tax charged at renewal is subject to change based on applicable tax rates.
- I can cancel using the cancel button in my account page, accessible on Noom's website or through the settings section in the app.
- If I cancel before the end of a subscription period, I understand that Noom will not provide a partial refund.

☐  I agree to the above terms of the 7-day trial and autorenewing subscription

**Submit**

Wittels Decl. ¶ 43.

These changes result in a checkout process where the consumer cannot complete the transaction without first expressly acknowledging clear autorenewal disclosures. Noom publicly describes these changes as part of an "investment in customer experience" to make "it even clearer, before you sign up, when and how your Noom subscription will be charged and renewed." Noom, *A Letter to Our Community*, Noom.com (Feb. 11, 2022), Ex. C to Wittels Decl., ECF No. 507-3.

Regarding the "cancel button" referenced above, Noom must keep this button available for at least two years. Settlement Agreement ¶ 72(i). Notably, neither this button nor a customer service line were available before this lawsuit. Wittels Decl. ¶ 45. An example of Noom's cancellation method shortly after this lawsuit was filed is below on the left, compared to the prominent button that now appears in a Noom user's account settings, as shown below on the right:

13

*Cancellation Method in July 2020*    *Cancellation Method in September 2021*

  

Additionally, Noom must now provide a receipt for every subscription charge, and for consumers enrolled in subscriptions lasting three months or more, Noom must send one reminder email prior to the conversion to a full subscription.   Settlement Agreement ¶ 72(e)–(g).   The reminder must plainly and prominently provide: (i) the deadline to cancel; (ii) the date of the next charge; (iii) the amount of the next charge; and (iv) how to cancel the plan, including a link that directs consumers on how to cancel.   *Id.* ¶ 72(g).   The reminder email program was an especially contentious point of negotiations, as Noom adamantly (and correctly) argued that no law requires such reminder emails for *any* of Noom's Healthy Weight subscriptions.   Wittels Decl. ¶ 47.

14

3.   *The Cash Value of the Programmatic Relief Secured by the Settlement*

Following Noom's internal analysis and Class Counsel's consultation with an outside economic advisor and noted professor from NYU's Stern School of Business, the parties estimate the cumulative value of the programmatic relief, as well as the other improvements Noom made prior to the settlement, as not less than $31,000,000 and up to $120,000,000.   Settlement Agreement ¶ 74; *see also* ECF No. 499, Declaration of Eli Bartov, Ph.D. Regarding Valuation of Noom, Inc.'s Business Practice Changes (valuation analysis of $31,168,744 over the minimum two-year settlement period, $53,381,240 over four years, and $120,018,728 over ten years).

This forward-looking relief is a substantial and hard-fought benefit that courts consider in the fairness analysis.  Accounting for this relief, the settlement's total value is between $93,168,744 and $182,018,728.  *See Fleisher v. Phoenix Life Ins. Co.*, No. 14 Civ. 8714 (CM), 2015 WL 10847814, at *10 (S.D.N.Y. Sept. 9, 2015) ("The overall value of the settlement comprises monetary as well as non-monetary relief."); *Ferrick v. Spotify USA Inc.*, No. 16 Civ. 8412 (AJN), 2018 WL 2324076, at *6 (S.D.N.Y. May 22, 2018) (both monetary and non-monetary relief considered in calculating settlement's value); *Velez v. Novartis Pharm. Corp.*, No. 04 CV 09194, 2010 WL 4877852, at *8, *18 (S.D.N.Y. Nov. 30, 2010) (same).

III.   **CLASS MEMBERS' POSITIVE RESPONSE TO THE SETTLEMENT**

As discussed above, the deadline for Class Members to opt out of and/or object to the settlement is June 24, 2022.  Preliminary Approval Order (ECF No. 500) at 6.  To date, only 5 Class Members have opted-out and none have objected to the settlement.  Wittels Decl. ¶ 58.

15

<u>**ARGUMENT**</u>

**I.    LEGAL STANDARD FOR FINAL CLASS ACTION SETTLEMENT APPROVAL**

In the Second Circuit there is a "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). To grant final approval under Rule 23(e)(2), as amended on December 1, 2018, a court must find the settlement "fair, reasonable, and adequate" after considering the following factors:

    (A)   the class representatives and class counsel have adequately represented the class;

    (B)   the proposal was negotiated at arm's length;

    (C)   the relief provided for the class is adequate, taking into account:

        (i)      the costs, risks, and delay of trial and appeal;

        (ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

        (iv)    any agreement required to be identified under Rule 23(e)(3); and

    (D)   the proposal treats class members equitably relative to each other.

Prior to the 2018 amendments, courts in this Circuit reviewed class settlements under the nine factors set out in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019). Because the amendments did not "displace any of the *Grinnell* factors . . . the Court's assessment of [a] settlement under

Rule 23(e) is guided and informed by the *Grinnell* factors."[2]  *Emeterio v. A&P Rest. Corp.*, No. 20 Civ. 970 (KHP), 2022 WL 274007, at *6 (S.D.N.Y. Jan. 26, 2022) (quotation omitted).

Thus, courts break the Rule 23(e)(2) final approval factors down into a procedural fairness analysis under Rules 23(e)(2)(A) and (B) and substantive fairness assessment under Rules 23(e)(2)(C) and (D), with the substantive analysis under Rule 23(e)(2)(C)(i) incorporating all of the *Grinnell* factors.  *Christine Asia Co. v. Yun Ma*, No. 15 MD 631 (CM) (SDA), 2019 WL 5257534, at *10 (S.D.N.Y. Oct. 16, 2019).  As set forth below, all factors are clearly satisfied here.

## II.    THE SETTLEMENT SATISFIES THE CRITERIA FOR FINAL APPROVAL

### A.    <u>The Settlement Is Procedurally Fair</u>

> 1.  *Rule 23(e)(2)(A)'s Adequacy of Representation Requirement:  Plaintiffs and Their Counsel Are Zealous and Qualified Advocates for the Class*

Rule 23(e)(2)(A) requires a finding that "the class representatives and class counsel have adequately represented the class."  This "typically 'entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'"  *In re GSE Bonds*, 414 F. Supp. 3d at 692 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).[3]  "[O]nly a conflict that goes to the very subject matter of the litigation will defeat . . . representative status."  *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 165 (S.D.N.Y. 2014) (quotation omitted).

---

[2] The *Grinnell* factors are (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class; (3) the state of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through trial; (7) the ability of the defendant to withstand greater judgment; (8) the range of reasonableness in light of the best possible recovery; and (9) the range of reasonableness in light of the attendant risks of litigation.  *Grinnell*, 495 F.2d at 463.  These factors are not to be applied in a rigid, formalistic manner.  Rather, "[t]he evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice."  *Id.* at 468.

[3] The "adequate representation factor is nearly identical to the Rule 23(a)(4) prerequisite of adequate representation in the class certification context."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 30 n.25 (E.D.N.Y. 2019); *see also In re GSE Bonds*, 414 F. Supp. 3d at 701 (finding adequacy under Rule 23(e)(2)(A) was likely met for same reasons as adequacy under Rule 23(a)(4)).

Plaintiffs are adequate as their "interests are aligned with other class members' interests because they suffered the same injuries—monetary losses resulting from [Defendants' allegedly unlawful practices]." *In re GSE Bonds*, 414 F. Supp. 3d at 692. Plaintiffs thus have an "interest in vigorously pursuing the claims of the class." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). Further, Plaintiffs "demonstrated their commitment to this litigation by retaining qualified and experienced counsel." *Emeterio*, 2022 WL 274007, at *4; *Lea v. Tal Educ. Grp.*, No. 18 Civ. 5480 (KHP), 2021 WL 5578665, at *6 (S.D.N.Y. Nov. 30, 2021) (Parker, J.). Plaintiffs also invested substantial time and effort to the case: meeting several times with Class Counsel, providing information regarding their experiences, reviewing and discussing the pleadings and discovery, including producing personal information like bank statements, and preparing for—and in most cases, sitting for—depositions. Wittels Decl. ¶¶ 86–88. Plaintiffs also supported Class Counsel during mediations. *Id.* ¶ 31. In sum, Plaintiffs have been excellent class representatives.

