UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MOJO NICHOLS, SUSAN BREWSTER, DUANE DEA,
MARYANNE DERACLEO, KAREN KELLY, REBECCA RICHARDS,
JENNIFER SELLERS, and STACY SPENCER, *Individually
and on Behalf of All Others Similarly Situated*,

                                        Plaintiffs,

                    -against-

NOOM, INC., ARTEM PETAKOV, and JOHN DOES 1 TO 5,

                                        Defendants.
-----------------------------------------------------------------X

**OPINION AND ORDER**

**20-CV-3677 (KHP)**

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

The above-captioned matter came before the Court on Plaintiffs' unopposed motion for (i) Certification of the Settlement Class, (ii) Final Approval of the Class Action Settlement, (iii) finding notice was the best practicable under the circumstances; (iv) service awards to the Class Representatives, (v) Class Counsel reimbursement of attorneys' fees and costs; (vi) approving the parties' proposed final settlement procedure, (vii) incorporating the terms of the Settlement Agreement, and (viii) dismissing the action with prejudice.  (ECF Nos. 505-11 (hereinafter, "Motion for Final Approval").)  Also before the Court is Plaintiffs' related and unopposed motion to approve their *cy pres* recipient designations. (ECF Nos. 513.)  All parties have consented to my exercising plenary jurisdiction pursuant to 28 U.S.C. § 636(c) for purposes of these motions.  (ECF No. 489.)  For the reasons that follow, Plaintiff's Motion for Final Approval is GRANTED and the requested *cy pres* designations are approved and GRANTED as further discussed below.

## BACKGROUND AND PROCEDURAL HISTORY

On May 12, 2020, Plaintiffs filed a Class Action Complaint against Defendants.  (ECF No. 1.)  Plaintiffs subsequently amended their Complaint an additional four times.  (*See* ECF Nos. 23, 88, 149, 174.)  Plaintiffs and Class Members are consumers from across the United States who were charged for an autorenewing subscription to Noom's Healthy Weight diet program. Plaintiffs allege that Noom's enrollment, autorenewal, and cancellation practices violated, *inter alia*, California's Automatic Purchase Renewal Statute, Cal. Bus. & Prof. Code § 17600 *et seq*. (the "ARL"), New York's General Business Law § 349 ("GBL § 349"), and the common law.  (ECF No. 493.)  On February 12, 2021, in lieu of answering the complaint, the Defendants filed a motion to dismiss the third amended complaint.  (ECF Nos. 204-07.)  On August 5, 2021, the Honorable Lorna G. Schofield dismissed the causes of action asserting conversion under New York, Ohio, Texas, Alabama and District of Columbia law; and also dismissed the portion of Plaintiffs' California Unfair Competition Law claim (i.e., Count Four), stemming from California's Bot Disclosure Law (Cal. Bus. & Prof. Code § 17941).  (ECF No. 415.)  However, Defendant's motion to dismiss was denied as to all other causes of action.  (*Id.*)

Discovery began on or around July 9, 2020.  On December 18, 2020, the parties engaged mediator Judge Edward Infante (Ret.) to hold a full-day mediation; however, the parties failed to reach a resolution.  Beginning in the spring of 2021, the parties shifted settlement discussions to the undersigned.  (*See, e.g.*, ECF No. 194.)  The undersigned held a two-day mediation on September 13-14, 2021, whether the parties ultimately reached an agreement in principle on certain material terms and executed a term sheet.  The parties then spent the period from mid-September 2021 to January 20, 2022, negotiating final terms.  On November

2

15, 2021, the undersigned ordered a stay of discovery for the parties to continue the

settlement discussions.  (ECF No. 479.)  The parties ultimately held an additional eight

conferences before executing the Settlement Agreement.  On January 25, 2022, the parties

represented that they reached a settlement in principle and the undersigned extended the stay

of discovery for six months for the parties to finalize the agreement.  (ECF No. 486.)

On February 11, 2022, the Plaintiffs filed a fourth amended complaint.  (ECF No. 490.)

On the same day, the Plaintiffs filed a motion for preliminary approval of the class action

settlement.  (ECF Nos. 494-96.)  The parties' proposed settlement resolves all claims in the

action.  On February 23, 2022, the Court granted Plaintiffs' unopposed motion for preliminary

approval of the class action settlement, provisionally certified the settlement class, approved

the appointment of class counsel and class representatives, and approved the notice plan and

related procedures.  (ECF No. 500.)

This Court held a final approval hearing on July 11, 2022.  At the hearing, the Court

heard oral argument on the overall fairness of the proposed settlement agreement from both a

procedural and substantive standpoint, as well as argument about the application for fees,

costs, and service awards.

## THE SETTLEMENT AGREEMENT

The proposed Settlement Agreement defines the Settlement Class as:

> All natural persons who purchased a Noom Healthy Weight
> Subscription in the United States via the Noom website or mobile
> app from May 12, 2016 to October 6, 2020 and who (i) were
> charged by Noom for a Healthy Weight Subscription and (ii) did not
> receive a full refund or chargeback of all Noom Healthy Weight
> Subscription charges.