Class Counsel also meets the adequacy requirement. Wittels McInturff Palikovic attorneys have extensive experience in prosecuting complex consumer and employment class actions. *Id.* ¶¶ 5–12. The lead attorney prosecuting this case, Steven L. Wittels, was one of the lead trial counsel in the largest class action jury verdict in the history of employment discrimination litigation. *Id.* ¶ 7. Mr. Wittels has also served as Class Counsel in dozens of class actions, generating hundreds of millions of dollars in recoveries for class members. *Id.* ¶ 6. Mr. Wittels' partners J. Burkett McInturff and Tiasha Palikovic have extensive class action experience, having led several complex class and collective action matters to completion and generating more than a hundred million dollars in recoveries for class members. *Id.* ¶ 11. The other members of Plaintiffs' legal team who played crucial roles in the investigation, prosecution, and settlement of this case— Jessica Hunter, Ethan D. Roman, Steven D. Cohen, Susan J. Russell, and the attorneys at

co-counsel Chimicles Schwartz Kriner & Donaldson-Smith LLP and Bramson, Plutzik, Mahler & Birkhaeuser—all focus their practice on class action cases and are dedicated to providing first-rate representation to the underserved.  *Id.*  The work that Class Counsel has performed in this case demonstrates their skill and commitment to representing the interests of the Class.  *Id.*

> 2.  *Rule 23(e)(2)(B)'s Requirement of Arm's-Length Negotiations:  The Parties' Vigorous Negotiations Were Arm's Length at All Times and Overseen by Experienced Neutrals*

"Rule 23(e)(2)(B) requires procedural fairness, as evidenced by the fact that 'the proposal was negotiated at arms length.'"  *In re GSE Bonds*, 414 F. Supp. 3d at 693.  Indeed, "[w]hen a settlement is the product of arms-length negotiations between experienced, capable counsel after meaningful discovery, it is afforded a presumption of fairness, adequacy, and reasonableness."  *Emeterio*, 2022 WL 274007, at *3 (quotation omitted); *Lea*, 2021 WL 5578665, at *4 (same).  The force of this presumption is increased when settlement is reached with the assistance of an experienced third-party neutral, as is the case here.  *Lea*, 2021 WL 5578665, at *8; *Puddu v. 6D Global Techs., Inc.*, No. 15 Civ. 8061 (AJN), 2021 WL 1910656, at *4 (S.D.N.Y. May 12, 2021). Indeed, the settlement in this case was overseen *both* by an experienced mediator and a federal magistrate judge well-versed in class action matters.  Wittels Decl. ¶ 15.

### B.    The Settlement Is Substantively Fair

The substantive factors likewise favor final approval.  Settlements require balancing the claims' merits and the defenses against the attendant risks of continued litigation and delay. Plaintiffs believe their claims have merit and would prevail if this matter proceeded to trial. Defendants do not agree, deny any potential liability, and up to the point of settlement indicated a willingness to continue to litigate vigorously.  The parties, with the continued assistance of the Court, concluded that the benefits of settlement outweigh the risks and uncertainties of continued litigation, as well as the attendant time and expense associated therewith.  Wittels Decl. ¶ 3.

1.  *Rule 23(e)(2)(C)(i) and the Grinnell Factors: The Settlement Amount Is Substantial, Even Considering the Best Possible Recovery*

Rule 23(e)(2)(C)(i) requires examining whether relief for the class is adequate, considering: the costs, risks, and delay of trial and appeal.  "Rule 23(e)(2)(C)(i) incorporates the factors set out in *Grinnell*, 495 F.2d at 463, and courts in this Circuit have long utilized the *Grinnell* nine-factor test in determining whether a settlement is substantively fair, reasonable, and adequate."  *Christine Asia*, 2019 WL 5257534, at \*10.

a.  Litigation Through Trial Would Be Complex and Costly (*Grinnell* Factor 1)

"Most class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them."  *Bryant v. Potbelly Sandwich Works*, No. 17 Civ. 7638 (CM) (HBP), 2020 WL 563804, at \*2 (S.D.N.Y. Feb. 4, 2020) (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub. nom.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)).  This case is no exception, with novel claims under the laws of 54 different jurisdictions applied to emerging internet sales practices.

Continued litigation is certain to add expense and delay.  While the parties are deep into document and deposition discovery, extensive additional discovery would be required to prepare this case for class certification and trial.  Wittels Decl. ¶ 65.  The parties would also likely file cross-motions for summary judgment.  *Id*.  If the Court denied the motions, a lengthy, fact-intensive trial would consume tremendous time and resources.  *Id*.  Further, any judgment would likely be appealed, adding further uncertainty and delay.  *Id*.  In contrast, the settlement confers substantial relief in a short time, has led to robust business practice changes, and avoids the risks

and costs inherent in class actions specifically, and litigation generally. *Id*. ¶ 66. Therefore, the first *Grinnell* factor heavily favors approval.[4]

> b. The Class's Reaction Is Overwhelmingly Positive (*Grinnell* Factor 2)

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002). This factor overlaps with Rule 23(e)(4), on the opportunity for exclusion, and Rule 23(e)(5), on the opportunity to object, both of which the settlement provides. No class members have objected, and only a mere five of nearly 2 million Class Members—less than 0.00026% of the Class—have opted out. Wittels Decl. ¶ 58.

> c. Discovery Has Advanced Far Enough to Allow the Parties to Resolve the Case Responsibly (*Grinnell* Factor 3)

Although preparing this case through trial would likely require thousands of hours of additional discovery, *id.* ¶ 28, the parties have more than enough discovery to recommend settlement. The question raised by this factor is "whether counsel had an adequate appreciation of the merits of the case before negotiating." *Delijanin*, 2021 WL 535635, at *3 (quotation omitted). The discovery taken here, and described *supra*, easily hurdles this standard. *See Quow v. Accurate Mech. Inc.*, No. 15 Civ. 9852 (KHP), 2018 WL 3368673, at *3 (S.D.N.Y. July 10, 2018) (Judge Parker approving settlement where discovery included production and review of "thousands" of pages of documents and data analysis).

> d. Plaintiffs Face Real Risks if the Case Proceeds (*Grinnell* Factors 4 to 6)

Although Plaintiffs believe their case is strong, they appreciate the risks ahead. In assessing this factor, the court "must only assess the risks of litigation against the certainty of

---

[4] *See, e.g.*, *Lea*, 2021 WL 5578665, at *4 ("[S]ettlement brings to a close litigation that could have lasted several more years[.]"); *Delijanin v. Wolfgang's Steakhouse Inc.*, No. 18 Civ. 7854 (LJL) (KHP), 2021 WL 535635, at *3 (S.D.N.Y. Feb. 12, 2021) (favoring approval because "litigation through trial would be complex, expensive, and long").

recovery under the proposed settlement." *Emeterio*, 2022 WL 274007, at *7 (quotation omitted); *Lea*, 2021 WL 5578665, at *9 (same). Here, without settlement, "the primary purpose of [which] is to avoid the uncertainty of a trial on the merits," *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 313 (S.D.N.Y. 2020) (quotation omitted), extensive litigation remained, including more depositions, expert discovery, and lengthy briefing. Then there would be a trial on the merits, which is "is inherently risky," *Delijanin*, 2021 WL 535635, at *4, followed by "lengthy appeals even if Plaintiffs prevailed," *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 412 (S.D.N.Y. 2018).