3

(Settlement Agreement ¶ 27.)  For the avoidance of doubt, persons who purchased a Noom

Healthy Weight Subscription via the Apple App Store or Google Play Store are excluded from

the Settlement Class.  (*Id.*)  Additionally, the following entities and individuals are not Class

Members: (a) Noom and any and all of its predecessors, successors, assigns, parents,

subsidiaries, affiliates, directors, officers, employees, agents, representatives, and attorneys,

and any and all of the parents', subsidiaries', and affiliates' present and former predecessors,

successors, assigns, directors, officers, employees, agents, representatives, and attorneys; (b)

any judicial officer presiding over the Action, or any member of his or her immediate family or

of his or her judicial staff; and (c) any Excluded Class Member.  (*Id.*)

Under the Settlement Agreement, Noom will deposit $56,000,000 into a non-

reversionary fund ("Settlement Fund").  This amount is comprised of $46,000,000 for Subclass A

and $10,000,000 for Subclass B.  Subclass A consists of all Class Members who either (i) never

enrolled in Noom, (ii) enrolled but never engaged, (iii) engaged during the trial but not

thereafter, (iv) engaged two times or fewer post-trial, (v) had zero engagement after day 58 of

their subscription, (vi) received a partial refund of any payments for the Healthy Weight

Subscription, or (vii) any other Class Member who is a resident of California.  (*Id.* ¶ 62.)

Subclass B consists of all Class Members who are not part of Subclass A.  (*Id.* ¶ 63.)  The

difference in the payment amounts reflects the strength of the Class Members' claims.  Cash

payments will be distributed to Class Members in proportion to the amounts they paid Noom.

(*Id.* ¶ 83(c)).

In addition, Noom will distribute 100,000 free one-month (non-recurring) Healthy

Weight memberships to the first 100,000 Subclass B members who request a credit when they

submit their claim.  This credit, valued at $60 each, is in addition to any cash award and will not reduce the cash payments.  (Settlement Agreement at ¶ 83(c).)

The average estimated cash payment to Class Members in Subclass A is approximately $167.  (ECF No. 496, Wittels Decl. ¶ 27.)  These consumers paid Noom on average $224.  (*Id.*)  The average estimated payment to Class Members in Subclass B is approximately $30, before accounting for any membership credits.  (*Id.*)  These consumers paid Noom on average $228.  (*Id.*)  These payment formulas track Plaintiffs' damages model used at mediation such that Class Members will be fairly compensated based on alleged damages.  (*Id.*)

The settlement also provides robust business practice changes that will prevent Class Members' future unintended purchases and provides additional safeguards by ensuring that any autorenewing subscription is entered into following informed affirmative consent and that subscriptions are easily cancelled.  Class members will receive reminders about upcoming charges and clearer instructions about how to cancel a subscription.  Some of these changes are not required by law, but Noom has agreed to adopt them, positioning itself as a leader in improved transparency for online transactions.  (*See* Settlement Agreement ¶¶ 72-74.)  Lastly, for Class Members with active subscriptions that did not use Noom in the twelve months following their conversion to full-fledged customers, Noom is barred from continuing to charge these consumers unless the Class Member expressly consents to renewal after being plainly and prominently advised that additional charges will not occur absent this consent.  (*See* Settlement Agreement ¶ 72(j).)

In exchange, Plaintiffs, each Class Member, and Defendants will fully release and discharge each other from all claims arising out of or relating to the action that accrued

between May 12, 2016 and the date of the Preliminary Approval Order, and that were asserted or could have been asserted in the action or the related state court actions.  (Settlement Agreement ¶¶ 52, 95-104.)

The parties also jointly selected Angeion Group as the Settlement Administrator to disseminate notice to the Class and administer distribution of the settlement benefits.  (Wittels Decl. ¶ 40; *see also,* Settlement Agreement ¶ 58.)  As part of this bidding process, the parties requested capped bids such that the risk of administration costs will be borne by the administrator and not the class.  (*Id.*)  Angeion Group estimated its costs for administration at approximately $700,000, but agreed to cap its costs at $635,000.  (*Id.*)

### LEGAL STANDARD FOR APPROVAL OF CLASS SETTLEMENT

In the Second Circuit, "[t]here is a strong judicial policy in favor of settlements, particularly in the class action context."  *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 330 (E.D.N.Y. 2010) (quoting *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (internal quotation marks omitted)).  "[C]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *Id.*  Rule 23(e) provides that "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  Court approval of a class action settlement must be premised on a hearing and subsequent finding that the settlement is "fair, reasonable, and adequate" and not the product of collusion or some other malfeasance.  *See* F.R.C.P. 23(e)(2); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (citing *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)).

Before approving a class action settlement, the district court must conclude that the proposed class meets the requirements for class certification set forth in Rule 23(a) and the relevant subsection of Rule 23(b). *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012). When confronted with a request for settlement-only class certification, the Court does not need to inquire whether the case, if tried, would "present intractable management problems, for the proposal is that there be no trial." *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). "At the same time, however[,] . . . other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention." *Id.* (quoting *Amchem*, 521 U.S. at 620) (internal quotation marks omitted). "Thus, in the context of settlement, Rules 23(a) and (b) continue to serve the purpose of 'focus[ing] court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives.'" *Id.* (quoting *Amchem*, 521 U.S. at 621).