Additionally, this inquiry focuses on the prospects of the Class, which underscores the hurdles to class certification. Prior to settlement, Plaintiffs had begun work on class certification and "fully anticipated that Defendants would oppose class certification as vigorously as it had contested Plaintiffs' allegations and discovery requests." *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *12 (S.D.N.Y. Apr. 6, 2006); *Puddu*, 2021 WL 1910656, at *5 ("Defendants would likely have challenged class certification [if] they [had] continued in this litigation.").[5] While Class Counsel believes the Class would be certified, they appreciate "[t]here is no assurance that Lead Plaintiffs' motion for class certification would be granted." *Puddu*, 2021 WL 1910656, at *5. Moreover, either party could seek an interlocutory appeal of a certification order under Rule 23(f), *In re GSE Bonds*, 414 F. Supp. 3d at 693, and Noom could have sought to decertify the class. *Med. Soc'y of the State of N.Y. v. UnitedHealth Grp. Inc.*, No. 16 Civ. 5265 (JPO), 2021 WL 4263717, at *1 (S.D.N.Y. Sept. 20, 2021) (Courts may "decertify a class if it appears that the requirements of Rule 23 are not in fact met.").

---

[5] *See also* ECF No. 311, Apr. 15, 2021 Hr'g Tr. 45:4-6 (defense counsel stating, "[w]e think we have strong arguments to oppose class certification, so Noom is very eager to move forward[.]").

Turning to class-wide liability and damages, Class Counsel are both experienced and realistic, and understand that the resolution of liability issues, the outcome of trial, and the inevitable appeals process are inherently uncertain.  The recent disposition of another proposed autorenewal class action against a weight loss provider in this very District serves as an apt comparator:  although just last year the consumer plaintiff in *Morrell v. WW International, Inc*., No. 20 Civ. 9912 (JGK), survived a motion to dismiss his claims under California's ARL and other California consumer protection statutes, *see* 551 F. Supp. 3d 173 (S.D.N.Y. 2021), after an early mediation, *Morrell* Dkt., ECF No. 24, the case was voluntarily dismissed with prejudice, *id*., ECF No. 32.  Indeed, while Judge Koeltl found that the *Morrell* plaintiff had "made a plausible showing that an ARL violation occurred," *Morrell*, 551 F. Supp. 3d at 186, the case was dismissed without seeking a class-wide recovery.  The *Morrell* litigation's history strongly suggests that sophisticated, rational actors prosecuting a similar case against a similar defendant assessed the litigation risks as simply too high, even after a favorable ruling on the core claim.

The settlement here ends the uncertainties of litigation and thus *Grinnell* factors 4–6 favor approval.  *See, e.g.*, *Quow*, 2018 WL 3368673, at *3 (Judge Parker finding that risks as to both liability and damages, including overcoming defenses, weighed in favor of final approval).

       e.  Although Noom Likely Could Withstand a Greater Judgment, That Does Not Suggest the Settlement Is Unfair (*Grinnell* Factor 7)

"[A] defendant is not required to empty its coffers before a settlement can be found adequate."  *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 191 (S.D.N.Y. 2012).  Even if Noom could withstand a greater judgment, this factor alone, "does not suggest that the settlement is unfair."  *In re Facebook*, 343 F. Supp. 3d at 413 (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001)); *see also Lea*, 2021 WL 5578665, at *10 (same).  This factor is therefore neutral.

23

f.   The Settlement Is Substantial, Even Considering the Best Possible Recovery (*Grinnell* Factors 8 and 9)

"[T]he question . . . is not whether the settlement represents the highest recovery possible . . . but whether it represents a reasonable one in light of the many uncertainties the class faces . . . ."  *Puddu*, 2021 WL 1910656, at *6 (quotation omitted).  "There is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  *Grinnell*, 495 F.2d at 455 n.2.

Here, Noom agreed to settle this case for a substantial amount: a cash settlement fund of $56,000,000, $6,000,000 in subscription fee credits, plus programmatic reforms valued at $31,000,000 to $120,000,000.  Even if the Court were to only consider the $56,000,000 in cash relief, this sum is 27.5% of the $203,559,671 in damages Plaintiffs would have sought at trial.  Wittels Decl. ¶ 63.  Of course, had Noom prevailed on any of its liability or damages arguments, recoverable damages would have been substantially reduced, if not eliminated.  The result is thus not just reasonable: it is admirable.  *See Lea*, 2021 WL 5578665, at *11 (Judge Parker approving settlement of 5.3% of estimated damages); *see also id.* ("Courts in this Circuit commonly find that settlements for less than half of potential damages are within the range of reasonableness" (citation omitted)); *Emeterio*, 2022 WL 274007, at *8 (Judge Parker noting that a settlement at 25% of total damages "weighs strongly in favor of final approval").  Weighing the benefits of settlement against the risks of litigation, the outcome achieved here is excellent.  Wittels Decl. ¶ 64.

2.   *The Remaining Rule 23(e)(2)(C) Factors Are Easily Satisfied*

a.   The Proposed Distribution Method Is Effective (Rule 23(e)(2)(C)(ii))

Rule 23(e)(2)(C)(ii) requires courts to examine "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."  Here, the parties implemented the latest, best practices for incentivizing claims.  The notice campaign is

24

primarily an "e-notice" campaign, Wittels Decl. ¶ 49, as is the standard in class actions involving

technology services or products, *see* Christine P. Bartholomew, *E-Notice*, 68 Duke L.J. 217, 234,

249 (2018) (e-notice employed in more than 60% of federal class actions involving technology

services or products from 2005 to 2017).

The email notice, follow-up email, and reminder notices sent electronically to Class

Members all provide a hyperlink to the Class Member's appropriate Claim Form, which is pre-

populated with their email address.   Wittels Decl. ¶ 51.   The Settlement Administrator also

implemented a custom social media campaign, targeting Class Members' social media accounts.

An example of a social media alert used here, *id*. ¶¶ 54–55, appears below:



The Settlement Administrator also took numerous steps designed to further stimulate

claims.  *Id.* ¶ 57.   These include: (1) mailing reminder notice to Class Members who have not

submitted claims, which is currently in progress; (2) utilizing a paid search engine optimization

campaign; and (3) causing the settlement to be listed and promoted through two leading class action settlement websites. *Id.*; *see also* Settlement Agreement ¶¶ 107, 109–11. Additionally, Class Members have access to a hotline and website, and Class Members will be allowed to cure any claim deficiencies. *Id.* ¶¶ 87, 89, 110, 112. This "belt and suspenders" approach resulted in a claims rate that is three times the average for consumer class actions. Wittels Decl. ¶ 58.

Regarding the allocation of settlement funds, while it must be fair and adequate, Your Honor has correctly observed that allocation plans "need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Lea*, 2021 WL 5578665, at *11 (collecting cases) (citation omitted). "[N]umerous courts have held [that] a plan of allocation need not be perfect." *Christine Asia*, 2019 WL 5257534, at *15 (collecting cases).

Here, the allocation plan tracks Plaintiffs' pre-settlement damages model and each Class Member's allocation is based on the strength of their claim (Subclass A and Subclass B) and their proportionate share of Noom's revenues. Wittels Decl. ¶ 36. A fundamentally fair allocation plan like the one used here easily hurdles the approval criteria. *Lea*, 2021 WL 5578665, at *11 (approving distribution based on overall loss for each class members' transactions and finding that class members were treated "equitably relative to each other"); *see also Puddu*, 2021 WL 1910656, at *6 (distributing fund "on a per-share basis, [is] fair, reasonable, and adequate").

   b. Class Counsel's Fee and Expense Award Is Well Within the Norms of this Circuit (Rule 23(e)(2)(C)(iii))

Rule 23(e)(2)(C)(iii) requires courts to examine "the terms of any proposed award of attorneys' fees, including the timing of payment." Class Counsel has not been paid for their extensive efforts or reimbursed for the $325,000+ in litigation costs they advanced on behalf of the Class. Class Counsel requests, and Defendants do not oppose, combined litigation expenses and attorneys' fees of one-third of *only* the $56,000,000 cash fund (*i.e.*, $18,666,666). Settlement