The determination of whether the class should be certified and the terms of the proposed settlement are "fair, reasonable, and adequate" rests in the discretion of the district court. *Denney v. Deutsche Bank AG,* 443 F.3d 253, 273 (2d Cir. 2006); *see* Fed. R. Civ. P. 23(e)(2). In exercising its discretion, the district court must engage in careful balancing but "must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). As such, "[i]t cannot be overemphasized that neither the trial court in approving the settlement nor [the Second Circuit] in reviewing that approval have the right or the duty to reach any

7

ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."

*Grinnell*, 495 F.2d at 456.  "Defendants in class action suits are entitled to settle claims pending

against them on a class-wide basis even if a court believes that those claims may be meritless,

provided that the class is properly certified under Rules 23(a) and (b) and the settlement is fair

under Rule 23(e)."  *In re Am. Int'l Grp., Inc. Sec. Litig.,* 689 F.3d 243-44 (2d Cir. 2012).

Courts tasked with approving a settlement then consider its procedural and substantive

fairness, determining whether the terms of the settlement and the negotiation process leading

up to it are fair.  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 408

(S.D.N.Y. 2018), *aff'd sub nom*. *In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020) (citing *In re

Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008) (internal quotation marks

omitted)).  When a settlement is the product of "arms-length negotiations between

experienced, capable counsel after meaningful discovery," it is afforded a "presumption of

fairness, adequacy, and reasonableness."  *Wal-Mart,* 396 F.3d at 116.  Additionally, when

considering the benefits achieved by a settlement, courts must keep in mind that "there is a

range of reasonableness with respect to a settlement—a range which recognizes the

uncertainties of law and fact in any particular case and the concomitant risks and costs

necessarily inherent in taking any litigation to completion[.]"  *Newman v. Stein*, 464 F.2d 689,

693 (2d Cir. 1972).

**DISCUSSION**

I.     ***Class Certification***

For purposes of settlement, the Court finds that the Class is suitable for certification, in

that it satisfies all applicable requirements of Fed. R. Civ. P. 23(a) and (b)(3).

8

a.  Rule 23(a)

Rule 23(a) imposes four threshold requirements for certification of a class action: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class").  Fed. R. Civ. P. 23(a).

With regard to the first requirement, "numerosity is presumed at a level of 40 members[.]"  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  "The movant need not provide a precise quantification of their class, since a court may make common sense assumptions to support a finding of numerosity . . . [n]evertheless, the movant must show some evidence of or reasonably estimate the number of class members."  *Kalkstein v. Collecto, Inc.*, 304 F.R.D. 114, 119 (E.D.N.Y. 2015) (internal quotation marks and citation omitted).  Insofar as the parties calculate that there are approximately two million class members, the Court finds that the proposed class satisfies the numerosity requirements of Rule 23.  *See* Fed. R. Civ. P. 23(a)(1). Accordingly, numerosity is satisfied.

Additionally, the commonality and typicality requirements are also met here.  The commonality and typicality requirements of Rule 23(a) tend to merge such that similar considerations inform the analysis for both prerequisites.  *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 n.5 (2011); *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).  A class may only be certified if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality demands that the class's claims "depend upon a common contention . .

. capable of classwide resolution" such that "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc,* 564 U.S. at 350. "'[F]actual differences in the claims of the class do not preclude a finding of commonality.'" *Newman v. RCN Telecom Servs., Inc.,* 238 F.R.D. 57, 73 (S.D.N.Y. 2006) (quoting 5 *Moore's Federal Practice* § 23.23). Put simply, commonality may be found were the plaintiffs' alleged injuries "derive from a unitary course of conduct by a single system[.]" *Marisol A.*, 126 F.3d at 377 (2d Cir. 1997). Similarly, with the typicality requirement, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of [those] of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.,* 126 F.3d at 376 (internal quotation marks and citation omitted). "[M]inor variations in the fact patterns underlying [the] individual claims" do not preclude a finding of typicality. *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993).

Here, the common questions of law and fact in this case all relate to whether Defendants engaged in fraudulent, unfair, unlawful, and deceptive business practices related to the autorenewal and cancelation of subscriptions. For example, common questions include whether Noom disclosed the autorenewal policy in a clear way and whether Noom's cancellation process was clear or, alternatively, designed to trap consumers into an autorenewed subscription they didn't want. *See* Fed. R. Civ. P. 23(a)(2). Additionally, typicality is easily met where all Class Members were "exposed to the same marketing [and] will have almost entirely the same claims with at most 'minor variations' in the facts surrounding their purchase[.]" *See Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,* 317 F.R.D. 374, 400

(S.D.N.Y. 2016).  This is sufficient to satisfy the commonality and typicality requirements,

particularly in the settlement context.  *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409-10

(S.D.N.Y. 2015); *Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229, 233-34 (E.D.N.Y. 2014).