Agreement ¶ 129.  A one-third fee is the standard in this Circuit.  *See Lea*, 2021 WL 5578665, at *12 (Judge Parker noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *see also Emeterio*, 2022 WL 274007, at *9 ("Fee awards representing one third of the total recovery are common in this District.") (quotation omitted).  Yet here, when the settlement's total value is considered the fee and expense award is between 10% and 20% of the overall value, depending on whether the nonmonetary relief remains in place beyond the two years provided for by the Settlement Agreement.  *See, e.g.*, Principles of the Law of Aggregate Litigation § 3.13(b) (2010) ("[A] percentage-of-the-fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and the nonmonetary value of the judgment or settlement."); *Fleisher v. Phoenix Life Ins. Co.*, No. 14 Civ. 8714 (CM), 2015 WL 10847814, at *10 (S.D.N.Y. Sept. 9, 2015) ("The overall value of the settlement comprises monetary as well as non-monetary relief.").  As discussed in the fee and expense application below, the requested sums are supported by abundant empirical data on fees in comparable cases, the substantial results achieved for both Class Members and Noom's future customers, and the risks borne by Class Counsel to achieve these benefits.[6]

3.  *Rule 23(e)(2)(D)'s Equitable Treatment Requirement:  The Parties' Allocation Plan Correlates with Actual Damages and Is Reasonable*

Rule 23(e)(2)(D) requires the Court to consider whether "the proposal treats class members equitably relative to each other."  Consideration of this factor "could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  2018 Advisory Notes to Fed. R. Civ. P. 23.  Here, the settlement

---

[6] Rule 23(e)(2)(C)(iv) also requires courts to consider "any agreement required to be identified by Rule 23(e)(3)," that is, "any agreement made in connection with the proposal."  Here, there are "no agreements under Rule 23(e)(3) that the Court must review."  *In re Payment Card*, 330 F.R.D. at 36, n. 30.

treats individual Class Members fairly in relation to their realistic outcomes at trial. As discussed *supra*, the allocation plan tracks Plaintiffs' damages model used at mediation and Class Members' awards are keyed to their alleged overpayment. Further, all Class Members will be bound by the same mutual release, Settlement Agreement ¶¶ 52, 95–104, that does not affect the apportionment of relief, demonstrating equity. *In re GSE Bonds*, 414 F. Supp. 3d at 698–99.

## III.   NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS

In addition to having personal jurisdiction over Plaintiffs, the Court also has personal jurisdiction over the Class because they received the requisite notice. *Wal-Mart Stores v. Visa U.S.A.*, 396 F.3d 96, 114 (2d Cir. 2005); *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118 (S.D.N.Y. 2001) ("Because adequate notice has been disseminated and all potential Class Members have been given the opportunity to opt out of this class action, the Court has personal jurisdiction over all Class Members."). As described *supra* and as set forth in Plaintiffs' preliminary approval brief, ECF No. 495 at 11–13, 37–38, the notice program incorporated current best practices and resulted in a claims rate that is three times that expected for consumer class actions. In sum, notice satisfied all requirements of law. *Id.*

## IV.   CERTIFICATION OF THE RULE 23 SETTLEMENT CLASS IS APPROPRIATE

On February 23, 2022, the Court preliminarily certified the Class for settlement purposes. *See* ECF No. 500. There have been no changes to alter the propriety of class certification for settlement purposes. Thus, for the reasons stated in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of the Class Action Settlement and Related Relief, ECF No. 495 at 30–36, this Court should affirm its determinations in the Preliminary Approval Order and certify the Class under Rule 23.

V.      **THE COURT SHOULD DIRECT SERVICE AWARDS TO PLAINTIFFS**

Under the settlement, Plaintiffs may apply to the Court for service awards of up to $12,500 for each of the 15 Class Representatives who assisted the prosecution of this action.  Settlement Agreement ¶ 134.  Service awards "are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." *Emeterio*, 2022 WL 274007, at *10; *see also Zeltser v. Merrill Lynch & Co.*, No. 13 Civ. 1531 (FM), 2014 WL 4816134, at *11 (S.D.N.Y. Sept. 23, 2014) ("It is important to compensate plaintiffs for the time they spend and the risks they take.").

The requested payments for each of the 15 Class Representatives range from $5,000 to $12,500, and total $135,000, 0.24% of the settlement's cash recovery.  Wittels Decl. ¶ 86.  Only two individuals would receive $12,500: the original Named Plaintiff Geraldine Mahood, who spearheaded the litigation as the sole plaintiff in May 2020 and Maryanne Deracleo, who though seriously ill, sat for a deposition, produced documents, repeatedly assisted Class Counsel at key case junctures, and served as the lead plaintiff in a related state court action also resolved by the settlement.  *Id*. ¶ 87.  The additional seven individuals who remained Named Plaintiffs in the federal action at the time of settlement and participated in all aspects of the litigation, including five that sat for depositions, will receive $10,000 each.  *Id*.  These consumers made themselves available on such matters as documentary evidence and/or testimony in presenting the class claims, reviewing electronic files, including searches of their personal cell phones and social media accounts, and keeping in close contact with Class Counsel.  *Id*.  Four other individuals appeared as Named Plaintiffs in this action (but were later dismissed) or appeared in one of the state court actions—both groups of which assisted Class Counsel with discovery and

29

prosecution—will receive $7,500. *Id.* Finally, two individuals who served as alternate Named Plaintiffs, were subpoenaed by Noom, and also assisted in the prosecution, will receive $5,000. *Id.* The Class Representatives at all times encouraged Class Counsel to obtain the best possible result for the Class. *Id.*

The requested service awards are well-deserved and are well within the range of approved awards. *See, e.g.*, *In re Polaroid*, No. 03 Civ. 8335 (WHP), 2007 WL 2116398, at *3 (S.D.N.Y. July 19, 2007) (case law supports service awards of up to $85,000); *Karic v. Major Automotive Companies, Inc.*, No. 09 Civ. 5708 (CLP), 2016 WL 1745037 at *8 (E.D.N.Y. Apr. 27, 2016) (collecting cases and approving service awards of $20,000 each to seven named plaintiffs); *Puglisi v. TD Bank, N.A.*, 2015 WL 4608655, at *1 (E.D.N.Y. July 30, 2015) (approving service awards of $15,000 each for each two named plaintiffs and $10,000 each for three other named plaintiffs). Moreover, the service award request was subject to arm's length negotiations between the parties and was disclosed to the Class. Wittels Decl. ¶ 88. No Class member has objected to the proposed service awards. *Id.* In sum, the service awards are reasonable.

## VI.   THE COURT SHOULD GRANT THE REQUESTED FEES AND EXPENSES

Class Counsel bore the financial risk of employing a team of lawyers to investigate and litigate this action for nearly three years. Wittels Decl. ¶ 60. This investment secured (i) the largest-ever cash recovery in an autorenewal case,[7] and (ii) programmatic relief that goes well beyond past

---

[7] *See, e.g.*, *FTC v. Age of Learning, Inc.*, No. 20 Civ. 7996, ECF No. 4-1 at 10 (C.D. Cal. Sept. 1, 2020) ($10 million monetary judgment); *King v. Bumble Trading Inc.*, No. 18 Civ. 6868, ECF No. 108-1 at 21 (N.D. Cal. June 22, 2020) ($22.5 million settlement fund); *FTC v. Triangle Media Corp.*, No. 18 Civ. 1388, ECF Nos. 126 at 12, 127 at 11 (S.D. Cal. May 30, 2019) (judgments totaling $171 million suspended after payment of $3.4 million); *Williamson v. McAfee, Inc.*, No. 14 Civ. 158, ECF No. 114, at 2 (N.D. Cal. Feb. 3, 2017) (approximately $3 million in cash payments made to the class); *Habelito v. Guthy-Renker*, No. BC499558 (Sup. Ct. Los Angeles Cnty. Feb. 1, 2017) (up to $15.2 million in cash payments to class), http://proactivclassaction.com/media/814170/settlement_agreement.pdf; *Marketers of Simple Pure Supplements Settle FTC Court Action*, FTC (May 3, 2016) ($105 million judgment suspended to $9.2 million in forfeited assets), https://www.ftc.gov/news-events/press-releases/2016/05/marketers-simple-pure-