      In order to meet the final requirement, adequate representation of the class's interests,

Plaintiffs must demonstrate that: (1) the class representatives do not have conflicting interests

with other class members; and (2) class counsel is qualified, experienced and generally able to

conduct the litigation.  *Marisol A.*, 126 F.3d at 378.  To satisfy the first prong, courts in this

Circuit have required plaintiffs to show that "no fundamental conflicts exist" between the class'

representatives and its members.  *See Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013)

(internal citation omitted).  Here, both requirements are satisfied because the class

representatives are adequate and do not have any interests that are different from or adverse

to the Class Members, and therefore will fairly and adequately protect (and have fairly and

adequately protected) the interests of the Class Members.  *See* Fed. R. Civ. P. 23(a)(4).  Class

counsel is also qualified insofar as Wittels McInturff Palikovic attorneys have extensive

experience in prosecuting complex consumer and employment class actions.  (Wittels Decl. ¶¶

5–12.)  The lead attorney prosecuting this case, Steven L. Wittels, was one of the lead trial

counsel in the largest class action jury verdict in the history of employment discrimination

litigation.  (*Id.* ¶ 4.)  Mr. Wittels has also served as Class Counsel in dozens of class actions,

generating hundreds of millions of dollars in recoveries for class members.  (*Id.* ¶ 5-12.)

Likewise, co-counsel firms Chimicles Schwartz Kriner & Donaldson-Smith LLP and Bramson,

Plutzik, Mahler & Birkhaeuser are equally qualified, having presented information about their

legal bona fides and experience in complex and class litigation.  (*See* ECF No 509-10.)

b.  Rule 23(b)(3)

In addition to satisfying the Rule 23(a) requirements, certification must be appropriate under Rule 23(b).  *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, 2021 WL 234550, at *20 (E.D.N.Y. Jan. 19, 2021) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).  "Certification under Rule 23(b)(3) requires both that (1) questions of law or fact common to class members predominate over any questions affecting only individual members, [predominance] and that (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *B & R Supermarket, Inc.,* 2021 WL 234550, at *20 (quoting Fed. R. Civ. P. 23(b)(3)) (internal quotation marks omitted).

"The predominance inquiry tests whether [the] proposed class[] [is] sufficiently cohesive to warrant adjudication by representation."  *Wang v. Tesla, Inc.*, 338 F.R.D. 428, 441 (E.D.N.Y. 2021 (citing *Amchem*, 521 U.S. at 623).  "The predominance requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Id.* (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)) (internal quotation marks omitted).  Plaintiffs need not prove, however, that the legal or factual issues that predominate will be answered in their favor.  *See, e.g., Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013).

With regard to the second prong, to satisfy the superiority requirement, the moving party must show that "the class action presents economies of 'time, effort and expense, and promote[s] uniformity of decision.'"  *B & R Supermarket, Inc.,* 2021 WL 234550, at *33 (quoting *In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d 108, 130 (2d Cir. 2013)).  The superiority

12

requirement is designed to avoid "repetitive litigation and possibility of inconsistent adjudications." *Id.* (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *64 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015)).

Here, as already discussed, Class Members' common factual allegations and a common legal theory – that Noom's public-facing autorenewal practices allegedly violated various state consumer protection laws, and common law theories – predominate over any factual or legal variations among Class Members.  Thus, the issue of whether all Class Members were the victims of unlawful practices will predominate over individualized inquires because "liability can be determined on a class-wide basis[.]"  *In re Visa Check/ Master Money Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001).  Further, given each Class Member's potential maximum damages (on average, roughly $200) there is little incentive to bring individual actions.  Accordingly, it is desirable to concentrate the claims in this Court.  Lastly, the request for class certification is only for purposes of settlement, and the Court need not inquire as to whether the case, if tried, would present management problems.  *See In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *7 (S.D.N.Y. Aug. 13, 2020) (citing *Public Emps.' Ret. Sys. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 120 (S.D.N.Y. 2011) (finding superiority where "there is no overwhelming interest by class members to proceed individually"); *see also Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997)).  Thus, the Rule 23(b)(3) factors are met.

II.      **The Settlement is Fair in Light of Rule 23(e) and the *Grinnell* Factors**

Pursuant to Fed. R. Civ. P. 23(e), courts routinely approve settlements of a class action

such as the instant one.   "Settlement approval is within the Court's discretion, which should be

exercised in light of the general judicial policy favoring settlement."  *In re Sumitomo Copper*

*Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) (internal quotation marks and citation omitted); *see*

*also Wal-Mart*, 396 F.3d at 116 (noting the "strong judicial policy in favor of settlements,

particularly in the class action context") (internal quotation marks and citation omitted).  As

provided above, the district court's approval of a settlement is contingent on a finding that the

settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  This entails a review of

both procedural and substantive fairness.  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir.

2001).