*Footnote continued on the following page.*

public or private autorenewal settlements[8] and will have continuing benefits to the Class, Noom's future customers, and the public at large. *Id.* ¶ 64. As compensation for their efforts Class Counsel requests the customary one-third legal fee, *but only* as measured against the $56,000,000 cash fund, not the settlement's total value. *Id.* ¶ 61. It is well settled that a one-third fee in complex class actions "is well within the percentage range that courts within the Second Circuit have awarded in other complex litigations." *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 118 (VM), 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012); *see also Lea*, 2021 WL 5578665, at *12 (Your Honor collecting cases and noting that a one-third fee is "a percent that has been approved as reasonable in this Circuit" for class action cases). Yet, in basing their fee request on only the settlement's cash fund portion, Class Counsel here is requesting substantially *less* than the customary one-third of the settlement's total value. When the full settlement value of between $93,000,000 and $182,000,000 (a $56,000,000 cash fund, $6,000,000 in subscription credits dispensed only to Class Members who elect them, and between $31,000,000 and $120,000,000 in injunctive relief, depending on how long Noom's business practice change remain in place) is considered, Class Counsel's fee and expense reimbursement request amounts to between 10% and 20% of the settlement's total value. Wittels

---

supplements-settle-ftc-court-action; *FTC v. Wilms*, No. 11 Civ. 828, ECF No. 117 at 18 (W.D. Wash. Mar. 6, 2012) ($359 million judgment suspended after forfeiture of less than $5 million).

[8] *See, e.g.*, *Age of Learning, Inc.*, No. 20 Civ. 7996, ECF No. 4-1 at 4–10 (requiring disclosures regarding autorenewal, trial practices, and simple cancellation option, but not reminder notice or cancellation of inactive accounts); *King*, No. 18 Civ. 6868, ECF No. 108-1, at 26–28 (requiring clearer disclosure of autorenewal and cancellation terms and post-purchase confirmation email, but not checkbox consenting to autorenewal, cancellation method via website or app, reminder notice, or cancellation of inactive accounts); *Williamson*, No. 14 Civ. 158, ECF No. 95 at 24–25 (N.D. Cal. Aug. 22, 2016) (requiring updated autorenewal and reference price disclosures, but no checkbox, reminder notice, or cancellation of inactive accounts); *see also FTC v. XXL Impressions LLC*, No. 17 Civ. 67, ECF No. 42 at 7–18 (D. Me. Sept. 13, 2017) (prohibiting misrepresentations, requiring disclosures on certain advertisements and express written consent for autorenewals, but not website or app cancellation, or reminder notice); *FTC v. Bunzai Media Grp., Inc.*, No. 15 Civ. 4527, ECF No. 676 at 8–13 (C.D. Cal. June 27, 2018) (prohibiting failure to clearly disclose terms of offer, refund, cancellation, or obtain express written consent for charges, but not requiring any affirmative consent, notice before subsequent charges, change in cancellation practices, or cancellation of inactive accounts); *Triangle Media Corp.*, No. 18 Civ. 1388, ECF No. 126 at 6–12 (S.D. Cal. May 30, 2019) (prohibiting misrepresentations, requiring clear autorenewal disclosures, express written consent, and a simple cancellation mechanism, but not reminder notice or cancellation of inactive accounts).

Decl. ¶ 62.  Further, the request of one-third of the cash fund is for attorneys' fees *and* the more than

$325,000 in litigation costs and expenses advanced for the Class's benefit.[9]  When Class Counsel's

costs and expenses are subtracted, the attorneys' fee represents 32.75% of the cash fund.  *Id.* ¶ 62.

Considering these facts, as well as the authorities cited below and in the accompanying

declaration of attorneys' fee expert and University of Texas School of Law professor Charles Silver

("Silver Decl."), ECF No. 510, Class Counsel's fee and expense reimbursement request is

reasonable, well in line with prior awards in this District, the local and national market for similarly

complex legal services, the risks incurred and the results obtained, multiple empirical studies of fee

awards in other class actions in this Circuit and District, and the terms sophisticated clients negotiate

in contingent fee representation both in class actions and other complex matters.  *See* Silver Decl.

¶¶ 35–53 (analysis of fees prevailing in contingency commercial litigation); ¶¶ 57–64 (risk and return

analysis); ¶¶ 68–75 (survey of empirical data); ¶¶ 14–34, 54–56 (marketplace proxy analysis of

sophisticated clients as named plaintiffs in class actions and other complex commercial litigations).

### A.     Class Counsel Should Be Adequately Compensated for their Substantial Efforts and the Tremendous Financial Risk They Took for the Class's Benefit

Awarding Class Counsel fees "serves the salutary purpose of encouraging counsel to pursue

meritorious claims on behalf of a class of individuals who could not afford to litigate their individual

claims."  *Steiner v. Williams*, No. 99 Civ. 10186 (JSM), 2001 WL 604035, at *1 (S.D.N.Y. May 31,

2001); *see also Flores v. One Hanover, LLC*, No. 13 Civ. 5184 (AJP), 2014 WL 2567912, at *9

(S.D.N.Y. June 9, 2014) (Because "[c]ommon fund recoveries" such as this one "are contingent on

---

[9] Plaintiffs' litigation costs and expenses total $329,494.01.  Wittels Decl. ¶ 81.  "Courts typically allow counsel to recover their reasonable out-of-pocket expenses" *separately* from fees paid as a percentage of the common fund. *DeLeon v. Wells Fargo Bank, N.A.*, No. 12 Civ. 4494 (RLE), 2015 WL 2255394, at *6 (S.D.N.Y. May 11, 2015) (awarding costs separately, and in addition to, percentage-of-recovery attorneys' fees award of one-third of common fund); *see also In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 WL 31663577, at *26 (S.D.N.Y. Nov. 26, 2002) ("In this district alone, there are scores of common fund cases where fees alone (i.e., where expenses are awarded in addition to the fee percentage) were awarded in the range of 33-1/3% of the settlement fund.").

a successful litigation outcome," class action contingency fees "transfer a significant portion of the risk of loss to the attorneys taking a case.  Access to the court would be difficult to achieve without compensating attorneys for that risk.").  It is also well settled that contingency fee awards should be greater than the fees in non-contingency cases, as "[n]o one expects a lawyer whose compensation is contingent on success of his services to charge, when successful, as little as he would charge a client who in advance has agreed to pay for his services, regardless of success."  *Grinnell*, 495 F.2d at 470; *Lea*, 2021 WL 5578665, at *11 (this Court acknowledging same).

Moreover, courts recognize that fee awards discourage "future misconduct of a similar nature."  *Maley*, 186 F. Supp. 2d at 369.  "[C]lass actions . . . have value to society . . . both as deterrents to unlawful behavior . . . and as private law enforcement regimes that free public sector resources.  If we are to encourage these positive societal effects, class counsel must be adequately compensated . . . ."  *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 287 (6th Cir. 2016); *see also* William B. Rubenstein, *On What A "Private Attorney General" Is—and Why It Matters*, 57 VAND. L. REV. 2129, 2168 (2004) ("[Class Counsel's] clients are not just the class members, but the public and the class members; their goal is not just compensation, but deterrence and compensation."); William B. Rubenstein, *Why Enable Litigation?: A Positive Externalities Theory of the Small Claims Class Action*, 74 UMKC L. REV. 709, 724–25 (2006) ("[T]he class action has the structural consequence of dividing law enforcement among public agencies and private attorneys general and of shifting a significant amount of that enforcement to the private sector.").

**B.**     **The Standard for Awarding Attorneys' Fees in Class Actions**

In common fund settlements such as this one, courts in this Circuit prefer the percentage-of-the-fund method for awarding attorneys' fees.  *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  As Your Honor has recognized, "[t]he trend in this circuit is toward

the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Lea*, 2021 WL 5578665, at *11 (quotation omitted).