"Fairness is determined upon review of both the terms of the stipulation and the

negotiating process that led to such agreement."  *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174,

184 (W.D.N.Y. 2005) (citing *Wal-Mart*, 396 F.3d at 116).  "Absent fraud or collusion, [courts]

should be hesitant to substitute [their] judgment for that of the parties who negotiated the

settlement."  *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *4 (S.D.N.Y.

July 27, 2007).

Rule 23(e)(2), as amended on December 1, 2018, instructs the Court to determine

whether the Settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately
> represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;

> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>
> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  Prior to the 2018 amendments, courts in the Second Circuit have long considered whether a settlement was "fair, reasonable, and adequate" under the nine factors set out in *Grinnell Corp.*:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d. at 463.  Importantly, "not every factor must weigh in favor of [the] settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).

The Advisory Committee Notes to the 2018 amendments to Rule 23 explain the goal of the amendments was "not to displace" any of the *Grinnell* factors, "but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve" the settlement.  *See* 2018 Advisory Notes to Fed. R. Civ. P. 23, Subdiv. (e)(2).  Accordingly, the Court's assessment of the settlement under Rule 23(e) is guided

and informed by the *Grinnell* factors.  *See In re GSE Bonds Antitrust Litig.,* 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019).

a.  Procedural Fairness

"With respect to procedural fairness, . . . a District Court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel . . . possessed the [necessary] experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests."  *McReynolds*, 588 F.3d at 804 (citing *D'Amato*, 236 F.3d at 85) (alterations in original) (internal quotation marks omitted).  Accordingly, "[a]bsent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement."  *Hall v. ProSource Techs., LLC,* 2016 WL 1555128, at *4 (E.D.N.Y. Apr. 11, 2016) (citing *Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *2 (E.D.N.Y. Nov. 20, 2012)) (internal quotation marks omitted).

Here, as discussed *supra*, the settlement was reached after Plaintiffs conducted a thorough investigation and evaluation of the claims, and after extensive negotiations between the Parties, including full-day mediations with neutral third-party mediator Judge Edward Infante and numerous settlement conferences before the undersigned.  *See Alves v. Main*, 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012), *aff'd,* 559 F. App'x 151 (3d Cir. 2014) (Courts have also recognized a presumption of fairness when a settlement is reached with the assistance of a mediator.); *Ceka v. PBM/ CMSI Inc.*, 2014 WL 6812127, at *1 (S.D.N.Y. Dec. 2, 2014) ("These arm's length negotiations involved counsel and a Magistrate Judge . . . raising a presumption that the settlement achieved meets the requirements of due process.").  From the outset, Class

16

Counsel thoroughly investigated the claims and defenses, focusing on the underlying merits of the class members' claims, the damages to which they were entitled, and the propriety of class certification.  Moreover, Plaintiffs contributed significant time and effort to the case by participating in numerous meetings with Class Counsel, providing Class Counsel with detailed information regarding their experiences, reviewing and discussing the pleadings and discovery, including producing personal information like social media account information, and preparing for – and in most cases, sitting for – depositions.  This Court supervised discovery and ordered production of robust data that informed Plaintiffs about the nature of the practices at issue and their impact on the consumers who comprise the settlement class.  At all times during the settlement process, the Parties' negotiated on an arm's-length basis—something this Court is well-positioned to assess given that it supervised the extended settlement discussions.

Furthermore, Plaintiffs are adequate representatives because their interests are aligned with other class members' interests because they suffered the same injuries—monetary losses resulting from Noom's autorenewal feature.  Additionally, the Court finds that the content, format, and method of disseminating notice as set forth in the Settlement Agreement and documents in support of the Preliminary Approval Motion fully complies with due process and Rule 23.  Notably, the parties utilized a combination of methods including electronic advisories, targeted social media advertising, search engine advertising, and paper mailing and reminders to ensure adequate notice.

Accordingly, taking into consideration all of the parties' efforts, the Court concludes that the settlement is procedurally fair.

b. Substantive Fairness

Rule 23(e)(2)(C) instructs the Court to consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).  And, as noted above, the *Grinnell* factors assist the Court in assessing the substantive fairness of the settlement.

The first and third *Grinnell* factors – which evaluate the complexity, expense, and likely duration of the litigation, and the stage of the proceedings and the amount of discovery completed – weighs in favor of final approval of the settlement.  The Court finds that litigation through trial would be complex, expensive, and long with approximately two million class members and novel claims under the laws of 54 different jurisdictions.  Moreover, in light of the current COVID-19 public health crisis and resulting delays, there would be significant delay getting to trial.  Additionally, although preparing this case through trial would likely require many hundreds (or thousands) of hours of additional discovery, the parties have completed more than enough discovery to recommend settlement.  The focus of this factor is "whether counsel had an adequate appreciation of the merits of the case before negotiating."  *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 537 (3rd Cir. 2004).  The parties' discovery here meets this standard.  The amount of data collected from the parties that exceeded review of over one million pages of documents, complex data sets, numerous meet and confer sessions, court hearings and motion practice, and a dozen fact depositions, favors settlement.