1. *The Goldberger Factors Support Plaintiffs' One-Third Requested Fee Award*

The requested one-third fee is reasonable when considering the following *Goldberger* guidelines: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  209 F.3d at 50.  In fact, all *Goldberger* factors weigh in favor of granting Class Counsel's one-third fee request here.

a.  Class Counsel's Time and Labor

Class Counsel devoted over 9,000 hours throughout the nearly three years they spent investigating, prosecuting, and settling this case.  Wittels Decl. ¶¶ 67, 69–70.  Class Counsel has deep experience in class actions and the time and labor spent is reasonable considering the many disputed issues that required vigorous advocacy in response to Noom's multipronged defense.  *Id.* ¶ 67.  Because Class Counsel took this case on pure contingency, all financial incentives were to work efficiently and minimize costs.  *Id.*  There was no unnecessary expenditure of labor or resources.  *Id.* Moreover, Class Counsel will spend additional time monitoring the programmatic aspects of the settlement and aiding in the settlement's further administration.  *Id.* ¶ 68.  The requested fee is also meant to compensate for this future work.  *DeLeon*, 2015 WL 2255394, at *6.

b.  Magnitude and Complexity of the Litigation

The requested fee is also reasonable considering this action's size and complexity.  With claims under 54 jurisdictions involving hundreds of millions of dollars and top-tier defense counsel, by any measure, this case is complex, thus justifying the substantial time and labor the Court, Defendants and their counsel, and Class Counsel dedicated to this matter.  Wittels Decl. ¶

34

74.  In addition, this litigation involves highly technical legal and factual issues, unsettled areas of law, and emerging technologies and evolving commercial norms.  *Id.*  As discussed earlier, autorenewal class actions are fraught with obstacles, not the least of which is identifying which class members were damaged by the alleged misconduct.  Here, through the ingenuity of Class Counsel in conjunction with our experts, we constructed a class-wide damages model that accounted for varying damages scenarios.  *Id.*  It was the strength of this model combined with the tenacity of Class Counsel in prosecuting this case that enabled this settlement.  *Id.*  The size and complexity of this litigation is also underscored by the fact that Defendants retained highly experienced class action practitioners, *id.* ¶ 65.  *See In re Brown Co. Sec. Litig.*, 355 F. Supp. 574, 592–93 (S.D.N.Y. 1973) (prestige of opposing counsel highlights complexity of litigation and challenges faced by class counsel).

Further, the requested one-third fee is the prevailing percentage in complex contingency class and non-class commercial litigation.  Silver Decl. ¶¶ 40–53.  The empirical data on class action attorneys' fees in this Circuit and District (which include the value of any nonmonetary relief obtained) demonstrates that Class Counsel's requested fee in this matter is well *below* the mean and median fee awards in the Second Circuit, *id.* ¶ 72, the Southern District of New York, *id.* ¶ 73, and federal class action settlements as a whole, *id.* ¶¶ 74–75).  Thus, the magnitude and complexity of the litigation weigh strongly in favor of the requested fee award.

c.  Risks of the Litigation

"The risk of the litigation is often cited as the first, and most important, *Goldberger* factor." *Lea*, 2021 WL 5578665, at *12.  Generally, "little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Cates v. Trustees of Columbia Univ. in City of N.Y.*, No. 16 Civ. 6524 (GBD), 2021 WL 4847890, at *5 (S.D.N.Y. Oct. 18, 2021); *see also In re Veeco Instruments*, No. 05 MDL 1695 (CM), 2007 WL 4115808, at *6 (S.D.N.

Nov. 7, 2007) ("[T]he risk of non-payment in complex cases . . . is very real.  There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise. . . . [E]ven a victory at trial does not guarantee recovery.") (collecting cases); Wittels Decl. ¶ 76.  Specifically, autorenewal class actions such as the instant case pose substantial risks of not becoming class actions at all.  *See Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 68 (S.D.N.Y. 2013) ("Whether a customer requested, wanted, or approved renewal of their subscription is not amenable to being proven through class-wide proof.").

In addition, "[t]he Second Circuit has recognized that risk is inherently associated with a case undertaken on a contingent fee basis."  *Lea*, 2021 WL 5578665, at *12.  Here, Class Counsel took this case on 100% contingency and zealously prosecuted it for nearly three years without payment.  The requested fee is in line with the substantial risks incurred, particularly considering that contingency work is entitled to greater compensation than non-contingency work; indeed, "Plaintiffs may find it difficult to obtain representation if attorneys know their reward for accepting a contingency case is merely payment at the same rate they could obtain risk-free for hourly work, while their downside is no payment whatsoever."  *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 246 (4th Cir. 2010); *Adams v. Rose*, No. 03 Civ. 7011, 2003 WL 21982207 (2d Cir. Aug. 20, 2003) ("[C]ontingent fee risk is the single most important factor in awarding a multiplier[.]").

As recognized by Your Honor in recently approving one-third fees, Class Counsel "undertook this litigation on a contingent basis and have received no payment for their work during the roughly three years that the case has remained pending, which counsels in favor of approving the requested fee."  *Lea*, 2021 WL 5578665, at *12; *see also Oleniak v. Time Warner Cable Inc.*, No. 12-CV-3971 (KPF), 2013 WL 12447094, at *9 (S.D.N.Y. Dec. 17, 2013) (fact that "Class

Counsel risked time and effort and advanced costs and expenses, with no ultimate guarantee of compensation" weighed in favor of a one-third fee).

> d.   Quality of Representation

When evaluating the quality of representation, "courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v. Ackermans*, No. 02 Civ. 7951 (PKL), 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007).   As set forth above on pp. 17–19 in connection with Rule 23 adequacy, Class Counsel have decades of experience successfully prosecuting consumer class actions.   The attorneys on Class Counsel's team have been appointed class counsel in dozens of matters and are highly experienced and knowledgeable in complex and class action litigation and trial practice.   Wittels Decl. ¶¶ 5–12; Declaration of Co-Plaintiffs' Counsel Benjamin F. Johns ("Johns Decl.") ¶ 3, ECF No. 508; *see also* Ex. 1 to Johns Decl., ECF No 508-1; Declaration of Co-Plaintiffs' Counsel A. Plutzik ("Plutzik Decl.") ¶ 3, ECF No. 509; *see also* Ex. 1 to Plutzik Decl., ECF No. 509-1.   Moreover, Class Counsel has demonstrated firsthand to the Court its ability to vigorously prosecute this case.   Wittels Decl. ¶¶ 26–33.   The negotiated settlement is a highly favorable outcome for the Class, and is the direct result of the creativity, diligence, and skill brought to bear by Class Counsel.   *Id.* ¶¶ 64–66.[10]

The recovery obtained equally justifies the requested fee award.   As noted, the settlement is comprised of a $56,000,000 cash fund, $6,000,000 in subscription fee credits, and programmatic relief jointly and independently valued at between $31,000,000 and $120,000,000.   In calculating class action fee awards, courts include the value of both the monetary and non-monetary benefits

---

[10] The caliber of defense counsel is further testament to the quality of Class Counsel's representation.   *See, e.g.*, *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) (reasonableness of fee supported by fact that the "high quality of defense counsel opposing Plaintiffs' efforts . . . proves the caliber of representation that was necessary to achieve the Settlement")).

conferred.  *Fleisher*, 2015 WL 10847814, at *10, *15.  "Leading authorities agree, as do courts in this Circuit and nationwide."  *Id.* at *15 (collecting authorities, including from the Federal Judicial Center).[11]  As discussed above on pp. 11–14, this case contributed to significant programmatic relief that will remain for a minimum of two years.  Wittels Decl. ¶¶ 39–48.

In its guide to *Managing Class Action Litigation*, the Federal Judicial Center provides an example of valuing injunctive relief when calculating attorneys' fees: "an injunction against a fraudulent sales practice might be valued by examining the amount of past sales attributable to the practice and projecting that value for a reasonable period of time, perhaps the life of the practice before the injunction."  Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, at 35 (3d ed. 2010), *available at* https://multijurisdictionlitigation.files.wordpress.com /2012/11/classgd3.pdf.  The Federal Judicial Center's method was the method used in calculating the value of the non-monetary relief Class Counsel obtained here.  Wittels Decl. ¶ 19; *see also Fleisher*, 2015 WL 10847814, at *15 (citing with approval FJC's method of valuing injunctive relief).