With regard to the second Grinnell Factor, this also weighs in favor of settlement.  The parties implemented a robust notice campaign designed to garner the attention of Class Members and inform them about the settlement.  This included a settlement website, call

center, direct email, banner ads that were displayed in Class Members' specific social media accounts, follow-up emails, mailed notice, and paid search engine advertising.  These efforts have led to a 28% opt-in rate (525,400 claims submitted).  (Pls. July 6, 2022 Letter, ECF No. 514.)  This opt-in rate is higher than comparable consumer class action settlements, which is indicative of a positive reaction to the settlement and the adequacy of notice.  Furthermore, Class Members have also claimed 79,844 of the available 100,000 non-reversionary subscription credits, indicating these credits are valuable and provided strong incentive to participate in the settlement.  (*Id.*)  There have also been no objections to the settlement and only a total of eight opt-outs-a tiny amount in relation to the 2 million members of the settlement class.  *See Ferrington v. McAfee, Inc.*, 2012 WL 1156399, at *4 (N.D. Cal. Apr. 6, 2012) ("[T]he prevailing rule of thumb with respect to consumer class actions is [a participation rate of] 3–5 percent.").

  *Grinnell* factors four and five – the risks of establishing liability and damages -- also favor approval of the settlement.  In considering these factors, the Court need not adjudicate the disputed issues or decide unsettled questions; rather, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement."  *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004).  While Plaintiffs believe that they could ultimately establish liability, Class Counsel are both experienced and realistic, and understand that the resolution of liability issues, the outcome of trial, and the inevitable appeals process are inherently uncertain.  Defendant's counsel was of the highest caliber and mounted a vigorous defense throughout and intended to mount strong defenses to certification and liability.  The settlement ends all uncertainties of litigation and weighs in favor

of approval.  *See, e.g.*, *Quow v. Accurate Mech. Inc.,* 2018 WL 3368673, a *3 (S.D.N.Y. July 10, 2018) (finding that risks as to both liability and damages, including overcoming defenses, weighed in favor of final approval).

As to the risks in maintaining the class action through the trial and the range of reasonableness of the settlement fund in light of the best possible recovery in light of all of the risks of litigation, they likewise favor approval.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 47-48 (E.D.N.Y. 2019) ("The range of reasonableness of the settlement in light of the best possible recovery, and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation, are two *Grinnell* factors that are often combined for the purposes of analysis.")  "Courts generally acknowledge that a contested motion to certify a class would pose at least some increased risk that class certification might be denied." *Mikhlin,* 2021 WL 1259559, at *6 (citing *In re Payment Card*, 330 F.R.D. at 40) (internal citation omitted).  Here, the parties stipulated to class certification solely for the purpose of settlement.[1]  If the class action were litigated, however, Defendant would have opposed certification of a litigation class and may have mounted winning arguments that at that precluded certification of a class or the class as currently defined.  The risks attendant to certifying a class and defending any decertification motion, coupled with the potential of an interlocutory appeal, supports approval of the settlement.  *See Garland v. Cohen & Krassner*, 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011) (citing *In re Med. X–Ray*, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) (possibility that defendants would challenge

---

[1] Conditional certification, which was granted here, does not necessarily mean that final certification is appropriate through trial.

maintenance of a class in the absence of settlement was considered a risk to the class and potential recovery)).

"In considering the reasonableness of the settlement fund, a court must compare the terms of the compromise with the likely rewards of litigation." *In re Payment Card*, 330 F.R.D. at 48 (internal quotation marks and citation omitted). The range of reasonableness for a settlement "'is a range which recognizes the uncertainties of law and fact in any particular case and concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Mikhlin,* 2021 WL 1259559, at *8 (quoting *Wal-Mart*, 396 F.3d at 119). Here, the parties agreed to a non-revisionary Settlement Amount of $56,000,000 in cash, $6,000,000 in subscription fee credits, and programmatic reforms valued between $31,000,000 to $120,000,000, after negotiations under the direction of a neutral and the undersigned. (Wittels Decl. ¶¶ 23–40). Class Members will receive net settlement cash payments that range from 13.2% to 96.7% of their total Noom subscription payments after deducting administration expenses and attorneys' fees and costs. (*Id.*) Even if the Court were to only consider the $56,000,000 in cash relief, this sum is 27.5% of the $203,559,671 in damages Plaintiffs would have sought at trial. This is a substantial recovery in light of the risks. Wittels Decl. ¶ 36; *see Grinnell*, 495 F.2d at 455 n.2 ("There is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."). The Court also notes that the allocation method, which is based on months enrolled in the Healthy Weight Program and usage (or non-usage) is fair and will provide those harmed more with a relatively greater recovery than those in the settlement class with lesser injury. The non-monetary benefits to the class and future customers of Noom are also valuable – by Plaintiffs' estimate

the add at least 31 million dollars more in value to the settlement.  These aspects of the

settlement also weigh in favor of approval.