When considering the substantial non-monetary benefit conferred on the Class, as well as the $6,000,000 in subscription credits on top of the cash fund, the requested attorneys' fee and expense award represents between 10% to 20% of the total settlement value.  Wittels Decl. ¶ 62.  The requested fee is thus at the low end of fees approved in comparable cases, as a fee of one-third (or 33.33%) of

---

[11] *Sheppard v. Consol. Edison Co. of N.Y., Inc.*, No. 94 Civ. 403, 2002 WL 2003206, at *7 (E.D.N.Y. Aug. 1, 2002) (valuing non-monetary relief at "an estimated $5 million," when considering class counsel's fee request); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 478 (D.N.J. 2008) (even though the parties could only "fairly value" the non-monetary relief "at between $26 million and $38 million," the court used this valuation for setting fee); *Tennille v. W. Union Co.*, No. 09 Civ. 938, 2013 WL 6920449, at *10 (D. Colo. Dec. 31, 2013) (adding $46,560,596 in non-monetary value to $19,000,000 in available refunds and awarding fee of 35% ($22,946,208) of $65,560,596 because an attorneys' fee based solely on the monetary component "would severely undervalue class counsel's efforts in obtaining the [non-monetary] relief and other benefits included in the [settlement]."); *Sykes v. Harris*, No. 09 Civ. 8486 (DC), 2016 WL 3030156, at *17 (S.D.N.Y. May 24, 2016) (considering value of non-monetary relief in setting class counsel fees); Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, at 35 (3d ed. 2010) (basing fees on the "actual value to the class of any settlement fund plus the actual value of any nonmonetary relief"); Principles of the Law of Aggregate Litigation, The American Law Institute, Mar 1, 2010, § 3.13 (noting fee awards are to be "based on both the monetary and nonmonetary value of the judgment or settlement").

the total value obtained for the class has repeatedly "been approved as reasonable in this Circuit." *Lea*, 2021 WL 5578665, at *12 (collecting cases).

> e.   The Requested Fee Is Reasonable in Relation to the Settlement

The requested fee of one-third of the cash fund is also reasonable considering the work performed and the results obtained and falls within the range of common fund awards in the Second Circuit.  As Professor Silver notes in his expert declaration, "[e]ven setting aside the fact that Class Counsel should have been expected to take an aggressive approach to damages in settlement negotiations," the resulting $56,000,000 cash fund represents 27.5% of the best-case pecuniary damages which "is substantially better than the typical recovery in the class actions for which we have empirical studies (securities fraud and antitrust)."  Silver Decl.  ¶ 63 (recoveries between 1.6% and 19%).  As set forth above, courts both in the Second Circuit and elsewhere have established that a standard fee in complex class action cases is one-third of the gross settlement benefit.  When considering the settlement's significant programmatic relief, the requested fee is markedly lower than what courts award in similar cases.

> f.   Public Policy Considerations

Awarding one third of the cash fund is also consistent with public policy.  *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 3400 (CM) (PED), 2010 WL 4537550, at *29 (S.D.N.Y. Nov. 8, 2010) (if the "important public policy [of enforcing consumer protection laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"); *Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing [consumer protection] laws must be considered."); *Hicks v. Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and

rewarding."); *Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D. 41, 60 (E.D.N.Y. 2010) ("If counsel did not have the prospect of an award that took account of the substantial risks and uncertainties of such litigation, there would be no incentive to take this type of case at all and the vast majority of the class would have gone without prospect of recovery.").

This is especially true where, like here, there are *no* public enforcement actions. *See Asare v. Change Grp. of New York, Inc.*, No. 12 Civ. 3371 (CM), 2013 WL 6144764, at *22 (S.D.N.Y. Nov. 18, 2013) ("In this case, public policy considerations weigh heavily in favor of awarding Class Counsel's requested fee. The violations complained of are of long-standing duration. Nevertheless, apparently no state or federal governmental action has ever been brought against Defendant to correct these deficiencies. The award of the requested fees will encourage the prosecution of similar claims and further a significant public interest goal."). Indeed, the deterrent effect of this case has already carried over to other market participants.[12]

Moreover, the requested fee does not bestow a windfall on Class Counsel (*see* the lodestar cross check discussion below) and represents reasonable remuneration for risking over 9,000 attorney hours and advancing more than $325,000 in the nearly three years they devoted to this case. Therefore, any concern about preventing windfalls is not at issue here.[13] Simply put, Class

---

[12] The settlement has been covered by Fox Business, Reuters, Newsweek, the New York Post, Business Insider, the National Law Review, Bloomberg Law, NASDAQ, Subscription Insider, and the Pew Charitable Trusts' Stateline. Wittels Decl. ¶ 84. Large law firms have also used the settlement to spread awareness of automatic renewal laws. *Id.* ¶ 85. These firms include Winston & Strawn, Kelley Drye & Warren, Hunton Andrews Kurth, Faegre Drinker Biddle & Reath, and BakerHostetler. *Id.*

[13] As Professor Silver notes, when the Seventh Circuit rejected the so-called "megafund rule," according to which fees must be capped at low percentages when recoveries are very large, that court correctly observed that "Private parties would never contract for such an arrangement" because it would encourage cheap settlements. Silver Decl. ¶ 26. Further, even if the megafund rule were applied here, accounting for the value of the programmatic relief as part of the overall settlement value puts the requested attorneys fee in the 10 to 20 percent range which is a percentage used in "only the largest 'mega-fund' cases with recoveries well north of $100 million." *Id.* ¶ 71.

Counsel's requested compensation is reasonable, as this amount falls below the range of fees normally approved within this Circuit.  In sum, the *Goldberger* factors support the requested fee.

       2.   *The Lodestar Cross Check Further Supports Class Counsel's Fee and Expense Request*

Application of the lodestar/multiplier method also confirms the reasonableness of Class Counsel's request.  Courts can award fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116–17 (2d Cir. 2005).  However, as Your Honor previously noted "[t]he trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."  *Lea*, 2021 WL 5578665, at *11.  By contrast, the lodestar method has been criticized for creating "a temptation for lawyers to run up the number of hours for which they could be paid" which "created an unanticipated disincentive to early settlement."  *Goldberger*, 209 F.3d at 48–49.  Further, "economic models of rational clients suggest that clients do not use the lodestar crosscheck when they hire lawyers on contingency," and when a noted scholar searched for real-world use of the lodestar crosscheck in contingency cases he "found no such evidence."  Silver Decl. ¶ 78.

From the standpoint of judicial economy, "the primary source of dissatisfaction" with the lodestar method "was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits," which produced an "inevitable waste of judicial resources."  *Goldberger*, 209 F.3d at 48–49.  Thus, "[t]he trend in the Second Circuit is to apply the percentage method and loosely use the lodestar method as a baseline or as a cross check."  *Solis v. OrthoNet LLC*, No. 19 Civ. 4678 (VSB), 2021 WL 2678651, at *4 (S.D.N.Y. June 30, 2021).

Under the lodestar cross-check, the number of hours each attorney worked is multiplied by that attorney's hourly rate.  *Goldberger*, 209 F.3d at 47.  "Of course, where used as a mere cross-

check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Id.* at 50. "Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case," *id.*, or the court "may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005).

In considering the lodestar, the court also determines the appropriate multiplier to "reflect litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Flag Telecom Holdings*, 2010 WL 4537550, at *23; *see also Maley*, 186 F. Supp. 2d at 370 (explaining that the lodestar "is typically enhanced by a multiplier to reflect consideration of a number of factors, including the contingent nature of success and the quality of the attorney's work") (citation omitted); *Cates*, 2021 WL 4847890, at *5 (observing that it is not "just to make a fee depend solely on the reasonable amount of time expended," "particularly in complicated cases producing large recoveries." (citing *Grinnell*, 495 F.2d at 470)).

Here, Class Counsel's lodestar to date is $6,472,894, which reflects the over 9,000 hours devoted over nearly three years of work. Wittels Decl. ¶¶ 67, 69, 79–80.[14] As detailed above, this action was hotly contested and included extensive discovery, claims under 54 different jurisdictions, a motion to dismiss the entirety of a 279-count complaint, fourteen hearings on contested matters, twenty contested discovery motions and applications, twelve depositions, ten joint or simultaneous discovery-related letter briefs, and multiple full-day mediations. *See, e.g., id.* ¶¶ 27–29, 31–33.