Lastly, the final *Grinnell* factor - the ability of the defendant to withstand a greater

judgment is neutral.  This factor stands for the proposition that if a defendant could not

withstand a greater judgment than what is provided for in the settlement, then the settlement

is more likely to be reasonable, fair, and adequate.  *See In re PaineWebber Ltd. Partnerships*

*Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd sub nom., In re PaineWebber Inc. Ltd.*

*Partnerships Litig.*, 117 F.3d 721 (2d Cir. 1997).  Here, even if Noom could withstand a greater

judgment, its ability to do so, standing alone, "does not suggest that the settlement is unfair."[2]

*In re Facebook*, 343 F. Supp. 3d at 413 (quoting *D'Amato*, 236 F.3d at 86).

In summary, the Court finds the settlement was structured to provide meaningful

consideration to the class in light of the risks of litigation and to ensure broad notice of

settlement to class members and incentive participation in the settlement.  Thus, final approval

of the settlement under Rule 23(e) as informed by the *Grinnell* factors is warranted.

### III.  *Attorneys' Fees*

Rule 23(e)(C)(iii) also requires consideration of the terms of any proposed award of

attorneys' fees.  "In a certified class action, the court may award reasonable attorneys' fees and

nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).

"Both the lodestar and the percentage of the fund methods are available to district judges in

calculating attorneys' fees[.]"  *Goldberger*, 209 F.3d at 50.

---

[2] At the fairness hearing, Plaintiffs' counsel pointed out that Noom is a private company and that he was unsure whether Noom could withstand a greater judgment.  Absent greater information about Noom's finances, the Court does not reach a conclusion on this.

"The trend in this circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *In re Parking Heaters,* 2019 WL 8137325, at *7 (E.D.N.Y. Aug. 15, 2019) (citing *Wal-Mart*, 396 F.3d at 121) (internal quotation marks omitted). "A court applying either method should consider the following *Goldberger* factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *In re Parking Heaters,* 2019 WL 8137325, at *7 (citing *Goldberger*, 209 F.3d at 50).

Here, Class Counsel requests, and Defendants do not oppose, combined litigation expenses and attorneys' fees of one-third of only the $56,000,000 cash fund (i.e., $18,666,666). (Settlement Agreement ¶ 129.)  A fee equal to one-third of a settlement fund is routinely approved in this Circuit.  *See, e.g.*, *Lea v. Tal Education Group*, 2021 WL 5578665, at *12 (S.D.N.Y. Nov. 30, 2021); *Gaspar v. Pers. Touch Moving, Inc.*, 2015 WL 7871036, at *2 (S.D.N.Y. Dec. 3, 2015) ("Fee awards representing one third of the total recovery are common in this District").

This is also true when considering the Lodestar.  Class Counsel spent approximately 9,000 hours litigating this matter and utilized a large team of lawyers and consultants.  This large team was needed in a case of this complexity, as there were novel e-discovery issues, new types of electronic data to evaluate and complex damages models.  Both sides vigorously litigated the matter, leading to multiple motions—driving up the hours.  The Court has also assessed Plaintiffs' counsels' rates, which range from $260 per hour for junior associates to

23

$995 per hour for lead counsel Steve Wittels.  While the Court could quibble with some of the

rates at some associate levels or paralegal rates, on balance they are within the range of rates

approved by Courts in this District.  The hours expended were significant because of the

vigorous manner of advocacy on both sides.  If the Court were simply conducting a Lodestar

analysis, it might trim some of the hours.  However, any trimming would be in the 10-15%

range.  Absent any cuts, the Lodestar would result in a multiplier of 2.88.  Even assuming a 15%

cut, the multiplier would still be less than 3.  Either multiplier is fully consistent with that found

to be reasonable other cases in this Circuit.  *See, e.g.*, *Lopez v. Fashion Nova*, 2021 WL 4896288,

at *3 (S.D.N.Y. Oct. 19, 2021) ("In this Circuit, courts regularly award lodestar multipliers of up

to eight times the lodestar, and in some cases, even higher multipliers." (cleaned up)).

Although a court generally may calculate reasonable attorneys' fees either by

determining the lodestar amount or by awarding a percentage of the settlement amount, this

Court's hybrid approach here is justified by the well-established principle that the lodestar

calculation should serve as a "cross check" on the reasonableness of a requested percentage.

*Picorelli v. Watermark Contractors Inc.*, 2022 WL 2386761, at *5 (S.D.N.Y. July 1, 2022).  Here,

Class Counsel expended significant time in this case – more than 9,000 hours in approximately

three years – and brought this litigation to a successful conclusion for Plaintiffs and the Class

Members.  Of note, Class Counsel represented the Plaintiffs on a contingency basis.  Therefore,

in light of the *Goldberg* factors, the Court finds the attorneys' fee award requested to be fair

and reasonable.  *See Goldberger,* 209 F.3d at 48-49; *Sukhnandan v. Royal Health Care of Long

Island LLC*, 2014 WL 3778173, at *9 (S.D.N.Y. July 31, 2014) ("Reasonableness is the

touchstone" of attorneys' fee award approval; applying the *Goldberger* factors).  This attorneys' fee award shall be deducted from the Gross Settlement Fund.