Class Counsel seeks a modest multiplier of 2.88, which is "in line with the average for the Second Circuit in cases of a similar size." Silver Decl. ¶ 92. In fact, despite the groundbreaking results achieved here, the requested multiplier is substantially lower than other multipliers approved in this Circuit. *See Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 7961 (CM), 2014 WL 1224666,

---

[14] Class Counsel used their billing discretion to lower their number of hours expended. *Id.*

at *24 (S.D.N.Y. Mar. 24, 2014) ("Lodestar multipliers of nearly 5 have been deemed 'common' by courts in this District."); *see also Spicer v. Pier Sixty LLC*, No. 08 Civ. 10240 (PAE), 2012 WL 4364503, at *4 (S.D.N.Y. Sept. 14, 2012) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts." (quoting *In re Telik*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008))); *Maley*, 186 F. Supp. 2d at 371 (a "modest multiplier of 4.65" is "fair and reasonable."); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481–82 (S.D.N.Y. 2013) (awarding "approximately 6.3 times" lodestar and stating "[c]ourts regularly award lodestar multipliers of up to eight times the lodestar").

Indeed, as Professor Silver observes, "[c]ourts have awarded far larger multipliers in many cases." Silver Decl. ¶ 91; *see also Lopez v. Fashion Nova*, No. 20 Civ. 9238 (LGS), 2021 WL 4896288, at *3 (S.D.N.Y. Oct. 19, 2021) ("In this Circuit, courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers." (cleaned up)); *In re Buspirone Antitrust Litig.*, No. 01 Civ. 7951, 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. April 11, 2003) (awarding 33.3% of a $220 million fund, which produced a multiplier of 8.46).[15]

Turning to Class Counsel's hourly rates, they are in line with the "rates prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation," *Cruz v. Local Union No. 3 of IBEW,* 34 F.3d 1148, 1159 (2d Cir. 1994), and are reasonable when analyzed under the "*Johnson* factors." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008). The Second Circuit has identified the twelve *Johnson* factors as:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of

---

[15] *See also Riveras v. Bilboa Rest. Corp.*, No. 17 Civ. 4430 (LTS) (BCM), 2018 WL 8967112, at *1 (S.D.N.Y. Dec. 14, 2018) (6.7 multiplier "fair and reasonable"); *Zeltser v. Merrill Lynch & Co., Inc.*, No. 13 Civ. 1531 (FM), 2014 WL 4816134, at *10 (S.D.N.Y. Sept. 23, 2014) (5.1 multiplier "falls within the range granted by courts"); *Wal-Mart*, 396 F.3d at 123 (3.5 multiplier "has been deemed reasonable" and "multipliers of between 3 and 4.5 have become common") (internal citations omitted); *Newman v. Caribiner Int'l Inc.*, No. 99 Civ. 2271 (GEL) (S.D.N.Y. Oct. 25, 2001) (7.7 multiplier); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011) (5.3 multiplier).

employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 186 n.3.  However, "separate findings as to each factor are unnecessary." *Espinosa v. Perez*, No. 18 Civ. 8855, 2020 WL 2950978 (LGS) (SN), at *1 (S.D.N.Y. Jan. 27, 2020).

Here, Class Counsel's rates are supported by the *Johnson* factors.  This action was undertaken on pure contingency by highly specialized attorneys.  *See, e.g.*, Wittels Decl. ¶¶ 11, 67.  Due to the intense time commitment (here, over 9,000 hours), counsel was precluded from other work.  *Id.* ¶ 77.  Cases like this are also not attractive to the greater class action bar, likely because they are highly complex and require multi-year efforts.  *Id.* ¶ 78.  Indeed, as noted above at p. 23, a similar proposed class action in this District was recently voluntarily dismissed after a favorable dismissal ruling.  Class Counsel's usual hourly rates are also competitive with rates awarded in other complex class actions in this District and have been repeatedly approved by courts in this District and beyond.  *Id.*[16]

Further, a compendium of rates recently awarded in complex class actions in this District and the Eastern District of New York demonstrates Class Counsel's hourly rates are in full accord with local rates for similarly complex class actions.  *See* Silver Decl. ¶ 80 (compiling approved class action attorneys fee rates as high as $1,350 per hour in 17 cases in the New York metro area spanning

---

[16] *See, e.g.*, *Medvedeva v. Assistcare Home Health Servs. LLC*, No. 17 Civ. 5739 (E.D.N.Y. June 1, 2021), ECF No. 151 (approving Class Counsel's 2021 rates in wage and hour class action); *Little v. Ambit Energy Holdings, LLC*, No. 16 Civ. 8800 (D.N.J. July 2, 2020), ECF No. 94 (approving Class Counsel's 2020 rates in consumer class action); *Delgado v. Ocwen Loan Servicing LLC, et al.*, No. 13 Civ. 4427 (E.D.N.Y. Aug. 20, 2019), ECF No. 429 (approving Class Counsel's 2019 rates, including the Chimicles firm's rates, in negative option consumer class action); *Simmons v. Ambit Energy Holdings, LLC*, No. 503285/2015, NYSCEF No. 205 (N.Y. Sup. Ct. July 16, 2018) (approving Class Counsel's 2018 rates in consumer class action); *Mirkin v. Viridian Energy, Inc*., No. 15 Civ. 1057 (D. Conn. June 27, 2018), ECF No. 185 (same); *Rasulev v. Good Care Agency, Inc.*, No. 16 Civ. 1993 (E.D.N.Y. July 28, 2017), ECF No. 70 (approving Class Counsel's 2017 rates in wage and hour class action); *Saldana v. Middletown Car-G-Cam Uni Corp.*, No. 15 Civ. 3651 (S.D.N.Y. Jan. 8, 2016), ECF No. 22 (approving Class Counsel's  2015 rates in wage and hour class action); *Davenport v. Elite Model Mgmt. Corp*., No. 13 Civ. 1061, 2014 WL 12756756, at *11 (S.D.N.Y. May 12, 2014) (approving Class Counsel's 2014 rates in wage and hour class action and comparing them to Outten & Golden's rates charged in S.D.N.Y.).

consumer, wage and hour, ERISA, securities, and antitrust class actions).  Other sources also confirm

the reasonableness of Class Counsel's hourly rates.  For example, Your Honor recently noted that

rates ranging "from $600 to $995 for partners, and $500 to $750 for associates" are "comparable to

peer plaintiffs and defense-side law firms litigating matters of similar magnitude." *Lea*, 2021 WL

5578665, at *12.[17]  In sum, the lodestar cross-check supports the reasonableness of the requested fee.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court finally approve

the Settlement Agreement, certify the Settlement Class, and enter the proposed Order and Final

Judgment, ECF No. 507-1.


Dated:  June 10, 2022
      Armonk, New York

Respectfully submitted,

/s/ Steven L. Wittels
Steven L. Wittels
J. Burkett McInturff
Tiasha Palikovic
Steven D. Cohen
Ethan D. Roman
Jessica L. Hunter

**WITTELS MCINTURFF PALIKOVIC**
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
tpalikovic@wittelslaw.com
sdc@wittelslaw.com
edr@wittelslaw.com
jlh@wittelslaw.com

---

[17] "[T]he use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) ("[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment.").

Benjamin F. Johns (*pro hac vice*)
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
361 W. LANCASTER AVENUE
HAVERFORD, PENNSYLVANIA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
BFJ@chimicles.com

Alan R. Plutzik
**BRAMSON, PLUTZIK, MAHLER**
**& BIRKHAEUSER, LLP**
2125 OAK GROVE ROAD, SUITE 125
WALNUT CREEK, CALIFORNIA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792
aplutzik@bramsonplutzik.com

*Class Counsel for Plaintiffs and the Class*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the documents submitted in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Related Relief were served via ECF this 10th day of June 2022 upon all counsel of record.

       /s/ Steven L. Wittels
       Steven L. Wittels