The requested fee is also reasonable considering this action's size and complexity.  With claims under the laws of 54 jurisdictions involving hundreds of millions of dollars and top-tier defense counsel.  Thus, the magnitude and complexity of the litigation weigh strongly in favor of the requested fee award.  As noted above, there is inherent risk in litigating cases, especially class actions, and it is appropriate to recognize the risk assumed by Plaintiffs' counsel when determining the appropriate fee award.  Awarding one third of the cash fund is also consistent with public policy, as this litigation and settlement serves as a warning to companies that utilize auto renewal for subscription services, and its non-monetary relief in terms of procedures to ensure consumers understand what they are signing up on-line provide examples of best practices.

Class counsel notes it has spent $325 000 in litigation costs and expenses.  These expenses included filing fees, service fees, notice printing and mailing fees, deposition and translation fees, travel expenses, and fees related to mediation.  However, Class Counsel does not seek to reduce the Settlement Fund by this amount; rather, they will absorb this expense. In other words, such expenditures are subsumed in the attorneys' fees requested, meaning that the fees are actually slightly less than one-third of the Settlement Fund.  That Class Counsel are not seeking to reduce the Settlement Fund by this amount also supports approval of the award of attorneys' fees.

## IV.   *Service Awards*

Service payments "are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." *Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, 2009 WL 5851465, at *6 (S.D.N.Y. Mar. 31, 2009) (citation omitted).

Under the settlement in this case, Plaintiffs may apply to the Court for service awards of up to $12,500 for each of the 15 Class Representatives.  (Settlement Agreement ¶ 134.) Plaintiffs Geraldine Mahood and Maryanne Deracleo request $12,500.  The additional seven individuals who remained Named Plaintiffs in this action at the time of settlement and participated in all aspects of the litigation, including five that sat for depositions, request $10,000 each.  Four other individuals who appeared as Named Plaintiffs in this action but were later dismissed or appeared in one of the state court actions request $7,500.  (*Id.*)  Finally, two individuals who served as alternate Named Plaintiffs, were subpoenaed by Noom, and also assisted in the prosecution, request $5,000.  (*Id.*)  The total requested by these Plaintiffs is $135,000. Class  counsel have explained how each Plaintiff was integral in providing documentary evidence and/or testimony in presenting the class claims, reviewing electronic files, including searches of their personal cell phones and social media accounts, and keeping in close contact with Class Counsel.  (ECF No. 507, Final Wittels Decl. ¶ 87.)

The Court finds that the Class Representatives diligently represented the interests of the class, provided Class Counsel with important factual knowledge, and were involved in settlement negotiations.  The staggered nature of the service awards reflects the increased

amount of effort and risk expended by the individual Class Representatives, and, in light of the total settlement amount, is fair and reasonable.  *See, e.g., In re Polaroid*, 2007 WL 2116398, at *3 (S.D.N.Y. July 19, 2007) (case law supports service awards of up to $85,000); *Karic v. Major Automotive Companies, Inc.*, 2016 WL 1745037 at *8 (E.D.N.Y. Apr. 27, 2016) (collecting cases and approving service awards of $20,000 each to seven named plaintiffs).

Therefore, I approve the proposed service awards as requested above.  This amount shall be deducted from the Gross Settlement Fund.

### V.      *Cy Pres Designation*

The Settlement Agreement provides for Plaintiffs to request the approval of cy pres recipients and recommend the Court designate National Consumers League ("NCL") and the National Consumer Law Center ("NCLC").  "A cy pres donation is appropriate where . . . residual class funds remain after class members were provided with an opportunity to deposit and claim their distribution."  *Reyes v. Buddha-Bar NYC*, 2010 WL 2545859, at *1 (S.D.N.Y. June 18, 2010) (quotation omitted).  "Under the cy pres doctrine, the best application of unused settlement funds is to donate them to an organization whose purpose is closely related to the purpose of the lawsuit."  *Capsolas v. Pasta Res. Inc.*, 505 F. Supp. 3d 255, 259 (S.D.N.Y. 2020) (quoting *Reyes*, 2010 WL 2545859, at *1).  After reviewing the submissions, including the letters provided by these organizations, the Court finds they have committed to comply with the Settlement Agreement and are well suited recipients insofar as their mission is to protect against fraud in the digital marketplace and educate legal practitioners regarding the same. Accordingly, the Court approves NCL and NCLC as *cy pres* recipients.

## CONCLUSION

For the foregoing reasons, this Court certifies the Class for purposes of settlement and approves the terms and conditions of the Settlement Agreement subject to it being fully funded by Defendant.  The Gross Settlement Fund for payment to Class Members is $56,000,000.  Plaintiffs' requests for (1) service awards totaling $135,000; and (2) $18,666,666 in attorneys' fees are GRANTED.  Thus, the Court approves awards, totaling $18,801,666 which are to be deducted from the Gross Settlement Fund amount of $56,000,000.  The parties shall proceed with the administration of the settlement in accordance with the terms of the Settlement Agreement.

This action is dismissed with prejudice.  The Clerk of Court is directed to terminate the case.

**SO ORDERED.**

Dated: July 12, 2022
     New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge